Cora McRAE, Jane Doe, Mary Doe, Susan Roe, Ann Moe, Individually and on behalf of all others similarly situated; Planned Parenthood of New York City, Inc.; and Irwin B. Teran, M. D., Jane Hodgson, M. D., David B. Bingham, M. D., Hugh Savage, M. D., Edgar W. Jackson, Lewis H. Koplik, M. D., Individually and on behalf of all others similarly situated; Women's Division of the Board of Global Ministries of the United Methodist Church, Theressa Hoover, its Associate General Secretary, Ellen Kirby, its Executive Director, Plaintiffs,

v.

Joseph A. CALIFANO, Jr., Secretary, United States Department of Health, Education and Welfare, Defendant,

and

Senators James L. Buckley and Jesse A. Helms, Congressman Henry J. Hyde, and Isabella M. Pernicone, Esq., Intervenor-Defendants.

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary, United States Department of Health, Education and Welfare, Defendant.

Nos. 76C1804, 76C1805.

United States District Court,
E. D. New York.

Jan. 15, 1980.

Rhonda Copelon and Nancy Stearns, Center for Constitutional Rights, New York City, Janet Benshoof and Judy Levin, American Civil Liberties Union, Sylvia A. Law, Jill Laurie Goodman, New York City, and Nadine Taub, Newark, N. J., for plaintiff women and medical doctors, and for Women's Division of the Board of Global Ministries of the United Methodist Church.

Harriet F. Pilpel, New York City (Greenbaum, Wolff & Ernst, New York City, of counsel) and Eve W. Paul, Planned Parenthood Federation of America, New York City, for plaintiff Planned Parenthood of NYC, Inc.

Ellen Kramer Sawyer, New York City (Allen G. Schwartz, Corp. Counsel, City of New York, New York City, of counsel) for plaintiff New York City Health and Hospitals Corp.

Richard P. Caro, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Brooklyn, N. Y., of counsel) for the Secretary.

A. Lawrence Washburn, Jr., New York City (Bodell & MaGovern, P. C., Leonard F. Manning, Washington, D. C., Dennis J. Horan, Patrick A. Troeman, Dolores V. Horan, and John D. Gorby, Americans United for Life, Inc., Legal Defense Fund, Chicago, Ill., of counsel) for intervenor-defendant Pernicone.

Gerald E. Bodell, New York City (John D. Gorby, Thomas J. Marzen, Patrick A. Trueman, Americans United for Life, Inc., Chicago, Ill., of counsel) for intervenor-defendants Buckley, Helms and Hyde.

Margo K. Rogers and John E. Heintz, Washington, D. C. (Covington & Burling, Washington, D. C., of counsel) for American Academy of Child Psychiatry, amicus curiae, supporting plaintiffs' contentions.

Leo Pfeffer, Brooklyn, N. Y., for American Jewish Congress, American Ethical Union, American Humanist Association, Americans United for Separation of Church and State, Board of Church and Society, United Methodist Church, Catholics for a Free Choice, Church of the Brethren, Christian Church (Disciples of Christ, Inc.), National Federation of Temple Sisterhoods, United Presbyterian Church in the United States of America, Union of American Hebrew Congregations, Unitarian Universalist Women's Federation, United Church Board for Homeland Ministries and United Synagogue of America, amici curiae, supporting plaintiffs' contentions.

Robert A. Destro, Cleveland, Ohio, for Catholic League for Religious and Civil Rights (and its members Michael J. Schwartz, Virginia C. Ryan, Kathleen C. Canepa, Ann Marie Segedy, Monte Harris Liebman and Bonnie J. Nitz), amici curiae, supporting the contentions of defendant and intervenor-defendants.

Anne R. Teicher, New York City, for Committee for Abortion Rights and against Sterilization Abuse, Committee to End Sterilization Abuse, and Comision Femenil Mexicana, amici curiae, supporting plaintiffs' contentions.

Edith Holleman, New York City (Phyllis N. Segal, New York City, of counsel) for NOW Legal Defense and Education Fund, amicus curiae, supporting plaintiffs' contentions.

DOOLING, District Judge.

Table of Contents

## CONTENTS

I   Statistical background on abortion   634

II   Legislative history, the Medicaid Act and the "Hyde amendments"   639

III   Effects of "Hyde amendments"
     A.   Medicaid-related abortion litigation   649
     B.   Consequences in the field   653

| | | |
|---|---|---|
| IV | The medical standards before the "Hyde amendments" | 661 |
| V | Medical standards for abortion and related to "Hyde amendments" | 664 |
| VI | Medical problems arising in pregnancy, related to poverty, "unwanted-ness," age, and delay | 668 |
| VII | Mental health problems related to pregnancy; poverty as aggravating stress | 674 |
| VIII | Familial circumstances related to unwanted pregnancy and childbirth | 676 |
| | A. Familial context of unwanted childbirth | 677 |
| | B. Fetal abnormality | 678 |
| IX | Age and pregnancy; the younger teenager | 680 |
| X | Rape and incest, prompt report | 686 |
| | A. Prompt report of rape | 686 |
| | B. Report requirement in incest cases | 688 |
| XI | Summary of Parts II to X | 689 |
| XII | First Amendment matters | 690 |
| | A. The Roman Catholic teaching | 692 |
| | B. The Orthodox Jewish position | 695 |
| | C. The Lutheran Church—Missouri Synod position | 695 |
| | D. The Conservative and Reform Jewish position | 696 |
| | E. American Baptist Church approach | 697 |
| | F. United Methodist Church, and American Protestant opinion | 700 |
| XIII | The Roman Catholic Church and the pro-life movement | 702 |
| | A. The Pastoral Plan and related action | 703 |
| | B. Other opinion among Roman Catholics | 707 |
| | C. Religion in relation to pro-life thought | 710 |
| | D. Religious attitudes related to pro-life choice | 712 |
| | E. Picketing, etc. | 713 |
| | F. The moral issue | 714 |
| XIV | Political activity on the issue | 715 |
| | A. The Peek episode (Minnesota) | 716 |
| | B. The political activity in Minnesota and church participation | 717 |
| | C. Conclusion on abortion and single-issue politics | 722 |
| | D. The impact of the pro-life, pro-choice campaigns on Congress | 723 |
| | E. Conclusion from Parts XIII and XIV | 727 |
| XV | The legal issues | |
| | A. Threshold issues | 728 |
| |   1. Plaintiffs' standing | 728 |
| |   2. Justiciability of issue | 728 |
| |   3. Absence of status as parties | 731 |
| | B. Statutory, due process and equal protection issues | 731 |
| |   1. The "Hyde amendments" amended Title XIX | 731 |
| |   2. The due process and equal protection issues | 733 |
| |     (a) *Beal, Maher* and *Poelker* | 733 |
| |     (b) "Medically necessary" related to the evidence | 735 |
| |     (c) The "Hyde amendments" impinge impermissibly on a fundamental right | 736 |
| |     (d) Impact on adolescents at high risk of pregnancy | 738 |
| |     (e) The "Hyde amendments" not reasonably related to a justifying legislative interest | 738 |
| | C. First amendment considerations | 740 |

MEMORANDUM and ORDER
for JUDGMENT

Following the decision of *Beal v. Doe*, 1977, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464; *Maher v. Roe*, 1977, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, and *Poelker v. Doe*, 1977, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528, the decision in the present case preliminarily enjoining the enforcement of the so-called Hyde Amendment to the Act making Medicaid appropriations for fiscal 1977 (D.C., 421 F.Supp. 533) was vacated by the Supreme Court (433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103) and the case was remanded "for further consideration in light of *Maher v. Roe* . . . and *Beal v. Doe* ". The Court denied plaintiffs' application for a stay of the execution of the order vacating the decision in this court, 434 U.S. 1301, and plaintiffs' petition for rehearing, 434 U.S. 881, 98 S.Ct. 244, 54 L.Ed.2d 165. A temporary restraining order entered in this court on July 28, 1977, was vacated on August 4, 1977.

I

The magnitude of abortion in contemporary societies appears, at least to an extent, from the published statistical data. The 1975 Abortion Surveillance Report of the Center for Disease Control ("CDC"), Department of Health, Education and Welfare, Public Health Service, supplemented by the prepublished tables for the 1976 Surveillance Report, analyzes the reported data on legal abortions in the United States. In the period 1969–1976, the number of legal abortions, the ratio of the abortions to live births, and the number of states reporting were as follows:

| Year | Abortions | Abortions per 1,000 live births | States reporting |
|---|---|---|---|
| 1969 | 22,670 | 6.3 | 10 |
| 1970 | 193,491 | 51.9 | 24 |
| 1971 | 485,816 | 136.6 | 25 |
| 1972 | 586,760 | 180.1 | 28 |
| 1973 | 615,831 | 196.3 | 51 * |
| 1974 | 763,476 | 241.6 | 51 |
| 1975 | 854,853 | 271.9 | 51 |
| 1976 | 988,267 | 312.0 | 51 |

* Includes District of Columbia

The data are not geographically uniform. For those states having 2,000,000 or more women aged 15–44 the figures were in 1976:

| State | Live births | Abortions | Abortions per 1,000 live births |
|---|---|---|---|
| California | 332,105 | 142,593 | 429 |
| Illinois | 170,181 | 66,356 | 390 |
| Michigan | 130,135 | 42,489 | 326 |
| New York | 235,176 | 147,860 | 629 |
| Ohio | 155,215 | 37,192 | 240 |
| Pennsylvania | 148,004 | 52,261 | 353 |
| Texas | 218,447 | 50,493 | 231 |

Surveys made by the Alan Guttmacher Institute ("AGI") give somewhat higher figures for abortions in the United States:

| Year | Abortions in 1,000s | Abortions per 1,000 live births |
|---|---|---|
| 1974 | 899.9 | 282 |
| 1975 | 1,034.2 | 331 |
| 1976 | 1,179.3 | 361 |
| 1977 | 1,270.1 * | NA |

* Extrapolated from data of quarters through the 1st quarter of 1977.

The percent distribution of legal abortions by classifying characteristics of the patients were given as follows in the prepublished CDC figures for the years 1972–1976:

| Characteristic | Percent Distribution | | | | |
| | 1972 | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|---|
| **Age** | | | | | |
| 19 or younger | 32.6 | 32.7 | 32.7 | 33.1 | 32.1 |
| 20–24 | 32.5 | 32.0 | 31.8 | 31.9 | 33.3 |
| 25 and over | 34.9 | 35.3 | 35.6 | 35.0 | 34.6 |
| **Race** | | | | | |
| White | 77.0 | 72.5 | 69.7 | 67.8 | 66.6 |
| Other | 23.0 | 27.5 | 30.3 | 32.2 | 33.4 |

| | | Percent Distribution | | | |
|---|---|---|---|---|---|
| Characteristic | 1972 | 1973 | 1974 | 1975 | 1976 |
| Marital status | | | | | |
|    Married | 29.0 | 27.4 | 27.4 | 26.1 | 24.6 |
|    Unmarried | 70.3 | 72.6 | 72.6 | 73.9 | 75.4 |
| Number of living Children | | | | | |
|    None | 49.4 | 48.6 | 47.8 | 47.1 | 47.7 |
|    1 | 18.2 | 18.8 | 19.6 | 20.2 | 20.7 |
|    2 | 13.3 | 14.2 | 14.8 | 15.5 | 15.4 |
|    3 | 8.7 | 8.7 | 8.7 | 8.7 | 8.3 |
|    4 or more | 10.4 | 9.7 | 9.0 | 8.6 | 7.9 |
| Weeks of gestation | | | | | |
|    8 or less | 34.0 | 36.1 | 42.6 | 44.6 | 47.0 |
|    9–10 | 30.7 | 29.4 | 28.7 | 28.4 | 28.0 |
|    11–12 | 17.5 | 17.9 | 15.4 | 14.9 | 14.4 |
|    13–15 | 8.4 | 6.9 | 5.5 | 5.0 | 4.5 |
|    16–20 | 8.2 | 8.0 | 6.5 | 6.1 | 5.1 |

The CDC data for 1976 give an age bracket distribution for 762,427 of the 988,267 abortions reported for that year. Of these abortions 241,845 were performed for women 19 or younger, 31.7% of the total, a slightly smaller percentage from that given by CDC in the more general "characteristics" table. Detailed age data for 184,938 of the 241,845 "teen age" abortions, reported by 26 states having such data available, showed the following age distribution:

| Age | Number of Abortions | Calculated ratio to 1,000 live births, same 26 states |
|---|---|---|
| 13 | 1,307 | ) 1,138 |
| 14 | 5,544 | ) |
| 15 | 14,475 | 835 |
| 16 | 25,792 | 672 |
| 17 | 34,711 | 574 |
| 18 | 52,336 | 634 |
| 19 | 50,773 | 494 |
| Total | 184,938 | 602 |

The calculated ratio of abortions to live births by age classes, based on the 762,427 abortions for which there were age data, are given as follows in the CDC tables for 1975 and 1976:

| Age | Abortions per 1000 live births | |
|---|---|---|
| | 1975 | 1976 |
| Less than 15 | 1,193 | 1,208 |
| 15–19 | 542 | 582 |
| 20–24 | 289 | 320 |
| 25–29 | 192 | 198 |
| 30–34 | 250 | 241 |
| 35–39 | 422 | 419 |
| 40 and over | 688 | 712 |
| Total | 313 | 328 |

The CDC tables for 1975 and 1976 give the following data from selected states distributing abortions by the number of the patient's previous live births:

| Number of previous live births | Abortions per 1,000 live births to women having same number of previous live births | |
|---|---|---|
| | 1975 | 1976 |
| 0 | 384 | 393 |
| 1 | 220 | 230 |
| 2 | 368 | 371 |
| 3 | 477 | 493 |
| 4 | 435 | 455 |
| 5 or more | 473 | 537 |
| Total | 341 | 351 |

The CDC Surveillance material gives some information on abortions in other countries. The data for those countries for which both 1975 and 1976 figures are given are as follows:

| Country | 1975 | | | 1976 | |
| --- | --- | --- | --- | --- | --- |
| | Number | Per 1000 live births | Per 1000 women 15–44 | Number | Per 1000 women 15–44 |
| Denmark | 27,900 | 388 | 42 | 26,800 | 25.8 |
| England & Wales | 106,600 | 177 | 11 | 127,900 | —— |
| Finland | 21,500 | 323 | 20 | 19,200 | 18.0 |
| Hungary | 96,200 | 495 | 42 | 94,700 | 41.5 |
| Singapore | 11,900 | 298 | 22 | 15,500 | 27.5 |
| Sweden | 32,500 | 314 | 20 | 32,400 | 20.1 |
| Tunisia | 16,000 | 82 | 13 | 20,300 | 17.1 |
| United States | 854,853 | 274 | 18 | 988,267 | 20.5 |

The prevalence of illegal abortions in this country before the state legislatures commenced to change the abortion laws, and before the decisions in *Roe v. Wade*, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and *Doe v. Bolton*, 1973, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 211, is not remotely determinable. A 1957 committee estimate of 200,000 to 1,200,000 abortions a year was often referred to, and the AGI Reports on Population/Family Planning, Number 14 (2nd Edition), December 1975, (page 15) found theoretical support for an estimate of 1,000,000 abortions a year. There was a history of maternal deaths due to abortion, and the Health Resources Administration of the Public Health Service (DHEW) had statistics of uncertain tenor covering the years 1960–1975. The figures indicate a distinct reduction in such deaths over the years.

| Year | Total maternal deaths | Death due to abortion | % due to abortion |
| --- | --- | --- | --- |
| 1960 | 1,579 | 289 | 18.3 |
| 1961 | 1,573 | 324 | 20.6 |
| 1962 | 1,465 | 305 | 20.8 |
| 1963 | 1,466 | 280 | 19.1 |
| 1964 | 1,343 | 247 | 18.4 |
| 1965 | 1,189 | 235 | 19.8 |
| 1966 | 1,049 | 189 | 18.0 |
| 1967 | 987 | 160 | 16.2 |
| 1968 | 859 | 133 | 15.5 |
| 1969 | 801 | 132 | 16.5 |
| 1970 | 803 | 128 | 15.9 |
| 1971 | 668 | 99 | 14.3 |
| 1972 | 612 | 70 | 11.4 |
| 1973 | 477 | 36 | 7.5 |
| 1974 | 462 | 27 | 5.8 |
| 1975 | 403 | 27 | 6.7 |

Data supplied by Dr. Christopher Tietze of AGI (Reports on Population/Family Planning, Number 14 (2nd Edition), Supplement, December 1977, page 15) are comparable in trend:

Deaths associated with abortion

| Year or average | All types | Legally induced | Other than legal | | |
| --- | --- | --- | --- | --- | --- |
| | | | Total | Illegally induced [1] | Spontaneous [2] |
| 1958–62 | 292 | 5 | 287 | — | — |
| 1963–67 | 222 | 4 | 218 | — | — |
| 1968 | 162 | 5 | 157 | 103 | 54 |
| 1969 | 158 | 4 | 154 | 113 | 41 |
| 1970 | 158 | 30 | 128 | 106 | 22 |
| 1971 | 132 | 46 | 86 | 63 | 23 |
| 1972 | 88 | 24 | 64 | 41(2) | 23(9) |

| | | | | | |
|---|---|---|---|---|---|
| 1973 | 56 | 26 | 30 | 21(2) | 9(4) |
| 1974 | 51 | 27 | 24 | 6(1) | 18(4) |
| 1975 | 44 | 27 | 17 | 5(1) | 12 |

1. Numbers in parentheses are classified as "undetermined" by CDC.
2. Numbers in parentheses associated with use of intrauterine device.

Whatever the extent of illegal abortion before the 1973 decisions of the Supreme Court and the changes in state abortion laws, the opinion current in the medical world was that abortion-related deaths were in large part attributable to illegal induced abortions, and that the general availability of legal abortion services after the 1973 decisions radically reduced mortality due to illegal induced abortion See, e. g., W. Cater & R. W. Rochat, Illegal Abortions in the United States: 1972–1974, in Family Planning Perspectives, Vol. 8, No. 2, March-April 1976 (DHEW reprint).

Therapeutic abortions were long known to medical and hospital practice, and, in general, were performed under strict medical safeguards. There are few data on the number of therapeutic abortions, but data for 1963–1968 gathered from hospitals accounting for from 8% (in 1963) to 26% (in 1968) of live births in hospital if applied to whole number of live births in hospital indicate the following: [1]

| Year | Abortions per 1,000 live births * | Estimated abortions in all hospitals |
|---|---|---|
| 1963 | 1.27 | 5,000 |
| 1964 | 2.36 | 9,000 |
| 1965 | 1.93 | 7,000 |
| 1966 | 1.76 | 6,000 |
| 1967 | 2.59 | 9,000 |
| 1968 | 5.19 | 18,000 |

\* In the hospitals in the sample.

The data of the reporting hospitals, broken down by years, gave the following percentage distributions by categories of indications:

| Indication | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|
| Percent | | | | | | |
| Not stated | 15.9 | 16.9 | 18.6 | 17.3 | 16.5 | 13.9 |
| Psychiatric | 44.6 | 23.3 | 39.6 | 53.2 | 57.9 | 69.6 |
| Rubella | 4.6 | 38.0 | 13.0 | 4.1 | 3.6 | 1.9 |
| Other | 34.9 | 21.8 | 28.8 | 25.4 | 22.0 | 14.6 |
| Number per 1,000 live births | | | | | | |
| Not stated | 0.20 | 0.40 | 0.36 | 0.30 | 0.43 | 0.72 |
| Psychiatric | 0.57 | 0.55 | 0.76 | 0.94 | 1.50 | 3.61 |
| Rubella | 0.06 | 0.90 | 0.25 | 0.07 | 0.09 | 0.10 |
| Other | 0.44 | 0.51 | 0.56 | 0.45 | 0.57 | 0.76 |
| Total | 1.27 | 2.36 | 1.93 | 1.76 | 2.59 | 5.19 |

A discontinuous series of New York City data on therapeutic abortions performed in New York City in the period 1943–1967 [2] gives the following summary figures, the data for two groups of years being extrapolated from incomplete data:

1. Data from C. Tietze, United States: Therapeutic Abortions, 1963 to 1968, in Studies in Family Planning 59:5–7, November 1970 (reprint).

2. Data from C. L. Erhardt, C. Tietze, and F. G. Nelson, United States: Therapeutic Abortions in New York City, in Studies in Family Planning 51: 8–9, March 1970 (reprint).

| Period (year) | Total Abortions | Annual Average | Abortions per 1,000 live births |
|---|---|---|---|
| 1943–47 | 3,592 | 718 | 5.1 |
| 1949 | 668 | 668 | 4.3 |
| 1951–53 | 1,698 | 566 | 3.5 |
| 1954–56 | 1,096 | 365 | 2.2 |
| 1957–59 | 1,034 | 345 | 2.1 |
| 1960–62 * | 1,029 | 343 | 2.1 |
| 1964 | 579 | 579 | 3.5 |
| 1965–1967 * | 1,407 | 469 | 3.1 |

* Adjusted data.

The New York City data showed a heavy concentration of the therapeutic abortions in the "Private Service" of the voluntary hospitals as against the "General Service" in such hospitals,[3] and marked concentration of such abortions among white patients as against "others". The data on "indications" for the therapeutic abortions are given and are divided by type of hospital and by service:

Therapeutic Abortions per 1,000 live births by specific indication, New York City, 1960–62 & 1965–67

| Indication | 1960 thru 1962 | 1965–1967 | | | | |
|---|---|---|---|---|---|---|
| | | Total 1965–1967 | Proprietary hospital | Voluntary Hospital | | Municipal Hospital |
| | | | | Private Service | General Service | |
| Mental disorders | 1.25 | 1.98 | 1.46 | 3.22 | 1.47 | 0.60 |
| Rheumatic heart disease | 0.08 | 0.07 | 0.04 | 0.09 | 0.13 | — |
| Other circulatory disease | 0.07 | 0.17 | 0.11 | 0.27 | 0.10 | 0.09 |
| Tuberculosis | 0.04 | 0.01 | 0.02 | — | 0.03 | — |
| German measles | 0.14 | 0.20 | 0.02 | 0.40 | 0.10 | 0.03 |
| Malignant neoplasms | 0.11 | 0.14 | 0.11 | 0.21 | 0.11 | 0.06 |
| Benign neoplasms | 0.02 | 0.03 | — | 0.05 | 0.02 | — |
| Hypertension and toxemia | 0.07 | 0.03 | — | 0.05 | 0.03 | 0.03 |
| Nephritis, pyelitis, other genito-urinary | 0.07 | 0.06 | 0.09 | 0.10 | 0.02 | 0.03 |
| Diabetes | 0.01 | 0.02 | — | 0.04 | 0.01 | — |
| Other allergic, endocrine, metabolic and nutritional diseases | 0.01 | 0.01 | — | 0.01 | 0.02 | — |
| Diseases of nervous system | 0.04 | 0.05 | 0.13 | 0.05 | 0.04 | 0.03 |
| RH incompatibility | 0.05 | 0.03 | 0.02 | 0.05 | — | 0.03 |
| Other and not stated | 0.11 | 0.27 | 0.11 | 0.24 | 0.25 | 0.41 |
| All indications | 2.05 | 3.07 | 2.12 | 4.78 | 2.34 | 1.31 |

3. In the same period 1964–1969 Bellevue, a public hospital, and New York University Hospital exhibited a similar contrast between the low ratio of therapeutic abortions to live births at Bellevue and the relatively high ration of therapeutic abortions to live births at University Hospital:

| Rate of therapeutic abortions per 1000 live births | | | | | | |
|---|---|---|---|---|---|---|
| | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
| Bellevue | 3.1 | 2.8 | 1.8 | 7.1 | 22.3 | 45.2 |
| University | 43.7 | 21.8 | 15.6 | 28.4 | 44.9 | 71.1 |

The rise in rate over the years was ascribed by Dr. Judith Belsky to the pressure for "liberali-

The Department of Health, Education and Welfare estimated that it annually financed between 250,000 and 300,000 abortions, principally under Title XIX of the Social Security Act (Medicaid), in the period after the decisions in *Roe v. Wade* and *Doe v. Bolton* and before the vacatur of the preliminary injunction and temporary restraining order in the present case. The plaintiff New York City Health and Hospitals Corporation has estimated that over the years 1970–1975 Medicaid financed from 46% to 50.8% of the 112,029 abortions performed in the municipal hospitals for residents of New York City, and financed over the same years from 31.8% to 35% of the 293,713 abortions performed for residents of New York City in other facilities in the city.

In forwarding to the Secretary in June 1977 a list of possible cost savings initiatives the Administrator of the DHEW Health Care Financing Administration included a section opening in this language:

"In 1973, about 3.6 percent of all women aged 15–44 eligible for Medicaid received abortions in States covering abortions. Add to this the proportion of unwanted pregnancies where abortion was rejected, and it is possible that close to half the welfare recipients of child-bearing age have unwanted pregnancies in a single year. In 1975, there were 3.5 million AFDC families, nearly all of whom have women of child-bearing age."

A 1977 study based on a 1973 survey conducted by the National Center for Health Statistics [4] reached the generalized conclusion that one-fifth of all births to mothers aged 15–44 would not have occurred if the women had given birth only to those babies they reported as "wanted" at the time of conception; the study notes that the survey dealt only with live births (excluding miscarriages and, of course, abortions), and that the answers did not signify that the babies, when born, became "unwanted children." A very small New York sample, from the period before the change in the New York abortion law, indicated that the incidence of pregnancies that were "unwanted" to the point of seeking to abort the birth cut across religious lines. [5]

II

The Medicaid Act (42 U.S.C. §§ 1396a–1396k), added to the Social Security Act as Title XIX in 1965, authorized the appropriation in each fiscal year of sums sufficient to carry out the purposes of the Medicaid Act, that is, "enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." State plans for medical assistance must be submitted to the Secretary of the DHEW for approval; "medical assistance" means payment of all or part of the cost of inclusively described health care services for those eligible for assistance whose income and resources are insufficient to meet all of such cost (42 U.S.C. § 1396d(a)). Where states operate approved plans, the United States pays not less than 50% nor more than 83% of the cost of the medical assistance furnished under the plans.

Approved state plans must provide for making medical assistance available to all

zation" of the abortion laws, and, possibly, increased staff awareness (Tr. 3714–3715).

4. "advance data," from Vital & Health Statistics of the National Center for Health Statistics, U. S. Department of Health, Education, and Welfare, No. 9, August 10, 1977 (Public Health Service & Health Resources Administration).

5. The sample was 276 cases of 378 that came under Dr. Judith Belsky's review. She tabulated the data thus (Tr. 3599, 3638):

| Denomination | Religious Background (whether "practising" or not) | |
| --- | --- | --- |
| | Number | Percent |
| Catholic | 120 | 43.5 |
| Protestant | 98 | 35.5 |
| Jewish | 46 | 16.7 |
| Other or mixed | 12 | 4.3 |

individuals receiving aid or assistance under any state plan approved under certain enumerated titles of the Social Security Act, including Part A of Title IV (Aid to Families with Dependent Children, "AFDC"), 42 U.S.C. § 601 *et seq.*, and the plans must provide that the medical assistance so made available to any individuals shall not be "less in amount, duration, or scope than the medical assistance made available to any other such individual," nor less than the medical assistance made available to individuals not receiving assistance under the enumerated titles but deriving their entitlement to medical assistance under schemes within Section 1396a(a)(10)(C) for those who have "insufficient income and resources to meet the costs of necessary medical and remedial care and services." The state plan must provide for some institutional and some noninstitutional care and services, for some home health services for those entitled under the state plan to skilled nursing facilities services, and, in the case of those receiving AFDC, at least (1) inpatient hospital services, (2) outpatient hospital services, (3) other laboratory and x-ray services, (4) skilled nursing facility services for adults, early and periodic screening of eligible minors for, and diagnosis of, their physical and mental defects and such health care of defects and chronic conditions discovered thereby as the Secretary's regulations provide, and family planning services and supplies to eligible individuals of childbearing age, including minors who can be considered to be sexually active; and (5) physicians' services furnished by a physician, whether the services are furnished in the office, the patient's home, a hospital, a skilled nursing facility, or elsewhere (Sections 1396a(a)(13)(A), (B), and 1396d(a)(1)–(5)). The state plan must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this Title". The Secretary's regulations impose the following general plan requirements (42 C.F.R. § 440.230):

"(a) The plan must specify the amount and duration of each service that it provides.

"(b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.

"(c)(1) The medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.

"(2) The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures."

(Service under § 440.210 is for the "categorically needy," such as those receiving AFDC; service under § 440.220 is for the "medically needy" provided for under 42 U.S.C. § 1396a(a)(10)(C); see 42 C.F.R. § 435.4).

Before the enactment of the Hyde amendment on September 30, 1976, as Section 209 of the Department of Labor and HEW Appropriations Act, 1977, 90 Stat. 1418, 1434, DHEW had regularly paid the federal share of the cost of abortions performed under approved State plans for medicaid eligibles; it was generally estimated that by 1976 there were approximately 250,000 to 300,000 federally funded abortions annually. The recorded legislative history of the Hyde amendment is comprised in principal part in the extended and bitter debates in the House of Representatives and in the Senate; that debate was renewed and extended in the even more contentious debates on the abortion funding issue in the following year, which ended with enactment on December 9, 1977, of Section 101 of Public Law 95–205, 91 Stat. 1460, of revised language restricting the funding of abortion. The language of the 1977 amendment was carried forward into the Appropriations Act for the fiscal year ending September 30, 1979, as Section 210 of Public Law 95–480 of October 18, 1978, 92 Stat. 1567, 1586, again not without debate. The content and tone of the debates cannot be fairly summarized within any reasonable compass. The accompanying Annex, not intended as a part of this deci-

sion but, rather, disclosed as the intermediate basis for statements made about the legislative history in the decision, does give by quotation and summary the course and sense of the debates. The detailed attention given to them is in part necessitated by the evidence adduced to show the nature and intensity of the conflicting pressures brought to bear on the members of both houses in the effort to influence their votes.

The Hyde amendment of September 1976 was introduced on the floor of the House as an amendment to an appropriations bill when efforts to bring the abortion issue to debate on a proposed constitutional amendment had failed. The debates made clear that the amendment was intended to prevent abortions, not shift their cost to others, and rested on the premise that the human fetus was a human life that should not be ended. Both houses viewed the issue as a moral and not a financial issue, sharply debated the place in any restrictive legislation of therapeutic abortion, the importance of leaving to the woman the decision between childbirth and abortion, the question whether a constitutional right to choose abortion rather than childbirth implied a right in the indigent to have the abortion paid for from medicaid funds, argued the issue of discrimination against the indigent woman who decided upon abortion, sought to quantify the practical consequences in death and health damage from illegal abortions that could result from denying funding, were pressed with the argument that the Hyde amendment would have a disproportionately heavy impact on blacks and Hispanics, and threshed out a basis for compromise exclusions from general prohibition against the funding that might be voted. The argument was made that the amendment was improper as an attempt to legislate through an appropriations bill; there were references in the House of Representatives to some members being fearful that they would be "punished at the polls" for their votes on the abortion issue; both houses adverted to the pendency in the Supreme Court of the *Maher, Beal* and *Poelker* cases; and throughout there were references to religion and morality and the mor-

al implications of the positions taken in the debate. The House voted the Hyde amendment into the bill, the Senate rejected the amendment completely, and in conference the language of Section 209 was agreed on along with explanatory language in a Joint Statement accompanying the conference report. Section 209 provided:

"None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

The language in the Joint Statement that professed to express the intention of the conferees read:

"It is the intent of the Conferees to limit the financing of abortions under the Medicaid program to instances where the performance of an abortion is deemed by a physician to be of medical necessity and to prohibit payment for abortions as a method of family planning, or for emotional or social convenience. It is not our intent to preclude payment for abortions when the life of the woman is clearly endangered, as in the case of multiple sclerosis or renal disease, if the pregnancy were carried to term. Nor is it the intent of the Conferees to prohibit medical procedures necessary for the termination of an ectopic pregnancy or for the treatment of rape or incest victims; nor is it intended to prohibit the use of drugs or devices to prevent implantation of the fertilized ovum."

After further debate both houses passed the bill, amended to include Section 209; the President vetoed the bill, but he expressed agreement with the restriction on the use of federal funds for abortion. The Congress overrode the veto and the bill became law on September 30, 1976. (See Annex pp. 743–772.) The Secretary did not implement the Hyde amendment until August 4, 1977 (42 F.R. 40486), after the *Maher, Beal* and *Poelker* cases were decided and the temporary restraining order in the present case was terminated. The Secretary's release was explicit that federal participation in the cost of abortions would be provided

". . . only where the attending physician, on the basis of his or her professional judgment, has certified that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term.

\*    \*    \*    \*    \*    \*

" 'Treatment for rape or incest victims' is, however, limited for these purposes to prompt treatment before the fact of pregnancy is established. As in all cases, Federal funds for abortions for rape or incest victims will be available where the physician has certified that the life of the mother would be endangered if the fetus were carried to term."

(See Annex, p. 772.)

By the time the Secretary implemented the 1976 Hyde amendment the first two stages of the 1977 debates concerning imposing restrictions on abortion funding had been completed, the House of Representatives had voted to include in the Labor-HEW appropriations bill the language of the preceding year's Section 209, the Senate had disagreed, and the Senate requested a further conference with the House of Representatives. At that point in the debates the Senate had approved, and the House of Representatives had, in effect, rejected (in favor of the Hyde amendment language) the Brooke amendment, providing that

"None of the funds in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term, or where medically necessary, or for the treatment of rape or incest victims. This section does not prohibit the use of drugs to prevent implantation of the fertilized ovum."

No agreement was reached before the fiscal year ended, and, as the disagreement on the abortion issue continued, resolutions were adopted continuing the appropriations of the previous year through October 31st, then through November 30th, and, finally, on December 7, 1977, a Joint Resolution was adopted appropriating such amounts as might be necessary for the projects or activities provided for in the Appropriation Act,

1978 that had been under debate (H.R. 7555), subject to certain limitations and provisions; Section 101 of the Joint Resolution contained a proviso in the following language:

"Provided, That none of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.

"Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy.

"The Secretary shall promptly issue regulations and establish procedures to ensure that the provisions of this section are rigorously enforced."

The language was arrived at as the thirtieth version considered in conference committee or during floor debate. The floor debates were concerned with the positions to be taken on (a) rape and incest, (b) health risks of the mother where the threat to her health was not covered by the expression "the life of the mother would be endangered if the fetus were carried to term," (c) preventing fraudulent circumvention of statutory restrictions, (d) teenage pregnancies, (e) prenatally determined fetal defects, and (f) funding procedures not generally regarded as abortion, such as preventing the implantation of the fertilized ovum and terminating ectopic pregnancies. But underlying the long debate were premises of surprising clarity that were irreconcilable in controlling principle, but which were resolved in legislative terms at a point that satisfied neither side, at their extremes of view, and reflected a seeming middle

position that at least in Senator Dole's telling phrase, seemed to express the sort of compromise [6] without which "a democracy would wither in its own indecision" (see Annex p. 835, 123 Cong.Rec. S 19438, daily edition). The major premise of the advocates of the Hyde amendment in its original form was that abortion was the taking of human life. The major premise of the opponents was that the woman's constitutionally protected right of privacy encompassed her medically advised decision whether or not to terminate her pregnancy; underlying that premise was the holding in *Roe v. Wade* that the unborn were not persons within the meaning of the Fourteenth Amendment.

The conflict in basic principle was reflected in the complexities of the debate about the victims of rape and incest: from the one point of view principle forbade any exception from the prohibition of funding abortions in the case of victims of rape and incest; the 1976 legislation allowed no such exception. From the other viewpoint the victim of rape or incest presented the paradigmatic instances in which there should be freedom of choice. The effort on the one side was to limit any exception for rape victims to victims of forced rape where the incident was promptly reported; the prompt report requirement was extended to incest, although it was assumed that the most general case was parental abuse of very young females. In the end the requirement of prompt report was retained and the limitation to "forced" rape was dropped; in the opinion of some members of the House of Representatives the Secretary should have interpreted the statutory language to exclude abortion from the "medical procedures" permitted to be funded where the rape or incest was promptly reported. From the standpoint of the supporters of the Hyde amendment the exception allowing the funding of abortions where the life of the mother would be endangered if the fetus were carried to term went far enough, if not too far, in preferring one human life over another, and in subjecting the fetal life to a physician's uncontrolled judgment. From the other side, the life endangerment exception was more restrictive than the law that preceded *Roe v. Wade* in stating too narrowly the occasions of therapeutically justified abortion. An effort to broaden the exception to cover abortion "where medically necessary" was met with the objection that it would allow so much medical discretion that it would amount to funding abortion on demand. The later substitution of the "severe and long-lasting physical health damage" language was objected to as little different from the "medically necessary" phrase; the insertion of the word "physical" at least arguably excluded purely psychiatric damage; yet, in the end, only the last minute addition of the "two physicians" requirement made enactment possible. Throughout much of the debate proponents of the restrictive amendment argued that to express the restriction in terms that depended to any significant extent on a physician's judgment was to maximize the risk of fraudulent impositions that would come to abortion on demand; even the "two physicians" requirement was seen as only mildly if at all diminishing the risk of fraud. On the other side the response was that whether or not to terminate an abortion for health reasons was intrinsically a medical question so many faceted that the Congress had not the expertise to draft criteria to define therapeutically justifiable abortions, and had no rational alternative to leaving medical questions to the decision of the medical profession; it was argued that Con-

---

**6.** In the debate in the House on October 12, 1978, the majority leader asked:

"Will there ever come a time when the gentleman from Illinois (Mr. Hyde) and others would be willing to accept any compromise?"

Mr. Bauman answered:

"Those of us who believe strongly in the right to life will never accept any compromise until all killing of unborn children with Federal funds is stopped and beyond that, we hope that all abortion will stop. We cannot accept the murder of unborn children under any circumstances unless the life of the mother is endangered."

See 124 Cong.Rec. (95th Cong. 2d Sess.) H 12519 (daily edition).

gress could not reasonably legislate on the assumption that the medical profession was untrustworthy. The problem of "teenage pregnancies" was much debated, and effort was directed to obtaining exception from the restriction on funding for, at least, those in the lower teens; those proposing exception emphasized the high incidence of permanent health damage due to teenage childbearing and the diminished health and nurture prospects of babies born to immature mothers. On the other side it was argued that the response to teenage pregnancy was not abortion but extension of family planning facilities directed to reducing the occasions for considering abortion as an alternative to childbearing, and improved health care and supportive measures for child mothers and their babies. The legislation as enacted made no exception for teenage pregnancies, except to the extent that deleting the word "forced" before "rape" might have that effect. *Cf.* 42 C.F.R. § 441.205; see "Response" and "Comment", 43 F.R. 31868, 31873. Opponents of restrictions on abortion funding sought exception for abortion funding in cases in which it was determined that the fetus, if carried to term would suffer serious health damage; it was indicated, too, that the "medically necessary" formulation, at one stage in 1977 approved in the Senate, would embrace judgments based on the health of the fetus; other conditions were referred to, but two, used as typical of what was intended, were Tay-Sachs disease and Down's syndrome (mongolism or trisomy 21 syndrome). Proponents of restrictions on abortion funding questioned the reliability of prenatal determinations of grave fetal abnormality and argued that fetal abnormality did not mean that the fetus was not a human being and that society should not destroy but find means of caring for such a fetus. The 1977 enactment did not provide any exception for cases of prenatally determined grave fetal abnormality. The provision for drugs or devices to prevent implantation of the fertilized ovum and for medical procedures necessary for the termination of ectopic pregnancies traced to the Joint Statement in the Conference Report

of September 15, 1976, and to the Secretary's August 4, 1977, ruling (Annex pp. 763–764, 772). It occasioned little debate.

While the debate in both years was on a rider to the departmental appropriations bill, it was quickly established that the restriction on abortion funding was not an economy measure; it was recognized that if an abortion was not performed for a medicaid eligible woman, the medicaid and other costs of childbearing and nurture would greatly exceed the cost of abortion. Opponents of funding restriction were equally at pains, however, to make clear that they did not favor funding abortion as a means of reducing the government's social welfare costs. It was more than once stated that pressing the Hyde amendment was an alternative means of forcing the abortion issue to debate in both houses, a means employed only because efforts to bring a constitutional amendment on abortion to a vote in both houses had repeatedly failed. The debates demonstrate that the purpose of the funding restriction was to its proponents a means of preventing abortions. Representative Hyde described to a Maryland audience on October 29, 1977, the circumstances of the introduction of the 1976 Hyde amendment in these terms:

> "[Representative] Bauman got me aside one day and said this bill was coming up that appropriated all sorts of money for abortions and wouldn't it be a nice idea if we could just sneak an amendment in there that would halt this nefarious practice . . . .. I might add that [Representative Bauman] drafted the amendment and we waited and handed it up and the next thing I knew I was in the well addressing my colleagues on behalf of the right to life."

Opponents of the restrictions argued that denying funding would not prevent abortions, but would only deny to indigent women the means of safe abortion and result in increased resort to illegal and self-induced abortions with a consequent increase in maternal deaths and post-abortion health complications. But near the close of the 1978

debate Representative Bauman, an uncompromising supporter of the Hyde-Conte amendment in the 1976 form, felt able to assert (124 Cong.Rec. (95th Cong., 2d Sess). H 12518, daily edition):

> "We do not have the final statistical analysis, but the past actions of Congress restricting abortions is having the desired effect. Children are being permitted to live. That is what the entire battle on this issue has been about from the beginning."

Proponents of the restrictions argued, too, that the Congress should not authorize the use of tax funds to pay for abortions when it knew that the majority of the citizens were opposed to abortion for any purpose except to preserve the life of the mother. Several times, in both houses, members cited the New York Times-CBS poll of July 1977 which reported on whether people thought the government should help poor women to pay for:

|  | Yes | No | Don't Know |
|---|---|---|---|
| Child-birth | 64% | 26% | — |
| Contraceptives | 63% | 29% | — |
| Abortion | 38% | 55% | 7% |

The argument was that taxpayers should not be required to pay for what they disapproved of on moral grounds. But the opponents of funding restrictions answered that precisely that argument, made by opponents of the Vietnam war, had been rejected by the Congress.

It was more than once agreed that the issue under debate was a moral one and that religious conviction entered into the positions taken; to the argument, at times made, that the proponents of funding restrictions were seeking to impose an inherently religious belief on those who did not share the belief, several answers were made: that abortion funding, too, reflected a moral view and imposed it on the unborn; that the view that human life began at, or soon after, conception was the teaching of biology not of theology, the religious view coming into play only through the familiar and universal precept that innocent human life cannot be taken; and that, in any case,

much of statutory law embodies moral beliefs and gives moral precept the force of law. While it was argued that acceptance of the exception allowing funding where the life of the mother would be endangered if the fetus were carried to term was a compromise of principle that opened the way to a range of further exceptions, including exceptions for rape and incest, severe fetal abnormality, serious health damage to the pregnant woman and grave threats to mental and emotional stability, the proponents of restriction throughout considered the life endangerment exception, itself thought to be subject to abuse, the only arguably defensible exception to the prohibition. The debate, in ultimate terms, dealt only with therapeutic abortions and came down to determining what therapeutic abortions would be funded. "Abortion on demand," abortion for social convenience, abortion as an element of family planning, none of these found articulate sponsorship. Generalized health reasons were marshalled, although unsuccessfully, to support some special consideration for pregnant children in the lower teens, and to the health reasons were added arguments based on the usually unmarried indigent child-mother's inadequacy to care for her child, to support herself, and to complete her education to the point of self-sufficiency. To some extent opponents of restriction on funding argued that the Congress should not make by public law the decision that the Supreme Court had said that it was the constitutional right of the pregnant woman to make privately in consultation with her physician, but, particularly after the *Maher, Beal* and *Poelker* decisions, the answer made was that denial of funding was not a denial of the constitutional right.

Throughout opponents of restrictions on funding argued that such restrictions discriminated against the indigent; it was argued with some confidence before the *Maher, Beal* and *Poelker* decisions that the Court would invalidate the restrictions, and it was argued, after those decisions, on the other side, that they validated the Hyde-Conte amendment of 1976. The decisions, however, hardly changed the trend of de-

bate; opponents of restrictions, saying that the Court meant that federal and state legislatures should define funding policy, argued, as before, that Congress should not discriminate against the indigent by denying to them the means of making effective their decisions to terminate their pregnancies. In this context both sides argued that the Government should be neutral: proponents of restrictions on funding argued that by not funding the Government simply withdrew a factor that favored and encouraged abortion; opponents of restrictions on funding argued that to withdraw funding of abortions while continuing to fund childbirth abandoned neutrality, and denied the indigent the right to choose one alternative.

The debates do reflect consciousness of the interest of the voters in the issue, and of the fact that some number of voters considered that a member's or a candidate's stand on the abortion issue alone would be decisive of how the voter used his or her ballot. The members of the House of Representatives were aware that they might be "punished at the polls" for their stand on abortion and abortion funding, and the debates refer more than once to the extent and zeal or organized advocacy, particularly on the side of the "right to life" group.[7]

Nearly all who took part in the debates deplored the circumstance that the issue was being debated upon a proposed amendment to an appropriations bill. It was recognized that under the rules of the House such an amendment was, strictly, almost

certainly not in order since it evidently imposed affirmative duties of action on officers of government; it was noted more than once that the consequence was that there were neither hearings nor committee reports on the subject matter of the amendment. There were references to the hearings that had been conducted on the proposed constitutional amendment,[8] and, as noted above, proponents of the funding restriction justified their course by reference to what they considered the unwholesome frustration of their efforts to bring a constitutional amendment respecting abortion to issue in both houses. Each side at one time or another charged the other with holding legislation hostage until the other side yielded on the issue. What is most remarkable in the long debates is that for all their complexity and occasional rhetorical brilliance neither side was remotely sensible of the evils that the other side saw clearly and sought to efface or at least ameliorate.

The legislation finally passed in 1977 and in 1978 was so far a compromise of principle that Representatives Bauman, Conte, Flood and Hyde, advocates of the original Hyde amendment, voted against it. The critical last votes in the Senate were not recorded.

The much shorter debates that led to the reenactment of the 1977 proviso as Section 210 of the 1979 Appropriation Act reflected no substantial change in the arguments made on both sides.[9] The bill became law on October 18, 1978.

---

7. For example, Representative Mitchell of Maryland said, during the debate on June 13, 1978 (124 Cong.Rec. H 5359):
    "I rise on behalf of the millions of poor women in this country who are being used by the Right to Life Committee and this House as pawns in a very cruel game which attempts to establish the moral codes for every American."
    Representative Obey, contending that the Congressional Liaison of the National Committee for a Human Life Amendment, Inc., had misrepresented his stand on abortion to his constituents because it deviated from the Committee's position, asked the House during the June 13, 1978, debate (124 Cong.Rec. H 5361)
    "So all I ask of you here today is that you vote your conscience and your judgment. Take this House back from those who would

abuse the legislative process by distortion, those who try to convince you, not through persuasion but by intimidation. That is the only way this House can function again." See Annex pp. 764–765.

8. There are four printed volumes of hearings. The hearings were conducted in 1974 and 1975. See Abortion, Proposed Constitutional Amendments: Hearings Before the Subcomm. on Constitutional Amendments of the [Senate] Judiciary Comm. on S.J. Res. 119 and 130, 93rd Cong.2d Sess., and on S.J. Res. 6, 10, 11 and 91, 94th Cong., 1st Sess.

9. The limited debates on the abortion amendment to the Labor and DHEW appropriations bill for the fiscal year ending September 30, 1979, commenced with Mr. Bollings' introduc-

Other enactments in October and November 1978 dealt with the abortion issue. The International Development and Food Assistance Act of 1978, in the past devoted to population planning and health planning, which emphasized reducing the rate of population growth in developing countries and motivation for small families, was amended to provide in 22 U.S.C. § 2151b(f)(1) that—

"None of the funds made available to carry out this subchapter may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions."

(P.L. 95–424, October 6, 1978, 92 Stat. 937, 946.) In the Foreign Assistance and Related Programs Appropriation Act, 1979, the Peace Corps appropriation provision read—

"For expenses necessary for Action to carry out the provisions of the Peace Corps Act, as amended (22 U.S.C. § 2501 *et seq.*) $95,000,000; . . . *Provided further*, That none of the funds appropriated in this paragraph shall be used to pay for abortions."

(P.L. 95–481, 92 Stat. 1591, 1597). Section 863 of the Department of Defense Appropriation Act, 1979, enacted October 13, 1978 (P.L. 95–457, 92 Stat. 1231, 1254), was in exactly the language of Section 210 of the DHEW Appropriation Act, 1979 (92 Stat. 1567, 1586). The amendment of Title VII of the Civil Rights Act of 1964 to prohibit sex discrimination on the basis of pregnancy (designed to deal with a holding in *Nashville Gas Co. v. Satty*, 1977, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356) (P.L. 95–598 of November 6, 1978, 92 Stat. 2679) emerged as 42 U.S.C. § 2000e(k) in the following form:

"(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion." [10]

tion in the House of a resolution embodying a Committee on Rules rule providing for waiver of points of order against the section setting limits on amendments to "Section 209" of the bill (H.R. 12929) and setting forth, as an amendment to a Section 209 then in the bill, which would have reinstated the 1976 language, a text of Section 209 identical with the 1977 enactment except for substituting "Act" for "paragraph" in the opening clause, and deleting the introductory "That". Proceeding under the rule was not objected to. 124 Cong. Rec. 95th Cong. 2d Sess. H 5098–5099 (daily edition). Dissatisfaction with the regulations was expressed in the House by opponents of abortion funding, particularly with allowing 60 days for reports of rape (H 5104–05), and debate on June 7 and 13, 1978, recapitulating the principal arguments of the two preceding years with unabated vehemence resulted in the House's rejection, in favor of reinstating the 1976 language, of the alternatives of eliminating all restrictions (H 5363–64) or adopting the 1977 formulation (H 5371). The Senate substituted for the 1976 language the Brooke "medically necessary" formulation of 1977 (H 12515), and the House, with difficulty, agreed on October 14, 1978, to a preferential motion that had the effect of re-enacting the substance of the 1977 proviso.

10. The National Conference of Catholic Bishops and The United States Catholic Conference, Inc., has commenced an action in the United States District Court for the District of Columbia (Civil Action No. 79–106) on behalf of employers who are federal contractors challenging the amendment and 29 C.F.R. § 1604.10 on the ground, essentially, that they compel such employers to "treat abortion as a fringe benefit and provide paid time off for all women employees who wish to have an abortion," and that such compulsion "is an undue and impermissible burden on the Free Exercise Rights of the NCCB, the USCC and the Class Represented." A second count concerns the employers' responsibilities toward employees wishing to

The legislation providing for the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (P.L. 95–622, 92 Stat. 3412, 3439) provided (42 U.S.C. § 300v–1(a)(1)) that—

"The Commission shall undertake studies of the ethical and legal implications of—

\* \* \* \* \* \*

(B) the matter of defining death, including the advisability of developing a uniform definition of death;

(C) voluntary testing, counseling, and information and education programs with respect to genetic diseases and conditions, taking into account the essential equality of all human beings, born and unborn."

Earlier, The Legal Services Corporation Act included a provision, 42 U.S.C. § 2996f(b), that no funds made available to the Corporation under the subchapter by grant or contract may be used—

"(8) to provide legal assistance with respect to any proceeding or litigation which seeks to procure a nontherapeutic abortion or to compel any individual or institution to perform an abortion, or assist in the performance of an abortion, or provide facilities for the performance of an abortion, contrary to the religious beliefs or moral convictions of such individual or institution . . . ."

When subsection (b) was extensively amended by P.L. 95–222, on December 28, 1977, 91 Stat. 1619, 1622, the Congress reenacted subdivision (8) without change. The Civil Rights Commission in its 1975 report, "Constitutional Aspects of the Right to Limit Childbearing," page 101, had recommended amending the Act to permit abortion related suits.

## III

The Hyde-Conte amendment of 1976 and its successors, coupled with the decisions in *Maher, Beal* and *Poelker,* have been dominant factors in state abortion legislation, state administration of medicaid in the abortion context, and in drastically reducing the number of federally funded medicaid abortions. The alterations in state law and administration precipitated a number of suits challenging the validity of the amended laws and altered regulations. After the *Maher, Beal* and *Poelker* decisions, and the termination of the restraining order in the present case, certain states which were already applying a "medically necessary" standard continued to do so (Alaska, California, Colorado, District of Columbia, Hawaii, Idaho, Illinois, Maryland, Massachusetts, Michigan, New Hampshire, New York, Oregon, Pennsylvania, South Dakota, Virginia, Washington, West Virginia, and Wisconsin) although the scant reported data indicate wide differences in administering the criterion. Twenty-five states [11] soon commenced to apply the standard of the Hyde-Conte 1976 amendment; they were states that had reported 288,363 of the 988,267 legal abortions reported to CDC for 1976. Three states restricted reimbursement to abortions performed to preserve the woman's life.[12] Wyoming provided reimbursement for abortions in the case of rape, incest and where the life of the mother is endangered. Minnesota had no effective regulations and stopped all reimbursement at September 1977 until after it enacted a "preservation of life" statute.

After the December 9, 1977, enactment the Secretary on January 26, 1978, issued regulations which were amended in July 1978; the states that had covered "medically necessary" abortions in the main continued to do so, or were required to do so, and litigation resulted in adding Illinois, New

---

have abortions "where the life of the mother would be endangered if the fetus were carried to term."

11. Alabama, Arkansas, Connecticut, Delaware, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Mississippi, Montana,

Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah and Vermont.

12. New Jersey, North Dakota, and Rhode Island.

Jersey, and Massachusetts to the states providing "medically necessary" procedures. Seventeen states,[13] principally from among those that had adopted the Hyde-Conte 1976 standard, followed the federal lead in adopting the standard of the December 9, 1977, "Hyde amendment." Nine states have adhered to or adopted the standard of the Hyde-Conte amendment of 1976.[14] Iowa, California and Maryland have more recently provided funding for abortion where the fetus is physically deformed, mentally deficient, or afflicted with congenital illness.[15] Kentucky and South Dakota adopted a "preservation of life" standard like that earlier adopted by Rhode Island and North Dakota.

### A

Litigation has to some extent modified the pattern of state law and administration governing abortion funding. Soon after *Maher, Beal* and *Poelker*, it was indicated in *Emma G. v Edwards*, E.D.La.1977, 434 F.Supp. 1048, 1050, that under Title XIX of the Social Security Act therapeutic abortions are medically necessary procedures, requests for payment for which should be processed and paid as are all other requests for payment for medically necessary services. The court invalidated the Louisiana statutory requirement that all abortions, including those performed in the first trimester, be performed in a licensed hospital. In a later decision in the same case (November 27, 1978) the court held that Louisiana statute forbidding the use of public funds for abortion "except when the abortion is medically necessary to prevent the death of the mother" violated the requirements of Title

XIX by failing to cover "medically necessary" abortions; the court declined to pass on the effect of the 1976 and 1977 forms of the "Hyde amendment." Without passing either on the question of the interpretation of the Title XIX standard or the effect of the 1976 and 1977 "Hyde amendments," the court in *Doe v. Kenley*, 4th Cir. 1978, 584 F.2d 1362, held that, Virginia having adopted the policy of eliminating funding only for non-therapeutic abortions, as defined in *Beal* and *Maher*, the standard used in the required physician's certificate should be "substantial endangerment of health" and not "endangerment of life," and that the state health authorities should be directed immediately to issue a public notice for the benefit of recipients and a written communication to physicians and hospitals participating in the medicaid program which "clearly set forth the standard for reimbursement to be one based upon a physician's professional medical judgment that the health of the recipient would be substantially endangered if the fetus were carried to term and that such judgment shall 'be exercised in light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient,' *Beal v. Doe*, 432 U.S. at 442, n. 3, 97 S.Ct. [2366] at 2369, n. 3, citing *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201". The court authorized changes in the certificate forms and in the regulations to conform to federal requirements for federal funding of abortions for which the state chose to seek federal funds. In *Smith v. Ginsberg*, S.D.W.Va.1978 (Civil Action No. 75–0380CH), the court decided that the state did not have to include cover-

---

**13.** Alabama, Arkansas, Delaware, Georgia, Indiana, Maine, Mississippi, Montana, Nevada, New Hampshire, New Mexico, Oklahoma, South Carolina, Tennessee, Texas, Vermont and Wisconsin. Wisconsin substituted "preservation of life" for the life endangerment standard and modified the rape and incest report requirement.

**14.** Connecticut, Florida, Kansas, Louisiana, Missouri, Nebraska, Ohio, Utah and Virginia.

**15.** All three states, in addition, provide funding for abortions (1) where the pregnancy's continuance will endanger the mother's life, or the

pregnancy resulted from rape reported within sixty days or incest reported within the first six months of pregnancy (Iowa), (2) in the first trimester for rape victims, the first or second trimester for incest victims, in the first trimester if two physicians certify that the pregnancy threatens severe and long-lasting health damage due to a specified condition, and for females under sixteen if the parents have been informed (California) and (3) where the pregnancy threatens the mother's life or health or the pregnant woman is the victim of a reported sexual assault (Maryland).

age of unnecessary abortions in its plan but was required by Title XIX to cover all "necessary medical services," and, therefore, to fund "necessary (*i. e.*, therapeutic) abortions"; the court expressed a doubt about the effect of the "Hyde amendment" and retained jurisdiction pending further consideration of that issue.

*Roe v. Casey*, E.D.Pa.1978, 464 F.Supp. 487, challenged the validity of the Pennsylvania law forbidding medical assistance payments for any abortions except those necessary to save the life of the mother. The plaintiffs were women whose pregnancies did not endanger their lives but whose physicians had certified that in their cases abortions were medically necessary: one plaintiff suffered from hyperemesis gravidorum and pregnancy complicated that condition; another plaintiff was a thirteen year old whose small pelvis implicated probable difficult labor and internal damage, increased incidence of pre-eclampsia and adverse affectation of her nutritional status; the third plaintiff, having a history of psychiatric problems, had been hospitalized because of an attempted suicide, and her physician certified that her pregnancy had increased her depression, that she was capable of suicide and that an abortion was necessary to avert severe psychological damage. The court held that Title XIX of the Social Security Act required participating states to provide all "medically necessary" services, including "medically necessary" abortions, to eligible participants and that by limiting medicaid reimbursement to those abortions that were necessary to save the mother's life the state arbitrarily discriminated among medically necessary abortions on the basis of diagnosis, type of illness or condition involved (*cf.* 42 C.F.R. § 440.230(c) as amended). The court considered that the 1977 "Hyde amendment" simply affirmed the conclusion in *Beal* that the states were not required to fund non-therapeutic abortions.

*Preterm, Inc. v. Dukakis*, 1st Cir. 1979, 591 F.2d 121, considered the validity (in terms of compliance with Title XIX and with the "Hyde amendment" of 1977) of the Massachusetts statute that limited state funding of abortion to those "necessary to prevent the death of the mother" and to those procedures "necessary for the proper treatment of the victims of forced rape or incest." The court held that *Beal* should not be read as a ruling that all services within the five types of service required to be furnished to the categorically needy (*e. g.*, AFDC eligibles) that a patient's physician deems "medically necessary" must be provided by the state's plan; the legislature has first to decide what kinds of medical assistance are sufficiently necessary to be covered in its Title XIX plan; the physician decides whether his patient's condition warrants administering a type of medical assistance that the plan covers. The statute was to be tested by answering the question whether or not limiting abortions as it did was "reasonable" and "consistent with the objectives of" Title XIX, as 42 U.S.C. § 1396a(a)(17) requires. The court found that the Massachusetts statutory limitation violated the purposes of Title XIX and discriminated impermissibly among medically complicated pregnancies—a discrimination based on medical condition that 42 C.F.R. § 440.230(c)(1) forbids. The court found that the 1977 "Hyde amendment" did not embody a reasonable standard consistent with the objectives of Title XIX (42 U.S.C. § 1396a(a)(17)), that the amendment could not be read as denying federal funding while nevertheless continuing the Section 1396a(a)(17) requirement that state plans embody reasonable standards consistent with the objectives of Title XIX, but that the amendment constituted a substantive policy decision concerning the public funding of abortions which left the states free to fund more abortions than those for which the amendment made federal funds available but did not require them to do so. Title XIX, "to the extent of its repugnancy with the Hyde Amendment, has therefore been altered by the Amendment." The court differed from the district court in concluding that Title XIX "does not mandate that a state provide all medically necessary services as determined by the physician." The case was remanded for consideration of the

constitutionality of the "Hyde amendment," construed as a substantive alteration of Title XIX and thus requiring the states to establish plans that provide abortion services in no more than those instances specified in the amendment.

In *Reproductive Health Services v. Walsh,* W.D.Mo.1979 (No. 77–4171–CV–C) the court held that the Missouri regulation, limiting abortion funding to the cases in which the physician in his best judgment believes that full-term pregnancy and childbirth would cause cessation of the mother's life, contravened Title XIX and transgressed the equal protection clause; the court held that the state did not have to bear the cost of all "medically necessary" abortions but was required only to fund abortions for the needy insofar as it received medicaid reimbursement under the "Hyde amendment."

*Zbaraz v. Quern,* 7th Cir. 1979, 596 F.2d 196, followed *Preterm, Inc. v. Dakakis, supra,* in holding that the Illinois statute limiting funding to abortions necessary to preserve the life of the pregnant woman was violative of Section 1396a(a)(17) and 42 C.F.R. § 440.230(c)(1), and in holding that the "Hyde amendment" altered the substantive requirements of Title XIX. In remanding the case for consideration of the constitutionality of the "Hyde amendment" the court said (596 F.2d at 202):

"This consideration should include, *inter alia,* whether the Hyde Amendment, by limiting funding for abortions to certain circumstances [18] even if such abortions are medically necessary, violates the Fifth Amendment in view of the facts that no other category of medically necessary care is subject to such constraints and that abortion has been recognized as a fundamental right. *Roe v. Wade, supra.*"

Footnote 18 reads:

"The constraints imposed by the Hyde Amendment on medically necessary abortions which are not imposed on other kinds of medically necessary care include (1) a greater degree of potential harm from withholding treatment (the threat-

ened damage in the case of an abortion must be 'severe and long-lasting'), (2) the threatened harm must be physical, and (3) two doctors must make the determination of likely harm."

Upon remand the district court on April 29, 1979, decided that both the Illinois statute and the "Hyde amendment" were invalid on equal protection grounds, and its final decree required Illinois to fund medically necessary abortions prior to viability; the district court refused to stay the injunction pending appeal. On May 24, 1979, Mr. Justice Stevens denied the appellants' applications for a stay.

*Committee to Defend Reproductive Rights v. Myers,* 1979, 93 Cal.App.3d 492, 156 Cal.Rptr. 73, dealt with a statute providing funding for abortions where the life of the mother would be endangered if the fetus were carried to term, where the pregnancy resulted from promptly reported rape, unlawful intercourse, or incest, where amniocentesis indicated that the child was likely to suffer from certain genetic or congenital abnormalities, and where severe and long-lasting physical health damage would result if the pregnancy were carried to term on account of any of ten specific conditions or diseases when so certified under penalty of perjury by two physicians. The court held that the statute transgressed Title XIX as modified by the "Hyde amendment" in limiting the severe and long-lasting health damage to the ten enumerated conditions.

The court in *Doe v. Busbee,* N.D.Ga.1979, 471 F.Supp. 1326, did not address the constitutional issues, finding that the statutory issue was dispositive of the case. Under the state's rules governing medical assistance medicaid reimbursement for abortion was available only in the instances outlined in the "Hyde amendment" as enacted in 1977. The court concluded that Title XIX required state plans to provide all medically necessary services to the categorically needy which fell within 42 U.S.C. § 1396d(a)(1)–(5), that abortion was a medical procedure within the five general categories, and that in consequence the Georgia

rules were inconsistent with the objectives of Title XIX (42 U.S.C. § 1396a(a)(17)). Declining to follow *Preterm* and *Zbaraz* in holding that the "Hyde amendment" substantively modified Title XIX, the court held that the amendment operated only to restrict the use of federal funds for abortions. The court enjoined the defendant public officers from refusing to provide medicaid reimbursement for the medically necessary abortions of the plaintiffs. *Right to Choose v. Byrne*, 169 N.J.Super. 543, 405 A.2d 427, Chancery Division, Middlesex County, 1979 (No. C–3817–77), somewhat similarly, held invalid proposed guidelines for abortion funding framed in the language of the 1977 "Hyde amendment"; the court reasoned that withholding medicaid funding for medically necessary abortions, although such funding had been previously available, was unconstitutionally discriminatory against medicaid eligible women with a medical necessity for an abortion, was without warrant in a compelling state interest, and was violative of the equal protection clause; the court considered that restrictions on the right to public benefits for the protection of one's health, which had theretofore been provided by general legislation, could be sustained only if a compelling state interest justified withholding medicaid funding for medically necessary treatment or procedure. The court authorized an injunction providing for funding of abortions where the medical indications as to the necessity of an abortion are not insignificant and relate to the physical and/or psychological condition of the woman and are not based solely on considerations of family planning or emotional or social convenience. And *Hodgson v. Board of County Commissioners*, D.Minn. July 13, 1979 (4–78 Civ. 525 and 3–79 Civ. 56), held invalid under Title XIX the provision of the Minnesota funding law which restricted funding for therapeutic abortions to those in which two physicians certified that the abortion was necessary to prevent the death of the mother and the woman had given her consent in writing; the court concluded that the "Hyde amendment" did not substantively alter or amend Title XIX, and it

made no finding or conclusion respecting the constitutionality of the amendment. Similarly, *Planned Parenthood Affiliates of Ohio v. Rhodes*, S.D.Ohio, 1979, 477 F.Supp. 529, invalidated under Title XIX an Ohio statute forbidding the use of state funds, or federal "pass-through" funds, to pay for abortions unless two physicians stated in writing that the abortion was "medically necessary to prevent the death of the mother," or unless the pregnancy resulted from rape reported within forty-eight hours after the incident or within forty-eight hours after the victim had become physically able to report the rape (as certified by two physicians), or unless the pregnancy resulted from an incest reported, with the name of the guilty relative, before the abortion was performed. The court rejected the view that the "Hyde amendment" either substantively amended Title XIX or relieved the states of their obligation to fund all those services required to establish consistency with the objectives of Title XIX even though one or more of the required services might not be reimbursed by the federal government.

*Doe v. Percy*, W.D.Wis., 1979, 476 F.Supp. 324, granted a preliminary injunction against Wisconsin's making any payments under its Medical Assistance Plan for medical services related to pregnancy unless it also provided funds "for all medically necessary abortions [for indigent women eligible under the Plan] in the same manner and under the same procedures applicable to reimbursement for pregnancy related medical care." Plaintiff Doe had become pregnant while under psychiatric treatment; her psychiatrist diagnosed her as suffering from a depression neurosis including suicidal feelings and threats, which, in the psychiatrist's medical judgment, had to be taken as a serious threat to her life and health; referred to an obstetrician and gynecologist, plaintiff Doe requested an abortion; the obstetrician, although he concurred in the psychiatrist's judgment "that an abortion was necessary to preserve Doe's health," declined to perform the abortion because he would not have been reimbursed

for it under the Wisconsin Medical Assistance Program. The Wisconsin statute provided funding for only those abortions "directly and medically necessary to save the life of the woman," or "directly and medically necessary to prevent grave, long-lasting physical health damage to the woman," or in cases in which the pregnancy resulted from sexual assault or incest. After a painstaking analysis of the *Poelker* and *Maher* cases in the light of *Roe v. Wade*, the court concluded

"I rely upon *Roe v. Wade* in assessing the probability that plaintiffs will ultimately prevail in their contention that when the right of choice [between childbirth and abortion] is claimed by a woman whose health is threatened by a continuation of a pregnancy, the right is to be regarded as fundamental. It is that same authoritative decision, as it happens, in which it was decided that in a case like this one, the governmental interest in potential life is insufficiently compelling to override the freedom of the pregnant woman to choose abortion even in the final stages of pregnancy. I hold that plaintiffs enjoy a strong probability of ultimate success in their contention that this interest of the state in the challenged classification embodied in [the Wisconsin statute] is insufficiently compelling. If this is correct, no other governmental interest could qualify as compelling."

The earlier case of *D.R. v. Mitchell*, D.Utah 1978, 456 F.Supp. 609 upheld, against constitutional and Title XIX arguments, the Utah statute limiting funding to the cases in which the mother's life would be endangered if the abortion was not performed. The court declined to hold that funding should be extended to those cases arising after December 7, 1977, in which there would be severe and long-lasting physical health damage to the mother if the pregnancy were carried to term. The court considered that the state did not have to fund every medical service for which there might be federal reimbursement under Title XIX.

### B

The necessarily incomplete data on the number of federally funded medicaid abortions performed after the restraining order in the present case was terminated have been separated as between the reported cases from August 4, 1977, until February 13, 1978, when the Secretary's regulations became effective and later periods. The data for the first period are both incomplete and of limited reliability because of a complex of reporting problems. However, in light of later and better data they appear to portray correctly, as far as they go, the effect of the amendment and the *Maher, Beal* and *Poelker* decisions. These data, revised to June 7, 1978, for twenty-two states (excluding New York, California, Illinois and Pennsylvania) show a radical decrease in average monthly number of abortions. The form that the local laws took appears not to have had a controlling effect. Grouped by (A) states using essentially the "Hyde amendment" language, (B) states funding only "life endangerment" cases, (C) states funding only abortions to "preserve life", and (D) states using the "life endangerment" and also rape and incest language, the monthly average number of medicaid funded abortions in the year 1976 (AGI) and in the fiscal year 1977 (DHEW), and in the six and a third months from August 4, 1977, to February 13, 1978 (DHEW), were as follows:

| | Monthly Average Number of Abortions | | |
|---|---|---|---|
| Group | 1976 AGI ESTIMATE | Fiscal 1977 DHEW | 8/7/77 to 2/13/78 (DHEW *) |
| A (8 states) | 698 | 631 | 8.5 |
| B (5 states) | 650 | 790 | 184.8 ** |
| C (5 states) | 1191 | 1569 | 22.5 |
| D (4 states) | 183 | 251 | 63.3 *** |

\* DHEW has concluded that no reliable figures can be developed for this period from the report data it has.

\*\* Connecticut and Kansas account for 170.8 of the total of 184.8. These states accounted for 396 of the 790 average monthly abortions in fiscal 1977.

\*\*\* Minnesota and New Mexico accounted for all of the 63.3. These states accounted for 203 of the 251 average monthly abortions in fiscal 1977.

Figures given for Connecticut alone indicate the following trend in federally funded medicaid abortions in the months September through January 1976–1977 as compared with the same month in the next years:

|  | 1976–1977 | 1977–1978 |
|---|---|---|
| September | 148 | 11 |
| October | 155 | 16 |
| November | 150 | 27 |
| December | 143 | 18 |
| January | 156 | 15 |
| Total | 752 | 87 |

The total numbers of reported medicaid abortions in the indicated periods in 1978, starting with February 14, 1978, when the regulations took effect, arranged by the assigned reason for the abortion, were as follows: [16]

| Justification for Abortion | Medicaid reported Abortions | | | |
|---|---|---|---|---|
|  | Total | 2/14/78 to 6/30/78 | 7/1/78 to 9/30/78 | 10/1/78 to 12/31/78 |
| Total Number | 2,421 * | 810 * | 831 | 780 * |
| Life of woman endangered | 1,857 | 546 | 666 | 645 |
| Severe and long-lasting health damage | 385 | 146 | 153 | 86 |
| Rape or Incest | 61 | 24 | 12 | 25 |

\* Figures do not add to Totals. Alaska did not assign reasons for 94 abortions in February–June period, and Massachusetts reported no reasons for 24 October–December abortions.

The figures by states for the twenty-two states that reported medicaid abortions for the last quarter of 1978 evince striking anomalies. Seven states, reporting 130 of the 780 medicaid abortions of the quarter, reported none under "severe and long-lasting health damage" and none under "rape or incest". Ohio reported 386 medicaid abortions (373 under life endangerment); that was 49% of the national total, and for the whole period, February 14 to December 31, 1978, Ohio reported 33% of the national total. Illinois, reporting 59 abortions in the last quarter of 1978, assigned 15 to life endangerment, 41 to severe and long-lasting health damage, and 3 to rape or incest. Illinois' report accounted for 47% of the total cases assigned to severe and long-lasting health damage. New York reported 55 medicaid abortions for the last quarter of 1978, 54 for life endangerment, one for severe and long-lasting health damage. Oregon, reporting 22 medicaid abortions in the last quarter of 1978, reported 14 under "rape or incest", six under life endangerment and two under severe and long-lasting health damage. The percentage distribution by assigned reasons of those reported medicaid abortions which did state the reasons for the abortion was as follows:

| Reason for Abortion | 2/14/78 to 6/30/78 | 7/1/78 to 9/30/78 | 10/1/78 to 12/31/78 |
|---|---|---|---|
| Life of woman endangered | 76.25% | 80.14% | 85.31% |
| Severe and long-lasting health damage to woman | 20.39% | 18.41% | 11.37% |
| Rape or Incest | 3.35% | 1.44% | 3.30% |

The fear was expressed during the debates in Congress by opponents of restrictions on abortion funding that the restrictions would result in an unacceptable increase in maternal deaths and serious com-

16. Data from DHEW, Health Care Financing Administration, Office of Research (Office of Policy, Planning and Research).

plications arising from self-induced abortions and abortions performed by unlicensed and unskilled practitioners. Some such consequence was inevitable, but the data thus far available are not sufficient to demonstrate the extent of this consequential effect of the restriction on abortion funding. An attempt was made within CDC to project the increased maternal mortality that would result from denying abortion funding because of both the substitution of nonlegal abortion for lawful abortion and of normal childbirth for abortion; it was estimated that five to ninety additional maternal deaths would occur annually. It is an easy and clear inference from the CDC's Abortion Surveillance, 1975 (issued April 1977) that the CDC considered that the availability of adequate abortion facilities was directly related to the rate of maternal death due to abortion and that for some women—those dependent on public assistance—the lack of public funding for legal abortion acted as a deterrent to their obtaining safer procedures (pp. 7–10). A CDC report based on review of 250 McAllen (Texas) Hospital charts coded as abortion-related complications admitted from January 1977 through January 1978 disclosed that such admissions averaged 20 a month before August 4, 1977, when subsidies for abortion became unavailable to medicaid eligible women in Texas, and 17 a month after that date; however, of the febrile cases admitted only one has a medicaid recipient admitted before August 4th, and four admitted after August 4th were medicaid recipients, and seven women were admitted with complications ascribed to illegal abortions after August 4th as compared with four admitted before that date. One woman admitted after August 4th with septic complications following an illegally induced abortion died; the reporting CDC reviewer expressed the opinion that "as a result of the Medicaid restriction, the fatal case, sought and obtained, a low cost illegal

abortion which resulted in her death." [17] CDC furnished the following data on admissions to four hospitals in states (Texas, Ohio, and Rhode Island) that had cut off funding; CDC qualified the data as based on small numbers and possibly not representative of trends in other hospitals, or of national trends:

Percentages * of Medicaid Eligible Women admitted with Abortion Complications before and after Restriction of Public Funds for Abortion (Selected Sentinel Hospitals, AMSH ** Project 1977)

| Hospital | Before Cut-off | After Cut-off |
|---|---|---|
| A | 8.4% | 16.3% |
| B | 5.9% | 14.1% |
| C | 42.0% | 33.3% |
| D | 7.4% | 30.0% |
| Total | 16.5% | 18.2% |

* The base to which the percentage is applied is not stated. It may be the whole number of women admitted for treatment of pregnancy-related complications.
** "Abortion Monitoring in Sentinel Hospitals".

The data from hospital "C", which appear to have greatest weight in the totals, contradict the data of the other three hospitals, and indicate an unaccountably abrupt improvement; it suggests a reduction in the number of abortions, legal and illegal, performed in the area, or a change in either admission or reporting practice.

An April 1978 internal CDC report on monitoring the impact of restricting medicaid funds for "elective abortions" noted that medicaid funds had paid for about 25% of all abortions, and that states that had restricted funding accounted for only 6% of all abortions. The report is based on 1,496 emergency room visits during the four months from October 10, 1977, to February 10, 1978, in 24 hospitals; 262 of the visits were in states which did not fund abortions. It was seen as possible that since medicaid abortions were fewer in non-funding states

---

**17.** It is agreed that a twenty-four year old black woman who, in her twelfth week of pregnancy, unsuccessfully sought an abortion in South Carolina and could not obtain one because she could not afford the fee, was aborted illegally in February 1978, apparently in her sixteenth week, when mortality risk is 28 times that at the index rate (8 weeks or less). She was later hospitalized for post-abortion complications that necessitated a hysterectomy, rendering her sterile.

than in funding states, the similarity in the percentages of medicaid eligible women admitted for abortion-related complications in funding and in non-funding states represented an increase in complications per procedure performed among medicaid eligible women in non-funded areas. The data did indicate that medicaid eligible women obtained their abortions (which led to their later hospital visits) later in nonfunding than in funding states. The tabular data given on mean gestational age for all induced abortion complications by state funding status and patient medicaid status are the following:

Mean gestational age of fetus at women's admission

| Patient status | Funding States | Non-funding States |
|---|---|---|
| Medicaid | 10.8 weeks | 13.2 weeks |
| Non-medicaid | 11.1 " | 12.2 " |
| Unknown | 11.8 " | 15.1 " |

The 1976 Abortion Surveillance Report uses eight weeks or less of gestational age as the index rate for maternal deaths from abortion; at that point the death rate per 100,000 abortions is 0.6. At 9–10 weeks the relative death risk is 2.8 times that at 8 weeks or less; at 11–12 weeks it is 4.7 times the 8 weeks or less rate; at 13–15 weeks the relative risk is 13 times that at 8 weeks or less. The April 1978 report states that the risk of complications increases 20% for each week abortion is delayed, and that the death risk increases 50% for each week of delay. However, the April 1978 report concluded that there was no direct evidence of increased abortion complications among medicaid eligible women in non-funding areas, and no evidence that they were seeking non-legal or self-induced abortions in any great numbers, but that it might be that the medicaid eligible women delayed their abortions in order to seek alternative funding; the report did project "some increased

morbidity and mortality following such delayed procedure."

The caution of the CDC April 1978 report reflects the small statistical base and imperfect randomness of the data—e. g., only 29% of the 262 cases in the non-funding states, that is, 76 cases, were definitely cases of medicaid eligible women. A 1975 report by CDC physicians of experience at Grady Memorial Hospital, Atlanta, a facility serving the medically indigent, confirmed the inverse relation of the numbers of admissions for complications from illegal abortion to the numbers of legal abortions performed, but indicated that the expected decrease in admissions for complications due to illegal abortion lagged the increase in availability of legal abortion services, and lagged markedly the increase in legal abortions performed at the facility. One conclusion from the data was that, "Clearly, the availability of abortion services must be sufficiently broad to obviate having to resort to criminal means." New York City data on admissions for incomplete abortions in the year preceding the change in New York's abortion law compared with the following years showed a drop in such admissions of 31% in the first year under the new law, and an ultimate decline to 50% of the admissions in the last year under the old law.[18] Dr. Cates of CDC concluded, in a 1976 article based on a review of the data of 1972–1974, that minority group women accounted for a disproportionate number of the deaths following illegal abortions, and that the study results suggested "a need to provide better and more widely available legal abortion services especially for those women who are at high risk of seeking illegal abortions. Any actions which impede their access to legal abortion may increase the risk of death."[19] Dr. Cates has noted that, despite the relatively greater disapproval of abortions by black women,

18. National Academy of Sciences, Institute of Medicine, Report of a Study: Legalized Abortion and the Public Health, May 1975, p. 65 et seq. Experiences like New York's were reported for San Francisco and U.S.C. Medical Center, Los Angeles; the 1967 change in California's law was said to be a major factor in reducing total illegal abortion related complications (ibid).

19. Illegal Abortions in the United States: 1972–1974, W. Cates, Jr. and R. Rochat in Family Planning Perspectives, Vol. 8, No. 2, March/April 1976, pp. 89–90 (DHEW reprint).

they have used legal abortion at about twice the rate of white women; uncertain data for the year 1974 suggest that the percentage of medicaid abortions performed for black women is somewhat greater, perhaps 20% greater than the percentage of abortions performed for all black women.[20] That is, the higher incidence of poverty among black people, reflected in greater use of medicaid facilities, is a factor increasing the risk factors turning on withdrawal of funding.

There was evidence that in Romania, where abortion was sharply restricted commencing in November 1966, the effect was a drastic increase in hospital admissions for complications arising from illegal abortion and a sharp increase in abortion-related maternal deaths; a short-term increase in birth rate was followed by a decline in birth rate, ascribed by Tietze and Murstein to resort to "folk methods of contraception and illegal abortion."[21] The Romanian data,[22] which involve some uncertainties of interpretation, for 1964 through 1972 were these:

Deaths attributed to Complications of
Pregnancy and Childbirth

| Year | Number of deaths from complications Of Abortion | Other | Death rate per 100,000 Abortions | Live Births |
|------|------|-------|------|------|
| 1964 | 66 | 163 | 6.0 | 56.7 |
| 1965 | 64 | 173 | 5.7 | 62.1 |
| 1966 | 83 | 152 | 8.5 | 55.5 |
| 1967 | 170 | 311 | 82.5 | 58.9 |
| 1968 | 221 | 285 | 100.5 | 54.2 |
| 1969 | 262 | 229 | 101.6 | 49.2 |
| 1970 | 315 | 182 | 107.9 | 42.6 |
| 1971 | 364 | 158 | 110.3 | 39.5 |
| 1972 | 370 | 136 | 97.1 | 34.9 |

The medical witnesses who testified on the health consequences that would follow if the "Hyde amendment" was made the standard for funding abortions were in agreement that it would cause an increase in abortions performed by unqualified persons and self-induced abortion with a resulting increase in maternal mortality and post-abortion complications. A factor in the concern of some was a belief that the legalization of a broad spectrum of abortions would by this date have drawn into legal practice the unknown number of qualified physicians who before the change in laws had performed abortions clandestinely, leaving only the least qualified available to perform abortions for those most determined to obtain abortions and least able to pay for them.

The most recent data compilations for the full year 1977 prepared for The Abortion Surveillance Report, 1977, of CDC record 1,079,430 abortions reported to CDC, an increase of 9% over the number reported for 1976. The national abortion ratio (that is, abortions per 1,000 live births) increased from 312 in 1976 to 324.5 in 1977. The percentage increase in abortion ratio from 1976 to 1977 was 4%, substantially less than the increases in the abortion ratios in 1976 over 1975, about 15%, and in 1975 over 1974, about 12.5%. The States reporting racial data (excluding states which reported over 15% as "race unknown"), 31 states, recorded the abortion ratio (per 1,000 live births to women of the same race) of white women as 268 and that of black and other women as 490. Data from 32 states recording marital status, and accounting for approximately half of the abortions reported to CDC,

**20.** D. Petitti and W. Cates, Jr., Restricting Medicaid Funds for Abortion. Projections of Excess Mortality for Woman of Childbearing Age (DHEW, Public Health Service, CDC) estimates that 64% of medicaid funded abortions were among white and 36% among black women in 1974. The 1976 prepublication Abortion Surveillance Summary Table gives the percentage of abortions among white women in 1974 as 69.7% and states that 30.3% were among black women. See Lincoln, R. et al., 1977, The Court, the Congress, and the President: Turning back the Clock on the Pregnant Poor, Family Planning Perspectives, Vol. 9, No. 5, Sept./Oct. 1977, pp. 207, 213.

**21.** C. Tietze and M. Murstein, Reports on Population/Family Planning, No. 14 (2d Ed.) Dec. 1975, pp. 64–65, and (Tietze) No. 14 (2d Ed.) Supplement, Dec. 1977, pp. 5–6.

**22.** Data furnished through testimony of Dr. Christopher Tietze, Senior Fellow, The Population Council. Dr. Tietze is accepted as a preeminent expert on human fertility and its control.

reported an aggregate abortion ratio (per 1,000 live births to women of the same status) of 93 for married women and of 1,480 for unmarried women; the abortion ratio of the two groups combined was 321, lower than the national abortion ratio.

The Summary in preparation for the Abortion Surveillance Report, 1977, states (p. 9) that, "For the first year since 1972, there was an increase in the total annual number of abortion-related deaths; there were increases in all 3 categories—legally induced, illegally induced and spontaneous . . . ." And, in discussing "Illegal Abortion Mortality" and referring to four 1977 deaths associated with illegal abortion, the Summary states (p. 12), "Therefore, for the first year since 1972, there was an increase in the annual number of illegal abortion deaths . . . ." The report continued (*ibid.*):

"In the past we have used the number of illegal abortion deaths as an index to reflect the number of illegal abortions actually being performed. Before 1977 the decline in the number of illegal abortion deaths was felt to reflect the increased availability of the safer legal procedures throughout the country; women who formerly terminated their pregnancies through illegal channels probably elected to use the safer legal facilities. However, in 1977, the Supreme Court ruled that states had the right to restrict the use of public funds for legal abortion services. In August 1977 federal funds for Medicaid-eligible women were restricted; over the next several months, 34 states similarly elected to restrict state funds for abortion for Medicaid-eligible women. It is reasonable to speculate that these public policy decisions may have created an environment of uncertainty for low-income women about the availability of legal abortion services, whether they lived in states which were continuing public funding for abortion or those which were not. Because of the small numbers involved, however, chance fluctuation of a rare event is a possible explanation for this increase in illegal abortion-related deaths. Moreover, for at

least 1 woman, the non-availability of public funds led to a situation in which she was forced to choose the less-safe illegal abortion because of financial factors."

The summary then gave in detail the medical history of the case of a woman, admitted to the McAllen General Hospital, McAllen, Texas, on September 26, 1977, in imminent septic shock, who died 8 days later despite intensive medical surgical care. The draft Summary concludes the detailed medical history with the comment (p. 14):

"In summary, this woman had an unwanted pregnancy and no Medicaid assistance (that she had used twice before) to pay for a legal abortion. She sought a low-cost abortion on 2 occasions in Reynosa, Mexico, because of financial hardship. When these were unsuccessful, her third attempt, by a lay midwife in McAllen, resulted in instrumentation of her uterus and the probable introduction of *C. perfringens* organisms. These factors led to the fulminant endometritis and sepsis which eventually caused her death."

The Summary refers (p. 17) to monitoring the data on women admitted to gynecological acute-care facilities in 24 institutions; 10 of the institutions were in states where, because of the absence of public funding, legal abortions might be less available, and 14 were in states that were financing legal abortions. Three thousand one hundred and fifty-seven abortion complication cases were reported in the project; seven women stated that their abortions had been illegal; three did not name the source of the abortion, and their cases were classified as illegal abortions. None of the ten women was reported to be a Medicaid recipient. No abortion related deaths were detected in the surveillance. The Summary states that, "There was no significant difference between institutions in funded and non-funded states and [should read *"in "*] the proportion of Medicaid women with abortion complications over the 8-month period." The Summary reported:

"The restriction of public funds was found to be significantly associated, how-

ever, with a later gestational age at the time of the abortion."

The Summary concluded on this point (pp. 17–18) that the data were susceptible to at least three "possible explanations":

"First, Medicaid-eligible women may be obtaining legally induced abortions through a combination of personal funds, public hospital services, philanthropic assistance, and/or reduced clinical fees. Second, they may be choosing to continue their pregnancies to childbirth. Third, though unlikely, they may be having illegally induced abortions by non-physicians under relatively safe conditions."

As yet unpublished data collected by the Alan Guttmacher Institute (AGI)[23] report that there was an approximately 12% increase in the total number of abortions performed in the United States in the year 1977 as against the year 1976; a little over 9% more abortions were reported to CDC in 1977 over the number reported in 1976; however, for the first quarter of 1978, the most recent quarter on which data are available, AGI reported an increase of only about 4.4% over the first quarter of 1977 in the number of abortions performed in the United States.

No conclusion can be drawn from the data now available about the impact of the withdrawal of federal funding and its repercussions in state action. The draft CDC Surveillance Summary outlines alternatives that, together, exhaust the possible explanations for the absence of a significant number of illegal abortion complication cases admitted to hospitals, if it be the fact that there has been no substantial increase in the number of such hospitalizations for post-abortion complications. But the statement that only seven of 3,157 abortion complications reported through hospital surveillance admitted illegally induced procedures is so little likely to be a safe

basis for the drawing of large scale inferences that the question of the extent of hospitalizations arising out of botched illegal abortions must be found to be indeterminable. The data do strongly suggest that there has been a marked reduction in the rate of increase in abortions since August 4, 1977, and that may well connote an increase in the resort to illegally induced abortions by non-physicians which, as in the past, has a high probability of escaping statistical report. An increase in involuntary childbirth is an obvious possibility. There is no evidence, however, and it cannot be and is not found as a fact that Medicaid-eligible women have been able to obtain legally induced abortions through any use of their necessarily exiguous "personal funds," or at free public hospitals, or through philanthropic assistance, or reduced clinical charges.

The evidence at the trial demonstrated that in fact indigent women, dependent on public assistance provided through AFDC programs and dependent on medicaid for their medical needs, have no significant alternative to medicaid for legal abortions. An AGI analysis[24] of the available data indicates that the average cost of medicaid reimbursed abortions for the fiscal year 1976 was between $222 and $233; the average cost of abortion in the United States was estimated at $280, the average cost for a hospital abortion being $460 and for a clinic abortion being $160; second trimester hospital abortions vary in cost up to $1,000 and more. The AGI analysis concluded that 69% of medicaid abortions were performed in hospitals whereas 26% of non-medicaid abortions were performed in hospitals; the remaining abortions were performed in practitioners' offices. The high ratio of medicaid abortions performed in hospital is attributed to several causes. First, AFDC clients are principal recipients of medicaid

---

**23.** CDC notes in the draft 1977 Surveillance Summary (p. 5) that the abortions reported to CDC are about 17% lower than the number reported by the AGI nationwide survey of abortion facilities. CDC ascribes the difference in part to unreported abortions performed in physicians' offices, a probably under-reported class of procedures.

**24.** Lincoln, and others, The Court, the Congress, and the President: Turning Back the Clock on the Pregnant Poor, 9 Family Planning Prospectives, 207, Sept./Oct. 1977.

assistance, and they, in common experience, are found to turn to large public hospitals or teaching hospitals and their out-patient or clinic services for their medical needs. Second, the indigent as a class are not well served medically, nor generally are they well-informed on health care matters; their resort to medical facilities for assistance is, characteristically, delayed, and delay results in a higher percentage of second trimester abortions, which, generally, are performed in hospitals rather than in clinics or in practitioners' offices. Finally, women nineteen and younger, and more particularly those seventeen and younger, who are poor are frequently unaware that they have become pregnant until the pregnancy is advanced, and, because of their youth and ignorance, they are slow to seek medical assistance. The same AGI study shows that the average AFDC monthly payment varies widely from state to state, from $363 a month in New York to $48 a month in Mississippi and averages $280. The testimony of one AFDC client and of the Director of the United Welfare League, a publicly funded community multi-service center, established that even under New York's comparatively generous public assistance provision, welfare recipients must live at a miserable and humiliating level of bare subsistence, and that they are without means to pay for abortion.

Philanthropic or charitable institutions are not a resource for indigent women seeking abortions. The DHEW, Social Security Administration Bulletin for January 1976 (Vol. 39, No. 1), shows that in 1975 when total expenditures for health and medical care reached $118.5 billion, philanthrophy and industrial in-plant services accounted for $1.3 billion. The AGI article referred to above pointed out (page 212) that an AGI 1977 sample survey of 1,353 abortion providers indicated that about 75% of non-hospital clinics, 30% of private hospitals and 27% of public hospitals were already providing some free or reduced-cost abortions to poor people in 1976; an estimated 14% of all clinic abortion patients and, possibly, 4% of all hospital abortion patients obtained reduced cost or free abortions in 1976; in addition three-quarters of non-hospital clinics and public hospitals and nearly two-thirds of private hospitals offered deferred payment plans to some women in financial difficulties; payments were deferred for an estimated 15% of clinic patients and possibly 6% of hospital patients; the authors of the AGI article concluded that if public subsidy were withdrawn, and assuming that medicaid recipients could pay reduced fees, current providers would have almost to triple the number of abortions that they were subsidizing to make up the medical service deficit. The Executive Director of the National Abortion Federation, an association of 106 providers who performed approximately one-third of the abortions in this country, approximately 20% of which were medicaid abortions, testified that she recommended to providers that in their budgeting they allow a 10% margin for free or reduced rate or deferred payment cases, including bad debts, and to cover the financing of references to other facilities; she testified that about 2% of the 300,000 abortions performed by member facilities during the preceding fiscal year were performed free and that about 7% were performed at reduced fees; it was her judgment that the members could provide an additional 2% to 4% of free or reduced rate abortions and remain financially stable provided that the total of their reduced rate and free cases remained within the 10% margin, but that it would be financially impossible for them to furnish free the number of abortions that had been covered by medicaid in the then recent past.

The role of public expenditures in health and medical care is portrayed in the Social Security Bulletin referred to just above. Of the $118.5 billion expended for health and medical care $68.6 billion represents private expenditures and $49.9 billion represents public expenditures; the public expenditures represent 42.1% of the total. The Social Security Bulletin notes that by 1975 the Federal Government was financing more than two-thirds of the public health services. The withdrawal of the public health service alternative in this field does

not genuinely leave the indigent woman on public health service any resort other than involuntary childbirth, a trifling—and unequally and arbitrarily allocated—possibility of free medical service, and resort to self-induced abortion or non-medical abortions.

## IV

The Hyde-Conte amendment as enacted in September 1976 forbade the use of any of the DHEW appropriated funds for the performance of abortions "except where the life of the mother would be endangered if the fetus were carried to term." As noted above (pages 641–642) the Hyde-Conte amendment did not provide funding for abortions for victims of rape or incest, nor did it provide funding for any therapeutic abortions other than those in which the physician certified that the abortion was necessary because "the life of the mother would be endangered if the fetus were carried to term." The 1977 and 1978 forms of the restriction on abortion funding (*supra*, pages 642, 648) added to the life endangerment exception from the restriction an exception for "those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians"; the 1977 and 1978 enactments also excepted "such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service"; the regulations define medical procedures as including abortion and require that the rape or incest incident had been reported within sixty days after it occurred. 42 C.F.R. § 441.201, § 441.205(a)(3). In addition the 1977 and 1978 enactments explicitly did not prohibit payment for drugs or devices to prevent implantation of the fertilized ovum or for medical procedures necessary to terminate an ectopic pregnancy.

The language of the 1976 and 1977 enactments is very evidently not derived from

**25.** The Uniform Act suggested 20 weeks, but left the precise period to be fixed by each enacting state.

but may be compared with the language used in the Uniform Abortion Act, quoted in full in *Roe v. Wade, supra*, 410 U.S. at 146 fn. 40, 93 S.Ct. at 723 fn. 40. The Uniform Act would not have imposed any clinical restrictions on abortions performed by a duly licensed physician during the first twenty weeks; [25] after the first twenty weeks abortion would, under the Act, have been authorized only if the physician "has reasonable cause to believe (i) there is a substantial risk that continuance of the pregnancy would endanger the life of the mother or would gravely impair the physical or mental health of the mother, (ii) that the child would be born with grave physical or mental defect, or (iii) that the pregnancy resulted from rape or incest, or illicit intercourse with a girl under the age of 16 years." The Uniform Act was drafted as a penal statute, as was the American Law Institute draft statute quoted in *Doe v. Bolton, supra*, 410 U.S. at 206–207, 93 S.Ct. at 754–755. The Institute Act would have defined "justifiable" abortion as a physician's termination of a pregnancy if he believed there was substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother or that the child would be born with grave physical or mental defect or that the pregnancy resulted from rape, incest, or other felonious intercourse; "unjustified" abortion would be a crime under the Act if committed at any time during the pregnancy and would be more serious in degree if performed after the twenty-sixth week.

The 1976 and 1977 abortion funding restrictions do not make any distinction between abortions occurring before and those occurring after viability. The Secretary's regulations, 42 C.F.R. §§ 441.200–441.208, do not contain any guidelines for applying the "life-endangerment" and "severe and long-lasting physical health damage" criteria; at the time the regulations were put in final form the Secretary's statement indicated that the legislative history was considered as requiring that application of

these criteria be left to the physicians to make on an individual-case basis. See 43 F.R. 31876–77. The Secretary indicated that the statute foreclosed funding where the only severe and long-lasting damage was to the mother's mental health, but it was pointed out that if severe and long-lasting physical health damage resulted from an emotional cause the statutory condition would nevertheless be met (*ibid.*). The comments and responses published at the time the regulations were put in final form support an inference that mental health circumstances which would endanger the life of the mother if the fetus were carried to term may be taken into account by the attending physician in making the "life-endangerment" judgment (*ibid.*).

In *Roe v. Wade* (410 U.S. at 153, 93 S.Ct. at 727) the Court defined the woman's right of privacy as being

" . . . broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood

may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation." The Court decided that until viability the attending physician in consultation with his patient is free to determine without regulation by the State that "in his medical judgment, the patient's pregnancy should be terminated" (410 U.S. at 163, 93 S.Ct. at 732); after viability, the Court concluded (410 U.S. at 164–165, 93 S.Ct. at 732),

" . . . the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."

In *Doe v. Bolton, supra*, 410 U.S. at 192, 93 S.Ct. at 747, the Court said, in discussing an abortion statute which did not distinguish between periods before and after viability, that whether an abortion is "necessary" is a professional judgment for the physician, and, it continued,

" . . . that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman."

The Court did not pass on the validity, as applied to the period before viability, of the three exceptions to the prohibition of abortion contained in the Georgia statute involved in the case.[26] The court below in

---

26. The statute excepted abortions that the physician performed based upon his best clinical judgment that an abortion was "necessary" because (1) continuation of the pregnancy would endanger the life of the woman or "seriously and permanently" injure her health, or (2) the fetus would "very likely" be born with "a grave, permanent, and irremediable mental or physical defect," or (3) the pregnancy resulted from forcible or statutory rape. The three-judge court approved the statute's approaching the problem as a medical one, considered that the state had a legitimate interest in seeing that the decisions, personal and medical, were not

undertaken lightly without considering all relevant factors, emotional, economic, psychological, familial or physical, but held that the state "may not unduly limit the reasons for which a woman seeks an abortion." *Doe v. Bolton*, N.D.Ga.1970, 319 F.Supp. 1048, 1055–1056. The court invalidated the three specific exceptions, leaving the statute as one excepting from proscription abortions performed by a duly licensed physician "based upon his best clinical judgment that an abortion is necessary." That part of the case did not reach the Supreme Court.

*Doe v. Bolton* had invalidated the exceptions as unduly limiting the reasons for which a woman might seek an abortion; the effect of its decision was to legalize abortions performed by a duly licensed physician "based upon his best clinical judgment that an abortion [was] necessary."

The data discussed at pages 637 to 638 above indicate that before the changes in state laws and the rendering of the January 1973 decisions, therapeutic abortions, while far from rare, were not significant in number in terms of the total numbers of abortions performed after the January 1973 decisions. The limited data do not give much insight into the reasons assigned for the therapeutic abortions, but those attributable to rubella or German measles would appear necessarily to be based on health damage to the fetus rather than to the mother. The evidence at the trial from qualified medical witnesses, and it was to an extent borne out by the statistical data cited above, emphasized that at least in the later years psychiatric reasons became increasingly important as bases for authorizing in-hospital abortions; not only psychotic conditions in the chronically mentally ill but suicidal tendencies and overt threats of suicide, as part of a complex of symptoms, furnished a base for applications to the abortion committees in the hospitals for permission to perform the abortion. The evidence was that on the whole patients who could afford competent medical and psychiatric attention were significantly more likely to have applications for abortion approved than were patients whose

limited means denied them timely access to adequate psychiatric and medical attention. The means-based contrast is illustrated particularly for abortions authorized on psychiatric grounds as well as for all other abortions by comparing the data from University Hospital with those from Bellevue Hospital in New York City for the years preceding the change in the New York law in 1970; New York University Medical School provides staff to both hospitals.

Therapeutic Abortions per 1000 live births

| Year | University Hospital | Bellevue Hospital |
|------|---------------------|-------------------|
| 1964 | 43.7 | 3.1 |
| 1965 | 21.8 | 2.8 |
| 1966 | 15.6 | 1.8 |
| 1967 | 28.4 | 7.1 |
| 1968 | 44.9 | 22.3 |
| 1969 | 71.1 | 45.2 |

The number of abortions was not large in either hospital in any year until 1968 and 1969. The total number ranged at University Hospital from a low of 17 in 1966 to a high of 110 in 1969. In Bellevue the abortions were 3 in 1966 and the highest number in 1969, 57. Live births at University were 594 in 1964 and 1556 in 1969. At Bellevue Hospital births tended to decline over the years; the highest number was in 1964 when there were 2,563, births, the lowest was in 1968 when there were 1,031 births at Bellevue. The following table gives the percentage distribution of the "indications for termination of pregnancy" at the two hospitals in 1968 and 1969:

Percentage Distribution
Indications for Termination of Pregnancy

| | 1968 | | 1969 | |
|---|------|------|------|------|
| | University | Bellevue | University [27] | Bellevue [28] |
| Psychiatric | 71% | 65% | 81.8% | 94.7% [29] |
| Medical | 12% | 9% | 9.1% | 5.3% |
| Malignant | 2% | 4% | 1.8% | — |
| Genetic | 15% | 22% | 7.3% | — |

---

27. The "indications" in the twenty non-psychiatric cases at University Hospital in 1969 were: *Medical*—Rheumatic heart diseases (3), Hypertension (2), Hypertension and Retinitis Pigmentosa (1), Astrocytoma, Renal disease (1), Obstructive Renal Disease (1), Severe Diabetes (1), Multiple Sclerosis (1); *Malignant*—Carcinoma of Thyroid (1), reticulum cell sarcoma; *Genetic*—Maternal Rubella (4), Tay-Sachs Dis-

A possibly skewed sample of the letters submitted to the Therapeutic Abortion Committee by the psychiatric consultant to the Obstetrics and Gynecology Department at Bellevue Hospital shows a remarkably high incidence of deepseated psychiatric problems coupled with social dislocation and stressful individual circumstances; a good many of the letters conclude that the patient has a suicidal ideation and some of the letters report previous suicide attempts by the patient.[30]

It is clear from the evidence that before the changes in the law the medical standards determining when an abortion would be authorized by a hospital's abortion committee were not uniform in their application over time, depended greatly on how carefully the individual cases were worked up for presentation to the committee, and reflected differences in underlying medical philosophy and different case evaluations.

## V

In spite of the very clear division within the medical profession about the circumstances in which it is appropriate medical procedure to perform an abortion, abortion has a clear-cut and established position in medical practice. The medical opinions reflect, if they do not clearly articulate, the two different aspects of abortion that were so clearly delineated in *Roe v. Wade*. There is, *first*, the therapeutic abortion, the abortion that the attending physician considers in some sense medically necessary to the successful treatment of the health of the pregnant woman. In general, the physician in such a case is not concerned with the week of gestation except as the advance in weeks of gestation radically increases the risk of maternal mortality and the related risks of physical health damage. The concern of the attending physician is with determining whether abortion is, in the Supreme Court's language in *Roe v. Wade* "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." (410 U.S. at 165, 93 S.Ct. at 732). But in the first weeks of gestation, those to which the very broad range of considerations quoted above from *Roe v. Wade* (*supra,* p. 662) is applicable, the period of which the Court said that "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician" (410 U.S. at 164, 93 S.Ct. at 732), the Court's standard was not one of preserving life or health but a decision inherently and primarily medical but which considered the pregnancy in the total circumstances, medical, societal, familial and economic in which the pregnancy existed. The medical testimony in considerable part was in substance applying the conceptualization of *Roe v. Wade* quoted above without specifically stating that the discussion was in terms of the period preceding viability and particularly related to the first trimester.

There was no dissent in the medical testimony from the proposition, so clearly borne

---

ease (1), Charcot-Marie—Tooth Disease (1), Rubella Vaccination (2).

**28.** The "indications" in the three non-psychiatric cases at Bellevue were: Hypertension (2), Rheumatic Heart Disease (1). Of the 54 psychiatric cases 30 were either in-patients at Bellevue Psychiatric Hospital or were registered with Bellevue Mental Hygiene Clinic before recognition of pregnancy. Of the remaining 24, most had a previous history of institutionalization or suicide attempts.

**29.** Dr. Judith Belsky ascribed the increase in percentage from 65% in 1968 to 94.7% in 1969 to her assignment to Bellevue in 1969 as psy-

chiatric consultant in the obstetrics and gynecology department.

**30.** The letters, prepared by Dr. Judith Belsky, were marked as Exhibits 149–153, 156–159X; there are 33 letters, and Dr. Belsky recalled that the Therapeutic Abortion Committee accepted the abortion recommendation in all cases except one. She estimated that she had written about 150 abortion recommendations in 1969–1970, ending at April 30, 1970, when the Committee was terminated; the termination followed the 1970 change in the New York abortion law.

out by the statistics, that abortions are most safely performed during the earliest weeks of gestation, preferably within the first eight weeks, and that the relative risk of maternal mortality increases drastically with each passing week after the eighth week. Nevertheless, the death-to-case rate for all legal abortions in 1976 was 1.1 per 100,000 abortions and in 1977 was 1.4 per 100,000 abortions. A study based on 1974 statistics comparing maternal mortality with abortion mortality and stating both in terms of deaths per 100,000 live births reported that the maternal mortality ratio for white women was 10 per 100,000 live births and the abortion mortality ratio was 0.5 per 100,000 live births; for "black and other" women the maternal mortality ratio was 35.1 per 100,000 live births and the abortion mortality ratio was 2.4 per 100,000 live births.

The medical testimony was substantially in agreement that by the use of the most advanced present day medical techniques, and with close medical supervision, it was possible for women with life threatening conditions to survive pregnancy and bear children with a comparatively low ratio of maternal mortality; it was reasonably clear that the testimony rested on the assumption that the pregnant woman was desirous of bearing the child, and was cooperative throughout the pregnancy.

The medical testimony requires the finding of fact that the life endangerment standard as used in the Hyde-Conte amendment of 1976 and in the 1977 and 1978 enactments is not a term used in the medical profession as a standard for determining medical procedures, and that it is not susceptible of any agreed definition among medical practitioners. The medical witnesses emphasized that any life endangerment concept necessarily had a number of dimensions. Since every pregnancy involves a degree of risk to the life of the mother, however remote in the case of the young and healthy woman, the threshold problems with the statutory term were first, determining what degree of risk to the life of the mother must be present to warrant abortion, and, second, what probability of even-

tuation of the risk visualized must be present. A separate set of problems involves relating the patient's medical condition to the available resources of sophisticated medical treatment and support, the regimen of patient behavior essential to the success of the pregnancy, and the probability or improbability of the patient's having the means, being in the circumstances, and having the will to carry out the medical program. A distinct group of problems arises out of the necessity for evaluating mortality risks in terms of the co-existence of pregnancy with a disease or complex of disease conditions, independently involving a distinct risk of mortality and the effective treatment of which is, at minimum, complicated by the pregnancy, and, in instances, requires giving up the use of the optimum medications in order to avoid grave harm to the fetus, or because any effective medication would unavoidably enhance the risks of mortality inherent both in the pregnancy and in the disease.

The medical testimony made clear that potentially life threatening conditions identified very early in the pregnancy very often could not be predicted as even relatively certain to create an unacceptably high risk of mortality at a later stage in the pregnancy notwithstanding that it would be said that such a condition would inevitably in a statistically significant number of pregnancies cause pregnant women's deaths. While a number of specifically describable diseases create risks of mortality that are unacceptably high, the medical evidence made it very clear that there is neither a closed list of life threatening conditions by which the life of the mother would be endangered if the fetus were carried to term, nor a compilation of risk factors cutting across disease conditions that would express a consensus medical judgment on the point at which statutory life endangerment would be present. For instance, multiple sclerosis and renal disease, mentioned in the joint statement accompanying the conference report in 1976 (*supra* p. 641), do not furnish a criterion against which other diseases can be measured. The reported data on mater-

nal mortality [31] are not illuminating. Reports of the causes of maternal death, some dividing assigned causes into direct and indirect causes (that is, those directly related to the pregnancy and birth itself, and those related to complicating conditions), do not suggest any uniformity in the occurrence of causes or, perhaps, uniformity of diagnostic terms. New York data on 149 maternal death cases occurring in 1972–1976 list as causes (in order of frequency) pulmonary embolism, anesthesia, ectopic pregnancy, hypertensive states of pregnancy, cardiovascular diseases, obstetric hemorrhage, amniotic fluid embolism, ruptured uterus, cerebrovascular accidents, gastrointestinal complications, the category "liver, biliary, spleen," and other less common causes. Minnesota data collected over the period 1950 through 1974 give the causes of death in 487 cases; in the order of frequency the causes of death were hemorrhage, infection (including pulmonary embolism), toxemia (classified in New York under "hypertension states of pregnancy"), heart disease, amniotic fluid embolism, chorioepithelioma, anesthesia, air embolism, transfusion deaths, diabetes, and electrolite imbalance.

There was, for example, testimony related to a tabulation of seventy-nine "Risk Criteria," used for identifying potential complications in pregnancy, evaluation of which would determine whether the pregnant woman could safely bear a child out-of-hospital: the criteria did not indicate specific maternal mortality risks as such, but the first forty-eight factors, grouped under socio-demographic factors (age and residence near hospital), maternal medical history, maternal obstetrical factors, previous infants' factors, maternal laboratory findings and physical findings, traverse the range of factors that can at varying intensity levels become indications for termination of pregnancy. Included are chronic hypertension, renal disease (moderate to severe), urinary tract infection, history of psychotic episodes, history of epilepsy or seizure, required use of anticonvulsant drugs, drug addiction or current addiction therapy, heart disease (systolic murmur, significant heart enlargement), diabetes mellitus, thyroid disease, history of pulmonary embolism, history of asthma or recent chronic bronchitis, history of any bleeding disorder or hemolytic disease, and "others"; maternal laboratory findings indicative of risk to the woman or fetus are hematocrit value below 27%, sickle cell hemoglobin, pap smear class 3 or greater, and evidence of fetal chromosomal disorder in amniotic fluid.[32]

The medical evidence made it abundantly clear that the medical profession does not treat pregnancy, the threat of complications in pregnancy, and the factor of the pregnant woman's attitude toward her pregnancy and child bearing in terms related to determining whether "the life of the mother would be endangered if the fetus were carried to term." Treatment, including surgical treatment, of a proportionately serious pathological condition in a pregnant woman may result in miscarriage, and physicians would not consider such treatment as inducing an abortion. The termination of the pregnancy as a therapeutic measure is un-

**31.** New York State Maternal Mortality Study, 1970–1976, Central New York Maternal and Perinatal Mortality Study, Table 1. (The data are for the State exclusive of New York City); Minnesota Maternal Mortality Study, 1950–1974. See Schaffner, et al., Maternal Mortality in Michigan: An Epidemiological Analysis, 1950–1971, 67 American Journal for Public Health 821, 828 ("The leading causes of direct obstetrical death were the classic triad: hemorrhage, infection and toxemia.")

**32.** A report of the British Medical Association, Committee on Therapeutic Abortion, entitled "Indications for Termination of Pregnancy," published in the British Medical Journal of Jan-uary 10, 1968, pages 171–175, makes clear the decisive importance in the committee's view of individual circumstances of severity and of a range of medically appropriate decisions on substantially similar objective findings. The report considers alimentary, cardiovascular, respiratory, renal, neurological, skeletal, dermatological, endocrine, malignant, gynecological, obstetrical and psychiatric conditions, and conditions causing fetal abnormality. The committee report explicitly dealt with termination of pregnancy where the fetus has not progressed to a stage at which it is capable of an independent existence.

dertaken essentially when the purpose of the patient and physician is averting unacceptable risks of injury to the mother's physical or mental health from the pregnancy, given the patient's condition of health and attitude toward her pregnancy, or is averting an unacceptable risk of grave fetal deformity. The life endangerment test is simply alien to the medical approach when put forward as a sole test, for it extends only over an indeterminate range of instances that appears to exclude significant instances in which before *Roe v. Wade*, and the first changes in the state statutes, the therapeutic abortion committees of hospitals were approving abortion. Conspicuously, the language excludes the rubella cases and those psychiatric cases which were not based on evident risk of suicide.

The medical evidence made equally clear that, although it was possible to theorize that a variety of conditions could be considered as life-endangering, the medical witnesses did not consider that they could certify such conditions as meeting the statutory standard either for the purpose of assuring hospital admission for abortion or for the purpose of claiming payment under state medicaid plans governed by the Hyde standard. They were not impressed by the suggestion that, if they certified in good faith that in their professional judgment the abortion was necessary because the life of the mother would be endangered if the fetus were carried to term,[33] they would not have to fear charges of fraud, or investigation of their practices. Their concern centered on the circumstance that there could be no broadly shared understanding of the novel term either within the profession or between the profession and DHEW, and that, in practice, it could operate only as a crisis intervention standard. Dr. Seymour L. Romney testified that the Hyde standard and the monitoring of practice under it would have a severely inhibitory effect on physicians' willingness to undertake and to certify cases because of their inability to

have marshalled and to present verifiable scientific data to support their professional judgment under later DHEW enforcement review; he visualized an increased risk of serious complications that would tend to arise from protracting observation until professionally certifiable necessity became a demonstrable certainty. He estimated that application of the Hyde standard would have meant that 50% to 75% of the 1976 medicaid abortions would not have been certified for performance. Dr. Johan W. Eliot testified that few abortions could be performed under the Hyde standard, and that it would not cover cases in which abortion was clearly medically necessary, but in which it would not be possible to certify that the mother's life would be endangered if the pregnancy were carried to term. He estimated that, of the total abortions performed before the "Hyde amendment," only two or three percent would have been certified for reimbursement under the language of the amendment, and that, in the case of women who wished to carry their pregnancies to term, abortion would have been certified as necessary in only about 1% of the total abortion cases; his experience indicated to him that a third to one half of abortions that came under his view were based on socio-economic considerations and were not "medically necessary," and that the remaining 47% to 65% could be classified as "medically indicated" or "medically advisable," and medically necessary from the point of view of preventive medicine to restore and preserve the patient's mental and physical health using the World Health Organization definition of health (not simply absence of disease but complete mental and physical well-being). Dr. David Bingham testified that the medically necessary standard then in use in Connecticut embraced far more cases than the Hyde life endangerment standard. He estimated that 80% to 90% of abortions performed at the Planned Parenthood outpatient clinic in Norwich, Connecticut, were medically nec-

---

**33.** The Secretary's April 4, 1977, press release had stated that DHEW would reimburse only where the attending physician, on the basis of his or her professional judgment, has certified

that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term. See 42 F.R. 40486.

essary, and that, in his judgment, 5% to 10% of them would meet the Hyde life-endangerment standard, as he interpreted it.

The teaching of the testimony as a whole, not excluding the testimony of the physicians presented as witnesses by the guardian, was that the Hyde-Conte amendment could not be equal and uniform in interpretation and application, but that medical judgments under the amendment would necessarily reflect individual professional evaluations of conditions of inherently uncertain prognosis, that could occur in very different degrees of severity and with radically different degrees of access to supportive care, and could become manifest at widely different gestational ages and physiological, psychological, and social circumstances. More particularly significant was the very substantial risk that professional reluctance to certify under a standard alien to medical experience and terminology would deny medical assistance to women in instances in which it would not have been withheld under the older abortion committee standards.

The less complete testimony on the 1977 and 1978 additional standard of "severe and long-lasting physical health damage" in substance was that it, again, was not terminology used by or familiar to the medical profession, and that it did not embrace any added class of definable instances. The evidence was that so far as concerned first trimester abortion practice, the language added in 1977 was materially restricted in practical utility by the two physician requirement. Dr. Romney pointed out that the "would result" language of the clause put physicians in the impossible situation of predicting outcomes; he judged that the consequence of requiring two physicians to join in determining the existence of the condition would result in reducing certification to what he called the "classic" life threatening conditions: the cardiac problems, well-established respiratory problems, such as bronchiectasis, chronic renal diseases, severe hypertension with definitely established evidence of renal compromise, and chronic nervous system degenerative diseases.

The reported data on the assigned reasons for the medicaid reported abortions in the period since August 4, 1977, *supra*, pages 654–655, evince anomalies of classification so extreme as to compel the conclusion that the "life endangerment" and the "severe and long-lasting physical health damage" criteria do not understandably identify or describe distinct classes of physical conditions.

## VI

Despite the low maternal mortality figures attained currently, pregnancy and childbirth involve genuine risks to the pregnant woman and to the fetus, risks the measure of which is found in the woman's medical, including psychiatric, history, her social condition, the circumstances in which she became pregnant, her age, her access to medical support systems, and—at times overwhelmingly—her attitude toward her pregnancy.

Poverty is the common element in all medicaid cases, not less so in cases in which medicaid funding for abortion is sought, and poverty is medically significant. Dr. Eliot testified that among women receiving public assistance, and receiving their medical care through medicaid, the incidence of medical necessity is two or three times higher than among the general population. Dr. Tietze pointed out that statistical evidence bore witness to the fact that physical disease is more common among the poor than among the average of the population, and he considered that the factors particularly relevant to indigent pregnant women were deficiencies in their education, and particularly education in health care, and their limited access to adequate and sympathetic medical care with their consequent tendency to be late in obtaining pre-natal attention. Dr. Bingham's generalized observation was that, of the abortion cases coming under his review, those possibly identifiable as abortions of convenience were infrequent among medicaid patients; he found that the poor women, because their health needs were greater, their level

of nutrition lower, their levels of anemia worse, and likely to worsen as pregnancy continued, were at significantly greater risk in their pregnancies than women generally. Dr. Bernard J. Pisano testified that in his practice with private patients he would, in order to avert life-threatening or endangering conditions, have to specially watch and ʒuide probably 5% of his patients in the management of their pregnancies because of their preexisting health problems; in the clinic population, however, he testified, he might have to raise that percentage to 10% or 15%. The markedly higher health risk of poor women is almost certainly indirectly reflected in the circumstance that maternal mortality per 100,000 live births, as reported in the Vital Statistics of the United States for 1968, 1971, 1973 and 1975, was three times as frequent among black women as among others;[34] maternal deaths from toxemia were four times more frequent among black women than among others; Michigan data collected for the period 1950–1971 show that the rate of direct maternal deaths among non-white women was 4.2 times that among white women.[35]

The pregnant woman's poverty, both as it affects her general health and denies her the means of dealing optimally with her pregnancy and its special problems and restrictions, increases her risks of health damage, and even of mortality, from the diseases and conditions that cause complications in the pregnancies of women generally. The medical evidence depicts in some detail a number of the conditions and diseases—additional to those primary life-threatening conditions already referred to—that indicate at some level of severity termination of pregnancy; but the total evidence is very clear that the severity and sequelae of any one of the conditions or diseases can vary between the widest extremes. Dr. Jane Hodgson observed that multiple sclerosis and renal disease, mentioned in the 1976 conference committee statement (*supra,* page 641), were not signals to abort since that would depend on the degree of involvement and willingness to accept the risk inherent in dealing with the disease and the pregnancy simultaneously. She pointed to the intra-uterine device *in utero* after pregnancy as creating a high risk of sudden and grave infection striking in the later stages of pregnancy; other evidence showed that removal of the device at times induces an abortion; the mortality data indicate that the risk of death from spontaneous abortion is increased over fifty-fold if the intra-uterine device remains in place until childbirth[36].

34. Petitti and Cates, *supra,* note 20, refer to the 1974 statistics as showing that maternal mortality per 100,000 live births among black and other women was three and a half times that among white women.

35. W. Schaffner, et al., Maternal Mortality in Michigan: An Epidemiologic Analysis, 1950–1971, 67 American Journal for Public Health 821, 823 (1977). The New York State data contained in the report referred to in the text, *supra* (New York State Maternal Mortality Study 1970–1976 of the Central New York Maternal and Perinatal Mortality Study (June 1977) at page 17 and Figure 6) show a similar disparity. The text states:
"For the years 1971–1976, 62.1% of all non-white maternal mortalities can be attributed to four 'cause-of-death' categories: embolism, ectopic pregnancy, hypertensive states of pregnancy, and anesthesia. These same four categories accounted for only 39.1% of maternal mortalities for white females."
Differences between the prevalence of cervical dysplasia and carcinoma-in-situ as between a highly select group of low income black women, and their prevalence among women of the same age group included in large scale epidemiologic studies of women, are of uncertain significance, but again the incidence of dysplasia and carcinoma-in-situ is significantly higher among the black women in the study group according to a DHEW, PHS, CDC study: H. W. Ory, The Association between Oral Contraceptives and Risk of Developing Cervical Neoplasia in Black Women in a Public Family Planning Program—Atlanta, Georgia, pp. 9–10.

36. W. Cates, H. W. Ory, R. W. Rochat, and C. W. Tyler, The Intrauterine Device and Deaths from Spontaneous Abortion, 295 New England Journal of Medicine 1155 (Nov. 1976) (DHEW, PHS reprint). The article, after recommending removal of the device when pregnancy is diagnosed if it "can be easily withdrawn," continues, "If the UD cannot be removed, interruption of the pregnancy should be offered as an option. If the patient elects to maintain the pregnancy with the IUD in place, she should be warned of the increased risk of sepsis and be followed closely for symptoms of septicemia."

Dr. Eliot testified that in such cases the IUD should be removed as soon as the pregnancy is diagnosed, and if that can not be done without terminating the pregnancy, he would counsel termination of the pregnancy. Dr. Hodgson instanced also a twenty-four year old mother of four children who developed, after her fourth pregnancy, a severe phlebitis which required a long hospitalization; the patient sought an abortion when she again became pregnant. The phlebitis was itself an extremely serious complication of the pregnancy: there was a great danger of blood clots to the lungs, yet the drugs used to prevent such blood clots are very dangerous to the fetus, so that the phlebitis could not be treated if the pregnancy continued. Dr. Romney explained that varicose veins of moderate to severe intensity are aggravated by pregnancy if the woman has to be on her feet a great deal; the condition can be disabling, the veins can ulcerate, and the pregnancy thus increase the severity and chronicity of the condition; in some cases phlebitis, with its risk of blood clots, can evolve because of changes in blood coagulation during pregnancy, and the condition can then become life-threatening.

Cancer presents special problems. Dr. Hodgson described the case of a woman with cancer, for which she was receiving radiation therapy, who had a life expectancy of five years; she could not use oral contraceptives because that would have accelerated her death, and her alternative contraceptive means failed. She sought an abortion, and Dr. Hodgson approved that request although the effect, if any, that the pregnancy would have on the progress of the cancer was not certainly determinable. But if the cancer requires drug or radiation therapy, Dr. Edmund O. Rothschild explained, treatment of the malignancy by radiation or chemotherapy would have serious consequences for the fetus; he testified

that such a complex indicated the medical necessity of terminating such a pregnancy; he noted that the case of phlebitis was the same: the use of anti-coagulants in pregnant women is contra-indicated although they are ordinarily prescribed for phlebitis and various embolic problems.

Women, particularly young women, suffering from diabetes are likely to experience high risks of health damage to themselves and their fetuses; the woman may become blind through the worsening during pregnancy of a diabetic retinopathy; in the case, particularly, of the juvenile diabetic, Dr. Eliot testified there is evidence that a series of pregnancies advances the diabetes faster; given an aggravated diabetic condition, other risks increased through pregnancy are kidney problems, and vascular problems of the extremities.

Such a condition as myoma of the uterus, Dr. Romney testified, may persist for a lifetime without becoming diseased enough to require surgical removal, but it may cause excessive bleeding and is one of the common causes for hysterectomies. Pregnancy can aggravate myoma: if the tumor grows beyond the vascular supply needed to keep it benign, the tumor may become necrotic and produce peritonitis, abcess formation, infection and so become life-threatening. Urinary tract infections, too, are not uncommon, but, Dr. Romney testified, the possibility of an ascending urinary tract infection is increased during pregnancy; if it remains a mild cystitis, that is, a localized bladder infection, it may not be dangerous; but if a virulent infective organism produces a severe cystitis, that can develop into a renal abscess, and, in a patient with a large pregnant uterus, prevent proper drainage, seriously threaten control of the infection and so jeopardize the woman's life. Dr. Romney explained that during pregnancy there is a constant risk of urinary tract infection; it may be a cystitis

And see NICHD Annual Report, July 1, 1976, through September 30, 1977, Center for Population Research, Contraceptive Evaluation Branch, p. 5, concerning study to develop estimates of risks of pelvic inflammatory disease, spontaneous abortion (with and without sep-

sis), etc., among women with a history of IUD use. Also H. W. Ory, A Review of the Association between Intrauterine Devices and Pelvic Inflammatory Disease (Abstract only), DHEW, PHS, CDC, Bureau of Epidemiology, Family Planning Evaluation Division.

controlled in the bladder location with antibiotic medication; but an ascending urethral infection can also lodge in the kidney or the renal pelvis and produce a chronic pyelonephritis, perhaps originating in pregnancy and not eradicated when the uterus delivers its fetus; such an intractable pyelonephritis can be "a smoldering chronic condition which would jeopardize a woman's life."

Anemia in pregnancy, if not properly and adequately treated, can, depending on its cause, be a serious complication which the pregnancy may aggravate, Dr. Romney testified; if related to iron deficiency it lends itself to therapy; failure of cooperation in therapy by the patient may result in development of fatigue and acute respiratory embarrassment, making the patient susceptible to super-imposed infections, such as pneumonia. During pregnancy any preexisting malnutrition is increased by the demands of the fetus on the maternal stores. Untreated severe anemia, and the protein malnutrition leading to it, threaten the success of the pregnancy through the malnutrition of the woman, producing marasmus and edema in the baby, preventing normal development of its brain. The major risks related to sickle cell anemia, although theoretically controllable by maintaining a 30% hematrocit, can end in cardiac failure, in one case apparently due to pulmonary embolism. A common borderline anemia and borderline nutrition, under the stress of an unwanted pregnancy, can produce a physiological decompensation and so lead to a bout of congestive heart failure.

Obesity is not unrelated to poor nutrition and anemia, in Dr. Romney's analysis: obesity, often the result of unbalanced diet and occurring in tense neurotic people, is productive of nutritional anemia; where marked obesity exists in women with a history of rheumatic heart disease with microvalvular disease, there is a mechanical fat distribution problem that results in a physical load on the heart; such obesity, and it can be in some part a result of the stresses of an unwanted pregnancy, would be considered as placing the pregnancy at high risk.

Dr. Don Sloan testified from his experience at the Florence Crittenden Home, Philadelphia, established to care for women bearing unwanted pregnancies in the last months of their pregnancies, psychosomatic illness occurs that is related to the stresses of unwanted pregnancy; he described hyperemesis—excessive vomiting and persistent nausea so severe as to affect bodily function—as a frequent condition that affects nutrition, and, in severe cases can persist throughout the pregnancy and cause problems; when the pregnancy is unwanted hyperemesis is accentuated and exaggerated. Dr. Romney testified that gall bladder disease, duodenal and peptic ulcers and ulcerative colitis with multiple polyposis, while having their own unique characteristics with their own sequelae, were all entities having a chronic element and might be long-lasting.

The diseases and conditions just discussed (page 669 and following) are not of a kind that, in the view of the medical witnesses, physicians generally can be expected to certify with confidence under the standards of the 1976, 1977 and 1978 Acts, because of the special nature of the life and health risks that all pose in some degree of their occurrence, and at some stage of gestation. The supporting data for safe certification can not be at hand at the time when professional judgment would approve a termination of the pregnancy as "medically necessary," as that term is understood in the medical profession. The effect tends to be to relegate abortion to the status of a crisis intervention procedure. The evidence is, and the survey exhibits make clear, that the diseases and conditions discussed are illustrative and not exhaustive of those presenting to medical practitioners the same difficult divorce between professional standards of judgment and the demands of statutory certification.

The medical evidence emphasized repeatedly the physiological as well as the

**672**

psychological criticality of the pregnant woman's attitude to the pregnancy. The clear testimony that the present day arsenal of medical skills, hospital resources and medications could carry dangerously threatened pregnancies to term successfully emphasized also that success depended on effective cooperation of the patient in a regime of strict oversight, adherence to prescribed courses, and effective monitoring. Drs. Hodgson, Eliot, Romney, Pisani and Mecklenburg were in agreement on the importance of the pregnant woman's will, her will to bear a child or her resolution not to carry the pregnancy to term. The long tasks of pregnancy require prenatal care on the woman's part that the woman whose pregnancy is unwanted has neither the will nor the resources of patience to carry out effectively. If the pregnancy is complicated and requires extraordinary medical attention and patient response and cooperation, the woman whose pregnancy is unwanted fails in response and cooperation, and every risk of the pregnancy is enhanced. Drs. Romney and Sloan pointed out that the woman whose pregnancy is unwanted will tend to have prolonged and difficult labor, dysfunctional uterine labor, and to require resort to Caesarian section or forceps delivery because of the protraction of the painful labor. Dr. Romney testified that the pregnant woman must be motivated to carry out the physical responsibilities of pregnancy, that the prognoses for wanted and unwanted pregnancies are different, and that the woman's failure in attitude, cooperation and motivation can result in the

evolution of potential complications into reality; he testified that the behavior in labor of women whose pregnancies were unwanted was almost physiologically different from normal labor, and that the apprehensive, tense unwanting woman adjusted poorly to the delivery room, her tensions stimulating, experimental data suggest, the production of epinephrine (a hormone secretion of the adrenal gland) which inhibits the uterine contraction. And in the earlier stages of pregnancy, Dr. Romney testified, the woman whose pregnancy is unwanted seems psychologically incapable of accepting the reality of what is required from the therapeutic point of view. Where poverty is superadded, Dr. Eliot noted, the attending physician may have to cope also with malnutrition, undiagnosed medical problems, and the tendency of poor women (referred to by Drs. Tietze and Romney) to be slow to realize their condition and to seek timely prenatal care.[37]

The risk of complications and of mortality in abortion increases sharply with the advance in gestational age (see above page 656 and Annex footnote 4). The 1977 CDC Abortion Surveillance Report (in unfinalized editorial state) gives the following tabulation of death-to-case rate for legal abortions by weeks of gestation in the United States for 1972–1977. (The table is based on a distribution to the whole number of legal abortions in the six years of the data derived from the 72.6% of abortions for which weeks of gestation were known):

37. Contraceptive failure followed by an unwanted pregnancy appears in the medical evidence in the physician's references to particular cases, and in the case histories presented through certain exhibits. The frequency of contraceptive failure is unexpectedly high, and it varies by type of contraception. Ryder, Contraceptive Failure in the United States, Family Planning Perspectives, Vol. 5, No. 3, pp. 140–141 (Table 7 and Figure 1), calculates standardized failure rates in the first year of exposure to risk as follows:

| Method | Percent Failing |
| --- | --- |
| Pill | 6 |
| IUD | 12 |
| Condom | 18 |
| Diaphragm | 23 |
| Foam | 31 |
| Rhythm | 33 |
| Douche | 39 |

The pill and IUD, however, are thought to create serious medical risks. One IUD risk is that attending pregnancy with IUD in place. See C. Tietze and S. Lewit, Mortality and Fertility Control, 2 Women and Health 3 (1977). Mr.

Deaths-to-Case Rate by Weeks of Gestation

| Weeks of Gestation | Deaths | Cases * | Rate ** | Relative Risk *** |
|---|---|---|---|---|
| 8 or fewer | 12 | 2,146 | 0.6 | 1.0 |
| 9–10 | 23 | 1,394 | 1.7 | 2.8 |
| 11–12 | 20 | 742 | 2.7 | 4.5 |
| 13–15 | 19 | 254 | 7.5 | 12.5 |
| 16–20 | 43 | 295 | 14.6 | 24.3 |
| 21 or more | 12 | 59 | 20.5 | 34.2 |
| Total | 129 | 4,889 | 2.6 | |

\* In thousands
\*\* Deaths per 100,000 abortions
\*\*\* Based on index rate for 8 or fewer weeks of 0.6 per 100,000 abortions

A report [38] by CDC personnel based on 1971–1975 data asserted that, "Our findings clearly demonstrate that *any* delay increases the risk of complications to a pregnant woman who wishes an abortion." By far the greatest number of legal abortions in the recent years—over 90%—are by curettage/dilation and evacuation, and are performed before the thirteenth week (about 87%). The data on deaths by abortion method used and for the years 1972–1977 are the following:

Deaths-to-Case Rate by Type of Procedure

| Type of Procedure | Deaths | Cases * | Rate ** | Relative Risk *** |
|---|---|---|---|---|
| Curettage D & E | 66 | 4,455 | 1.5 | 1.0 |
| Intrauterine instillation | 48 | 355 | 13.5 | 9.0 |
| Hysterectomy/ Hysterotomy | 9 | 21 | 43.6 | 29.1 |
| Other | 6 | 58 | 10.4 | 6.9 |
| Total | 129 | 4,889 | 2.6 | |

\* In thousands
\*\* Per 100,000 abortions
\*\*\* Based on curettage/D & E rate of 1.5 per 100,000 as index.

All the deaths reported for the instillation procedure (saline and prostaglandin) were in the thirteen weeks and over categories. A similar increase with gestational age in the rate of major and minor complications arising in abortion was found in the cases reported to CDC from the thirty-two hospitals in its Joint Program for the Study of Abortion, 1971–1975.[39]

The medical consequences of delay in decision affect the outcome of the decision making process and the scale of implicit medical risk; the decision that is delayed while a second opinion is sought, or a verifiable history to support certification against DHEW review is compiled, is made in circumstances of enhanced risk in the delayed abortion procedure itself, and that consequence of the delay is a factor in the ultimate medical decision that must finally be made. In addition, delay in evaluating and compiling a history of a potentially life-threatening condition, and in seeking a second opinion, inherently risks avoidable health damage from the suspect condition. Delay denies the physician the use of the optimal time of decision. Dr. Romney, in effect, so testified, and Dr. Tietze attrib-

Frederick S. Jaffe, President, Alan Guttmacher Institute, testified to the risks on the basis of Dr. Tietze's statistical material.

38. W. Cates, et al. The Effect of Delay and Method Choice on the Risk of Abortion Morbidity, Family Planning Perspectives, Vol. 9, No. 6, Nov./Dec. 1977, p. 266 (DHEW reprint).

39. See W. Cates, et al., *supra*, note 38.

uted the sharp decrease in Sweden's second trimester abortions between 1968 and 1973 to the Swedish profession's realization that delay in order to verify diagnosis increased maternal mortality.[40]  Delay may result, too, in the patient's seeking other means of terminating her pregnancy.  Dr. Judith Belsky in her testimony instanced five cases in which patients sought illegal abortions rather than await the outcome of the hospital's processing their applications.

### VII

The medical testimony, and the case histories presented through the testimony and the affidavits, demonstrate the impact of unwanted pregnancy on mental health, both in gravely aggravating mental ill health that existed before the pregnancy, and in producing severe mental disturbance, including suicidal ideation, in the case of patients in trying life circumstances who are already near the limits of endurance.  The letters addressed to the Bellevue Therapeutic Abortion Committee, presented through the testimony of Dr. Judith Belsky,[41] give not only what amounts to a survey of the range of psychiatric problems centering on the patients' unwanted pregnancies, but also the general health background and life circumstances of the patients.  The intolerable life circumstances and familial burdens of the patients, interacting with underlying psychotic conditions or mental states at best on the very border of the normal, all but dictated Dr. Belsky's recommendations of therapeutic abortion and the Committee's acceptance of the recommendations.  Dr. Bingham, in his July 20, 1977, affidavit explained the case of a sixteen year old Hispanic welfare recipient who spoke no English, who had two children, suffered from rheumatic heart disease, with a loud murmur, and became pregnant when her contraceptive (foam) failed; in Dr. Bingham's opinion the pregnancy presented a significant risk of aggravating the patient's heart ailment and affecting her mental

health as well:  he said, understandably, "she is barely able to cope with her present circumstances."  Yet the pregnancy did not threaten her life—Dr. Bingham thought it possible to manage the medical and emotional problems through a pregnancy and keep the patient alive.  Dr. Eliot's affidavit of July 24, 1977, detailed the case of a thirty-three year old mother of three children furloughed from a state mental hospital on weekends after nine months treatment for a cyclic depressive state, for which she had been treated for several years.  Though prepared for the furlough with a diaphragm, she became pregnant, apparently on her second furlough.  The patient's husband had only intermittent employment, and the family was receiving public assistance.  The patient was much disturbed by the pregnancy, and her doctors judged it inadvisable for her mental health to try to carry the pregnancy to term.  The patient was aborted, after counselling, but Dr. Eliot considered that it could not have been certified under the "Hyde amendment."  Dr. Eliot's affidavit included the description also of the case of a woman already burdened with the care of two retarded children who became pregnant despite use of an IUD.  She feared a third child would be retarded, or, if not, beyond her capacity to rear properly in addition to caring for the retarded children.  Dr. Hodgson's affidavit of January 4, 1978, shows that plaintiff "Ann Moe," fifteen years old, had become pregnant more than two months before consulting Dr. Hodgson; plaintiff Moe had spent most of the preceding three years in adolescent psychiatric wards and correctional institutions, and her history included repeated episodes of running away and of truancy, and a diagnosis of schizophrenia; Dr. Hodgson's opinion was that compulsory pregnancy would result in severe and longlasting mental health damage, and while Dr. Hodgson considered an abortion "medically necessary" for plaintiff Moe because

---

**40.**  See C. Tietze and M. C. Murstein, Reports on Population/Family Planning, Induced Abortion: 1975 Factbook, December 1975, pp. 38, 42.

**41.**  See note 30, *supra.*

of the increased physical risks of pregnancy for a teen-ager as well as the increased mental risks for one with an unstable past, she did not believe that she could give the certificate required by the Hyde-Conte 1976 amendment, or the 1977 enactment.

An unwanted pregnancy is a source of stress for anyone, Dr. Belsky testified, and, for the psychiatrically disturbed, the danger of breakdown is greater; the progress of patients under treatment may become regressed and psychotic. Where the psychiatric patient is taking strong medication, such as thorazine, and the medication is continued into the early months of pregnancy, there is, Dr. Belsky testified, a risk that the medication may cause a developmental defect in the fetus; thorazine can cause jaundice to an adult or certain kinds of neurological disorders involving malfunction of certain parts of the brain, producing symptoms somewhat like those of Parkinson's disease; these same side effects can occur in the newborn baby; yet discontinuing the medication may produce decompensation, a return to the psychotic state.

More generally, an unwanted pregnancy can itself be productive of mental derangement. The unwanted pregnancy, never occurring as an abstraction or in isolation from the woman's total life circumstance, can occur in the extreme social circumstances of Dr. Belsky's patient who, married at sixteen and, at twenty-six having four young children and a husband addicted to heroin and soon to be released from prison, was pregnant by a married man, and apprehensive that her husband would kill her when he was released; in addition, her two school age children were emotionally disturbed, required psychiatric care, and were in special classes. The patient was depressed, agitated, insomniac, had tried unsuccessfully to abort herself, and she spoke of killing herself if she could not obtain an abortion. Dr. Belsky found her by reason of her unwanted pregnancy severely depressed, disorganized and self-destructive, and recommended abortion.

The mental consequences of unwanted pregnancy was a subject of consideration by the Special Populations Subpanel on Mental Health of Women submitted to The President's Commission on Mental Health at February 15, 1978; the Subpanel in its report underscored the issue of reproductive freedom "because of its particular importance in the prevention of mental disorders among women." [42] A British study [43] of 321 patients referred for termination of pregnancy, whose cases had been followed up, concluded that termination of pregnancy caused little psychiatric disturbance provided the patient wanted an abortion, but that continuation of pregnancy did, on occasion, lead to serious psychiatric disability, and that a third of the mothers who kept their babies showed evidence of resenting them. It was noted that most unmarried women who were refused an abortion obtained one elsewhere. The same study said, "This study confirms the opinion of workers in the United Kingdom that the stress of bearing an unwanted child can lead to psychiatric symptoms. . . . In our series such symptoms were not uncommon, were sometimes protracted, and were occasionally severe enough to require admission of the patient: they were especially likely in the overburdened multipara and in the single girl lacking support." A rather narrow study [44] of the cases of twenty-one women in the ward population of a Massachusetts mental health center states that thirteen of the women reported twenty-six unwanted pregnancies resulting in nine abortions and seventeen unwanted children; eight of the

42. The Subpanel said that the restrictions on medicaid funding of abortion "forces poor women to choose between compulsory pregnancy and motherhood and the danger of amateurish or self-induced abortions. This is a special hardship for women who are members of racial and other minorities, since they are disproportionately represented among the poor."

43. C.N.B. Pare and H. Raven, Follow-up of Patients Referred for Termination of Pregnancy, The Lancet, March 28, 1970.

44. H. U. Grunebaum, et al., The Family Planning Attitudes, Practices, and Motivations of Mental Patients, 128:6 American Journal of Psychiatry 740, (December 1971).

thirteen women reporting an unwanted pregnancy stated that they felt that having and caring for children had contributed to their decompensation. The British study referred to above reported that in a typical case the patient is fairly well until she becomes unexpectedly pregnant; then, "Psychiatric symptoms are exactly related to the stress the pregnancy causes and will be relieved as soon as the stress (pregnancy) is terminated." Several of the cases Dr. Belsky described in her letter-presentations to the Therapeutic Abortion Committee at Bellevue illustrate the point made in the British study.

The suicidal ideation, noted in a number of Dr. Belsky's letter reports, was demonstrated in a datum reported by an expert in adolescent attempted suicides: [45] twenty-two percent of all suicide-attempting girls, compared to zero percent of control girls, either were pregnant or believed themselves to be pregnant at the time of their suicide attempts.

The Hyde-Conte amendment and its successors, as administered, exclude reimbursement for abortions performed to avert severe and long-lasting mental health damage to the mother (see pages 661–662, *supra*), and the Secretary's intimation that mental health circumstances which would endanger the life of the mother might be taken into account by the physician in making the life endangerment judgment (*ibid.*) appears so uncertain in meaning that it is illusory. The funding restrictions exclude from consideration the whole area of mental health concerns that, from the standpoint of the medical profession, are relevant and significant in treating pregnancies and making professional judgments about the termination of problem pregnancies.

The Hyde-Conte amendment and those of the succeeding years necessarily exclude from funding abortions for women whose pregnancies occur in such circumstances of poverty, slum subsistence in substandard housing, and helpless insecurity that their pregnancies become unendurably stressful and emotionally destructive. The overwhelming testimony of Catherine Krouser depicting her life on public assistance and the hopeless humiliations of insuperable poverty, Mildred Dweck's careful description of the limits inevitable under the AFDC program, of the habitations of the poor, and of the poverty cycle in which many of the poor exist from generation to generation, coupled with the testimony of Drs. Romney, Eliot and Belsky concerning the emotional damage and physical depletion that unwanted pregnancy produces in women living in these circumstances of desperate entrapment in poverty, make clear the bases of those abortion decisions made by the indigent women in consultation with their physicians when medicaid was available—just such decisions as the Supreme Court summarized in the language quoted above (page 662) from *Roe v. Wade* and *Doe v. Bolton*.

## VIII

Among the detriments that would be imposed on women if they were denied the right to decide whether to terminate or to carry their pregnancies to term, the Supreme Court, in *Roe v. Wade*, 410 U.S. at 153, 93 S.Ct. at 727, noted that

"Maternity, or additional offspring, may force upon the woman a distressful life and future. . . . There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved."

Other factors, noted by the Court, that the woman and her responsible physician "necessarily will consider in consultation" in addition to the familial factors just quoted are, "Specific and direct harm medically diagnosable," possibly imminent psychologi-

---

45. J. D. Teicher, A Solution to the Chronic Problem of Living: Adolescent Attempted Suicide, in Current Issues in Adolescent Psychia-try, J. C. Schoolar, editor, at pages 129, 136 (1973).

cal harm, and possible taxing of mental and physical health by child care (*ibid.*).

## A

The medical testimony of Drs. Hodgson, Eliot, Hofmann, Romney and Belsky describes a number of cases, in all of which, as it happens, elements of threatened physical or mental health damage are also present in different degrees, which show the pitiably distressed familial circumstances of the pregnant women, and the manifest bearing of familial circumstances on the decision to continue or terminate the pregnancy. Dr. Belsky's letter reports and recommendations to the Bellevue Therapeutic Abortion Committee present cases that are at an extreme in some respects but not in the very obvious difficulty they would have in satisfying the Hyde-Conte standard or that of the 1977 and 1978 enactments. Eighteen of the thirty-three cases presented in Dr. Belsky's letters disclosed familial conditions approaching or in total breakdown, and few of the letter histories fail to exhibit the consequences of family breakdown as it affected the development of the pregnant woman whose plight occasioned Dr. Belsky's letter. The case histories summarized at pages 670 and 674–675, above, similarly demonstrate the weight of familial factors bearing on the decision to terminate or to carry the pregnancy to term.

Unwanted children, children born to women denied abortion, have been thought predestinately disadvantaged in consequence of their pre-natal rejection. An interim Czechoslovakian study [46] of two hundred twenty such children in their pre-adolescent years, measured against an equal number of control children, concluded tentatively that compulsory childbearing has varied and sometimes unfavorable consequences for the child's subsequent life, that the higher incidence of illness and hospitalization despite the same biological start in life, the slightly poorer school marks and performance despite the same level of intelligence, the somewhat poorer integration in the peer group, all point to a higher risk situation for the child, the family, and society; the higher risks concern, "above all," emotional and social development, particularly of boys; a common denominator of difference was seen in the unwanted children's increased defensive position against stress and frustration; no excessive cases of breakdown were found. The study noted that while the mothers had been denied abortions by the (public) abortion commission, they had accepted the decisions and borne the children, and, thus, were not the most extremely negative prospective mothers. A somewhat earlier Swedish study [47] of 120 children born to mothers denied legal abortions followed the children to age twenty-one; the authors concluded that the very fact that a woman applied for a legal abortion meant that the child ran a risk of having to surmount greater social and mental handicaps than its peers even when the psychiatric grounds on which the abortion was sought were so slight that the application was refused; as compared with the control group, the study found, many more of the unwanted children lacked the advantage of a secure family life during childhood, were registered more often in psychiatric services, received psychiatric care somewhat more often, were more often registered for antisocial and criminal behavior and slightly more often for drunken misconduct, and more frequently received public assistance; a few more of the study group were educationally substandard, and far fewer pursued theoretical studies over and above what were obligatory; they were

46. Z. Dytrych, et al., Children Born to Women Denied Abortion, Family Planning Perspectives, Vol. 7, No. 4, July/Aug. 1975, pages 165–171.

47. H. Forssman and 1. Thure, One Hundred and Twenty Children Born after Application for Therapeutic Abortion Refused, 42 Acta Psychiatrica Scandinavia 71 (1966). Dr. Richard Sarles also testified to the unwanted child's special vulnerability to abuse, both physical and sexual.

more often exempted from military service; more of the females married early and had children early; it was observed that, where differences in the two groups were not statistically significant, they always pointed toward the unwanted children's being born into a worse situation than the control children.[48]

The pattern of "unwantedness" in childbirth is the expectable pattern; a National Center for Health Statistics study,[49] based on sample data collected in 1971, reports that the percentage of births that are "wanted" diminishes with age of the mother at childbirth and with the number of children that she already has; the wantedness of childbirths increases with years of education: that is, a higher percentage of children born to women with four years or more of college are wanted children than of children born to women with less than high school education; and a smaller percentage of the children born to women living below the poverty level are wanted than of the children born to women living above the subsistence level. The data given at page 635 above, correspondingly, reflect the increased ratio of abortions to live births in the thirty-five and over age groups and in the groups of women having three or more previous live births.

Dr. Belsky's testimony and her case histories suggest the linkage between unwanted pregnancy and childbirth and the enhanced risk of child abuse. While it is believed that child abuse occurs at every income level and tends to be selective of one child in a family, often selective of a child suffering from some defect or disability, it has been said[50] that child abuse or neglect "is more often reported in the lower socioeconomic levels. The pressures of unemployment, lack of money, unwanted children, threatened loss of a job—all can produce a state of affairs which can cause a parent or caretaker to lose control and abuse or neglect his or her child." Dr. Adele Hofmann testified that there is a pattern of individuals who become child abusers, and Dr. Belsky testified to her observation that many of the pregnant multiparas who came under her observation had themselves been abused or neglected in childhood and were disposed to be abusive or neglectful of their own children. That is reflected in the January 2, 1978, affidavit of plaintiff "Susan Roe," expressing her fear that if she carries her pregnancy to term, she will become an abusive parent like some of her friends.

### B

The debates in Congress, and the succession of amendments proposed, make it clear that fetal abnormality was intentionally excluded from the conditions for which abortions would be funded. In this respect the Congress excluded from funding a class of abortions that had been sanctioned in hospital practice before the changes in state law and before the decisions in *Roe v. Wade* and *Doe v. Bolton* (see pages 637, 638 above, "Rubella" and "German measles").[51] The child born with serious birth defects presents a grave threat to family stability

---

**48.** The material on the killing of the newborn by parents refers to the killing of unwanted children; the two articles, introduced through Dr. Belsky's testimony, appear to have no significant relation to abortion or to the inability to obtain an abortion. P. J. Resnick, Child Murder by Parents: A Psychiatric Review of Filicide, 126:3 American Journal of Psychiatry 325 (Sept. 1969); P. J. Resnick, Murder of the Newborn: A Psychiatric Review of Neonaticide, 126:10 American Journal of Psychiatry 1414 (Apr. 1970).

**49.** Advance Data from Vital & Health Statistics of the National Center for Health Statistics,

DHEW, PHS, Health Resources Administration, No. 9, August 10, 1977.

**50.** A Self-Instructional Text for Head Start Personnel, Child Abuse and Neglect, October 1977, DHEW Publication No. (OHDS) 77–31103, page 25.

**51.** The British study cited in note 32, *supra*, states that, "If rubella occurs during the first month of pregnancy severe foetal abnormality may occur in as many as 80% of the cases. . . . In cases of *influenza* the rate of foetal abnormality is about twice the normal rate if the infection occurs during the first three months of pregnancy."

and to the rearing of the defective child's siblings.

Fetal abnormality occurs not only in consequence of disease contracted during pregnancy but also for genetic reasons and as a side effect of medication administered to the pregnant woman to control disease and of drug addiction. Dr. Hodgson testified to her concern about drug abusers who may have created damage to the fetus—and who, having the least social responsibility, will not be competent mothers. Dr. Eliot testified to the risk of fetal damage in the case of juvenile diabetics who become pregnant, and to the apprehension of fetal defect on the part of a pregnant woman whose two children were retarded. Dr. Belsky testified to the danger that the medications prescribed for schizophrenic women posed for fetal development if the woman became pregnant. Dr. Belsky testified also to the case of a pregnant woman who had borne two children who died of a rare genetic disorder identified as Liber syndrome and whose treating physician recommended abortion: in this case the statistical risk of Liber syndrome was 12% or one in twelve, and there appeared to be no pre-natal test that could predict the outcome of the pregnancy. The woman elected to continue the pregnancy, and she bore a normal child, but lived in fear that every incident in the child's behavior indicated abnormality.

A British study[52] divided conditions causing fetal abnormality into three classes, infective conditions, primarily rubella and influenza, non-infective conditions, such as significant maternal exposure to a teratogenic agent, cytotoxic drugs used in treating maternal leukemia, exposure to high doses of radiation, etc., and genetically determined conditions of three main types, that is, chromosomal aberrations, conditions of multifactorial etiology where alleles at

many loci interact with environmental factors (including mental deficiency, epilepsy and anencephaly), and conditions due to abnormal alleles at a single locus and transmitted in a classic Mendelian manner. A study[53] conducted by the National Registry for Amniocentesis under contract with the National Institute for Child Health and Human Development stated that all recognized chromosomal anomalies and more than sixty inborn errors of metabolism can be identified *in utero* by amniocentesis. An accuracy rate of 99.4% in diagnosis was attained in the study, and it appears that in 1974 amniocenteses were performed for 30,000 women.

One in fifteen Jews of Eastern European descent is a carrier of Tay Sachs disease, a disease fatal to children born with it. Carriers are easily identified by blood test, and Tay Sachs disease is detectable by amniocentesis; if both potential parents are Tay Sachs carriers, the chance that a child born to them will have the disease is one in four. Dr. Tietze described the progress of the disease, which first manifests itself, generally, when the child is six to nine months old, and grows worse, requiring intensive care, until the child dies in or before its fifth year. The Tay Sachs problem was fully discussed during the debates in Congress, and the discussion of fetal defect in relation to the funding of abortion extended to other familiar genetically determined fetal defects including mongolism (Down's syndrome, trisomy of chromosome 21).

Dr. Romney testified to the statistically higher incidence of premature births to economically deprived women whose pregnancies were unwanted and stressful, and to seeing greater numbers of such premature infants born with disabilities, some of which remain for life, such as cerebral palsy, congenital malformations, and permanent

---

52. See British Medical Association report, note 32, *supra*, at page 175.

53. National Registry for Amniocentesis Study Group, NICHD, Midtrimester Amniocentesis Study Group, Diagnosis, 236 JAMA 1471 (Sept.

27, 1976). The study included follow up to age one year for 946 of the children born to the women who elected amniocentesis; the amniocenteses were performed in the period July 1, 1971, to June 30, 1973.

brain deficit. Dr. Sloan, too, described the risks to the fetus in the difficult deliveries of women whose pregnancies are unwanted.

## IX

The debates in Congress reflect the effort made to except the funding of abortions for teenagers, and especially the younger teenagers, from the restrictions on abortions; the extent of teenage pregnancy, and the problems it presented, were repeatedly elaborated and argued in both houses; no exception from the restrictions was enacted, except as the limited rape exception, taken with local definitions of statutory rape, in theory extended to promptly reported rapes of younger teenagers.

A December 1976 report [54] of the Office of Child Health Affairs asserted that "Teenage pregnancy, because of its adverse effects on the young mother and her infant, is one of the most if not the most pressing health problem, of individuals 19 years of age and under." And the report [55] of a 1976 survey, published in 1978, concluded that "Pregnancy among teenagers is a major public health problem, with serious medical, health, educational, social, psychological, and vocational implications for the mother and baby." An "overview" [56] of adolescent behavior as related to health, of adolescent health problems, of available services, and of suggestions for future trends, prepared by the DHEW Public Health Services Administration, stated that "Two out of thirteen first births in the United States are to girls who are so young that they are biologically 'at risk' in child-

bearing . . .. Studies show that pregnant adolescents have higher rates for toxemia, prolonged labor, premature delivery, pelvic disproportion, and caesarean section than more mature women, and therefore require more intensive maternity care."

A memorandum [57] prepared in 1977 by the DHEW Deputy Assistant Secretary for Planning and Evaluation in support of proposed budgetary provisions for the fiscal year 1979 summarized the findings on teenage pregnancy: (a) adolescents are at high risk of becoming pregnant; over four million adolescent females (ages 15–19) have had sexual intercourse and less than half use contraceptives (37% of unmarried adolescents interviewed said they had not used a contraceptive the last time they had sexual intercourse); one million adolescents (one in ten) become pregnant each year and almost 600,000 give birth; nearly 250,000 births (400,000 pregnancies) are to adolescents 17 or younger, and 13,000 (30,000 pregnancies) are to adolescents under 15; (b) adolescent pregnancy poses serious health risks to mother and child; about 300,000 adolescents receive abortions each year (of which 85,000 are medicaid funded), and almost half are to those 17 or younger; adolescents are over-represented among those receiving second trimester abortions, which involve greater health risks; the incidence of low birth weight infants is twice as high for mothers under 15 and 1.3 times as high for mothers 15 to 19, as for mothers 20–24; low birth weight infants run higher risks of death and serious developmental defects; adolescents who become pregnant once are likely to experience rapid repeat

54. "Teenage Pregnancy," prepared by the Office of Child Health Affairs, Office of the Assistant Secretary for Health, DHEW, Dec. 1976.

55. H. Goldstein and H. M. Wallace, Services for and Needs of Pregnant Teenagers in Large Cities of the United States, 1976. 93 Public Health Reports 46 (Jan./Feb. 1978).

56. Approaches to Adolescent Health Care in the 1970s, DHEW Publication No. (HSA) 75–5014, p. 17.

57. See August 4, 1977, Memorandum to the Secretary from Peter Schuck and attachment; September 16, 1977, note from Peter Schuck to the Secretary and attachment; November 4, 1977, "Note to Bert Carp" from Peter Schuck. The August 4 attached memorandum noted (p. 23) that "Adolescent pregnancy is often associated with alienation from school and family, poor self-images, lack of recreational and work alternatives, inadequate supervision outside the schools, especially for those with working parents."

pregnancies, with increased risks to the woman and her infants; about 44% of adolescents having first babies will have second pregnancies within a year, absent prevention programs; and (c) adolescent pregnancies raise serious social and economic risks; pregnancy and marriage account for one third to one half of adolescent female "drop-outs" from school, and early parenthood is also a major reason for males' dropping out of school; adolescent parents run higher risks of unemployment and welfare dependency than those who delay parenthood until their twenties; one-third of all births to adolescents are out-of-wedlock, and adolescents account for one-half of all out-of-wedlock births in the United States; adolescents who marry are 2 to 3 times more likely to divorce than those who marry in their early twenties.

Dr. Adele Hofmann testified [58] that the death rate from complications of pregnancy, birth and delivery are 60% higher for women becoming pregnant before age fifteen than the rate for women in their twenties, and the death rate for 15 to 19 year olds is 13% greater than for women in their twenties; she testified that women 15 to 19 are 31% more likely to suffer from toxemia than women 20 to 24; are 25% more likely to become anemic than those 20 to 24; will have a 13% higher incidence of infection in fetuses around the period of delivery than women 20 to 24; and have a 13% greater likelihood of premature births. Drs. Romney and Hofmann testified that younger teenagers often have not sufficient pelvic development to enable them to deliver a baby normally, and they are more frequently delivered by Caesarean section; such surgical delivery reduces the probability of normal delivery in future childbirth. Dr. Hofmann testified that girls are in their puberty spurt of growth in the two years or so following menarche, amassing bone and muscle, and expanding their blood volume, and in need of iron for their blood cells; major endocrine changes are also taking place. In the period after menarche a mean growth potential of 7.6 cm. remains which is normally accomplished in the ensuing five years; it is thought that completion of this linear growth is a benchmark for biological maturity; conceptions by girls under 16 within twenty-four months after menarche produce twice as many low birth weight infants as do conceptions by girls under 16 occurring more than twenty-four months after menarche.[59]

Although adolescents as a class are considered to be a healthy population group,[60] that generalization cannot be extended to the subclass of adolescents who are poor, medicaid-eligible and pregnant; the Schuck memorandum [61] referred to above noted that teenagers experience disproportionately problems such as venereal disease and drug and alcohol abuse that threaten their well-being. The higher incidence of low birth weight infants in the cases of teenage mothers has already been referred to; infants weighing 2,500 grams or less at birth are considered low birth weight, and such infants have radically greater infant, neonatal and post-neonatal mortality rates than full weight infants: [62]

58. In this part of her testimony Dr. Hofmann used the figures from The Alan Guttmacher Institute publication entitled "11 Million Teenagers" (1976). The figures on teenage maternal fatalities indicate that the fatality rate for 15 to 19 year olds from toxemia is 52% greater than that of women 20 to 24 and the fatality rate for hemorrhage and spontaneous abortion is twice that of women 20 to 24.

59. See "Teenage Pregnancy," supra, note 54, at p. 5.

60. See Approaches to Adolescent Health Care, supra, note 56, at pp. 23–24.

61. See note 57, supra, Schuck, August 4, 1977, Memorandum at p. 3.

62. J. Menken, The Health and Demographic Consequences of Adolescent Pregnancy and Childbearing (Prepared for Conference on the Consequences of Adolescent Pregnancy and Childbearing, co-sponsored by Center for Population Research, NICHD and Alan Guttmacher Institute, Bethesda, 1975; certain of statistics updated to January 1970), Table 9.

Infant Mortality per 1,000 Live Births, by Birth Weight [1]

| Time of Death | All Birth Weights | | | 2500 grams or less | | | 2501 grams or more | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | White | Non-White | Total | White | Non-White | Total | White | Non-White |
| Under 1 year | 25.1 | 22.2 | 41.4 | 190.3 | 191.9 | 185.7 | 11.2 | 9.7 | 20.0 |
| Under 28 days | 18.4 | 16.9 | 26.7 | 171.6 | 177.4 | 154.8 | 5.5 | 5.1 | 7.7 |
| 28 days [2] to 11 months | 6.9 | 5.4 | 15.1 | 22.6 | 17.7 | 36.6 | 5.8 | 4.6 | 12.4 |

1. Data based on the "1960 United States Birth Cohort."

2. The rate for 28 days to 11 months is the rate per 1,000 *survivors*, that is, the rate for infants surviving to the 28th day.

---

Data from 1967 show that 17.2% of the infants of mothers under 15 years of age had low birth weights and 10.5% of the infants of mothers 15 to 19 had low birth weights, compared with the overall rate of 8.2% low birth weights and the lowest rate of 7.2% for women 25 to 29.[63] The low birth weights, accepted as the index of premature birth, are not only related to higher mortality rates, but also grave birth defects. It has been said that [64] "Prematurity has also been linked to such conditions as epilepsy, cerebral palsy and mental retardation, and, to higher risks of deafness and blindness." A National Institute of Health Study of 1959–1965 data found that white children born to mothers 15 and younger were about 2.4 times more likely to be born with neurological defects than those born to women 20 to 24 years old.[65] Dr. Hofmann's testimony traced the high incidence of neurological defect in low birth weight (and, therefore, premature) infants to the fact that the blue vessels within their central nervous systems are more fragile than those of full term infants, and, in the process of delivery, if they are affected by the respiratory distress syndrome—immaturity of the lungs and difficulty with exchanging oxygen—there is decreased oxygen in the blood and increasing blood capillary fragility, and the small blue cells break in the brain; there is an increase in central nervous system hemorrhages during and just after birth, as well as hemorrhage within the brain substance and around the brain, causing irreparable destruction of nervous tissue. Mental retardation can be one consequence of the brain tissue damage, and it is evidenced in the child's inability to function at the level expected in children of its age; the child does not learn to walk at the predicted age, fails to register expected progress by different growth measures (e. g., I.Q. testing), and may evince learning disabilities which may be related also in some part to familial traits; there may be specific areas of learning disability, mathematics or reading, for example, indicative of specific, isolated dysfunction within an otherwise average I.Q.; since the prematurity can damage almost any brain area, it can cause short-circuiting and seizure prob-

63. J. Menken, The Health and Social Consequences of Teenage Childbearing, 4 Family Planning Perspectives 45, 51 (Table 8) (July 1972). See also note 62, supra, Table 10.

64. See J. Menken, etc., note 63, supra, at p. 50, and J. Menken, The Health and Demographic Consequences, etc., supra, note 62, at pp. 9–10.

65. See "11 Million Teenagers", supra, note 68, pp. 22 and 62. The tabular data on neurological defects are confusingly identified. The table says, with equal clarity, "Rate per 1,000 white children" and also "% with abnormalities":

| Age of mother at childbirth | % abnormal (or number of abnormal per 1000 white childbirths) |
|---|---|
| 10–15 | 35.40 |
| 16–17 | 19.71 |
| 18–19 | 10.95 |
| 20–24 | 14.87 |

The ratio of 35.40 to 14.87 is 2.38.

lems, and generally, impair impulse control; sometimes these "minimal brain dysfunctions" make the child clumsy or hyperkinetic.

The medical testimony and the literature are clear that the risks of physiological damage to the adolescent mother and child are greatly increased for the younger teenagers, those seventeen and younger, and, very particularly, those younger than fifteen. Dr. Hofmann agreed that a female under fifteen years of age is not physiologically competent to carry a fetus to maturity in the way that healthy reproduction requires, nor emotionally capable of the nurturing role that it requires, and that, in that sense, and in the broad definition of the word "pathologic," her pregnancy is a pathological condition—physiologically undesirable for the female under fifteen years, and, for the total adolescent group, socially and emotionally undesirable.

It has been said that prenatal care, no matter how comprehensive, appears unable to ensure to pregnant adolescents pregnancy outcomes similar to those sustained by older women.[66] And the testimony of Drs. Hodgson and Romney, as well as the Schuck memorandum, requires the conclusion that pregnant adolescents, particularly those from low income families, do not seek timely prenatal care; the irregularity of younger teenagers' menstrual cycles coupled with their ignorance of their own health service needs and of the existence of public health services, where they exist, are said to result in only half of them receiving prenatal care in the first trimester, and up to 10% to receive no prenatal care until the third trimester. Typically, access to abortion services, too, has continued to be a problem for pregnant teenagers particularly, with the consequence that they are more likely to receive abortions later in pregnancy, increasing the medical risks associated with the procedure, or to receive them at a time when abortion is no longer appropriate.[67] As late as 1976, an increasing number of states (29 at that date) did not provide prenatal care for poor women during their first pregnancies because they did not become eligible for welfare and medicaid until their first child was born.[68] Drs. Hofmann and Eliot testified that adolescents too often do not cooperate effectively in prenatal care programs when they are extended to them.

That teenage pregnancy imports high psychological stress for the adolescent appears to be a safe generalization.[69] While suicide is more often associated with emotional disturbance or deep-seated mental disorder, it is also an alternative to unwanted childbirth; suicide rates among teenagers have increased over recent years; they accounted for 5.4% of teenage deaths in 1973,[70] and the correlation between pregnancy and suicide attempts of young girls was noted above (page 676). Dr. Hofmann's testimony outlined the serious emotional problems and the depression resulting from adolescents' unwanted pregnancies. The specific cases of plaintiffs Ann Moe and Mary Doe, explained in their affidavits of January 4, 1978, and July 29, 1977, and those of a number of the patients described in Dr. Belsky's letters to the Therapeutic Abortion Committee, marked the wide range of emotional disturbance, and even of psychosis, that unwanted pregnancy can impose on adolescents, and in some of these cases the unwanted pregnancy and its stresses are superimposed on preexisting mental impairments. Several of the letters disclose instances in which marked mental weakness was a factor in the patient's becoming pregnant. Dr. Hofmann's testimony explained that the younger teenager's parenthood impeded the process of maturation, of mature identity formation. Dr.

**66.** See "Teenage Pregnancy", note 59, *supra*, at p. 10.

**67.** Id. pp. 8–9.

**68.** Id. p. 12.

**69.** See "Report prepared by the Chair of the 'Alternatives to Abortion'" task group, pp. 2–3, attached to Memorandum of Downey to Designees, July 25, 1977.

**70.** See "Approaches to Adolescent Health Care in the 1970s," *supra*, note 56, at pp. 9, 10, 19.

Hofmann testified that, typically, the adolescent mother never completes her own growing up, drops out of school, loses the path of her early life goals, and tends to drift purposelessly through life; where the pregnancy is unwanted, and abortion is unavailable, and the fundamental conflict is exaggerated, and hostility and ambivalence enter what should be the mother's normal, instinctive biological relation to the child product of her own body; yet, typically, the adolescent mother does not surrender her infant for adoption, but keeps it in the family, whether it was born in wedlock or outside it.

Adoption, even if there were enough potential adopting parents, does not present a humanly available alternative. More than 85% of adolescent mothers keep their babies, although few day care programs accept infants.[71] Whether it is the pressure exerted by the social milieu, as Dr. Hofmann thought, or, as Dr. Belsky inferred, a more basic feeling that expressed itself at times in a stated preference for suicide over childbirth followed by surrender of the infant to adoption, the demographic fact is that adoption does not function as a haven for infants born to adolescent mothers.

Even when such infants are surrendered, they may not be, all too often are not, adopted but are institutionalized or are placed in foster home care, as Dr. Hofmann explained. A June 1977 "Media Tip Sheet" of DHEW's Office of Child Development stated that "A foster child may hope for adoption, but if he's older, handicapped or black, his chances are just not that good." A June 30, 1977, Memorandum from the Assistant Secretary for Human Development to the Secretary (DHEW) noted that adoptions increased steadily from the late 1950s to a high of 175,000 children in 1970, but declined thereafter to 149,000 in 1974,

and, it seems, only one-third of the children are adopted by unrelated petitioners; less than 18% of all adopted children were from minority groups; the Memorandum estimated that between 90,000 and 120,000 foster care children with special needs who were or should have been legally free for adoption remained, inappropriately, in foster care. A somewhat earlier DHEW Memorandum,[72] related to legislative proposals on subsidized adoption, estimated that 350,000 children were in foster care, an estimated 90,000 of whom were children with special needs whose natural parents could not or would not provide for them; the Memorandum reported that in California, Massachusetts, and New York City 40 to 50% of the foster children had been in foster care for five or more years, that the average stay in foster case is four years, and that, after two years in foster care, it becomes increasingly unlikely that the child will be extricated from the system before the age of eighteen; childhood, thus, is spent in uncertainty, without the stability of a permanent family. Infants born to adolescents denied abortion are even less likely to be adopted because of their higher incidence of ill health and because minority infants are disproportionately represented among them.

A DHEW publication[73] asserted that "If you look at any group of abused and neglected children approximately one quarter of them have a history of being 'premature.' By that we mean they have a birth weight under five and a half pounds [i. e., 2500 grams]." Infants born to adolescents, as has been said above (pages 681–683), have a high ratio of low birth weight, that is, are premature infants, at high risk of having the neurological defects related to premature birth.

71. See note 57, supra, Schuck, August 4, 1977, memorandum, p. 3.

72. Assistant Secretary for Human Development to Robert Fulton, Administrator, Social and Rehabilitation Service, July 21, 1976.

73. See A Self-Instructional Text, etc., note 50, supra, at p. 45. In "Child Abuse and Neglect,

The Problem and Its Management," DHEW publication (OHD) 75–30075, p. 156, it is stated that "Dr. John Caffey has pointed out that deformed, premature, multiple-birth, adopted, foster and step-children—those who are in reality, different—run a higher risk of maltreatment than 'normal' children do."

The social and economic disadvantages of the indigent adolescent who becomes a mother have been referred to above (pages 680–681). Dr. Hofmann testified that eight-tenths of the women who become mothers at seventeen or younger drop out of school, and alternative educational programs for such young mothers are provided by only about one-third of the states. The risk that the adolescent mother will not be competent to rear her child, and will be unable to realize on her native endowments but will rather be stunted in her development and remain unable to function adequately in employment or home management is pitiably great.

The Memorandum referred to above (pages 680–681) stated that the Task Force formed to study adolescent pregnancy and the related problems did not address the provision of abortion *per se*, but that

". . . the Task Force considers abortion information, counseling, services and research essential to reduce the numbers of high-risk adolescent births, particularly for younger adolescents.

"*Recommendation*: Even if Federal funding is not available for pregnancy termination, we recommend that *health service providers make available abortion information and counseling*, and where appropriate, *referrals to and from abortion services*, to permit the adolescent a full range of choice, and to assist those who do choose to terminate their pregnancy to receive adequate and safe abortion services." (Emphasis in original.)

The Secretary's June 14, 1978, testimony before the Senate Human Resources Committee summarized the adolescent pregnancy problem, saying that for hundreds of thousands of teenagers, particularly the majority who are unmarried, the birth of a child

". . . can usher in a dismal future of unemployment, poverty, family breakdown, emotional stress, dependency on public agencies, and health problems for mother and child."

The Secretary's summary to the Committee included much of what is outlined above (page 680 and following), and he said:

"Scarcely anyone—liberal or conservative, permissive or restrictive—can read these figures about teenage pregnancy without a sense of shock and melancholy. Whatever our opinions about adult morality and sexual standards, it is sad to contemplate the specter of children being suddenly and prematurely faced with the responsibilities of adults—of children becoming parents while they are still children."

After a general comment on the human need for self-discipline, the Secretary said:

"And we must recognize also that teenage pregnancies are often linked with other, persuasive social problems: poverty, unemployment, poor education, family breakdown.

"All this means that there are limits to what government can accomplish. Nevertheless, I believe that a concerned and compassionate government should do what it can to reduce the social costs and the toll of human suffering caused by premature sexual activity and unwanted pregnancy among teenagers."

The legislation, introduced as the Adolescent Health Services, and Pregnancy Prevention and Care Act of 1978, now 42 U.S.C. §§ 300a–21 to 300a–41,[74] had as its

74. The expressed legislative findings, 42 U.S.C. § 300a–21(a), referred to in Annex footnote 10, *infra,* are, in full

"(1) adolescents are at a high risk of unwanted pregnancy;

(2) in 1975, almost 1,000,000 adolescents became pregnant and nearly 600,000 carried their babies to term;

(3) pregnancy and childbirth among adolescents, particularly young adolescents, often results in severe adverse health, social, and economic consequences, including: a higher percentage of pregnancy and childbirth complications; a higher incidence of low-birth-weight babies; a higher frequency of developmental disabilities; higher infant mortality and morbidity; a decreased likelihood of completing schooling; a greater likelihood that adolescent marriage will end in divorce; and higher risks of unemployment and welfare dependency;

(4) an adolescent who becomes pregnant once is likely to experience rapid repeat preg-

expressed purpose expanding and improving the availability of and access to services "which assist in preventing unwanted initial and repeat pregnancies among adolescents, enable pregnant adolescents to obtain proper care and assist pregnant adolescents and adolescent parents to become productive independent contributors to family and community life, with primary emphasis on services to adolescents who are 17 years of age and under and are pregnant or who are parents . . . ."

Problems of a very different kind arise in the case of the unwanted pregnancies of older women, particularly those pregnant for the first time. Dr. Romney testified to the higher risks of toxemia, a toxemia of greater severity than in younger women, at times leading to intrauterine death of the fetus. In addition a disproportionately high number of older women must be delivered by Caesarean section. The maternal mortality data show a markedly higher risk of mortality than for younger women. The rates of maternal mortality by age per 100,000 live births, taken from Vital Statistics of the United States,[75] are the following:

| Year | Age | | | |
|------|-------|-------|-------|--------------|
|      | 20–24 | 35–39 | 40–44 | 45 and older |
| 1968 | 14.1  | 72.8  | 122.4 | 237.5        |
| 1969 | 13.1  | 63.0  | 119.5 | 178.3        |
| 1970 | 13.0  | 71.0  | 124.1 | 31.8         |
| 1971 | 10.3  | 67.7  | 97.7  | 37.7         |
| 1972 | 14.6  | 35.2  | 70.5  | 175.1        |
| 1973 | 9.3   | 44.2  | 76.5  | 154.5        |

nancies and childbearing, with increased risks;

(5) the problems of adolescent pregnancy and parenthood are multiple and complex and are best approached through a variety of integrated and essential services;

(6) such services, including a wide array of educational and supportive services, often are not available to the adolescents who need them, or are available but fragmented and thus of limited effectiveness in preventing pregnancies and future welfare dependency;

(7) Federal policy therefore should encourage the development of appropriate health, educational, and social services where they are now lacking or inadequate, and the better coordination of existing services where they are available in order to prevent unwanted early and repeat pregnancies and to help adolescents become productive, independent contributors to family and community life."

X

The rape and incest exception was not included in the Hyde-Conte amendment enacted in 1976, but it has been included in the 1977 and later enactments with a requirement of prompt report. The regulations require report within sixty days of the incident. See 42 C.F.R. § 441.205(a)(3).

A

The report requirement excludes a large part of rape victims from medicaid coverage. The very young, those in fear of retaliation, those inhibited by a natural revulsion from recounting what happened, and those who fear unsympathetic and uncomprehending treatment by the authorities tend not to report rape to law enforcement agencies or to public health services. Whatever may have been the number of rapes that led to pregnancy followed by abortion in the period after February 14, 1978, medicaid reimbursement, presumably based on promptly reported episodes, was granted for only 61 cases of rape and of incest in the last ten and a half months of 1978 (page 654 above). It is said[76] that about 56,000 rapes are reported to the police each year and that victimization surveys suggest that there are probably to 250,000.

Data concerning the victims of rape are not in the record except for those from Grady Memorial Hospital,[77] Atlanta, an affiliate teaching hospital of Emory Universi-

**75.** The copies of the pages from the Vital Statistics of the United States furnished to counsel are so poorly reproduced that errors in reading out the figures are possible. Significant error appears to be excluded.

**76.** News Release, U.S. Department of Justice, Law Enforcement Assistance Administration, August 6, 1978, page 2.

**77.** F. Jones and A. McAllister, "The Effectiveness of Diethylstilbestrol as a Postcoital Contraceptive for Rape Victims," DHEW, Public Health Service, Family Planning Evaluation Division, Bureau of Epidemiology, CDC. The study concluded that "currently available data on the safety and effectiveness of DES as a postcoital contraceptive in women does not adequately demonstrate the efficacy of this drug, . . . . At this point in time, we feel a more safe and efficacious course to follow would be

ty Medical School; it is a municipal hospital serving the predominantly black indigent population of metropolitan Atlanta. Review of its "Ob/Gyn" daily log books for 1972–1974 showed 1,409 victims of sexual assault. For effective study of pregnancy risk and of the efficacy of administering diethylstilbestrol ("DES") to prevent pregnancy the subject group was narrowed to the cases of 299 women on whom there were adequate records and who were at some risk of pregnancy (*i. e.,* within childbearing age, not sterilized, etc.), and available for follow-up. Of the victims 77.6% were "black and other," 22.4% were white. The cases were classified thus:

| Age Group | At high risk * | | Not at High Risk | | Total | |
|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent |
| 12–19 | 25 | 49.0 | 144 | 58.1 | 169 | 56.5 |
| 20–29 | 18 | 35.3 | 82 | 33.1 | 100 | 33.4 |
| 30–39 | 5 | 9.8 | 14 | 5.6 | 19 | 6.4 |
| 40–44 | 3 | 5.9 | 8 | 3.2 | 11 | 3.7 |
| | 51 | 100.0 | 248 | 100.0 | 299 | 100.0 |

* *i. e.,* the episode occurred within 11 to 18 days after the victim's most recent menstrual period.

Thus 17% of the victims were at high risk of pregnancy. DES was administered to all the victims. It was found that five pregnancies followed which were compatible with conception at the time of the rape; three of the pregnancies were to women in the high risk group, two to the women in the very much larger "not at high risk" group.

Dr. Morton Bard testified in detail to the devastating consequences of rape, the most scarifying violation of self, resulting in a first stage period of repressed rage, distraction of mind, irrational sense of guilt and troubled sleeplessness, followed by a stage of depression and discouragement. Dr. Bard considered that a typical rape victim could not function normally for six months to a year after the assault, and that total recovery, free of fits of depression could take as much as a year to two years. Pregnancy resulting from rape, Dr. Bard testified, would intensify the crisis reaction, delay the victim's adaptation, and have disruptive and distressful effects; he said that he would not hesitate to prescribe abortion and counseling to a rape victim unwilling to carry the pregnancy to term. Dr. Bard found self-destructive tendencies in the behavior of rape victims, the suicide impulse present, and, if abortion was unavailable, an overwhelming need in the victims to rid themselves of the remembrance of the product of the assault, through drugs, or by other means; the wish to abort he related to the victim's self-destructive ideation, the ultimate of which is the suicidal fantasy, sometimes acted upon; the unreasonable sense of guilt, self-punishment mixed with a will to be rid of the fetus, would, Dr. Bard considered, make it close to certain that the pregnant victim would do something to rid herself of the fetus.

How frequently pregnancy results from rape is uncertain. The Grady Hospital study disclosed 5 pregnancies consistent with conception in rape out of 299 cases; Dr. Richard Sarles testified to a 7% incidence of pregnancy in rape cases.

Dr. Eliot described the plight of one rape victim, afraid to complain of the rape, jobless and pregnant; an abortion was per-

the use of menstrual regulation or early suction abortion." The report noted (page 1) that consequences of administering DES as a standard hospital procedure were (1) women not at risk of pregnancy were needlessly medicated, (2) women pregnant when the DES was administered may have suffered fetal exposure to DES with resultant increased risk of adenocarcinoma of the vagina and cervix in later life, and (3) women at high risk of pregnancy became pregnant although DES was prescribed.

formed, without complications, and the patient given supplemental counseling to help her in emotional adjustment to the traumatic experience; it was Dr. Eliot's opinion that if she had been forced to continue the pregnancy to term, a pregnancy that was utterly repugnant to her, that would greatly have disturbed her personal life and her mental health.

## B

Dr. Richard Sarles testified that there were studies indicating that 2.4 to 4% of the general population and 4% of those in the psychiatric population had admitted to incestuous relationships at some time during their lives, and that he and others he has worked with in the field consider the 4% estimate very low. His testimony was that the incest taboo is so universal, in this country's culture as in almost every other culture, that the fact of incest is discovered only indirectly, for example, in court proceedings, or is disclosed only under particular inquiry, inquiry which even professionals avoid because it brings up such deep emotional feeling. It was Dr. Sarles's testimony that incest is possibly most common between father and daughter, although incest between siblings may possibly be more common but less frequently reported, that father-daughter incest is, typically, continued over time, ending when the daughter is in mid-adolescence, at about age 15 or 16, and that 20 to 25% of such relationships result in the child's becoming pregnant.

Incestuous pregnancy is considered by pediatric psychiatrists to be extremely stressful; the adolescent has neither the physical nor mental maturity, nor the emotional stability, required to deal with pregnancy itself, and the added element of incest increases the stresses of the pregnancy. The child born of incestuous pregnancy is a special case of the more general class of unwanted children; the vulnerability of unwanted children to parental abuse, is greater. Dr. Sarles read into the record data from a published article [78]: eighteen cases of infants born of father-daughter and sibling pregnancies, followed up six months later, disclosed that six had major congenital defects or had died at birth or within the next six months, and five others had minor birth defects. The eighteen infants in the control group registered only one major birth defect.

It was Dr. Sarles's judgment that abortion was a medically necessary option for the teenage woman carrying an incestuous pregnancy; the pregnant woman is at risk of increased medical illness, of vulnerability to abuse, and of bearing a defective child; carrying the pregnancy to term would, in his judgment, have long-lasting adverse effects on the infant and the family.

In the case of incest the sixty day report requirement is inherently likely to restrict the availability of funding to a minor fraction of the total number of cases. Incest, Dr. Sarles testified, is unlikely to be reported because of its characteristically secretive nature.[79] Dr. Hodgson testified that, although she had seen a number of incest cases in her practice, she had never seen one within forty-eight hours of the incident. During the debate in the House on December 6, 1977, Representative Fraser inserted in the record a letter from a law enforcement officer in which the prevalence of incest was noted; the officer wrote that his department had investigated eight incest complaints in one week, "all involving long-term offenses of several years," and one

---

**78.** The article was identified as one published in the periodical "Pediatrics," the official publication of the American Academy of Pediatrics; the article was based on a study done at the Department of Human Genetics, University of Michigan: Adams and Neel, "Children of Incest" [40 Pediatrics 55]. The other articles related to incest in evidence do not deal with pregnancy resulting from incest. R. S. T. Brant and V. B. Tisza, "The Sexually Misused Child," Amer. J. Orthopsychiatric 47(1) (Jan. 1977) page 80 at 85–86; R. M. Sarles, "Incest," 22 Pediatric Clinics of North America 633 (Aug. 1975).

**79.** See Brant et al. "The Sexually Misused Child," *supra*, note 78.

involving pregnancy in the oldest of three sexually abused daughters in one family.[80] Incest, then, of its very nature is reported only by exception and not generally, and is not, like rape, a single episode but, characteristically, has been occurring over a period of time.

### XI

The legislative history of the Hyde-Conte amendment of 1976 and the successor amendments makes it clear that all were, and were understood to be, "legislation" on an appropriation bill, *Andrus v. Sierra Club*, 442 U.S. 347, 357–361, 99 S.Ct. 2335, 2341–43, 60 L.Ed.2d 943 (1979), and they were understood to involve increased demands on medicaid funds for pre-natal, obstetrical and after care costs to the extent that childbirth rather than abortions took place. The effect of the legislation has been to reduce the number of abortions funded by the government from about 250,000 to 300,-000 annually to a few thousand a year.

The evidence requires the conclusion that the consequence of the legislation has been at the very minimum to delay abortions with the serious consequence of increasing maternal mortality risks, that the restrictions on funding have in fact caused some resort to illegal abortion, although the extent of that is not measurable, and that in fact medicaid eligible women who wish to terminate their pregnancies have no significant alternative to medicaid for obtaining abortion. While some states at present continue to fund abortions, the general effect of the federal legislation has been to bring about conformity between state funding and the federal pattern, so as to assure funding assistance or effectuation of a parallel legislative purpose, or both.

The evidence is that the standards provided by the Hyde-Conte 1976 amendment and those of the following years are not framed in medical terms; they apply the same standard to the entire gestational period, without distinguishing the periods before and after viability, exclude consideration of prenatally determined serious fetal abnormality, completely exclude consideration of familial problems, and damage to mental health, and, by using the life endangerment standard, and, for part of the time, the severe and long-lasting physical health damage standard, relegate abortion to a procedure limited to crisis intervention in cases with fully developed symptoms, and preclude early safer use of the procedure in conditions in which professional judgment can reasonably find that termination of the pregnancy is medically necessary to the continued health of the pregnant woman. The standards of the appropriation acts are in some respects, *e. g.*, serious fetal defect cases, more restrictive than the therapeutic abortion practices of the hospitals before the changes in the laws respecting abortion. Ironically, the difference noted in the period before the changes in state laws, and before *Roe v. Wade* and *Doe v. Bolton*, between the treatment accorded the indigent and those with means to pay for medical care (above pages 638, 663), appears to be resumed.

The evidence requires the conclusion that the medical profession will interpret and has interpreted the Hyde-Conte amendment and its successors narrowly rather than attempt to demonstrate to DHEW the basis of their medical judgments in cases in which they are satisfied that abortions are medically necessary for the pregnant woman's health but in which they can have no confidence that they could produce clinical data demonstrating to the satisfaction of DHEW that certainty of life endangerment or of severe and long-lasting physical health damage that the enactments appear to require.

The evidence detailing the medical concerns and social circumstances that bear on the abortion decisions of physicians and their patients demonstrate that the question whether a pregnancy should be termi-

---

**80.**  See 123 Cong.Rec. H 12656 (Daily Edition).

nated is inescapably a medical question that must be resolved in terms of many variables of time, of patient's will, of patient's medical history, of patient's family situation, and of the patient's mental health and her age. Poverty is itself, and persistently, a medically relevant factor; it takes its toll on pregnant women's general health and in the heightening of the health risks of pregnancy. And every condition presenting problems during pregnancy is rendered more serious and difficult to treat if the pregnancy is unwanted and the pregnant woman is an unwilling and uncooperative patient. There is a very large number of specifically pathological conditions that at some level of intensity and under some circumstances of treatment will jeopardize the health or life of a pregnant woman and indicate termination of the pregnancy as the medically most appropriate procedure. However, except for a few classic conditions, they are not characterized by that certainty of predictability that the Hyde-Conte amendment and its successors appear to require; in large part the conditions do not assume their definitely life-threatening or health destructive intensity until so late in pregnancy that abortion is no longer a safe procedure. The risks of mortality in and of complications from abortion increase sharply with the gestational age at which the pregnancy is terminated, and for that reason any delay in taking the abortion decision is itself a factor in determining whether it is then the medically appropriate procedure.

The unwanted pregnancy is times without number the focus of emotional and psychic disturbance that, especially in the cases of the indigent, are often insupportable psychically, and the pregnancy, when superimposed on pre-existing conditions of mental ill-health, can materially worsen the pre-existing mental condition. Unwanted pregnancy, if abortion is refused, can result in suicidal ideation. Apart from distinct damage to mental health, unwanted pregnancies leading to involuntary childbirth are disruptive of family life and significantly correlate with child abuse and disappointing child development.

Fetal abnormality, the evidence demonstrates, can be detected pre-natally by amniocentesis, and traditional practice appears to have sanctioned abortion where severe fetal abnormality was predictable, as in the case of rubella. No funding is available under the Hyde-Conte amendment and its successors for abortions in the cases of pre-natally determined fetal abnormality, no matter how grave the abnormality nor how great its threat to the stability of the existing family of the pregnant woman.

Teenage pregnancies pose serious health risks to the pregnant woman and to any child she bears, and such pregnancies and childbirths have seriously adverse effects on the teenage mother's education, employment opportunities and development to maturity. Children born of adolescent mothers are more likely to be premature and susceptible to birth defects, including mental retardation. Pregnancy and childbirth for women over thirty-five years of age also involves higher rates of maternal mortality than they do for women twenty to twenty-four years old.

The prompt report requirement applicable under the 1977 and later enactments excludes many rape victims from funding, and is wholly unsuited to the incest cases.

## XII

Plaintiffs have argued that the Hyde-Conte amendment of 1976 and its successors violate the First Amendment's command that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." A great deal of evidence was introduced to explain the positions that have been articulated as representing the views on abortion of different Christian sects and of different bodies of thought within the Jewish faith, and to show the magnitude of the organized effort of the clergy and laity of the Roman Catholic Church to obtain passage of a

right-to-life amendment to the Constitution, and passage of the Hyde amendment in its most restrictive form.

The Annex summarizing the debates that led to the enactments shows the debates repeatedly asserting that a moral issue was being debated, but in truth none was. The proponents of funding restriction left nothing to debate, for their view was that abortion was the taking of human life and, therefore, not debatable. Moral debate could not commence unless both sides of the debate could agree that there was a place in the country's social structure for abortion in some circumstances, and were prepared to debate the matter of identifying the circumstances in which abortion was morally justified. But the proponents did not agree: *Roe v. Wade* and *Doe v. Bolton* were, in their view, unqualifiedly wrong; there was no question of shaping legislation that would seek to define the limits of the constitutionally protected liberty of action that the two cases had outlined. Their task was to nullify *Roe v. Wade* and *Doe v. Bolton* to the extent legislatively possible. There was not in any real sense any agreement on what law should be enacted. Political necessity exacted the appropriation bills, and the restriction on abortion funding did not express what would have been enacted, had it been possible to bring to the floor a bill devoted to abortion alone, but only what could be negotiated across an unbridgeable gulf of principle.

The debates reflect the members' awareness of the magnitude of the right-to-life political effort, of the single-issue voting with which many were faced and which, inferentially, favored some members' electoral chances; the members heard again and again about the divergent views on the issue expressed by different Christian sects and Jewish spokesmen; they were made familiar with the polls, and heard a great deal of the medical background material; they heard the Deity invoked, heard the prevalence of abortion compared to the Nazi Holocaust and Herod's Slaughter of the Innocents; and, in the end, the enactments, at least those of 1977 and 1978, cut across principle.

While the statutory purpose of preventing abortion is clear, it is equally clear that encouragement of childbirth was not a purpose of the legislation. There is no national commitment to unwanted childbirth. Existing law encourages family planning, it does not foster unwanted pregnancy and unwanted childbirth. That is very particularly true with respect to teenage women, and, especially, women seventeen years of age and under. A secondary justification for the restrictions on abortion funding, put forward from time to time during the debates, was that taxpayers who reprobated abortion on moral or religious grounds should not have their taxes used to defray the cost of abortions.

Plaintiffs argue, using the analysis of elements given in *Committee for Public Education v. Nyquist,* 1973, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948, that the legislation to be valid (a) must reflect a clearly secular legislative purpose, (b) must have a primary effect that neither advances nor inhibits religion, and (c) must avoid excessive government entanglement with religion.

It is important, then, in discussing institutional positions on abortion to keep much in mind that no institution speaks for a unanimous membership, or takes a position that will be unchanged over time, or can incontestably claim unchallenged authority for its views. As a conspicuous example, the trial was much concerned with the Roman Catholic position as contrasted with the view of Mainstream Protestantism, and with the action taken by Roman Catholic church organizations and clerical bodies. Yet opinion surveys do not show wide differences in the views expressed by those identifying themselves as "Protestant" and as "Catholic". The Gallup Opinion Index based on surveys made in December 1977 and in February 1979 reported these divisions of view on abortion, by percentage:

| December 1977 | Legal in any circumstances | Legal in certain circumstances | Illegal in all circumstances | No opinion |
|---|---|---|---|---|
| Protestant | 18 | 58 | 19 | 5 |
| Catholic | 20 | 53 | 23 | 4 |
| February 1979 | | | | |
| Protestant | 20 | 59 | 17 | 4 |
| Catholic | 17 | 52 | 25 | 6 |

Those who thought abortion legal under certain circumstances were asked under which of six "circumstances" they thought abortions should be legal if performed in the first trimester. The answers divided as follows:

| December 1977 | Woman's Life Endangered | Pregnancy by Rape/Incest | Woman Suffer Physical Damage | Baby might be deformed | Woman's Mental Health Endangered | Cannot Afford Child | Don't know |
|---|---|---|---|---|---|---|---|
| Protestant | 77 | 66 | 54 | 44 | 41 | 15 | 2 |
| Catholic | 77 | 68 | 51 | 42 | 40 | 15 | 2 |
| February 1979 | | | | | | | |
| Protestant | 76 | 54 | 43 | 45 | 59 | 14 | 1 |
| Catholic | 82 | 46 | 39 | 41 | 57 | 15 | * |

* Less than one percent.

The New York Times published on October 2, 1979, during the visit of Pope John Paul II to this country, a pictographic representation of an AP–NBC News Poll stating that 50% of American Catholics approved of "abortion on demand" and 45% disapproved of it, and that 66% approved of the Church's approving artificial birth control and 27% disapproved of its doing so; the poll also reported that 79% of American Catholics approved of the Pope's "handling" of the papacy although the Pope had expressed his disapproval of abortion and of the use of artificial contraceptives.[81] (The percent of error possible in the poll results was 6%.)

81. The New York Times of November 11, 1979, reported the results of a poll of 1,385 voting age persons who were asked in the period October 29, to November 3, 1979, whether they agreed or disagreed with the statement "The right of a woman to have an abortion should be left entirely to the woman and her doctor." The answers divided, by percentage, as follows:

| | Agree | Disagree | Can't Decide |
|---|---|---|---|
| Protestant | 69 | 27 | 4 |
| Catholic | 64 | 32 | 4 |

A

The evidence is that the moral teaching of the Roman Catholic Church is that abortion is immoral. The language of the Hyde-Conte amendment of 1976, "None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term," does not conform to or represent the moral teaching of the Roman Catholic Church. A life endangering condition would not, under that teaching, make direct abortion a morally permissible course because no innocent life is to be preferred over another innocent life. Reverend William B. Smith testified

It was noted that two years earlier 69% of Catholics had agreed to the statement. The same poll produced the following percentage distribution of answers to the question, "Would you approve of someone you know having an abortion?"

| | Depends | Approve | Disapprove |
|---|---|---|---|
| Protestant | 25 | 32 | 39 |
| Catholic | 25 | 27 | 44 |

that the Declaration on Abortion of the Sacred Congregation for the Doctrine of the Faith of November 18, 1974, was the Church's most definitive and authoritative statement on the morality of direct abortion. The Declaration states that life must be safeguarded from conception; that abortion and infanticide are abominable crimes. Stating that human life begins with fertilization, the Declaration states that even if a doubt existed concerning whether the fruit of conception is already a human being, it would be objectively a grave sin to dare to risk murder through abortion. The Declaration states that, in a considerable number of cases, denying abortion endangers important values to which it is normal to attach great value and which sometimes may even seem to have priority. The Declaration continues:

"We do not deny these very great difficulties. It may be a serious question of health, sometimes of life or death, for the mother; it may be the burden represented by an additional child, especially if there are good reasons to fear that the child will be abnormal or retarded; it may be the importance attributed in different classes of society to considerations of honor or dishonor, of loss of social standing, and so forth. We proclaim only that none of these reasons can ever objectively confer the right to dispose of another's life, even·when that life is only beginning."

The Declaration emphasizes that abortion can never be resorted to either by a family or by the political authority as a legitimate means of regulating births. Referring to the changes in laws relating to abortion, the Declaration states:

"One must, however, be attentive to what a change in legislation can represent. Many will take as authorization what is perhaps only the abstention from punishment. Even more, in the present case, this very renunciation seems at the very least to admit that the legislator no longer considers abortion a crime against human life, since murder is still always severely punished. It is true that it is not the task of the law to choose between

points of view or to impose one rather than another. But the life of the child takes precedence over all opinions. One cannot invoke freedom of thought to destroy this life.

\*  \*  \*  \*  \*  \*

"Human law can abstain from punishment, but it cannot declare to be right what would be opposed to the natural law, for this opposition suffices to give the assurance that a law is not a law at all.

"It must in any case be clearly understood that whatever may be laid down by civil law in this manner, man can never obey a law which is in itself immoral, and such is the case of a law which would admit in principle the liceity of abortion. . . . Moreover, he may not collaborate in its application. It is, for instance, inadmissible that doctors or nurses should find themselves obliged to cooperate closely in abortions and have to choose between the law of God and their professional situation."

The Declaration "expressly leaves aside the questions of the moment when the spiritual soul is infused. There is not a unanimous tradition on this point and authors are as yet in disagreement. For some it dates from the first instant, for others it could not at least precede nidation [implantation]." The Declaration argues that the matter presents a philosophical problem and not a scientific question, but that the Declaration's "moral affirmation" remains independent of the philosophical problem because, if animation is belated, there is nevertheless a human life preparing and calling for a soul and, since the presence of the soul is probable, the taking of the life involves accepting the risk of killing a human being already in possession of its soul.

The 1971 Ethical and Religious Directives for Catholic Health Facilities, approved as the national code, subject to the approval of the bishop for use in each diocese, by the Committee on Doctrine of the National Conference of Catholic Bishops, makes clear that the abortion which is forbidden is "the

directly intended termination of pregnancy before viability," but that operations, treatments and medications which do not directly intend termination of pregnancy, but which have as their purpose the cure of a proportionately serious pathological condition of the mother, are permitted when they cannot be safely postponed until the fetus is viable, even though they may or will result in the death of the fetus. If hemorrhage occurs during pregnancy and before the fetus is viable, procedures designed to empty the uterus of a living fetus still effectively attached to the mother are not permitted, but procedures designed to stop the hemorrhage are permitted, insofar as necessary, even if fetal death is inevitably a side effect. Caesarean section to remove a viable fetus is permitted even if there is risk to the pregnant woman's life if necessary for a successful delivery, and it is likewise permitted, even with risk for the child, when necessary for the safety of the mother. In extrauterine pregnancy the dangerously affected part of the mother may be removed even though fetal death is foreseen, if the affected part is presumably already so damaged and dangerously affected as to warrant its removal, and if the operation is not just a separation of the embryo or fetus from its site within the part (which would be a direct abortion), and if the operation cannot be postponed without notably increasing the danger to the mother. Hysterectomy in the presence of pregnancy and before viability is permitted when directed to removing a dangerous pathological condition of the uterus so serious that the operation cannot safely be postponed until the fetus is viable. Radiation therapy of the mother's reproductive organs is permitted during pregnancy only when necessary to suppress a dangerous pathological condition.

While curettage of the endometrium after rape to prevent implantation of possible embryo is "morally equivalent" to abortion, a text on moral and pastoral theology, apparently approved for publication, states that if rape has been committed the rape victim may interrupt the effect of the act if she does so before probable conception. 2

H. Davis, Moral and Pastoral Theology 171 (1949). Dr. Bernard J. Pisani testified that if a rape victim is admitted at St. Vincent's Hospital (which conforms its practices to the Ethical and Religious Directives for Catholic Health Facilities) immediately after the rape incident, she is treated by irrigation of the reproductive tract, the vaginal canal, to prevent conception; he also testified that at one time diethylstilbestrol was administered to alter the endometrium and so prevent the implantation of the fertilized ovum. Dr. Pisani said that the use of DES had been discontinued because it was not efficacious.

Father Smith testified, and the Declaration on Abortion is clear, that Roman Catholic doctors and nurses may not participate in the performance of abortions. (See 42 U.S.C. §§ 300a–7 and –8, 1396f; Pub.L. 95–215 § 7, 91 Stat. 1507.)

Father Gregory Baum, relating the Roman Catholic position on abortion to the goals of the Vatican II Decree on Ecumenism, observed that Christian thinkers, on grounds they regarded as responsible, tested, and in keeping with the Gospel, had come to conclusions on abortion that differed from the traditional teaching but were shared by great numbers of Christians, in the highly developed countries, whose moral judgments on other issues, even if untraditional, deserved the greatest respect. Discussing the extent of disagreement, Father Baum continued:

> "The first conclusion I draw from the above reflections is that one cannot approve of the language and the arguments adopted by Catholics in their defense of the traditional position, which implied that the defenders of abortion are immoral, selfish, insensitive, cruel, lacking in respect for life, or worse. Yet such language is found even in statements made by bishops and popes."

He observed that the dilemma was that there were Christians who thought that a liberal position on abortion was more moral and more in keeping with God's will than the traditional one. He continued:

"Since no one claims that the traditional position is revealed by God, Catholics should not adopt a tone of voice as if their position is beyond challenge. Catholics may hold that, from their point of view, a liberal position on abortion is immoral, possibly due to false consciousness induced by the social conditions of industrial society, but they have no right whatever to suggest that the thinkers who differ from them are immoral, that their position reflects the lack of virtue and that the theologians and the theologically-oriented among them have refused to search the gospel to find God's will in regard to this contemporary problem." (See Baum, "Abortion; An Ecumenical Dilemma", in November 30, 1973, Commonwheel, page 231 *et seq.*)

## B

Rabbi Arron M. Schreiber testified that it is the nearly unanimous opinion of American Orthodox Jewish religious and legal scholars that abortions are prohibited except in a case where the mother's life is clearly threatened, and that such abortions are homicides. Rabbi Schreiber explained that the exception allowing abortion in the case in which the mother's life is threatened was in the nature of a justifiable homicide, the equivalent to killing in self-defense and did not mean that no homicide was involved. Rabbi Schreiber also testified that in the older tradition, even in the case in which life was threatened, the abortion had to take place before the fetus emerged from the woman's body; that if the head of the fetus emerged, then the fetus could not be touched even to save the mother's life. Rabbi Schreiber questioned whether there was any broad exception allowing abortion in the case of rape, and he indicated that the case might not be the same for married and for single victims of rape. Rabbi Schreiber explained that in Jewish law a person's body is not regarded as belonging to him or to her but to God so that a person may not, for example, decide that he or she wishes to commit suicide: there is no freedom to say, It's my body, I will do with it as I wish. Similarly, where the issue is abortion, neither the life of the fetus nor the body of the mother is regarded as belonging to the mother, and the decision is not in her discretion.

A detailed statement of the Jewish tradition, including the apparently anomalous position of R. Plocki, Chemdat Yisrael, p. 176, that an embryo may be destroyed with impunity in the first forty days of its development, was supplied by Rabbi J. David Bleich to the Senate Subcommittee in the hearings referred to in footnote 8. See Volume 1, pages 288–314.

## C

There was no direct testimony concerning the position of the Lutheran Church-Missouri Synod but its position was set forth in the course of the abortion hearings (see note 8, *supra*, vol. 1, pages 319–29). Under this view life is seen as beginning with fertilization, and individual human life is thought of as established at the time of the blastocyst. Nascent life is designed to inherit eternal life and stands in enduring relationship to God who wills that His creatures live in his eternal presence. However, nascent life enjoys no independent existence but is completely dependent on maternal life. Incipient life may become a threat to the life of the mother. In that case, a choice needs to be made; its primary thrust must be to save that life which is already in existence as a fully developed human being. The saving of the pregnant woman's life with loss of the fetus is regarded as indirect abortion, a consequence of action taken to preserve life. The indication is that where the evidence that an abnormal child will be born is strong—nor merely a suspicion—the pregnancy may be terminated, and also that pregnancies may be terminated in the presence of extreme psychiatric conditions. It was said in the course of the Synod's statement, after a comment on the trend toward laws repealing prohibitions of abortion, that

"When, in a self-governing society committed to popular sovereignty, the point is reached at which the principal surviving support for a given law is the *reli-*

*gious* credo of a minority or a diminishing majority, it must regretfully be concluded that the law has lost its title to public authority." (Emphasis in original.)

Pastor Richard John Neuhaus is a Lutheran, affiliated with the Association of Evangelical Lutheran Churches, a group which separated from the Lutheran Church-Missouri Synod. He described human life as being on a continuum from at least implantation until death, at least from a biological viewpoint. His view of the circumstances in which abortion may be lawful approximates those of the Missouri Synod, and reflects his recognition that Christian people are deeply divided on the question of defining human life and the role of abortion.

D

The testimony of Rabbi David Feldman explained Jewish law affecting abortion as it appears in Conservative and Reform teachings. The early teaching was that a life-threatening pregnancy made abortion mandatory because the pregnant woman's life took precedence over the life of the fetus. That evidently remains the cornerstone of the Orthodox view, but the other school of Jewish legal thought considers that abortion is mandated to preserve the woman's health and is permitted in the interest of the well-being of the woman and her existing family. The position on abortion is seen as a part of the larger principle of choosing life, that is, life in this world, not in the next. Abortion is appropriate when there is a possible danger to the life of the pregnant woman since the duty is to choose life. More generally any threat to health sets aside all the laws of the Torah except those involving the very gravest kinds of sin. In the stricter Jewish view abortion is a very serious matter permitted only where there is a threat to life, or to sanity, or a grave threat to mental health and physical well-being. Abortion for rape victims would be allowed, using a field and seed analogy: involuntary implantation of the seed imposes no duty to nourish the alien seed.

In the broader view of Jewish law affecting abortion, termination of a new pregnancy might be justified if the new pregnancy threatens the milk available for a baby still being nursed. A very young bride who might be harmed by a pregnancy may be commanded to make use of either contraception or abortion, the two being viewed in the same light. There is a principle that has recognition permitting women whose birth pains would be extreme to seek sterilization or abortion in order to avoid the pain. Mental anguish that is life-threatening may be a ground of abortion. The risk that a child may be born defective is not considered a ground for an abortion, and there is uncertainty that amniocentesis would either be permissible, or would be relied upon to remove the element of uncertainty as to fetal abnormality and so furnish a basis for recommending abortion. However, mental anguish, caused by fear that the pregnancy will end with a defective child, may itself be a ground for recommending abortion, because the mental anguish itself, the woman's own pain, is a consideration of primary importance. The shame of bearing a child without being married, even though the child is legitimate under Jewish law, may in the liberal tradition, at least, be a basis for allowing abortion.

Rabbi Feldman explained that when a woman's life or health is threatened and abortion, therefore, becomes mandatory, that constitutes the performance of a religious duty on her part; performing the acts or duties which the law imposes are religious acts just as are ritual observances, and indeed are oftentimes more important than the ritual observances. The role of the Rabbi in connection with abortion is not to direct or determine, but to advise the woman about her religious duty; in the cases in which abortion is not mandatory but permissible, the Rabbi's office is to counsel with the woman about the decision, and his counsel may include a recommendation to the woman, but in every case the final decision is the woman's.

In the Jewish theology, as Rabbi Feldman explained it, a fetus is not a person, and no person is in existence until the infant emerges from the womb into the world, or, more exactly, until the head of the infant emerges, or, in the case of a breach birth, half of the body emerges. Biological learning is not relevant to the issue, because it is a metaphysical one. In Rabbi Feldman's view of the Jewish law, the principle that a fetus is not a human life is immutable. Hence under Jewish law abortion can never be murder; if it were murder it could not be performed even to save the life of the pregnant woman.

The Biennial Convention of the United Synagogue of America, the supreme authority over the affairs of the United Synagogue, at the 1975 convention, reaffirmed a position taken for the United Synagogue in 1967, a position said to reflect as well the views of the Law Committee of the Rabinical Assembly, in the following language:

"Rabbinic law holds that 'the mother has theoretical power over the foetus as part of herself.' She must, however, have valid and sufficient warrant for depriving it of potential life. The Talmud and subsequent rabbinic responsa throughout the centuries have ruled on what is or is not adequate warrant.

"In all cases 'the mother's life takes precedence over that of the foetus' up to the minute of its birth. This is to us an unequivocal principle. A threat to her basic health is moreover equated with a threat of her life. To go a step further, a classical responsum places danger to one's psychological health, when well established, on an equal footing with a threat to one's physical health. Although the definition and determination of the seriousness of these threats are subject to detailed and specific discussion, the principle is nonetheless clear."

The report of the resolutions adopted at the 1975 convention states that the United Synagogue later reaffirmed the 1967 position in executive statements, and that the Rabinical Assembly had emphasized that abortions "though serious even in the early stages of conception, are not to be equated with murder, hardly more than is the decision not to become pregnant." The concluding portion of the report of resolutions states:

"The United Synagogue affirms once again its position that 'abortions involve very serious psychological, religious, and moral problems, but the welfare of the mother must always be our primary concern' and urges its congregations to oppose any legislative attempts to weaken the force of the Supreme Court's decisions through constitutional amendments or through the deprivation of medicaid, family services and other current welfare services in cases relating to abortion."

The by-laws of the United Synagogue described it as an association of conservative congregations, and as representing the Conservative Movement in the Western Hemisphere.

E

Dr. James E. Wood, Jr., Executive Director of the Baptist Joint Committee on Public Affairs, testified that there is no distinct Baptist moral or theological position on the subject of abortion; he explained that a Baptist Confession of Faith is not a norm of faith but a testament of faith. Such a confession of faith could not be and is not viewed from the point of view of theological discipline as a norm such that one would be excluded if he did not share the statement. Generally in such statements, and in an early part, there will be repeated the expression "since we know only in part," followed by the affirmation of belief. The keynote in Baptist expressions on the issue of abortion is liberty of conscience, and advocacy of a public policy that allows for the right of persons to make the abortion decision for themselves. The Baptist Church considers liberty of conscience itself the most precious single principle for the Baptist understanding of religious faith and in particular Christian faith. The Baptist faith is a religion of believers baptized out of their own consciences, voluntarily. In consequence there is no infant baptism, since that is not voluntary.

The Baptist Church has a long history about the family and responsible parenthood, and of persons electing this for themselves; these matters involve a decision-making process and require the exercise of conscience. There is no history of teaching that marriage necessarily requires children, that procreation is essential or a divine obligation of all people. It is for the people themselves to decide on the number of their children, because that is a value judgment. Conscience means moral awareness, and liberty of conscience means the exercise of one's moral awareness. Abortion presents a matter for individual moral decision, in a matter of ultimate concern respecting bringing a life into the world.

The American Baptist Churches in 1967 adopted a resolution requesting the constituent churches to support legislation in their states making abortion legal where the health of the mother was impaired and under certain other conditions. In 1968 the American Baptist convention adopted a resolution reading:

"Because Christ calls us to affirm the freedom of persons and the sanctity of life, we recognize that abortion should be a matter of responsible personal decision. To this end we as American Baptists urge that legislation be enacted to provide:

1. That the termination of a pregnancy prior to the end of the 12th week (first trimester) be at the request of the individual(s) concerned and be regarded as an elective medical procedure governed by the laws regulating medical practice and licensure.

2. After that period the termination of a pregnancy shall be performed only by a duly licensed physician at the request of the individual(s) concerned, in a regularly licensed hospital, for one of the following reasons as suggested by the Model Penal Code of the American Law Institute . . . ."

Three following paragraphs list, as circumstances justifying abortions, danger to the physical or mental health of the woman, evidence that the conceptus has a physical or mental defect, and evidence that the pregnancy resulted from rape, incest or other felonious act. The resolution concluded:

"Further we encourage our churches to provide sympathetic and realistic counselling on family planning and abortion.

"We commend study, research and development of understanding on the part of the populace led by the people of our churches toward an enlightened view of this provocative problem."

The Baptist general convention of Texas in 1969 adopted a resolution stating that meaningful and necessary changes in the state's abortion laws had been delayed in Texas, and that the delay ignored the need for change expressed by a majority of law and medical groups, including the state medical association's Abortion Study Committee. The resolution said that delay also ignored:

"2. Infringement of personal liberty by prohibiting best medical judgment and practice in certain instances;

"3. The need for protection for victims of rape or incest;

"4. The misfortune of continued unwanted pregnancy in instances of fetal deformity . . . ."

The evidence does not indicate the circumstances in which the resolution was adopted, and the consequences of its adoption were not explained.

In October 1973 the Baptist Joint Committee on Public Affairs adopted a resolution that it "go on record as opposed to the Buckley-Hatfield Amendment and like or similar constitutional amendments, and that the staff be authorized to take all available action to oppose them." Early in 1974 the General Board of American Baptist Churches in the USA adopted a motion referring to the efforts of the National Conference of Catholic Bishops in the U.S.A. to seek a constitutional amendment, and then stating:

"We acknowledge the legal right of all individuals and groups, both religious and secular, to seek the enactment of laws which reflect the values they hold to be necessary to the exercise of their freedom and on behalf of the common welfare.

However, we believe that the present national effort of the National Conference of Catholic Bishops in the U.S.A. to coerce the conscience and personal freedom of our citizens through the power of public law in matters of human reproduction constitutes a serious threat to that moral and religious liberty so highly prized by Baptists and so long protected for all people under the nation's policy of the separation of church and state.

"3. We recognize the moral ambiguities involved for many people, including American Baptists, in the birth control and abortion issues. We are nevertheless saddened when such crusades seek the passage of laws which violate the theological and moral sensitivities, and hence the freedom, of other church bodies. All must be given their constitutional rights in a free society to guide and assist their constituencies in formulating a responsible life style in matters of sexual expression and family planning.

"4. We affirm freedom of conscience for all but object to an appeal to the state which would coerce all citizens to accept a moral judgment affirmed by one member of the body of Christ. We urge a continuation of dialogue with our Roman Catholic brothers and sisters on this and other matters. Let us seek a common understanding of the mind of Christ, and let us listen to each other in love."

The 1976 Southern Baptist Convention adopted a resolution on abortion emphasizing that Southern Baptists historically held a biblical view of the sanctity of human life, that abortion was a very serious moral and spiritual problem, that Christians had the responsibility to deal with all moral and spiritual issues affecting the society including abortion, that the practice of abortion for selfish non-therapeutic reasons only destroys fetal life, dulls society's moral sensitivity and cheapens all human life, and resolving, therefore, that the messengers to the convention reaffirmed the biblical sacredness and dignity of all human life "including fetal life," further resolved to call on all Southern Baptists and all other citizens to work "to change those attitudes and conditions which encourage many people to turn to abortion as a means of birth control," resolved further that it was in the best interests of the society to reject any indiscriminate attitude toward abortion, as contrary to the biblical view, and, finally:

"Resolved, that we also affirm our conviction about the limited role of government in dealing with matters relating to abortion, and support the right of expectant mothers to the full range of medical services and personal counseling for the preservation of life and health."

Two other paragraphs had been offered as amendments to the resolution, but had been voted down overwhelmingly at the meeting. The first of the paragraphs read:

"Whereas, Every decision for an abortion, for whatever reason, must necessarily involve the decision to terminate the life of an innocent human being."

The second paragraph was a resolution, and it would have read:

"Be it further Resolved, that we reject as contrary to Southern Baptist doctrine and tradition, any suggestion that Southern Baptists should become political activists in support of permissive abortion legislation."

At the Southern Baptist Convention in the next year, 1977, the resolution of the preceding year was reaffirmed by a resolution which read:

"*Resolved* that this Convention reaffirm the strong stand against abortion adopted by the 1976 convention, and in view of some confusion in interpreting part of this resolution we confirm our strong opposition to abortion on demand and all governmental policies and actions which permit this."

Dr. Wood considered that the 1976 and 1977 action of the Convention were primarily significant as calling for non-interference by government in the individual decisions of conscience.

Dr. Wood made it clear, however, that there was within the Baptist Church, as within the Roman Catholic Church, a dissent from the prevailing view, and that

appears plainly enough from the sequence and altered language of the resolutions. There was in existence for some time at least after the January 1973 decisions, an organization named "Baptists for Life," formed in Texas and claiming as members of its advisory committee Senator Helms of North Carolina and a State Senator from Enid, Oklahoma.

Dr. Wood explained that in the Baptist view participation in public affairs on the part of the churches was proper and expected. But he was insistent that while, in the Baptist understanding, the church was free to advocate laws which had a moral foundation, the church disapproved of efforts to have laws enacted which would express a particular moral viewpoint or a particular church teaching. He considered the Hyde-Conte amendment a law based on a religious view of abortion because he failed to see a secular basis or bases or purpose in the Hyde-Conte amendment and the later riders.

Dr. Wood indicated that woman's right to choose abortion should extend to three broad categories of pregnancies: first, involuntary pregnancies, which would include, in addition to rape, the thirteen year old unmarried girl, typically, and those women whose contraceptive devices or medications failed; second, the problem pregnancy, involving fetal deformity or injury to the mental, emotional or physical health of the mother; and third, pregnancy that is unwanted for significant familial reasons. It was Dr. Wood's view that when there is a public policy of providing funds for medical services, as in the medicaid program, the Congress is compelled to provide funds for abortions; if there had been no medicaid program, or if the medicaid program were repealed, there would be no issue over abortion funding. Dr. Wood argued that the Hyde-Conte amendment was not neutral, but represented gross entanglement of institutional government into the moral and religious values of the people. Repeal of the amendment and a return to the conditions that existed before August 4, 1977, would involve the federal government in abortion matters, but that funding would be funding of a secular activity and unlike funding denominational schools: the point made was that medical services are themselves secular and religiously neutral.

### F

Reverend John Philip Wagaman, an ordained United Methodist minister, Dean and Professor of Christian Social Ethics at the Wesley Theological Seminary in Washington, D.C., and a past president of the American Society of Christian Ethics, testified that in the thinking of mainstream Protestant Christian Ethics, and probably more broadly, nearly no aspect of life is more sacred, closer to being human in relation to God, than bringing new life into the world to share in the gift of God's grace and God's covenant; and that it is generally accepted among leading Protestant denominations, and to a considerable extent also in Roman Catholic circles, that human beings in their parenthood, in giving birth to children, must act responsibly and seriously, and not simply let nature take its course. In bringing new life into the world human beings must be sure that the conditions into which the new life is being born will sustain that life in accordance with God's intention for the life to be fulfilled. The teaching is ultimately based on the Bible in the light of the person of Jesus Christ and the significance of his life, the meaning of the Old Testament being most fully disclosed through the person of Christ. In the view of most Christian theologians the basic, the organizing belief of the whole Bible is that human life is in relationship to God and that God, through his work of creation and through the work of salvation in Jesus Christ, has given to humanity the gift of life and of his love. In every important issue the question to be answered is whether the human being is responding out of faith and love of God to the love which God has provided to human beings.

In the case of planned or responsible parenthood, again, the question is, whether the human being is bringing a life into the world under conditions which make it possi-

ble for that life to participate in God's intention. It is possible for the material, legal and social conditions of human existence, the conditions of life, to aid or to impede God's purpose. Since human beings are in a created physical world, it matters whether a new life brought into that world will be able, with proper support in the conditions of the world, to experience what God has intended, and whether that new life might threaten to undermine the theologically understood fulfillment of already existing human beings. There are many circumstances in which it might be contrary to God's purposes to bear a child: for example, in the case of pregnancy in a twelve or thirteen year old, concern for her health, and concern over the possibility that the new life might not receive the nurture necessary for human fulfillment, would raise the question whether the pregnancy should be terminated; cases involving risk to the life or to the basic physical or mental health of the mother might again raise the question; and pregnancy close to the period of menopause might raise similar questions in terms both of the health of the mother and of the social situation in which the child would be placed, including the effect its birth would have upon the mother and her existing family.

The resolution of the United Methodist Church, adopted at the 1976 General Conference, affirmed the "principle of responsible parenthood" and the right and duty of married persons prayerfully and responsibly to control conception according to their circumstances. It provided further that:

"When, through contraceptive or human failure, an unacceptable pregnancy occurs, we believe that a profound regard for unborn human life must be weighed alongside an equally profound regard for fully developed personhood, particularly when the physical, mental, and emotional health of the pregnant woman and her family show reason to be seriously threatened by the new life just forming. . . .

"We believe that continuance of a pregnancy which endangers the life or health of the mother, or poses other seri-

ous problems concerning the life, health, or mental capability of the child to be, is not a moral necessity. In such case, we believe the path of mature Christian judgment may indicate the advisability of abortion. We support the legal right to abortion as established by the 1973 Supreme Court Decisions. We encourage women in counsel with husbands, doctors, and pastors to make their own responsible decisions concerning the personal or moral questions surrounding the issue of abortion."

Dean Wogaman testified that it was a common view among Protestant Christian theologians, and to some extent among other religious bodies, that human personhood—in the sense in which the person receives its maximum value in relation to the Christian faith—does not exist in the earlier phases of pregnancy. His view, and that of a number of other theologians, is that there is not a fully human person until that stage in development where someone has begun to have experience of reality. That experiencing of reality, in his view, would take place before the moment of birth, somewhere around the fifth month of pregnancy. Others among Protestant Christian theologians consider, rather, that there is no one point at which personhood emerges. Rather it emerges over the long months of pregnancy, and the degree of sanctity or value ascribed to fetal life increases correspondingly to the stages of fetal development. The theological basis for relating human personhood to the dawning of awareness is that the basis of the covenant between God and humanity is that it is a covenant between beings possessing awareness; the covenant subsists between God as the Creator of reality and those who have begun to experience the reality which God has created. Before the time of awareness abortion is a much freer option; Dean Wogaman considered that the Supreme Court guidelines in *Roe v. Wade* corresponded approximately to his theological position; even at the last phase abortion would be appropriate where there is grave risk to the health and life of the mother, and where it can be

known that the fetus is so gravely deformed that the new life will never be able to experience genuine human fulfillment. In the present state of biological technology viability might roughly correspond with the point of awareness of reality. Dean Wogaman summarized his view in saying that the United Methodist position is not only to state the circumstances in which the collective judgment is that abortion would be wise, but to refer that question to the woman and her own religious conscience, and, therefore, the church does not interpose its institutional judgment. Referring to Congressman Hyde's contention that a fetus is a human life and not a merely potential human life but a human life with potential, Dean Wogaman contended that virtually all theologians and all ethicians would agree that descriptive science cannot establish the value of an entity; the entity's value is determined by its relationship to the ultimate reality that is there; Dean Wogaman appeared to mean that science did not profess to answer value questions and that value questions remained moral and ethical questions and were therefore basically religious in character. Put in another way, Dean Wogaman's position was that facts do not establish value, and, in consequence, that descriptive science cannot ascribe values to entities; the value of the entity arises from its relation to ultimate reality, and science can be no more than descriptive of the entity. The value question is one of moral judgment and is ultimately religious in origin. Dean Wogaman's position was that finally ethics and morality have a religious root or else are either purely formal or rather trivial.

Dr. Paul Ramsey, Professor of Religion in the Department of Religion at Princeton, specializing in Christian ethics and a member of the Commission of twenty-five United Methodists who drafted the Statement of Social Principles for the United Methodist Church, testified that Dean Wogaman was in error in saying that a reason justifying abortion might be that the new life might threaten to undermine the theologically understood fulfillment of the already existing human beings in the family; he argued that that concept had been excluded by a change in the language of the Social Principles Statement appended to the excerpts from the Resolution on Responsible Parenthood of the United Methodist Church. He disagreed also with Dean Wogaman's statement that there was a justification for considering abortion in the case of a woman who became pregnant close to menopause because of the social situation in which a baby born to very old parents might be placed; Dr. Ramsey thought that was not in accordance with Methodist or Christian teaching. Dr. Ramsey testified to a belief, based on his participation in the preparation of the Statement of Social Principles, that the reference to "unacceptable pregnancy" in the United Methodist Resolution on Responsible Parenthood was not a reference simply to unwanted pregnancies; he said that the term unacceptable pregnancy had been inserted in lieu of an earlier expression describing recognition of "the damage to women and families caused by the birth of malformed or intensely unwanted children." He agreed, however, that the term "unacceptable pregnancy" has not been defined. Dr. Ramsey disagreed also with Dean Wogaman's statement that the Methodist view referred the question of abortion to the woman's own religious conscience, not interposing its institutional judgment where the fetus was a self-aware being *in utero.*

## XIII

The Roman Catholic Church has made very clear its institutional disapproval of the January 1973 abortion decisions of the Supreme Court and has publicly and strongly advocated the adoption of a constitutional amendment "providing protection for the unborn child to the maximum degree possible." On March 7, 1974, the second day of the hearings before the Subcommittee on Constitutional Amendments of the Senate Committee on the Judiciary, the Cardinal Archbishops of Philadelphia, Los Angeles, Boston and Chicago appeared as witnesses and submitted documentation on the right to life and abortion in support of their

advocacy of a constitutional amendment that would "Establish that the unborn child is a person under the law in the terms of the Constitution from conception on" (Abortion Hearings, Part I, pages 153–253). During the questioning the Cardinals were asked whether they agreed to the correctness of Section 2 of the so-called Buckley Amendment (S.J.Res. 119, 93d Cong., 1st Sess.) which provided that "This article shall not apply in an emergency when a reasonable medical certainty exists that continuation of the pregnancy will cause the death of the mother," and it was made clear that, if that language was intended to permit direct abortion as distinguished from indirect abortion, it was opposed.

A

Under date of November 20, 1975, the National Conference of Catholic Bishops promulgated a Pastoral Plan for Pro-Life Activities. The Pastoral Plan opens with a quotation from the Constitution on the Church in the Modern World that concluded, "from the moment of its conception life must be guarded with the greatest care, while abortion and infanticide are unspeakable crimes." After referring to the trend of laws and decisions denying or ignoring basic human rights and moral responsibilities for the protection and promotion of the common good, the pamphlet continued by saying:

"In this category are efforts to establish permissive abortion laws, the abortion decisions of the United States Supreme Court in 1973 denying any effective legal protection to the unborn child, and the growing attempts to legitimatize positive euthanasia through so-called 'death with dignity' laws."

The Pastoral Plan outlined three major efforts: (1) an educational/public information effort, (2) a pastoral effort addressed to the specific needs of women with problems related to pregnancy and abortion, and (3) a public policy effort directed toward the legislative, judicial and administrative areas so as to insure effective legal protection for the right to life. Then the pamphlet continued:

"This Pastoral Plan is addressed to and calls upon all Church-sponsored or identifiably Catholic national, regional, diocesan and parochial organizations and agencies to pursue the three-fold effort. This includes ongoing dialogue and cooperation between the NCCB/USCC on the one hand, and priests, religious and lay persons, individually and collectively, on the other hand. In a special way we invite the continued cooperation of national Catholic organizations."

The public information/educational program visualized in the Pastoral Plan was addressed in its first aspect to the general public, and in its second aspect it would be directed primarily to the Catholic community. The Pastoral Plan pamphlet explained:

"Recognizing the value of legal, medical and sociological arguments, the primary and ultimately most compelling arguments must be theological and moral. Respect for life must be seen in the context of God's love for mankind reflected in creation and redemption and man's relationship to God and to other members of the human family. The Church's opposition to abortion is based on Christian teaching on the dignity of the human person, and the responsibility to proclaim and defend human rights, especially the right to life."

The second part of the threefold effort, Pastoral care, emphasizes moral guidance and motivation, service and care for women and unborn children, and the reconciliation of men and women to God, to one another, and in the human community. After discussing the reconciliation of sinners, the pamphlet continued:

"Granting that the grave sin of abortion is symptomatic of many human problems, which often remain unsolved for the individual woman, it is important that we realize that God's mercy is always available and without limit, that the Christian life can be restored and renewed through the sacraments, and that union with God can be accomplished despite the problems of human existence."

The third major element of the Pastoral Plan is the legislative/public policy effort. Stating that it is generally realized that the maintenance and protection of human rights are primary purposes of law, the pamphlet continues:

"As Americans, and as religious leaders, we have been committed to governance by a system of law that protects the rights of individuals and maintains the common good. As our founding fathers believed, we hold that all law is ultimately based on Divine Law, and that a just system of law can not be in conflict with the law of God.

"Abortion is a specific issue that highlights the relationship between morality and law. As a human mechanism, law may not be able fully to articulate the moral imperative, but neither can legal philosophy ignore the moral order. The abortion decisions of the United States Supreme Court (January 22, 1973) violate the moral order, and have disrupted the legal process which previously attempted to safeguard the rights of unborn children. A comprehensive pro-life legislative program must therefore include the following elements:

a) Passage of a constitutional amendment providing protection for the unborn child to the maximum degree possible.

b) Passage of federal and state laws and adoption of administrative policies that will restrict the practice of abortion as much as possible.

c) Continual research into and refinement and precise interpretation of *Roe* and *Doe* and subsequent court decisions.

d) Support for legislation that provides alternatives to abortion."

Noting that well-planned and coordinated political action at national, state and local levels would be required, the pamphlet states that the activity is not simply the responsibility of Catholics and should not be limited to Catholic groups or agencies.

There is to be in each state a State Coordinating Committee, functioning under the State Catholic Conference or its equivalent, which will include bishops' representatives from each diocese in the state, and will function to monitor political trends in the state and their implications for the abortion effort, to coordinate the efforts of the various dioceses and evaluate progress in the dioceses and congressional districts, and to provide counsel regarding specific political relationships within the various parties at the state level.

Diocesan Pro-life Committees are to coordinate groups and activities within the diocese, particularly efforts to effect passage of a constitutional amendment to protect the unborn child. The diocesan committee is to rely for information and direction on the Bishop's Pro-Life Office and on the National Committee for a Human Life Amendment. The objectives of the diocesan committee are: to provide direction and coordination of diocesan and parish education/information efforts and maintain working relationships with all groups involved in congressional district activity, to promote and assist in developing groups involved in pregnancy counselling and those providing alternatives and assistance to women who have problems in pregnancy, to encourage the development of "grass roots" political action organizations, to maintain communication with National Committee for a Human Life Amendment in regard to federal activity, so as to provide instantaneous information concerning local senators and representatives, to maintain a local public information effort directed to the media, including seeking equal time, etc., and to develop close relationships with each senator or representative.

Parish pro-life committees are to sponsor and conduct intensive education programs, promote and sponsor pregnancy counselling and other alternatives to abortion, generate public awareness of the continuing effort to obtain a constitutional amendment (coordinating efforts of parish pro-life groups, K of C groups, etc., and seeking ways to cooperate with non-sectarian pro-life groups, including right-to-life organizations; in each congressional district the parishes will pro-

vide one basic resource, the clergy having an active role in the overall effort), and prudently convince others—Catholics and non-Catholics—of the necessity of the constitutional amendment to provide a base for legal protection for the unborn.

In each congressional district a pro-life action group should be formed; its task is essentially political, to organize people to help persuade elected representatives, and its range of action limited, focused on passing a constitutional amendment; the action group should be bi-partisan, non-sectarian, inclined toward political action. The pamphlet states, in italics:

"It is not an agency of the Church, nor is it operated, controlled or financed by the Church."

The congressional district pro-life group is to conduct a continuing public information effort, directed to elected officials and potential candidates, to persuade them that abortion must be legally restricted; to counterbalance propaganda efforts opposing a constitutional amendment; to persuade all residents in the district that permissive abortion is harmful to society and that some restriction is necessary; to persuade all residents that a constitutional amendment is necessary as a first step toward legally restricting abortion; "To convince all elected officials and potential candidates that 'the abortion issue' will not go away and that their position on it will be subject to continuing public scrutiny"; to enlist sympathetic supporters who will collaborate in persuading others; to enlist those who are generally supportive so they may be called upon when needed to communicate to the elected officials; to elect members of their own group or active sympathizers to specific posts in all local party organizations; to set up a telephone network that will enable the committee to take immediate action when necessary; to maintain an informational file on the pro-life position of every elected official and potential candidate; to work for qualified candidates who will vote for a constitutional amendment, and other pro-life issues; and to maintain liaison with all denominational leaders (pastors) and all other pro-life groups in the district.

Father Smith testified that the Pastoral Plan is not a doctrinal teaching but a program. He agreed that the changes in the abortion laws, from the point of view of the Roman Catholic position, reflected a net loss. He said, however, that he did not think the purpose of civil law is to enforce church teachings, and that the church did not need civil law to enforce its morality, but that, nevertheless, it was not optimum that civil law should be contrary to the church's teachings either. One purpose of the Pastoral Plan, he agreed, was to bring the civil law into consonance with Catholic teaching. Father Smith testified that it is very rare for church documents to get into particular statutes of particular states or countries on a doctrinal level, but that the country's legal system is certainly a matter of concern because it is part of the mores of the country: "Nobody lives in a vacuum, including Catholics." Father Smith was very clear that the pro-life effort in the congressional districts under the fourth part of the Pastoral Plan was political action, and that the church was careful and prudent about not getting into those activities as the church. He agreed that the attempts to enact a constitutional amendment were directed toward the same persons and for the same purpose, that is, as few abortions as possible.

How systematically the Pastoral Plan was carried out is far from clear. The Clergy Bulletin of the Diocese of Fargo, North Dakota, reflects, in the Bishop's instructions to the clergy, a fairly complete implementation of the program. There is no question that, to a very considerable extent, Roman Catholic clergymen have encouraged their parishioners to participate actively in the political effort to have a right to life amendment passed and to support the Hyde amendment. The evidence does not justify the conclusion that all Catholic clergymen have done so, and there is no evidence that their efforts, where made, are uniformly and certainly effective. A great deal of documentary evidence is in the record showing numerous parish and

diocesan publications, and some national publications, urging political action, giving information on the voting records on the abortion issue of state and federal legislators, emphasizing the special importance of the abortion issue because of its connection with life values, intimating and, occasionally, advocating single issue voting, and, perhaps less frequently, cautioning against voting on a single issue where many issues are involved.

Annual March for Life marches have been organized to take place on the anniversary of the decision of *Roe v. Wade* and *Doe v. Bolton*, often preceded by a sermon or part of a sermon directed to the value of the march, and the march has often been noted in the parish bulletins. There were local marches or rallies, but, in addition, very considerable support was mustered for the annual march in Washington, D. C., on the anniversary of the *Roe v. Wade* decision. The evidence is that the annual march was made the occasion for visits to the offices of the legislators to impress on them the purpose of the occasion.

No complete census of the Catholic press was attempted in the record, but the record is replete with evidence that a number of Catholic periodicals give a great deal of attention to explaining the Roman Catholic point of view on abortion, soliciting support for organized Roman Catholic effort to enact legislation both constitutional and statutory, and providing information on the stand taken on the abortion issue by legislators and candidates for office. Some of the Catholic periodicals carried political advertising, and a number of the political advertisements, near election time, stated the candidate's position on the abortion issue. The parish publications, often simply mimeographs providing the calendar of church services, announcements of parish activities and meetings, and other matters related to the complex of parish activities, at times included some material on the abortion issue and not infrequently included a good deal of that material. Again, however, no census of the innumerable parish publications could be essayed, and the parish materials included in the record are not shown to

be typical. Typical of the particular parishes during particular pastorates they must be.

Roman Catholic pastors have been urged to set aside the Sunday preceding January 22 to mark annually the decision in *Roe v. Wade*, and a nationwide "Respect Life" Sunday is recommended for observation in each October. The Pastoral Plan said of the latter, however, that

"The annual Respect Life Program sets the abortion problem in the context of other issues where human life is endangered or neglected, such as the problems facing the family, youth, the aging, the mentally retarded, as well as specific issues such as poverty, war, population control, and euthanasia. This program is helpful to parishes in calling attention to specific problems and providing program formats and resources."

In October 1976 "pro-life affirmation cards" were recommended for signature in connection with the Respect Life observance of that October. In Los Angeles the Feast of the Holy Innocents (December 28) has been made the occasion in each year from 1971 through 1978 for a candle-lit procession followed by the celebration of a Mass of Atonement; organized by a Holy Innocents Reparation Committee, whose 1978 chairman stated that the Committee is pursuing goals that are completely spiritual in nature, because abortion is primarily a spiritual and moral problem, not a political one, the Committee also sponsors at a parish church a monthly Mass, benediction and rosary of atonement for abortions. The Westchester (New York) Right to Life Committee included in a list of its endeavors in December of 1975 and 1976 an Annual Mass of the Holy Innocents in Ossining, New York.

The effort of clergymen and lay members of the Roman Catholic Church in the United States, although it does not express the attitudes and purposes of a unanimous religious body, has, however, been demonstrably resolute, well organized, and well supported by voluntary workers, and it has

required and obtained very substantial sums of money. Statewide collections, through the parishes but with support from diocesan representatives, were taken up in New York; a common method was to solicit contributions outside the churches after the Sunday Masses, particularly for the "Respect Life" collection in October or early November of each year. In New York State the bishops were asked to request the parish priests to announce the collections and to permit the "canister" collections to be taken up outside the churches. The receipts accounted for by the New York Right to Life Committee from "Respect Life" contributions were:

| Period covered | Amount received |
|---|---|
| Year 1974 | $ 62,458.07 |
| 10/1/75–3/31/76 | 87,377.63 |
| 10/76 –7/31/77 | 116,485.15 * |

\* $77,656.77 listed by NYSRTLC as revenue from "Respect Life" collections increased by the ⅓ retained by or refunded to the local units.

The total revenue accounted for by the New York State Right to Life Committee for the year ending September 30, 1976, was $102,834.57, of which $60,932.88 represented "Respect Life" collections retained by the State Committee; the total revenue accounted for by the Committee for the ten months ending July 31, 1977, was $113,-487.92, of which $77,656.77 represented "Respect Life" collections retained by the State Committee. A spring "Save-a-Baby" collection, organized as a raffle, accounted for $27,828.38 of the State Committee's revenue in the year ending September 30, 1976, and for $25,569.07 of its revenue in the ten months ending July 31, 1977. A portion, evidently one third in New York State, of the funds collected by the State Committees was reserved for the National Right to Life Committee. In Minnesota Right-to-Life organizations were stated beneficiaries of the Annual Catholic Appeal collection of the Archdiocese of St. Paul and Minneapolis, and a Catholic periodical published, under the heading "Opus Dei support for pro-life activities," a classified tabulation of sources or uses of funds; listed twice is "MCCL," the Minnesota Citizens Concerned for Life,

a pro-life organization; it is listed once under the item "MCCL–Regional Office—$1,000," and a second time under the item "From Bishop's Contingency/MCCL—$3,500." The diocesan Opus Dei fund was described in an earlier issue of the same periodical as "a drive currently being held to aid diocesan projects of Catholic education and pro-life activities." Another Catholic periodical reported MCCL as raising $14,000 in Minnesota as "seed money" for work in several southeastern states. The MCCL Newsletter of April 1976 reported receipt of a $1,500 contribution from the State Council of the Knights of Columbus to help finance a projected "Lifemobile" travel trailer intended for use in explaining the MCCL view. Other newspaper items report activities of local Knights of Columbus Councils conducted to raise funds for MCCL.

Such press reports, plainly hearsay for the most part, have independent relevancy for the contribution that they made, whether accurate or not, to the clear impression that there was a very close identification between the pro-life, antiabortion position—the move to end abortion for everyone—and the "official" view of the Roman Catholic Church, an impression communicated to the readers of Catholic periodicals and to the public generally as well.

B

Not every element of Catholicism approved of the Pastoral Plan program to "go political" and bend efforts to enact a pro-life amendment and other legislation expressing the aim to end the legalization of abortion. The "Choose Life" pamphlet of the Leadership Conference of Women Religious, while taking an "unequivocal stand in opposition to elective abortion," saw a need to relate the recognizably complex issues involved to the life continuum at all levels—euthanasia, capital punishment, violence and war, ecological stewardship, racial and sexual injustice—and to inquire how each choice contributes to "a more life-giving society." The pamphlet recognized that women faced with the decision of choosing

life or choosing abortion are women in crisis; in stating the need to pose "the pastoral questions," it presented a moving summary of the circumstances of the decision to choose life or abortion:

"How can the Church minister in a healing way to persons who are facing the death or prolonged illness of a child? to those who know psychologically they cannot sustain another pregnancy? to the one who knows her physical health cannot withstand a pregnancy? to one who has no partner in marriage to help her sustain financially, physically, psychologically, emotionally, the well-being of another human person? How does the Church community encourage women to nurture the life within when they are teenagers and still need to be "nurtured" themselves? when they have experienced rejection from their own families? when they seek sexual relations as a means of feeling some sense of intimacy and acceptance? when they are psychologically fragile, distraught, immature, and have a child to satisfy their need to be needed? when their needs for love and affection are so great that a child who interferes with or fails to return that love may become the victim of child abuse because of parental anger? How does the Church community act truly as "sister or brother" to an expectant mother who knows she is carrying a child to whom she will pass on hemophilia or sickle cell anemia? or who fears that her own addiction to drugs or alcohol will build up the chemical dependency in her unborn child? or to a woman who contracts measles during pregnancy and fears that her child will be brain damaged, or has reason to fear that the child will be physically deformed?"

The pamphlet emphasizes the need to make available and active adequate support services "so that the pro-life position can be made more credible." Emphasizing the need for active attention to legislative activity, particularly in the field of social legislation, the pamphlet observed that

"We have a responsibility to contribute actively to the intelligent identification of candidates for public office whose consistent stand is not limited to a single issue."

The pamphlet counselled increased attention to the place of law in the society and in the moral order, and continued:

"The relationship of morality to law is complex, particularly within a pluralistic nation. Contemporary society is extraordinarily diverse in terms of religious beliefs and practices. In such a situation, law cannot be co-extensive with morality since different religious beliefs result in different moral judgments and it is obvious that not all of them can or should be enforced by law. Yet, law and morality cannot be divorced. Even within a pluralistic society, law does not exist in isolation but reflects some cross section of the common beliefs and values of its people. Furthermore, most serious breaches of law are also moral offenses and the notion of personal responsibility which informs law was first a principle of morality before it was incorporated into the legal realm."

Saying that the conflict between ideal and feasible law making becomes particularly intense when applied to abortion, and that, in theory, the conflict should not occur because the issue is life, the pamphlet went on:

"However, it is not that simple. A legal position on abortion ultimately rests on a moral evaluation of fetal life and there is wide disagreement in society as to the nature and dignity of that life. This is why the feasibility aspect of an abortion law is so difficult. The good whose legal possibility is being discussed is itself under bitter questioning.

\*    \*    \*    \*    \*    \*

"It seems clear that any law which would be capable of winning passage at this time would be far from satisfactory. It also seems clear that a law which rests on a moral position will be looked upon as an imposition of one view on the rest of society."

The Executive Board of the National Federation of Priests' Councils in September 1976 advised Cardinal Cooke (Archbish-

op of New York and Chairman of the Committee for Pro-Life Activities of the NCCB) that it favored an amendment to protect the lives of the unborn, the aged, the ill and the disadvantaged, and it stated:

"Deep concern, however, was expressed by a vast majority of board members that this one issue is being stressed by the U.S. hierarchy to the neglect particularly of other important social issues stressed by the NCCB in the document *Political Responsibility in an Election Year.* Rightly or wrongly, the impression reflected by many of these board members is that the one issue on which candidates are being judged is their legal approach to the issue of abortion. We hope that in the coming months a more balanced image will surface." (Origins, Vol. 6, No. 15, Sept. 30, 1976.)

An editorial in Commonweal (January 2, 1976), while addressed broadly to the root cause of a supposed decline in Roman Catholic church going and in the quality of its leadership, and suggesting changes that might lead to renewed spirituality, asserted:

"Meanwhile, the American bishops, rather than recognize the crisis which has grown up over their failure to deal with their people's problems with the liturgy, birth control and divorce, have pulled themselves deeper into the quicksand with their plan for 'citizens lobbies' in every congressional district to work for an anti-abortion amendment.

"We did not approve of the Supreme Court's ruling on abortion; and we support the right of religious groups to lobby for legislation that protects those human values that have a religious dimension. But in staking their prestige on the abortion issue, which is more and more an open question in some Catholic minds, the bishops have shown their indifference to the ecumenical dimension of this issue, raise questions about the violation of church and state laws and—over-estimating their influence with their constituents—have promised a vote they can't deliver. The anti-abortion amendment is a right-wing issue, and the bishops will

quickly become tools of conservative so-called 'pro-life' (and perhaps anti-busing, anti-'welfare chiselers,' pro-arms race, pro-CIA) candidates in the 1976 elections. The effort will fizzle and the church will have been had. With shepherds like this, is it any wonder that the flocks have wandered away?"

A December 27, 1975, editorial in the Jesuit magazine America noted that issues connected with abortion had become more diverse and complicated than was implied in the pro and anti-abortion labels, and that "abortion" had become a code word for a range of issues:

"Over and above the fundamental questions of the morality of a pregnant woman's choice to abort and of the morality of those who cooperate with her in executing the abortion decision, the nation is faced with a series of other fundamental questions about the shape our public policy on abortion should take."

Referring to the Public Information/Education Program in the Pastoral Plan, the editorial said that such a program must be preceded by one within the church, and continued:

"It seems regrettable that there is no explicit recognition by the bishops that many Catholics have persistent doubts about the correctness and wisdom of the hierarchy's stand on certain aspects of what our public policy should be. These doubts exist particularly with respect to whether a constitutional amendment should be sought and, if so, what kind of constitutional amendment. . . .

\*      \*      \*      \*      \*      \*

"Even more radically, it would be fatal to proceed on the assumption that there are no hesitations among educated and loyal Catholics about the morality of abortion itself. The church's teaching that abortion is a 'grave sin' and an 'unspeakable crime' is quite clear. Nevertheless, many individual Catholics, and especially women, who have faced abortion as a personal problem in their own lives or in those of close friends and rela-

tives, suffer from deep-seated doubts about the correctness of the church's teaching that there are no exceptions to the rule against direct abortions. Such doubts are no proof of disloyalty in faith and morals, especially when the faithful who encounter them do so because of serious and conscientious attention to both the church's teaching and the practical dilemmas that sometimes face pregnant women."

An editorial in the March 6, 1976, issue of America denounced single-issue voting, related to the abortion issue, as opposed to the policy statement of the Administrative Board of the U.S. Catholic Conference, as leaving out of view other social and political issues, and as "a disastrous misunderstanding both of Christian political responsibility and effective political strategies." The editorial asserted that impugning "the good conscience of those disagreeing with us is itself a contradiction of Christian life," and that the misgivings that many Catholics "feel about some of the anti-abortionist tactics" are not "a failure of nerve before the secularist establishment." Much later, in the National Catholic Reporter of July 14, 1978, an impatient editorial decried the distortion of emphasis produced by the anti-abortion campaign—"The pro-life movement is distorting the Catholic Church's public image."

### C

"Religion" has been defined as "An attitude of awe towards God, or gods, or the supernatural, or the mystery of life, accompanied by beliefs and affecting basic patterns of individual and group behaviour" (The Fontana Dictionary of Modern Thought, 1977), and Webster's Third New International Dictionary (1961) has defined religion (in terms of being "religious") as "the personal commitment to and serving of God or a god with worshipful devotion, conduct in accord with divine commands especially as found in accepted sacred writings or declared by authoritative teachers, a way of life recognized as incumbent on true believers, and typically the relating of oneself to an organized body of believers," and

the dictionary further defines religion, in objective terms, as "one of the systems of faith and worship." The Supreme Court in *Wisconsin v. Yoder*, 1972, 406 U.S. 205, 215–216, 243, 92 S.Ct. 1526, 1533–1534, 1547, 32 L.Ed.2d 15, had to deal with a creed, a religion, that was presented as "not simply a matter of theocratic belief," but as one in which "religion pervades and determines virtually [the believers'] entire way of life, regulating it with the detail of the Talmudic diet through the strictly enforced rule of the church community," prompting the Court to say that although determining "what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standard on matters of conduct in which society as a whole has important interests"—notwithstanding that as Justice Douglas observed, "Religion is an individual experience." The concern in the present case is with institutional religion and the concern of institutional religions with abortion.

The Roman Catholic Church's position on abortion is not of the same order as the Christian beliefs set forth in the Nicene Creed (A.D. 325), nor in the Roman Catholic dogmas of the Immaculate Conception and the Assumption. These deal with central beliefs of Roman Catholic Christianity; they are unmistakably and ineffaceably religious, by any definition. The position on abortion is a moral one. Rabbi J. David Bleich testified to the Senate Subcommittee (Hearings, Abortion—Part 1, Vol. 1, p. 288) that on the presupposition that the unborn fetus is a human being, "the question of abortion is quite properly a general moral one rather than a uniquely religious or uniquely sectarian one"; later, when asked for his answer to the suggestion that a right-to-life amendment would be "imposing a religious concept on others," he answered (p. 317):

"   .   .   .   our society clearly distinguishes between religious viewpoints and moral viewpoints or, if you like, the difference between dogmatic theology and

rational theology. The provision against homicide would not be viewed by anyone as in our society as being a purely religious one or sectarian view. I think that we all recognize that homicide is an offense against moral consciousness. By the same token I would view feticide as a form of manslaughter at the very minimum and as such, fetal life is entitled to protection. And society in doing that is simply reflecting moral views, which are not part of the sectarian code of any specific religious denomination but rather a part of the common morality of Western civilization."

The Declaration on Abortion is a teaching of the Church, of the supreme Magisterium "which teaches moral norms in the light of faith." The teaching entails a grave obligation for Christian consciences. But although the Declaration cites Scripture for God's identification with life, his willing of life and his enmity to evil and death, explains that human life even on this earth is precious since it is infused and taken back by the Creator and remains under his protection, that life is a gift and a responsibility, it nevertheless points out that (footnote 5) "The authors of Scripture do not make any philosophical observations on when life begins but they speak of the period of life that precedes birth as being the object of God's attention: he creates and forms the human being, like that which is moulded by his hand (cf. Ps 118:73). It would seem that this theme finds expression for the first time in Jr 1:5. It appears later in many other texts. Cf. Is 49:1, 5, 46:3; Jb 10:8–12; Ps 22:10, 71:6, 139:13. In the Gospels we read in Luke 1:44: 'For the moment your greeting reached my ears, the child in my womb leapt for joy.'" The Declaration recites the early Church's opposition to the morals of the Graeco-Roman world and espousal of Christian morals condemning both abortion of the fetus and murder of the born infant, and it quotes Athenagoras's condemnation of "killers of children, including those still living in their mother's womb." Then the Declaration asserts that "the various opinions on the infusion of the spiritual soul did not introduce any doubt

about the illicitness of abortion." St. Thomas Aquinas is cited as teaching that "abortion is a grave sin against the natural law." Vatican II is quoted as saying that "Life must be safeguarded with extreme care from conception; abortion and infanticide are abominable crimes." Arguing from the light of reason, the Declaration asserts that the right to life is antecedent to its recognition, and that life may not be discriminated against based on the stage of its existence: from the fertilization of the ovum a life is commenced which is not that of either parent. The Declaration states that, independent of discussions about the "moment of animation," from the first moment the individual living being which "will be" is "determined." And, as noted above, page 693, the Declaration leaves aside "the question of when the spiritual soul is infused," observing the absence of a unanimous tradition on the point, and that authors are still in disagreement. The significant point is that the Declaration is not rested on any notion that an embryo or fetus is a "human person" with spirituality, a soul. The moral principle is independent of that.

The right-to-life movement, although not confined to Roman Catholics and Roman Catholic clergymen, does use religious language, invokes religious motivations, and enlists prayer as an aid. The Declaration on Abortion and the Pastoral Plan of course embody explicitly religious teaching: the Declaration "entails a grave obligation for Christian consciences"; the Pastoral Plan speaks of "the grave sin of abortion," as does the Declaration. Rational analysis and biological learning may, in the teaching of the Declaration, suffice to impose the same obligation to respect human life, but the obligation is seen as nonetheless religiously imposed.

While all explicitly religious references are excluded from, for example, the Rose leaflet solicitation for the January 22, 1978, March for Life, the right to life and the need for a mandatory human life amendment are stated in terms of "the life of each human being" and of its preservation "from

that human being's biological beginning when the Father's sperm fertilizes the Mother's ovum." And the leaflet announced a vigil and assembly that would "prayerfully anticipate our lobbying activities"; pro-lifers are to "continue the battles so that good can triumph over evil." In 1974 "Operation Avalanche," a program to "force enactment" of the human life amendment in 1975, by directing an "avalanche" of ten million letters to Congress, professedly acted on the suggestion of the NCCB; and it circularized a flyer by its national chairman appealing for a resetting of the nation "upon the theocentric foundation laid down by the Protestant Founding Fathers." The literature of those opposing abortion speaks of embryos and fetuses as human beings, children, unborn children, the innocent unborn, and it personifies them. Abortion is characterized as murder.

A theme constantly used in right-to-life literature is that abortion is a Slaughter of the Innocents, parallelling, exceeding Herod's slaying all the children in Bethlehem and its neighborhood two years old and under (Matthew 2:2–6, 16). A retired bishop, chaplain of the Knights of Columbus, speaks of abortion as violating the "sacredness of the life of an innocent child," and speaks too of the "legalized massacre of unborn infants," and says that the "tiny, unsilenced, haunting voice of the murdered unborn child will ever be gnawing at the conscience of the guilty mother." The New York State Right to Life Committee seeks to raise funds to halt "the 20th Century Slaughter of the Innocent." Representative Hyde used the reference to Matthew in an October 1977 speech to the Maryland Right-to-Life Convention; he spoke of "The slaughter of the innocents. We have over 1 million homicides a year . . . ." In an April 22, 1978, speech in St. Louis Mr. Hyde again referred to Herod's attitude toward the dimensions to which "we have extended his slaughter of the innocents."

The religious association was kept alive not only by references to the issue in parish and diocesan publications but also by the practice of having prayers said and services conducted in direct relation to the pro-life activity. A CDAC Action-Alert, of the National Committee for a Human Life Amendment, mobilizing efforts to support the Hyde amendment in September 1977, requested that the addressees in each Congressional district

"EACH DAY, until the Congressman agrees to support the present Hyde language, have a different congregation or parish conduct a private, 24-hour prayer vigil in behalf of the unborn."

The same exhortation was repeated in a CDAC Action-Alert of November 9, 1977, and it was added that the addressees' "past prayers" accounted in the writer's view for the Hyde amendment's remaining in effect. Reference has already been made to the Processions of Reparation and the monthly Mass in Los Angeles; the Knights of Columbus marched in the procession, and a statue of Our Lady of Fatima was carried. An October 1973 New York State Right to Life Newsletter suggested that "One resolution which can't wait any longer is one calling for all RTL people to make a special effort to pray together (although separated by miles)" at one agreed hour one day in each week. Work in the 1976 "Save-A-Baby" fundraising campaign is referred to as "truly God inspired," and the enthusiasm shown at the 1976 National Right to Life Convention is described as manifesting "Joy in doing God's work for the 'denied' ones . . . ."

Roman Catholic clergy and laity are not alone in the pro-life movement, but the evidence requires the conclusion that it is they who have vitalized the movement, given it organization and direction, and used ecclesiastical channels of communication in its support. The union of effort with representatives of other denominations is based on shared religious conviction.

D

The divergence in views among religious leaders of different faiths has generated more dispute than useful interdenominational dialogue, but the absence of unanimity within denominations is an element that

impairs clarity of dialogue in any direction. The Religious Coalition for Abortion Rights (RCAR), an organization of national religious bodies,

" . . . seeks to encourage and coordinate support for safeguarding the legal option of abortion; for ensuring the right of individuals to make decisions concerning abortion in accordance with their consciences and responsible medical practice; and for opposing efforts to deny these rights through constitutional amendment, or federal or state legislation."

RCAR argued that

"It is vital to build public awareness of the principle that in a pluralistic society the state should not embody in law one particular religious or moral viewpoint on which widely differing views are held by substantial sections of the religious community. All those concerned with religious liberty can join in opposing any attempt by constitutional amendment or legislation to take us back to the era of criminal abortion which legally denied to all, but in practice, particularly denied to the poor, the right and responsibility to make their own decisions.

"We believe that religious organizations have a special contribution to make to this significant and complex matter."

In opposition to the efforts of Roman Catholic clergy and laymen to secure passage of a human life amendment and restrictions on abortion funding, RCAR and some of its member religious organizations have taken limited action, including issuance of press releases making known its and their opposition to legislation inhibiting freedom of choice in respect of abortion. RCAR very particularly decried injection of the abortion issue into the 1976 presidential campaign, and protested President Carter's failure to meet with representatives of eleven Protestant and Jewish denominations on the abortion issue after he had met with members of the Catholic hierarchy. When a Catholic periodical, the Wanderer, in April 1978, published an article stimulated by the television showing of "The Holocaust," suggesting that the deliberate formulation and

appalling execution of this "Final Solution" had parallels in the far greater degree of guilt involved in the permissiveness of Americans toward abortion, RCAR promptly issued a release asserting that Jewish and Christian communities "reacted with outrage" to the charge that legal abortion may be a greater sin than was the Holocaust. Through its chairperson, RCAR, in February 1977, protested against retired Bishop Sheen's statement of January 21, 1977, to a vigil sponsored by March for Life, that the country was divided into "biophilics" and "necrophilics," and linking abortion, the Holocaust and euthanasia; the RCAR letter to Bishop Sheen concluded:

"Honest men and women can differ on the morality of abortion but let's for Heaven's sake keep the dialogue rational. Epithets and slurs can only confuse and obscure."

Independently of RCAR, over 200 theologians and pro-choice ethicists published, in the October 3, 1977, issue of Christianity and Crisis, a "Call to Concern" expressing support for the January 1973 Supreme Court decisions, and opposition to the "absolutist" position that it is always wrong to terminate a pregnancy at any time after the moment of conception; the "Call to Concern" states that the most compelling argument against the inflexibility of the "absolutist" position is its cost in human misery, and that the signers believe it is wrong to deny medicaid assistance to poor women seeking abortion; it is then said that

"We are saddened by the heavy involvement of the bishops of the Roman Catholic Church in a campaign to enact religiously-based anti-abortion commitments into law, and we view this as a serious threat to religious liberty and freedom of conscience."

### E

Organized pro-life activity has included the picketing of abortion clinics, a demonstration intended to persuade the pregnant women to forego abortion; in some instances, apparently few, protesters against abor-

tion have entered clinics and used a species of sit-in tactics to half-dissuade, half-prevent pregnant women from undergoing abortion. Roman Catholic institutions, on a limited scale, have encouraged picketing of such clinics; that appears to have been the case in the picketing of the Highland Park, St. Paul, Planned Parenthood Clinic. However, when a possibly incendiary fire occurred at the clinic on Ash Wednesday in 1977, causing very extensive damage, and a suspension of operations, the editor of the Catholic Bulletin, the diocesan publication, deplored the action and its violence, insisted that the battle for "human life" would have to be won in the courts, the Congress and the legislatures, in the media, and, finally, before the bar of public opinion, and concluded that the incident had set the pro-life campaign back. The editorial, after referring to the clinic as an "abortion mill" and a "little Dachau," noted with relief that no one was seriously injured in the fire, that no lives were lost, and then asked, "who knows how many lives were lost earlier the same day as the clinic went about its daily routine of snuffing out human lives . . ." RCAR reported that a bomb thrown at a window of the same clinic a year later failed to detonate.

Other incidents, few in number, of such vandalism against abortion clinics have occurred; such incidents have been reported as occurring in Omaha, Cleveland, Columbus, Cincinnati, Akron, and Burlington, Vermont. RCAR by letter to 270 Roman Catholic bishops referred to the St. Paul and Omaha incidents, and then said:

"Whatever differences there may be among us regarding the moral and theological implications of abortion, as religious people we cannot stand idly by while a climate of violence grows in this country. Our Judeo-Christian heritage and the traditions of our democratic form of government both speak to the importance of solving our disagreements by peaceful means. Fear and intimidation are not appropriate means of arriving at constructive solutions to difficult social problems. If religious leaders remain silent, we appear to endorse the attempts of a misguided few to enact their will at all costs.

"We are therefore calling upon you to join the undersigned in endorsing the enclosed statement, which calls for an end to violence and for efforts to debate our differences in a spirit of dignity, decency, and openness of mind. We also ask you to issue a statement which supports these concepts to your constituencies."

While none of the Roman Catholic bishops appears to have responded affirmatively to the tacitly accusatory "call," two bishops who answered the letter expressed disapproval of violence, but found the letter's appeal against violence to property incompatible with the RCAR's attitude toward the graver violence implicit in abortion. And, after the firing of a Cleveland clinic in February 1978, the Roman Catholic bishop of Cleveland issued a statement advocating peaceful discussion of the issue.

Because there is no evidence of the identity of those responsible for the vandalization of abortion clinics, no more can be said than that the issue is one that lends itself to extremes of expression and to easy incitement to anger and violence.

### F

The seeming religious confrontation, with the damage that it may well be doing in the already difficult area of ecumenism, does not relate to whether the issue is one involving moral principle and resting on religious teaching. Nevertheless the denominational teachings, where the premises of all the denominational teachings in this area appear to be the same in substance, necessarily derive their conclusions by reason not revelation; the derived principles govern conduct, not worship; they relate to the field of the last seven commands of the decalogue, not to the first three. While the denominational differences do not seem to be explicable in terms of the differences in central beliefs that distinguish the denominations but to be explicable only as different reasonings from common premises, the differences are identifiably religious, and

constitute an integral element of denominational religious difference. The differences do not in truth turn on whether an embryo or fetus or, indeed, a zygote or blastocyst is a "human being," but on the direct moral evaluation of the interests involved. So in the Orthodox Jewish view, the fetus is simply a limb of the mother until birth, but it may not be aborted except where the life of the mother is in the balance. The Roman Catholic doctrine puts on the embryo and fetus a value equivalent to that placed on the life of born human beings, ignoring its futurity as irrelevant to a value analysis determined by considerations of divine purpose and of the divine relation to the creation of human life. In different degrees other denominations deal with the embryo and fetus as having values but values of a different order than that belonging to born human beings until the fetus is born; hence the value attaching to the fetus remains subordinate to the value attaching to the life of the mother. In some views the value attaching to the fetus is subordinate as well to the mother's health interests, and the value attaching to the fetus may vanish as a value if the prospect that the fetus will attain fulfillment in life approaches nullity. But all the views are rooted firmly in religion, in belief in God's will, in God as the author of life, and in God's concern with humankind. The moral principle once determined by right reasoning is recognized as willed by God; it is, simply, inevitable, and beside the point, that reasonable men, without any knowledge of God or of his existence, would evolve the same principles of action by right reasoning alone as appropriate determinants of conduct in the civil order.

The Declaration on Abortion is explicit that

"Human law can abstain from punishment, but it cannot declare to be right what would be opposed to the natural law, for this opposition suffices to give the assurance that a law is not a law at all."

That is, natural law, immutable because ultimately divine in origin, and discoverable by reason, itself divine in origin, can toler-ate the absence of any punishment for abortion by civil government—the decriminalization of certain abortions—but it cannot tolerate its affirmative legalization since that transgresses natural law. Other denominations make precisely the same argument to different conclusions: that law which attempts to make illegal what religious conscience justifies as licit is not tolerable, because it conflicts with the rule of conduct that moral theology explicates.

## XIV

Abortion became a political issue of prominence after the Supreme Court's decision of January 22, 1973, not only through the effort to secure enactment of a human life amendment, but also through state and local legislative efforts and the effort to enact the Hyde amendment and its successors. Candidates for public office have been identified as pro-life and pro-choice, and, indeed, in the 1976 presidential election there was a candidate campaigning on a pro-life platform. A Westchester (New York) Right-to-Life Committee printed a pamphlet "Vote Survey" for pro-life groups to use in the forthcoming elections; it stated:

"Where a choice is indicated in November, all pro-lifers will be called to support the pro-life candidates irrespective of party affiliation of the voter and/or candidate.

"The result? Pro-life candidates become members of the 94th Congress who will work to get the Human Life Amendment passed; pro-life state senators and assemblymen will be in the New York State Legislature to ratify the HLA.

\* \* \* \* \* \*

"Even if only a minority of pro-life voters are surfaced, it can still accomplish its goal, especially in primaries when relatively few voters turn out.

\* \* \* \* \* \*

"Party loyalties must be laid aside, especially by those involved with a party, unless they influence their party to back only pro-life candidates."

During the 1976 presidential campaign representatives of the NCCB visited both candidates and elicited expressions about abortion from them. The result was extensive newspaper coverage of the candidates' views and vigorous discussion in the newspapers of the propriety of the NCCB action and of the meaning and the political significance of the candidates' expressions of view. The NCCB action was construed by some as supporting President Ford's candidacy and as intended to influence Roman Catholics to vote for the President. Newspaper reporting saw both candidates as trimming their sails to meet the seeming NCCB wind. Federal funding of abortion was injected into the newspapers' interviews with the candidates and reports of the candidates' remarks. Ultimately NCCB issued a statement of non-partisanship, the effect of which is necessarily a matter of conjecture.

### A

There is little room for conjecture—except on the issue of ultimate effect—concerning the impact of organized pro-life activity on Minnesota politics.

Mary Peek decided, when in 1972 Minnesota's redistricting of its senate and house created a vacancy in her district, to stand for the House of Representatives from her Twin Cities area district. She had been active in Democratic-Farmer-Labor (DFL) politics, had taught high school and had some experience from that of high school students' pregnancy-abortion matters, had participated in anti-war activities (Vietnam), had been a founder of the local League of Women Voters unit, and had a position on current state issues. She favored reform of the state's abortion law. She sought the DFL party endorsement, but was advised that the DFL already had chosen a young man who had recently moved into the district: "He's a Roman Catholic and safe on abortion," she was told. "We cannot afford to lose the district." The district was considered a DFL district but was of mixed income levels, and, in Mrs. Peek's view at least, its large Roman Catholic population included more conservative than liberal Catholics. When Mrs. Peek appeared before the DFL local board she was questioned about her stand on abortion and her statement of position seemed to Mrs. Peek to disturb the board. At more casual meetings she was asked about and disclosed her views on abortion. At a county board meeting at which the four candidates were present all were asked about their religious affiliation, church attendance and activity in church affairs; the young man named his parish church, his regular attendance and belief. When Mrs. Peek said that she was a Unitarian, an occasional church-goer and sought to live her beliefs, one of the Board members indicated a belief that Unitarians were atheists. Abortion was not mentioned in the meeting, but Mrs. Peek sensed that it was what occasioned the inquiries.

Mrs. Peek incautiously answered an MCCL questionnaire by saying that she favored the ABA position on abortion. She did not know the then most recent ABA position, and MCCL took the answer to mean that Mrs. Peek approved abortion if performed in the first twenty weeks. MCCL made the result of its poll of all candidates available to the diocesan periodical, The Catholic Bulletin, which, just before the primary voting, published the list, grouping Mrs. Peek with those who "Favor abortion on demand up to 20 weeks of gestation." A letter of correction, worked out with Mrs. Darle St. Martin of MCCL, explained that Mrs. Peek believed that if abortions were lawful, they should be performed in the first twelve weeks and that after viability abortions should not be performed except for the gravest reasons. The Catholic Bulletin published the letter, but not in its entirety, on September 8, 1972, and on September 13, 1972, published a further item asserting that it had treated Mrs. Peek fairly, and explaining that the ABA had adopted a resolution in February 1972 approving the Uniform Law, permitting abortion "on demand" up to twenty weeks, and under specific circumstances thereafter, and that the ABA had taken no earlier position on abortion, although the

ALI formulated a proposal several years earlier.

Mrs. Peek experienced an erosion of support, and some positive attempts by former supporters to dissociate themselves from her candidacy. It was her impression that some Roman Catholics, even those whom she had regarded as liberal and willing to vote for her although unsympathetic to her stand on abortion, were ceasing to support her. She believed, nevertheless, that most of her avowed Catholic supporters continued to support her, although with difficulty; one said that she had heard Mrs. Peek called a murderer; she heard no statement that any priest had spoken against her, and, indeed, thought that some quietly favored her. When she handed out flyers at a shopping center, some of those to whom she gave them, tore them up in her presence, and others said they would not vote for her because of her stand on the abortion issue. Her children told Mrs. Peek that in school other children had said that their mother was a baby killer. Her stand on the Vietnam war was also raised against Mrs. Peek.

She lost the election by 116 votes. Two of the four in the race were elected. Her young DFL opponent ran first, a moderate Republican, who did not exploit the abortion issue, ran second, and an older DFL candidate ran fourth.

Mrs. Peek has continued her interest in politics and it is her judgment that the abortion issue has been far more divisive in Minnesota than the Vietnam war issue and the issue of aid to parochial schools.

Mrs. Peek does not assert that the abortion issue certainly caused her loss. But she observed that her young opponent's views on almost all issues approximated hers, that he was a DFL liberal too—both Hubert Humphrey Democrats—and that the added facts, that he had a view on abortion that was that of his many co-religionists in the district and that he did somewhat better than she did in the heavily Roman Catholic parts of the district, have significance. Mrs. Peek did not believe that there was any institutional coercion of Catholics, but that the social disapprobation of abortion

within the Catholic community, resulting from the hierarchically created atmosphere of disapproval, must to some extent carry through to the voting booth.

### B

As early as 1967, when the Abortion Rights Council and MCCL were formed in Minnesota, there were efforts to have the abortion law of Minnesota repealed or modified; a number of groups were interested in the matter, including religious, social and medical organizations and a Minnesota coalition group called Freedom of Choice. The position of the Roman Catholic Church on abortion had become known through legislative hearings before 1972. In that year, when the legislature was redistricted, and the DFL thought it possible that it could elect majorities in both houses, an effort was made to select candidates whose "profiles" would fit the districts they were to run in; the result was to favor selection of candidates who were "safe" on abortion. In that year MCCL identified all candidates' positions on abortion, and, as Mrs. Peek found, the Catholic Bulletin published the MCCL findings.

In 1973, in the new legislature bills were introduced to change Minnesota's abortion law, and the Supreme Court decisions were handed down: a flurry of legislative activity and publicity followed; bills were presented proposing to memorialize the Congress to pass a human life amendment; the Catholic Bulletin, early in February 1973, published articles quoting Catholic bishops as denouncing the Court's decisions and urging various types of action to limit their effect and to initiate educational and informational programs. There was active lobbying in the Minnesota legislature, and discussion in the public press of the issue and of the Catholic Church's "hard-sell" image on abortion, an approach to the issue to which some Catholic clergymen and laymen objected even though they accepted the Church's underlying moral teaching. In late March an editorial in a St. Paul paper warned that memorializing the Congress to pass a constitutional amendment would not

bypass the issue but would put the state on record as wishing to "circumvent" the Supreme Court's decisions, and that, if the Congress did act on the memorialization, the memorialization would end in the legislature's having to face the issue later on in a vote on the proposed amendment. The hearings before and the debates in the legislature provoked discussion of religious involvement, interference with religious liberty, and denigration of personal religious values; higher authority was invoked, a court higher than the Supreme Court was referred to, and, on one side, there was insistence that the legislation dealt with human life. The rhetoric of debate was "harsh," "unbelievable." On April 6, 1973, a Minneapolis newspaper column, reporting the action of the State Senate Judiciary Committee on a bill requesting Congress to pass a human life amendment, stated that "Throughout the hearing, there were overtones of religious influence behind the anti abortion movement." A St. Paul paper reported a little later in April, 1973, that the Minnesota House passed a similar bill "after an emotional debate." The author of the bill was quoted as saying that the right to life is not a question of women's rights or of religious rights, but that "it is a question of public societal morality." The press reported, in May 1973, that the executive director of the Minnesota Catholic Conference (who had also become a director of MCCL), who acted as legislative lobbyist for the ten Roman Catholic bishops of Minnesota, had written to the bishops urging them to add their effort to MCCL's campaign to have the Minnesota legislature enact new restrictions on abortion; the letter suggested that the matter "be commented on from the pulpit or any place else which is appropriate"; with the letters to the bishops were enclosed copies of a bulletin of MCCL's lobbyist recommending that MCCL's members write their representatives that they would hold the "DFL-controlled Legislature and particularly its leadership, responsible" if Minnesota was left without any law to regulate abortion. When a Minnesota Senate bill was voted out of committee in May 1973, a newspaper quoted its author as say-

ing that the bill reflected a compromise between "two totally different perspectives"; the reporter asserted that, "During the hearing he [the bill's author] was advised by John Markert, lobbyist for the Minnesota Catholic Conference. Several representatives of Minnesota Citizens Concerned for Life (MCCL) the major antiabortion organization, sat nearby; not far away sat several lobbyists for Minnesota Organization for Repeal of Abortion Laws (MORAL), the MCCL's principal adversary."

To a witness active as a Pro-Choice lobbyist during the 1973 legislative session, the members seemed to be divided into opposing groups who sincerely believed in their respective pro-life and pro-choice positions, and an intermediate group whose members sought a politically expedient course that would avoid direct commitment on the question. The pro-life proponents appeared to the witness to have a basically religious belief that life began at conception and that they had the obligation to protect that life; to the witness they seemed unable to distinguish between belief and imposition through civil law. The witness testified to her participation in the organization in the spring of 1973 of a DFL Feminist Caucus by party members (women and men) committed to fourteen principles, the first of which was separation of church and state, and another of which was support of the Supreme Court's January 1973 decisions. In the summer of 1973 a similar caucus was formed within the Republican party, and the two caucuses have cooperated in support of issues and candidates.

January 22, 1974, marked the first March for Life, one year after, as Archbishop Byrne expressed it, the Supreme Court "issued its tragic and destructive opinions on abortion." On that date a "Circle of Life" march was formed around the State Capitol—school children were excused from school to take part in it; the St. Cloud Visitor, a publication of the diocese of St. Cloud, communicated the bishop's request that the people of the diocese engage in the Circle of Life program: the bishop's message to the pastors outlined six methods of

participating, including special Mass or Masses at convenient hours, a prayer vigil in each parish, family prayer and acts of self-sacrifice during the week of January 22, emphasis in Catholic school and religious instruction programs on the sacredness of life, tolling of bells from 11:50 a.m. to 12 noon, and the "Circle of Life" observance at the State Capitol "arranged by MCCL members and friends," in which 3,000 marchers were expected to join. The bishop's message also complimented the people on having contributed $11,000 to the pro-life cause. The March for Life was organized by the MCCL and Catholic churchmen. (MCCL was not a Roman Catholic organization; a majority of its members were believed to be Roman Catholics, but it was both non-denominational, and, practically, interdenominational.)

The political year in Minnesota begins with preparations for the caucuses, held on the last Tuesday in February or the first Tuesday in March, in the more than three thousand electoral precincts in the state. Separate caucuses are held by the DFL and the Republican parties. Everyone who will be eighteen by the next general election is eligible to participate in his or her precinct caucus, but can attend only one. The caucus elects a number of delegates determined by the number of votes of that party cast in the precinct in the last preceding general election. The delegates elected in the caucuses elect from their number the delegates to the State Senatorial District Convention; the delegates to the District Convention elect from their number the delegates to the Congressional District Convention and the State Convention (the members of which are the same persons), and they in turn elect from their number delegates to the National Convention. Subcaucuses may be formed within the precinct caucus in terms of the delegate's position on a particular issue or cluster of issues. Delegates are elected on a proportional representation basis. Subcaucuses related to the abortion issue were to be anticipated in 1974 in light of the experience with the issue in the 1973 legislative session.

The 1974 caucuses were held on February 26, 1974. The parish bulletins of two Roman Catholic churches for Sunday, February 24, contained notices about the caucuses. The St. Rose of Lima bulletin said in part:

"*ALL PRO–LIFE PEOPLE*: Be sure to attend your precinct caucus to be held on Tuesday, February 26th at 8 PM. Roseville Precincts 2, 4, 6, 7 & 8 will meet at Alexander Ramsey High School. Roseville Precinct 5 will meet at Falcon Heights Elementary School. We need *YOU* to vote for pro-life delegates to Democratic and Republican conventions. *There will not be another chance to do this for two years*! If you wish to know who your pro-life delegates are in your precinct or if you have any questions at all please call . . . Roseville-Falcon Heights Pro-Life Committee.

"*PRO–LIFE MASS* at St. Rose on Tuesday, Feb. 26th at 11:00 AM for all those planning to attend the caucuses that evening. The theme of the Mass will be: "Encouragement in the Lord." Members of St. Odilia's & Corpus Christi Churches have also been invited to join us at this Mass."

The relevant part of the St. John the Baptist bulletin read:

"Do you Love Life? If you are concerned about the erosion of our traditional values of respect for life as seen in the issues of Abortion, Infanticide & Euthanasia, then Tuesday the 26th is the day you can do something about it. Join your friends & neighbors at your precinct caucus & guarantee that your views be represented by becoming a delegate or voting for a pro-life delegate. For more information call Marilyn Nystrom . . ."

The bulletin also invited those interested in knowing more about the pro-life movement to attend "an informational meeting & regrouping of the New Brighton Chapter of MCCL" at the New Brighton village hall.

A flyer of unknown origin distributed in Fridley on the same Sunday, addressed to "Fellow Catholics," asserted that "we" need your votes at the precinct caucuses on reso-

lutions for human life legislation and for "equal funding for each student" whether a student in public or in private school. The flyer asserted that in 1972 there were 100,-000 at the DFL caucuses and 35,000 at the Republican caucuses, and that there were 640,000 Roman Catholics aged 18 or older in the state. After giving the addresses of three DFL and one Republican caucus, the flyer continued:

"The caucuses will last only one hour required by law so be there on time. One hour out of your life to help save a lifetime for an un-born, and to save your right to send your children to what school you would like. When a baby is aborted and your private school is gone, they're gone forever. So if you are tired of the indignities heaped upon us as a Catholic community judicially then attend these caucuses and cast your shadow on these issues of our time."

There is no evidence that clergy of any other denomination urged their congregation to support caucus candidates on the basis of their positions on the abortion issue; clergymen of such other sects simply urged their congregations to attend the caucuses. The DFK Feminist Caucus sent out mailings referring to threats to religious liberty.

The selection of delegates at the precinct caucuses in many districts produced subcaucuses identified as "Pro-Life" and "Freedom of Choice," directly referring to the abortion issue, and there were "Supreme Court Dec." subcaucuses representing a pro-choice position; "Unity" and "Labor" subcaucuses reflected a concern with avoiding polarization on the abortion issue; "Independent" and "Progressive Democratic" caucuses reflected a pro-choice position linked with, apparently, a position on other issues as well. Other subcaucuses are identified as "Education," "Environment," "United DFL," and by proper names; no subcaucus designation is recorded for many delegates to the district and state conventions, but the absence of a designation does not necessarily signify that the precinct delegate or a precinct delegation did not reflect an ascertainable alignment on issues.

The record of the delegates to one district (and state) convention in evidence shows the extent of the subcaucus identifications related to the abortion issue.

Precinct subcaucus designations could survive into the district and thence into the congressional and state conventions; however, a subcaucus that reflected no more than the minimum number of votes needed to elect one delegate would be unlikely to survive into congressional and state conventions. The pro-life subcaucus designations were very evidently numerous enough to secure injection of the abortion issue into the 1974 primary and general elections in Minnesota.

As in 1972 the Catholic Bulletin published the MCCL identification of pro-life and pro-choice candidates both for the primary and for the general election. A council of the Knights of Columbus circulated a mimeographed flyer headed "Support Respect for Life" giving the names of the candidates for statewide office, United States House of Representatives and for the Minnesota legislature in the district, together with their party designations and their response to a questionnaire asking their attitudes toward the "Respect for Life and/or the liberalized abortion issue." Not all candidates responded; the statewide DFL caucus had agreed that DFL candidates on both sides of the issue would decline to respond; eleven candidates answered that they supported "Respect for Life," and nine did not respond. After listing the names and responses the flyer continued:

"It is our duty as Catholics and Christians to vote for the Pro-Life candidate regardless of whether or not it means crossing party lines. To do otherwise is to give our stamp of approval to legalized murder."

A flyer circulated in the 4th Congressional District listed candidates for Congress and the state house of representatives in three columns, "pro-life," "pro-abortion," and "no response," and among pro-life candidates distinguished with an asterisk those who were "strong pro-life candidates." The

flyer's data were said to be from a recent MCCL survey and from voting records. Just above the list of candidates was printed, in solid capitals, the statement:

"OVER A MILLION BABIES ARE KILLED IN COLD BLOOD BY THEIR MOTHERS EVERY YEAR. ONLY YOU CAN STOP THEIR SLAUGHTER. VOTE FOR CANDIDATES WHO ARE PLEDGED TO SUPPORT THE HUMAN LIFE AMENDMENT TO THE U. S. CONSTITUTION."

The Republican candidate for Congress was asterisked as a "strong pro-life" candidate; his adversary, the incumbent, was also pro-life, but a newspaper advertisement of his Republican opponent, under the prominent heading "PRO–LIFE," criticized the incumbent's alleged failure to work for immediate passage of a pro-life constitutional amendment "bottled up in a House Committee while countless lives are being terminated." The incumbent DFL candidate won the election, and in 1976 did not stand for re-election. In an election for one of the state House seats a windshield flyer circulated by a pro-life citizens committee asked voters to "Make sure you get what you vote for/Moral, responsive representation/Life is the Issue." The pro-life candidate, the incumbent, who had fairly recently adopted that position, was supported on the ground that he *"Denounced* the U.S. Supreme Court ruling on abortion," whereas his opponent *"Supports* the U.S. Supreme Court ruling on abortion. (The ruling in effect provides abortion on demand.)" The flyer stated that the pro-life candidate would vote for a "right to life" amendment to the national constitution, and that he had voted for the MCCL bill regulating abortion in Minnesota (an enactment later held unconstitutional) and for the bill requesting Congress to pass a human life amendment. The flyer stated that the candidates' positions were given as they stated them at an MCCL-sponsored meeting on October 3, 1974. The pro-life candidate lost the election. (The invalidation of the law regulating abortion was commented on adversely by the editor of the Catholic Bulletin in an editorial that concluded with an appeal for prayers and for contributions to the Legal Defense Fund of MCCL.)

On January 22, 1975, the second anniversary of *Roe v. Wade,* a second "circle of life" demonstration was organized around the theme "Everyone deserves a birthday," under MCCL's sponsorship; participants were asked to take canned food to the demonstration as a "birthday gift" for the poor, and three day partial fasts were suggested to heighten awareness. The MCCL brochure on the "Celebration of Life" at the state capitol was addressed to "Minnesota Clergy," and the Catholic Bulletin of January 7, 1975, published an article summarizing the points of the proposed program and noting that participants were asked to send "pledges and savings on food costs to be donated to MCCL." The article concluded that "parish groups sending buses to the rally at 10:30 a. m." included those of parishes in Burnsville, Savage and Mendota. A later article in a Knights of Columbus publication referred to the participation of five parishes in the Highland Park area; the report stated that the "literature" was passed out at a Lutheran Church before those attending departed via bus for the march, and that there was an "evening requiem" at St. Agnes church.

In November 1975 an article in the St. Cloud Visitor, a diocesan publication, discussed the NCCB Pastoral Plan, and quoted the Bishop of St. Cloud as saying that much of the Pastoral Plan was already being carried out in Central Minnesota, an area "ahead of the nation in the whole pro-life effort." The Bishop was quoted as approving organized political action through citizens' lobbies identified not only with the Catholic Church but with all other interested groups. The editor of the Catholic Bulletin had already told his readers in September 1975 that then was the time to get together with people who really believed that human life was sacred from the moment of conception, and stated that "The caucuses of both major parties are where the action starts. . . ."

The March for Life organized with MCCL to mark the third anniversary of *Roe v.*

*Wade* was planned to circle the Federal Building in Minneapolis where Senators Humphrey and Mondale had their offices: the St. Cloud Visitor reported that the senators were to be picketed for their inaction on the human life amendment; the Federal Building also contained the office of Representative Frenzel, who had been non-committal, and of Representative Fraser who had opposed the amendment. (The other six Minnesota representatives were said to favor the amendment.) The St. Cloud Visitor article advised that all parish pro-life coordinators would receive informational mailings from MCCL, and they were asked to organize bus rides to the Federal Building. It was reported in the press that about 3,000 gathered at the Federal Building on January 22, "a large percentage" of them school age children, and that afterward the protesters marched to the National Guard Armory and heard pro-life speeches from two state senators and the president of MCCL and were urged by one of the state senators to attend their state caucuses in February in an effort to elect officials who were against abortion.

Before the caucuses, held on February 24, 1976, pro-life workshops were reportedly conducted in two Roman Catholic parishes, and one parish bulletin advised parishioners to support pro-life at the caucuses, saying that "Your vote now could be more important than your vote in November, when your choices are limited." The caucus voting in the precincts and at the legislative district level again showed subcaucuses expressing the opposing views on abortion, and news reports of the caucuses reflect discussions of the issue in the caucuses. In one locality, it was reported, the one-issue anti-abortion candidate for president won the most delegates in the DFL caucuses, that the delegates' votes were equally divided on a resolution favoring a constitutional amendment overruling *Roe v. Wade*, and that a resolution that welfare funds should not be used for abortion, since it is an elective procedure, was narrowly adopted. After the caucuses the Catholic Bulletin reported that the past president of MCCL asserted that pro-life had done as well as or

better in the 1976 DFL caucuses than in 1974 and much better in the 1976 Republican caucuses than in 1974. In the September 14 primary election, the Catholic Bulletin asserted, there was a supporter of the human life amendment in 75% of the legislative districts; the same issue of the Bulletin published the result of the MCCL poll of the candidates' responses to a proposed human life amendment which would have allowed abortion only to save the life of the pregnant woman.

As political activity extended to include the presidential campaign and the platforms of the national parties, the abortion issue was the subject of much newspaper reporting. The Church was roundly accused of meddling in politics and of seeking to impose its views on others, and the churchmen as vigorously defended their right to interrogate candidates, determine their positions on the abortion issue, advise their church members of the candidates' positions, and state the Church's position on the issue, as one among a number of social issues with which the Church was deeply concerned. The churchmen insisted that they did not tell their members how to vote. The differences between the positions of President Ford and Mr. Carter on the issue were made the subject of a flyer that urged a vote for President Ford as a Pro-Life candidate. And candidates were insistently criticized if they failed to make their positions on abortion clear. Candidates were sufficiently alive to the issue to cause some of them to advertise their candidacies in the Catholic Bulletin, and, in some cases, to emphasize their positions on the abortion issue.

### C

The abortion issue has become an important part of the electoral and legislative processes since 1973. The evidence does not, of its nature cannot, demonstrate that the abortion issue has begun to dominate politics. Equally, it cannot be said that the abortion issue has not decided any elections. Practical reason gives assurance that it must have done so, that the forces to pro-

duce that result have been often deployed, and that they could not have failed uniformly. The Annex and the trial evidence demonstrate significant phases of the impact and the workings of the abortion issue. The prominence of the issue and its unmeasurable but probable effect on the outcome of elections cannot, however, safely be regarded as an untoward distortion of electoral and legislative considerations. The ratio of abortions to live births in this country, the trend of the ratio, the inevitable problems of adjusting from the earlier prohibitory laws to a new generation of laws that must conform to newly defined constitutional considerations, these are matters that in a federal republic necessarily and properly occupy legislative and voter attention; they are matters of critical social importance, and their implications for religion and religious difference cannot impose a rule of silence. That the issue is seen as alive with considerations of specifically religious morality neither means that legislatures may not deal with the issue nor that candidates may not debate it nor voters divide on it. Single-issue politics, in quiet truth, is no more than a recognition of and action upon the fact that certain issues are seen by a large part of the voting population as having decisive importance; there is no authority that can or should require voters to accept any scale of issue evaluation except their own. The electoral process is itself the regulator; it admits of the effective entrance of the single-issue wedge only by popular vote.

That is not to say that the single-issue voting almost inevitably encouraged by the bitterly controversial abortion issue may not be relevant to some other analysis of the complex whole.

### D

There was little change, and no fundamental, change in the content of the annual debates that led to the funding restriction enactments in 1976 and the three following years. The Annex summarizes the debates in 1976 and 1977, notes the scope of the 1978 debate, and summarizes in principal part the 1979 debates. In addition there were each year unreported meetings of the conference committee; the record has evidence only on the 1977 committee proceedings.

A witness present at every session of the conference committee meetings as a lobbyist for the National Abortion Rights Action League (NARAL), and who spoke to Senator Brooke, the key conferee on the part of the Senate, before, during and after each conference session and kept in close touch with the Senator's staff, testified that Mark Gallagher was also present at every conference session and at significant points during the process of formulating and voting on amendments communicated with subcommittee counsel on the House side who would then communicate with Representative Flood, who headed the House conferees. Mark Gallagher was the lobbyist of the National Committee for a Human Life Amendment, which the witness described as the lobbying arm of the NCCB. (The reports filed by the National Committee for a Human Life Amendment, Inc., under the Federal Regulation of Lobbying Act, 2 U.S.C. § 264, disclosed receipts of $279,119.35 in 1977 and expenditures in connection with legislative interests of $45,533.29; of the receipts $272,747 was in gifts of $500 or more from 118 archdioceses and dioceses; the report for 1976 reflected $277,414.89 of such gifts from 120 archdioceses and dioceses included in total receipts of $290,323.93, and expenditures in connection with legislative interests of $36,280.30.)

In the protracted conference committee proceedings thirty-one different versions of funding restriction were brought forward— and a thirty-second position was that there should be no such amendment to the appropriations bill. Exhibit 46 supplies both a chronology of floor and committee action, keyed to the proposed amendments, and the texts of the amendments. Intense lobbying efforts were exerted both by the pro-life and pro-choice organizations, and to at least one reporter, as well as to the witness lobbyist of NARAL, Mark Gallagher's influence on the position of the principal confer-

ees on the part of the House was an expression of the NCCB view and was decisive of the position the House conferees took, at least until the very last, when the "leadership" in the House and Senate intervened. The long sequence of amendments marks the effort to reach a compromise of what could not be the subject of a principled compromise result but could only become a register of the point at which the struggle of principle was arrested. During the conference committee proceedings and on the floor the members made and responded to the charge that a religious restriction was being put forward by the pro-life group, and the counter-charge that the pro-choice group was subordinating life values to social convenience. Oddly, the debates were most trying to the Roman Catholic legislators who were unsympathetic to the political approach of NCCB and who did not share the view that the Congress should restrict funding to the abortion required to save the pregnant woman's life: they had to meet attacks from a Catholic press that seemed to insist on strict adherence to the "Hyde" amendment, usually meaning the Hyde-Conte Amendment of 1976, and excluding the rape and incest exception and the severe and long-lasting physical health damage exception. See Annex, pages 764–765, and 124 Cong.Rec. H5360–61 (June 13, 1978: criticizing Mark Gallagher's reporting of Representative Obey's votes; Mr. Obey said, "I am especially appalled when those distortions are engaged in by people who parade as representatives of religion and morality."). The Bishop of Fargo in his bulletin to his clergy of August 29, 1977, indicated that he had written his clergy about their and their parishioners' contacts with Senator Burdick to request him "to support the Hyde Amendment, as he did last year, with no federal funds for abortion 'except to save the *life of the mother*'." The Bulletin continued, "Please continue your efforts until we close off all abortion funds and until we have laws to protect the Unborn Child. I am most grateful for your prayers and persistence. God will bless them, I know." When Senator Burdick reportedly voted for an amendment that included exceptions from the funding restriction for rape and incest victims and for "medically necessary" abortions, the Catholic Action News of the Fargo diocese in a page one article reported that fact, and that the Senator had refused to change his view despite receiving many letters expressing concern over his "present position"; the article quoted the Fargo Pro-Life Director as saying that the only way out of the "dilemma" was to persuade the Senator to change his view by writing or calling him, and by praying and sacrificing "so that all Unborn Children will be permitted to enjoy their right to live." In the Bishop's column in the same issue of the News he appealed to the Senator to "come to the defense of the Unborn Child," and concluded, "I join thousands of North Dakotans in asking Senator Burdick to vote for life and not death, to vote as he did last year on the Hyde Amendment."

Religious motivation and allegiance to religiously perceived principle on the part of many legislators, on both sides of the issue, are easy and necessary inferences from the record and the legislative history. That does not signify that only religious motivation can explain the pro-life position nor does it signify that secular reasoning could not readily arrive at the pro-life principle. What finally influenced the votes of the decisive number of legislators cannot be said with any confidence to be religious motivation or religious conviction or will to make effective a religiously perceived principle of conduct or the influence of institutional religion and religious pleading or fear of reprisal from religiously oriented voters. What can be said is that an organized effort of institutional religion to influence the vote on the enactments in question on religious grounds was made, that it cannot be said that the effort did not influence a decisive number of votes through a combination of religious belief and principle on the part of some with a fear of political reprisal on the part of others, and that the narrow votes in both houses are open to the inference that in one or the other way the religious factor was decisive of the issue for

enough legislators to affect the outcome of the voting. On the specific effect of Roman Catholic institutional intervention Representative Hyde said in his April 22, 1978, St. Louis speech:

"It would be amusing (if it weren't so threatening) that the current crusade of the American Civil Liberties Union is to prove in Federal Court that the pro-life movement in America is a religious plot—specifically a Catholic plot—and hence a violation of the First Amendment. I should like to point out that while several Catholic voices—many Catholic voices—are heard in Congress on behalf of innocent pre-natal life—the leading Senatorial pro-life spokesmen are mostly non-Catholic. I speak of Senator Jesse Helms of North Carolina, Senator Dick Schweiker of Pennsylvania.

"The most prominent Catholics in the Senate—the senior senator from Massachusetts and the junior senator from New York—do not support our effort to stop the abortion tidal waive. The same sad truth applies to the celebrated Catholic governors of California and New York. In the House we have a Jesuit Priest Congressman who wears his Roman collar while casting votes to continue the use of taxpayers' money to pay for medicaid abortions. To my knowledge, he remains in good standing with his religious superiors. In a nearby state, one Catholic college invited a Senator who was a leader of the pro-abortion forces in Congress to address its graduating class last June. The point of all this I suggest, is that the outrage of abortion isn't all that disturbing to some influential Catholics. That is what Jacques Maritain calls 'kneeling to the world.'

"There is one nun based in Chicago who travels the country attacking me for opposing abortion. Occasionally, the newspapers give her coverage which I suggest ought to embarrass every Catholic."

When Representative Hyde voted in 1976 to override President Ford's veto of the 1976 enactment despite his agreement with the veto on the appropriations aspect of the bill (which exceeded the President's budget by $4 billion), he said (123 Cong.Rec. H11855):

"I am, nevertheless, voting to override the President's veto because within this legislation is a provision forbidding the use of Federal funds to pay for abortions. In starkest terms, the potential exists of saving some 300,000 lives which otherwise might be destroyed with the use of taxpayers' funds. The saving of these lives far outweighs the economic considerations involved in this legislation."

The language of the debates, the arguments made, revolve around the pro-life assertion that the fetus is a human life from its beginning, and that, therefore, abortion is either never permissible, or is permissible only in the narrowest circumstances. There was no absence, on either side of the debate, of a sufficient knowledge of human physiology; there were no mistaken notions about the physical nature of the fetus. Indeed, it was the pro-life forces which called on the discoveries of modern science to confirm if not to establish the validity of their position. Nevertheless, the insistence that fetal life has the inviolability accorded by all to the life of born human beings is not genuinely argued; it is adamantly asserted and forms the basis for much essentially religious language. There was, thus, no common ground on which to debate the morality of abortion and to consider in a moral or social view the kind of legislation needed to deal with the altered constitutional position. The pro-life legislators argued from a premise that foreclosed discussion. The pro-choice legislators' every argument was met with the assertion that the fetus was inviolable human life, that there was nothing to discuss. The language of the debates is replete with references to "unborn children"; birth is simply a "change of address"; the 800,000 or 1,000,000 abortions a year are repeatedly equated with the Holocaust; the fetus aborted is an "inconvenient human being," sacrificed to parental convenience; those having abortions are said "to terminate the lives of their posterity."

Yet it would not be difficult to point to considerable pro-life argument that counted on the evident facts that the fetus begins in a union of living human cells and is from nearly the first moment a potential human being, and that its dependent existence, is, for all its dependence, separate life of human quality; and to pro-life argument that the "right to life"—the affirmation that only great reasons can justify frustrating the natural growth into being of rational human life—is separately significant, and that the reasons advanced for funding abortion are for the most part empty. Others argued that federal neutrality would be represented by not subsidizing abortion, that the right to choose abortion did not imply a right to have an abortion paid for from public funds. Others argued that if there was a public duty it was a duty to provide alternatives to abortion, and so to relieve poor women of the need to resort to the always tragic recourse of abortion.

The repeated use during the debates of "human life" terminology extended at times to referring to the immortal soul of the fetus, to invoking Herod's "slaughter of the innocent," and to emphasizing that the fetus is "defenseless," is "innocent." Much of this language is seen in the Roman Catholic literature already referred to, and it implies humanity in the fetus—for only rational beings can be "innocent" in moral terms. The language and references are specifically religious, but, again, much other argument was in the debates that was free of religious reference, whether or not the debaters were motivated by their religious convictions. Other parts of the debates are very insistent that the issue was a moral issue, and that the members had to, or ought to, vote their consciences. The pro-choice debaters, in their reference to the pro-life members' positions, frequently emphasized their respect for the pro-life members' views and, in so doing, manifested an evidently informed belief that the pro-life views were essentially religious. More broadly, the pro-life members at times portrayed abortion as one element of the moral decay that they saw about them in this country and against which they sought to rouse the Congress.

The charge that the pro-life members were seeking to impose their "morality" or their religious views on the Congress, and on poor women, and the counter-charge that the pro-choice members were preparing to require taxpayers to whom abortion was morally abhorrent to subsidize it with their taxes, resulted in frequent avowals by members of their religious affiliations; indeed, members did not hesitate to instance in aid of their arguments their own religious upbringing, their conduct of their own families, and their legal and medical professional experience with abortion. The positions of the various churches on abortion were referred to more than once. The pro-choice members argued that the abortion decision was a matter of individual conscience. And there was a recognition that in the minds of some members their religious beliefs did not really leave them a free vote.

The debates were often bitterly controversial, even inflamed; the members returned to the debate again and again with expressed reluctance but with unabated resolution. The members recognized that the debates were often emotion-charged, and much of the argument, even read in the black and white of the Congressional Record, is deeply felt, personal in tone, and consciously moralistic—because the speaker sees no escape from the moral issue or from its importance. The members were plainly aware, were made aware, of the pressures exerted upon them by their sense of their constituencies' views on the issue and of the religious setting in which the views were entertained and expressed.

The intense lobbying on both sides of the issue is reflected in the debates and made clear in the record. The members were fully aware of it, and the not infrequent references to the picketing, the March for Life, and the letters from the constituencies indicate general consciousness that the issue was one that had gained wide popular attention and recognition that their votes would be reported to their constituencies. While the overall impression is that the

pro-life lobbying effort was better centralized and more strongly presented than the pro-choice lobbying, the pro-choice lobbying was effectively present and skillful. Remarkably, the issue cut across party lines, so that the lobbying effort had to be more personal than organizational in its address. To an extent the essentially non-partisan cast that the issue assumed seems to have cost the pro-choice advocates a substantial part of the Democratic support that might normally have been expected on a DHEW issue affecting medicaid. Representative Flood's 1976 change from opposition to support of the Hyde amendment is illustrative. See Annex pages 744, 750 and 764.

No measure of the effect of the lobbying is possible. The unanswered question is whether there would have been any abortion legislation if the pro-life group had not used the expedient of presenting the issue as a "rider" on the appropriation bill for 1976. The inference from the fact that the funding restriction has survived only as a rider for four successive years is that the expedient itself is responsible for the fund restrictions, and not any congressional consensus on abortion, or any fruition of effective lobbying effort. It is evident enough that the amendments are legislation on an appropriation bill, and that, although each side has charged the other with hostage taking, the reality has been that the pro-life forces have held the appropriation bills hostage until the amendments were passed. Yet that would not have been possible unless in one of the two bodies there was a consensus for abortion legislation. In a sense the amendments are enactments of the House of Representatives to which the Senate has acceded, with such amendments as it could negotiate, rather than risk the appropriation bills.

As pointed out earlier (*supra,* pages 646–648), right to life language has found its way into a number of statutes, and, in the case of the pregnancy amendment to Title VII (Equal Employment Opportunities), 42 U.S.C. § 2000e(k), occasioned exchanges as bitter as many of those that occurred during the Hyde amendment debates. In addition to the other enactments referred to above, Public Law 95–444 of October 10, 1978, 92 Stat. 1067, added to the section enumerating the duties and functions of the Civil Rights Commission the provision:

"(f) Nothing in this or any other Act shall be construed as authorizing the Commission, its Advisory Committees, or any person under its supervision or control to appraise, or to study and collect information about, laws and policies of the Federal Government, or any other governmental authority in the United States, with respect to abortion."

The Commission had issued a report in 1975 on *The Constitutional Aspects of the Right to Limit Childbearing* which argued against legislation aimed at narrowing the effect of *Roe v. Wade.*

### E

What ultimately emerges from the facts found in parts XII through XIV is that the major religions whose views were presented all regard abortion as presenting religiously framed questions of moral right, moral duty and conscience, that they are in disagreement on the appropriate rules of conduct but in agreement that abortion is a morally grave undertaking in any circumstances, and that their sharpest disagreement concerns the role of civil government. In this period, the record indicates, only the Roman Catholic Church, among the institutional religions, has sought to secure the enactment of legislation that would forbid abortion, has organized educational and lobbying efforts to that end, and acted to mobilize popular support for its legislative goals. The principal effort, to persuade Congress to pass a human life amendment for submission to the states, has failed completely to date. That the efforts of the Roman Catholic clergy and laity have produced the Hyde-Conte amendment of 1976 and its successors cannot be found as a fact, but it is more likely than not that those efforts have been a factor that cannot be eliminated from the chain of causation. In any event the pro-life effort, of which the organized Roman Catholic effort has been the most active component, has made use of the po-

litical process, and played a significant part in bringing about congressional legislation on the subject.

## XV

### A

■ 1. The Secretary argues that the action should be dismissed because there is no justiciable controversy: the plaintiffs have no standing since the states administer the Title XIX programs and are free to do so whether the federal government reimburses them or not, and here the Congress has simply failed to appropriate funds, a non-action that does not give rise to a cognizable injury; the injury to plaintiffs flows from the failures of the states of their residence to act, and if the states' failures trace to the federal government's failure to appropriate funds, then it is the states, not plaintiffs, who are injured.

It must be doubted that the question remains open; the Supreme Court's remand was to reconsider the decision in light of *Maher, Beal,* and *Poelker;* the terms of the remand rather confirm the existence here of jurisdiction over a justiciable controversy than suggest a re-examination of the point. What was decided earlier (421 F.Supp. 533, 537–539) answers the Secretary's points. In addition the challenged enactments have been held in some cases to modify Title XIX and, in consequence, the obligations of the states under their Title XIX plans. See *Preterm, Inc., supra,* pages 650–651; *Reproductive Health Services v. Walsh, supra,* page 651; *Zbaraz v. Quern, supra,* page 651; *Committee to Defend Reproductive Rights v. Myers, supra,* page 651. The evidence in the case demonstrates that plaintiffs have been denied abortions in cases in which abortion is medically appropriate because physicians have found themselves unable to certify the cases under the Hyde amendment standards; such certificates, if given, would come under review in DHEW audit of reimbursement data, and they could give rise to fraud investigations of providers if the DHEW saw reason to question a provider's good faith in making the certificate. More-

over, the Hyde amendment has precipitated changes in state law and Title XIX plans that depend for their validity on the validity of the challenged amendments. See pages 648, *et seq., supra.*

To the extent that the Hyde-Conte Amendment and its successors are held to modify Title XIX they are "legislation," despite the implicit transgression of the rules of parliamentary procedure of House and Senate, *Andrus v. Sierra Club,* 1979, 442 U.S. 347, 357–361, 99 S.Ct. 2335, 2341–2343, 60 L.Ed.2d 943; they are legislation directly affecting the rights of members of the plaintiff classes. That the funding restrictions are "legislation" even in the Secretary's view is clear from the circumstance that he adopted informal regulations under the 1976 enactment, and formal regulations under the 1977 enactment; indeed, the latter enactment directed:

"The Secretary shall promptly issue regulations and establish procedures to ensure that the provisions of this section are rigorously enforced."

He did so. See, *supra,* pages 644, 661, 661–662; Annex, pages 836–837.

■ 2. The Secretary argues the case is not justiciable because a congressional failure to appropriate funds presents only a political question, and that, for that reason, the issue is not one within judicial competence. The point's substance was dealt with in the earlier Memorandum, it must surely have been prominently presented to the Supreme Court, and yet the Court evidently remanded the case for consideration on the merits. See *Califano v. McRae,* 1977, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103.

■ No doubt an appropriation act must precede the final act of drawing money from the federal treasury; the argument that the Secretary seeks to press from article 1, section 9, clause 7, however, is without merit. First, in practical reality the language of each of the challenged enactments (a) relates to the "use" of concurrently appropriated funds, and the present actions challenge the validity of the restriction upon the use of appropriated funds; (b) to

the extent that the enactments achieved their purpose, they increased the Title XIX medicaid expenditures from the appropriation, as the Congress understood (see Annex, *passim* ); and (c) the enactments classified abortions, and confirmed the propriety of using appropriated funds for abortions (and certain somewhat similar procedures) in certain of the classes of cases. Second, to repeat, the enactments are legislative in content. See *United States v. Dickerson,* 1940, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356, the Congress realized it, passed by their own points of order, and consciously legislated on an appropriation bill. See Annex, *passim,* and, for example, pages 748–749, 772–773, 797. Representative Hyde spoke of the October 12, 1979, enactment as "the only vehicle to stop the killing is an appropriation bill." (Annex p. 838. As the Secretary points out (Defendant's Post Trial Memorandum pp. 22–23 fn.18) the purpose of the enactments was to change the administrative practice of providing funding for legal abortions. Third, the argument that, in order to avoid trenching on the congressional power of appropriation, a constitutional wrong to citizens must be held to be irremediable if the wrong takes the form of a deliberate congressional failure to appropriate funds, is unanswerably self-refuting; it is excluded by the nature of constitutional government. *E. g., Califano v. Wescott,* 1979, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382.

The cases relied on by the Secretary do not support the argument made. *Hart v. United States,* 1886, 118 U.S. 62, 6 S.Ct. 961, 30 L.Ed. 96, held simply that Congress was competent to decide, as it did, by a joint resolution enacted in 1867, that the United States would not, until Congress otherwise ordered, pay debts it incurred before April 13, 1861, to merchants who thereafter "in any manner sustained, the late rebellion" and that a presidential pardon, granted earlier in 1865, although it relieved the merchant of liabilities to the United States for disloyal acts, would not have authorized payment of the debt even if the 1867 resolution had not explicitly stated, as it did, that no pardon theretofore granted should au-

thorize payment until the resolution was modified or repealed; *Hart,* simply, said that the United States could decline to waive its immunity to suit as against those who had supported the "rebellion." *Knote v. United States,* 1877, 95 U.S. 149, 24 L.Ed. 442, similarly, had earlier held that President Johnson's general pardon and amnesty of December 25, 1868, did not raise an implied contract on the part of the United States to pay compensation for property it had condemned, and sold on the ground of Knote's treason, the proceeds of the sale having been paid into the treasury; had the money still been in the registry of the condemnation court, Knote's 1868 pardon would have entitled him to it; to sue in the Court of Claims, however, he would have to show an implied contract to pay or else some act of Congress authorizing payment from the Treasury—an appropriation. *Austin v. United States,* 1894, 155 U.S. 417, 15 S.Ct. 167, 39 L.Ed. 206, also held that it is for Congress to say when and for what causes the United States may be sued in the Court of Claims. *Cincinnati Soap Co. v. United States,* 1937, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. 1122, held that the Revenue Act of 1934, imposing an excise tax on the first domestic processing of coconut oil, could validly provide that the tax collected on coconut oil of Philippine origin should be set aside for and paid over to the Philippine treasury so long as the Philippine government did not subsidize producers of the oil; the court rejected the argument that turning the tax proceeds over to the territorial treasury was not an apt "appropriation" of public funds; Congress had established the territorial government and could assume the tax proceeds would be applied to public purposes. *United States v. Dickerson, supra,* held that an amendment appended to an appropriation for the Rural Electrification Administration, in the form "no part of any appropriation contained in this or any other Act for the fiscal year . . . shall be available for the payment" of any re-enlistment allowance "notwithstanding . . . §§ 9 and 10" of the Act of June 10, 1922, was not simply a restriction on

payment that left the old Section 9 re-enlistment allowance in force but was, and was intended to be, a provision suspending the operation of old Section 9 for one year; the Court met the argument that the plain words used did not suspend Section 9 by saying (310 U.S. at 562–563, 60 S.Ct. at 1038):

> "It is sufficient answer to deny that such words when used in an appropriation bill are words of art or have a settled meaning."

The actions do not seek to require the Secretary to ignore 31 U.S.C. § 628 by applying Title XIX appropriations to any object other than those for which they were made, that is, reimbursement under Title XIX plans of the necessary medical expenses of poor women, free of invalid limitations. *Cf. Califano v. Westcott, supra. Reeside v. Walker*, 1850, 52 U.S. (11 How.) 272, 13 L.Ed. 693, does not support the argument made from the nature of the Secretary's duty with respect to appropriations; the United States there sued a postal contractor on his account, he counterclaimed, and a jury found that he owed nothing but that the government owed him $188,000; although under the local practice of the time no judgment award had been made against the United States, the defendant sought an order directing the Secretary of the Treasury to enter the debt on his accounts and to pay it; the Court pointed out that the case was not one for mandamus, and went on (at page 290):

> "It is well settled, too, that no action of any kind can be sustained against the government itself, for any supposed debt, unless by its own consent, under some special statute allowing it, which is not pretended to exist here. (Citation omitted.)
>
> "The sovereignty of the government not only protects it against suits directly, but against judgments even for cost, when it fails in prosecutions."

The Secretary appears not to recognize that there was no difficulty in giving full and fair effect to the preliminary injunction issued at an early stage in this cause, and in effect until August 1977. See *Califano v. Westcott, supra*, 99 S.Ct. at 2659–60 (form of order).

*Lovett v. United States*, 1946, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252, is no less in point because it was, of course, a very easy case; the addition to the restriction on the use of the appropriated funds to pay compensation to plaintiffs of the derisory "unless . . . such person has been appointed by the President, by and with the advice and consent of the Senate," or has served as a juror or in the armed forces, and the background of the enactment did not make it anything more or less than a direct and clear prohibition of the use of appropriated funds to pay the plaintiffs' compensation after November 15, 1943; on the Secretary's theory it was the paradigmatic, double underlined failure to appropriate funds. That it was simply that did not protect it from judicial scrutiny, nor result in denying the plaintiffs a remedy: faced with the argument founded on the congressional control of appropriations the Court promptly rejected it, holding that the purpose of the statute was not merely to cut off plaintiffs' compensation through regular disbursing channels but permanently to bar them from government service, and that the issue of whether it was constitutional was justiciable. So here, it is the invalidity of the restriction, invalidity allegedly flowing from the operative consequences of the restriction for the people whose interests it affects, that is the gist of plaintiffs' claims and the basis of justiciability.

■ The claims put forward by plaintiffs are peculiarly for courts to determine. What the Supreme Court said concerning legislative competence to deal with the policy issues affecting the funding of non-therapeutic abortions (*Beal*, 432 U.S. at 448, fn.15, 97 S.Ct. at 2373, fn.15, *Maher*, 432 U.S. at 479–480, 97 S.Ct. at 2385–2386) did not signify that legislative bodies had the power to determine the validity of their own laws by framing them as funding laws. For the Secretary to argue that "there are no judicially discoverable and manageable

standards that the court can apply for determining what political balance should have been struck between policy considerations, conflicting interests and the other myriad factors to be taken into account" (Defendant's Post Trial Memorandum, p. 31), may be correct and may suggest that, therefore, there can be no legislative standards in this field; the inquiry here is not what is wise policy, but whether the Congress has or has not adopted a policy which, wise or unwise, the law forbids. The Secretary's argument ignores the lesson taught by *Roe v. Wade, Doe v. Bolton,* the *Maher, Beal* and *Poelker* cases, and not less than six other cases in which the Supreme Court has dealt with the abortion issue in one or another of its aspects. It is the inescapable responsibility of the judiciary, state and federal, to determine whether or not legislation transgresses the constitutional limits on legislation, and to interpret legislation. That is intrinsic to the separation of powers.

3. The Secretary argues that the actions should be dismissed because the states are indispensably necessary parties and have not been joined in the action. The contention is without merit, as a host of cases, most recently *Califano v. Wescott, supra,* demonstrates. The case is concerned with the meaning and validity of the annual funding restrictions as they affect the poor women and the medicaid providers concerned with legal abortion. The plaintiffs' evident and reasonable expectation is that, if what they see as the illegal incubus of the Hyde-Conte amendment and its successors ought in law to be and is removed, the medicaid responsibilities of the states under Title XIX will be appropriately discharged.

### B

A glance at the Annex will show that pro-life advocates in Congress were of the view that *Maher, Beal* and *Poelker* settled the constitutional questions involved in the Hyde-Conte type of amendment, and that the pro-choice advocates argued that the constitutional question, if settled by *Maher, Beal* and *Poelker,* did not decide the policy issues that were before the Congress. The basic questions in the case concern issues cognate to those in *Maher, Beal* and *Poelker,* and require review of those cases.

The series of enactments involved is directed to reducing the number of abortions performed in the United States by excluding from medicaid coverage all abortions except those described in the enactments. As nearly as can be determined the effect of the 1977 enactment for the period February 14, 1978, to December 31, 1978, was to reduce the rate of medicaid funded abortions by over 95%. The legislative history establishes that the riders were not enacted to encourage normal childbirth but to end abortion, so far as that could be done by limiting medicaid coverage, because it was a moral evil. The national policy, to the extent formulated, encourages family planning, 42 U.S.C. §§ 300, *et seq.,* 300a–21, *et seq.,* 1396d(a)(4), excludes use of abortion as a family planning method, 42 U.S.C. § 300a–6 and establishes safeguards against involving health service personnel and recipients of family planning assistance in violation of their religious beliefs, 42 U.S.C. §§ 300a–7, 300a–8. The legislative history demonstrates conscious rejection by the Congress of any provision for therapeutic abortion as a procedure to deal with the array of the principal maternal and fetal health considerations presented during the debates.

1. Title XIX, the structural provisions of which are outlined above (pages 639–641), is intended to provide medical care for the needy; the state plans of medical assistance must include reasonable standards for determining eligibility—need—and the extent of medical assistance—necessary medical care. 42 U.S.C. § 1396a(17). Those standards must be consistent with the objectives of Title XIX, the first-stated purpose of which is to appropriate sufficient funds each year to enable each state, as far as practicable under the conditions in each state, "to furnish . . . medical assistance" to AFDC families and certain others "whose income and resources are insufficient to meet the costs of necessary

medical services." 42 U.S.C. §§ 1396, 1396a(a)(10)(B), (C)(i), (13), 1396d(a). The state plan must provide the safeguards needed to assure that eligibility for care and services will be determined and such care and services provided in a manner consistent with simplicity of administration "and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). Certainly, as *Preterm* observed, Section 1396 identifies the needy, but it also identifies the relevant need—"the costs of necessary medical services"—which it is a primary object of the act to fund. There are, indeed, categories of medical service that need not be covered—Section 1396d(a)(1)–(17), read with Section 1396a(a)(13)(B), (C)) is explicit. But in the case of AFDC recipients the state plan, under 42 C.F.R. § 440.210, must specify that at a minimum categorically needy recipients are provided the services as specified in §§ 440.10–440.50. These include "inpatient hospital services" that are ordinarily furnished in a hospital for the care and treatment of an inpatient under the direction of a physician and that are furnished in an institution that is maintained primarily for the care and treatment of patients with disorders other than tuberculosis or mental diseases, is a licensed institution, meets medicare requirements and has a utilization review plan applicable to medicaid patients. 42 C.F.R. § 440.10. The mandatory physician's services—whether furnished in office, home, hospital or elsewhere—means services provided within the scope of practice of medicine or osteopathy as defined by state law by or under the personal supervision of an individual licensed to practice medicine or osteopathy. Under 42 C.F.R. § 440.-230(b) and (c)(1) each service must be sufficient in amount, duration and scope reasonably to achieve its purpose, and the medicaid agency may not deny or reduce the amount, duration or scope of a service required to be provided for the categorically needy or the medically needy "solely because of the diagnosis, type of illness, or condition." Medical and hospital service and care are specific to human health needs. Prenatal and obstetrical care are obvious kinds of customary medical care provided under medicaid, and abortions were covered under medicaid until the Hyde-Conte amendment became effective. Apart from the effect of that amendment, the cases have with one exception concluded that state plans must include provision for "medically necessary" abortions. See *supra* pages 649–650, 651, 651–652. No reason can be perceived for excluding therapeutic abortions from medicaid coverage after *Roe v. Wade* and *Doe v. Bolton,* even if it were thought that the first and second trimester right of the pregnant woman included choice of abortion for reasons, like those enumerated in *Roe v. Wade,* 410 U.S. at 153, 93 S.Ct. at 726 (quoted *supra* page 662), and in *Doe v. Bolton,* 410 U.S. at 192, 93 S.Ct. at 747 (quoted *supra* page 662), not all of which were immediately within "the scope of practice of medicine," or called for inpatient hospital services ordinarily furnished in a hospital for the care and treatment of an inpatient. But in any case, the "Hyde amendments" of 1977, 1978 and 1979 make clear the congressional recognition that abortion services are covered medical services; the Congress was concerned only with drastically limiting the circumstances in which the abortions would be within medicaid.

■ Plaintiffs argue that the only legal effect of the "Hyde amendments" is to withhold federal matching funds for certain classes of abortions without relieving the states of the duty to include in their plans provision for all medically necessary health care, including provision for medically necessary abortions. However, the analysis in *Preterm, Inc. v. Dukakis,* discussed, *supra,* pages 650–651, is persuasive that the 1977 amendment and its 1978 reenactment must be read as amending Title XIX substantively (591 F.2d at 128–133), the court in *Zbaraz v. Quern* agreed (596 F.2d at 199 to 202), and the amendments have been so administered. Concern that such a continuing duty would be imposed on the states has induced Representative Bauman to introduce an amendment on the subject to the bill that would add a new section to Title

XIX (Child Health Assurance Program); Mr. Bauman's amendment would add a Section 1914 to Title XIX (to follow 42 U.S.C. § 1396k), providing that none of the funds "authorized to be appropriated" under Title XIX should be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term: "*Provided however,* That nothing in this title shall be construed to require any State funds to be used to pay for an abortion." 125 Cong.Rec. (96th Cong., 1st Sess.) H 11770 (December 11, 1979). The amendment was adopted (H 11776).

■ 2. Plaintiffs contend that the Congress could not validly discontinue medicaid coverage of those medically necessary abortions that are not included in the classes of cases for which Congress has continued medicaid coverage, that is, where the pregnancy would endanger the pregnant woman's life if the fetus were carried to term, where severe and long-lasting physical health damage would result if the fetus were carried to term, in the cases of victims of rape and incest, in the cases of ectopic pregnancies, and to prevent implantation of the fertilized ovum. The questions related to the validity of the enactments must be analyzed in terms of accepting that, as the Court said in *Maher v. Roe,* 432 U.S. at 475, 97 S.Ct. at 2383, that case marks no retreat from *Roe v. Wade,* or the cases applying it. *Roe v. Wade* found that a pregnant woman's right to decide whether or not to terminate her pregnancy is a right founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action or in the Ninth Amendment's reservation of rights to the people; it is a "fundamental right," a "constitutionally protected liberty interest," *Maher v. Roe,* 432 U.S. at 474, 476, 97 S.Ct. at 2384. *Roe v. Wade* was not limited to ending criminal liability for abortions before viability. The right it defined may not be subjected to a requirement of spousal consent, or, if the pregnant woman is a minor, to a requirement of parental consent, *Planned Parenthood of Central Missouri v. Danforth,* 1976, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788, and, while a requirement affecting legal abortion is

not unconstitutional unless it unduly burdens the right to seek an abortion, *Bellotti v. Baird,* 1976, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844; *Maher v. Roe,* 432 U.S. at 473, 97 S.Ct. at 2382, if such a burden is imposed upon access to legal abortion services, the statute imposing it is invalid. *Bellotti v. Baird,* 1979, 443 U.S. 622, 642, 655, 99 S.Ct. 3035, 3048, 3054, 61 L.Ed.2d 797. A pregnant woman does not, however, have an absolute constitutional right to an abortion on her demand. *Doe v. Bolton,* 410 U.S. at 189, 93 S.Ct. at 746, and (concurring opinion) 410 U.S. at 208, 93 S.Ct. at 755.

(a) *Beal v. Doe, supra,* reached the Supreme Court as a case in which respondents contended that Title XIX required Pennsylvania's medicaid program to cover "nontherapeutic abortions." The state's plan did cover those abortions that physicians certified as "medically necessary," a standard met by documentary evidence that "continuance of the pregnancy may threaten the health of the mother," or that "an infant may be born with incapacitating physical deformity or mental deficiency," or that continuance of a pregnancy resulting from proved statutory or forcible rape or incest "may constitute a threat to the mental or physical health of a patient." The Court held that Title XIX did not require the state's medicaid program to find all abortions permissible under state law, noting, however, that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." The Court stated that the Court had been advised during oral argument that the state's definition of medical necessity was broad enough to encompass the factors in the *Bolton* definition (410 U.S. at 192, 93 S.Ct. at 747), quoted *supra* page 662. To the argument that exclusion of nontherapeutic abortions from coverage was unreasonable on health and economic grounds the Court answered that the exclusion was not unreasonable, given the state's valid and important interest in encouraging normal childbirth—in protecting the potentiality of human life; that interest

of the state alone does not justify "unduly burdensome state interference with the woman's constitutionally protected privacy interest" until approximately the third trimester. The Court made clear that the state, although not required to do so, was free to cover nontherapeutic abortions. The Court left open the validity under Title XIX of the requirement that two additional physicians concur in the attending physician's certificate of medical necessity.

*Maher v. Roe, supra,* considered "whether the Constitution requires a participating State to pay for nontherapeutic abortions when it pays for childbirth." Connecticut's Welfare Department regulations limited funding to first trimester abortions that in the attending physician's opinion were "medically necessary." That term was defined as including "psychiatric necessity." The provider was required to obtain authorization beforehand by submitting, *inter alia,* the physician's certificate of medical necessity. The plaintiffs had been unable to obtain such certificates. It was held below that Title XIX allowed but did not require state funding of nontherapeutic abortions and that, although there was no constitutional right to a state-financed abortion, the equal protection clause forbade the exclusion of nontherapeutic abortions from a program that generally subsidized the expenses of pregnancy and childbirth, and that, having no justification in any state interest, the exclusion infringed upon a fundamental interest of the plaintiffs. The Court observed that although the states are not constitutionally obligated to pay pregnancy related or any other medical expenses of indigents they are subject to constitutional limitations on the manner of dispensing any medical benefits that they undertake to provide in alleviation of some of the hardships of poverty. The challenge to Connecticut's funding childbirth but not nontherapeutic abortion, the Court said, presents an equal protection argument that required the Court to consider whether the legislation either operated to disadvantage a suspect class, or impinged upon a fundamental right explicitly or implicitly protected by the Constitution (both of which alternatives evoke strict judicial scrutiny); and if neither alternative applies, the legislation must be examined to determine whether it rationally furthers some legitimate, articulated state purpose, and therefore does not invidiously discriminate. No suspect class was found, for financial need alone does not identify a class, and, in a sense, every denial of welfare to an indigent creates a wealth classification. *Roe v. Wade,* the Court said, "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy," but it implies no limitation on the state's authority to make a value judgment favoring childbirth over abortion. Since Connecticut has added no disadvantage to the lot of the indigent woman desiring an abortion by making childbirth the more attractive alternative, no impingement on the fundamental right is present. That the state may not constitutionally prohibit or substantially restrict an activity does not imply that it may not encourage an alternative activity—childbirth. Applying the less demanding test of rationality, the Court found that the state's unquestionable " 'strong and legitimate interest in encouraging normal childbirth' " is rationally furthered by its assuming the medical costs of childbirth; the state's interest "in encouraging normal childbirth" exceeds the minimal level of furnishing a " 'reasonable basis' " for the classification. The Court also sustained the requirement of obtaining prior authorization for the procedure, based on a showing of medical necessity, on the ground that the procedure terminated a potential human life, and so was distinguishable from other medical procedures for which no advance authorization was required.

*Poelker v. Doe, supra,* considered the validity of an executive directive prohibiting the performance of abortions in two St. Louis municipal hospitals except when there was a threat of grave physiological injury or death to the pregnant woman. Agreeing that the constitutional question presented by the plaintiff, refused a nontherapeutic abortion at one of the municipal

hospitals, was identical in principle with that presented by a state's refusal to provide medicaid benefits for abortions while providing them for childbirth, the Court found no constitutional violation in the city's election, as a policy choice, to provide publicly financed hospital services for childbirth without providing corresponding services for nontherapeutic abortion. The Court said (432 U.S. at 521, 97 S.Ct. at 2392):

> "We merely hold, for the reasons stated in *Maher*, that the Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth as St. Louis has done." (Footnote omitted.)

All three decisions considered the cases as presenting claims that nontherapeutic abortions must be funded if pregnancy and childbirth care are funded. In each case the Court emphasized the reasonableness and constitutionality of the state's and city's action "in encouraging normal childbirth" (*Beal*, 432 U.S. at 446, 97 S.Ct. at 2371, *Maher* at 478, 479, 97 S.Ct. at 2385), and in "expressing a preference for normal childbirth." *Beal* treats nontherapeutic abortion as an *"unnecessary"* medical service in the perspective of Title XIX (*id.* at 445, 97 S.Ct. at 2371), that is, a medical service that becomes "needed" only after and if the election to abort has been made, and is not "necessary" if normal childbirth is chosen. The Court is explicit that the state's interest does not until the third trimester become sufficiently compelling "to justify unduly burdensome state interference with the woman's constitutionally protected privacy interest" (*Beal, id.* at 446, 97 S.Ct. at 2371), and that the pregnant woman is constitutionally protected "from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy" (*Maher, id.* at 474, 97 S.Ct. at 2382).

■■ The ultimate common holding of the three cases, then, is (a) that funding normal childbirth does not unduly burden women's constitutionally protected fundamental right to choose whether or not to terminate a pregnancy, and (b) that nontherapeutic abortion is an unnecessary medical service that may be withheld, notwithstanding that childbirth is funded, because it is reasonable to encourage the birth of the potential life in which the state has an interest. The Court does not say that to fund childbirth and deny funding for nontherapeutic abortion does not influence the pregnant woman's choice between the alternatives. The decisions assume that the state action does influence the decision, and that, as between normal childbirth and nontherapeutic abortion, the state need not be neutral, and hold that the state has not interfered with, or burdened, or put obstacles in the way of the protected decision to seek a nontherapeutic abortion by failing to fund such abortions, nor discriminate against the woman seeking an abortion by funding childbirth.

The trio of cases signalizes the Court's conclusion that the state has no interest in encouraging or facilitating nontherapeutic abortions by providing unnecessary medical services.

(b) Parts IV through X above (pages 661–689) set out the background of the medical management of pregnancies, the standards by which the medical profession guides its practices, and the very wide gap between the circumstances in which the medical profession finds abortion a "medically necessary" procedure and the few types of cases in which the profession could certify under the successive "Hyde amendment" standards (see particularly pages 671–672 *supra*); Part IX shows the very special medical risks and disabilities of the younger teenage woman who becomes pregnant; Part VI emphasizes the medical relevancy of poverty itself, and of the unwantedness of the pregnancy, and Part VII, the problems connecting pregnancy and mental health; and Part X shows the special factors affecting victims of rape and incest. These Parts are summarized in part in Part XI at pages 689–690. That abortion has become a dimension of the country's social structure and legal order is evident from Parts I and III, pages 634 to 639, 648 to 653 and 657 to 659.

The evidence requires the finding that by the professional standards of modern medicine adequate and timely treatment of pregnancy includes recourse to abortion, and particularly abortion in the early weeks of gestation when the risk of mortality is lowest, and is well below maternal mortality in childbirth; that the abortion procedure is a means of safeguarding the health of the pregnant woman from exposure to serious impairment, and to avert unacceptably high risks of death; and that the "life endangerment" and "severe and long-lasting physical health damage" standards do not include but exclude the greater part of the cases in which the profession would recommend abortion as medically necessary procedure to safeguard the pregnant woman's health. The evidence requires the finding that the endangerment of the mental health of the pregnant woman, due to or aggravated by pregnancy, can reach a degree that in professional medical judgment makes abortion medically necessary in the sense of *Doe v. Bolton, supra,* 410 U.S. at 192, 93 S.Ct. at 747. The evidence justifies the conclusion that pregnancy among younger teenagers, and the constellation of special health problems pregnancy involves for them, make abortion medically necessary over a broader range of instances than in the case of women in their twenties. The evidence warrants the finding that poverty entrains enhanced health risks, nutritional deficiencies, and limitations on access to health care that make the incidence of medically necessary abortion markedly higher among the poor than among those who have the means to maintain well-nourished life and regular health care. Unwantedness itself is a factor deranging the management of pregnancy, and aggravating the risks from otherwise controllable complications. The evidence shows further that the professional standards of modern medicine accept that grave fetal defect, determined early in pregnancy with a high degree of probability, may make abortion medically necessary in the judgment of a large part of the medical profession.

A substantial part of the medical profession, the evidence makes clear, will not, in principle, perform abortions, other than indirect abortions, and, possibly in cases of crisis intervention by abortion where the pregnant woman's life is threatened. The evidence does not afford a basis for a conclusion that, if the point of principle that influences their practice could be eliminated from the medical evaluation, physicians in this group would disagree that from a therapeutic viewpoint abortion would be medically necessary to preserve the pregnant woman's health in significant classes of cases falling outside the classes delineated in the successive "Hyde amendments."

(c) The medicaid legislation expresses the concern of nation and state with health, and with providing health care for the categorically needy and the medically needy. *Roe v. Wade* and *Doe v. Bolton* defined the pregnant woman's fundamental right of decision largely in terms of the medically warranted abortion as a protected alternative to childbirth. *Colautti v. Franklin,* 1979, 439 U.S. 379, 400, 99 S.Ct. 675, 688, 58 L.Ed.2d 596, reflects, it would seem, that primacy of concern is for the woman's life and health. It is the state's concern for the health of the pregnant woman, not its interest in bringing the fetus to birth, that justifies state regulation of abortion procedure in the second trimester "in ways that are reasonably related to maternal health" (*Roe v. Wade, supra,* 410 U.S. at 164, 93 S.Ct. at 732), and concern for the woman's health justifies the state in prosecuting a non-physician who performed an abortion in the first trimester. *Connecticut v. Menillo,* 1975, 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152. On the other hand, *Beal, Maher* and *Poelker* read as cases in which there was no health care need for an abortion.

The "Hyde amendments" would deny necessary medical care to indigent women in specific need of such care because of medical conditions affecting their pregnancy, where the condition, in their attending physicians' judgments, calls for abortion as the appropriate and medically necessary procedure. At that point the impact of the "Hyde amendments" is not to influence the

pregnant woman toward normal childbirth, for that is not medically possible, but to frustrate her making, in consultation with her physician and for medical reasons, that "abortion decision . . . that must be left to the medical judgment of the pregnant woman's attending physician" in the first trimester, and which, in the second trimester, can be affected only in ways reasonably related to maternal health. *Roe v. Wade, supra,* 410 U.S. at 164, 93 S.Ct. at 732.

Medicaid is directly involved. The concern of medicaid is with the problem pregnancy that, as such, requires medical treatment, and, as that treatment passes the diagnostic stage, has resulted in an "appropriate medical judgment, for the preservation of the life or health of the mother," *Roe v. Wade,* 410 U.S. at 165, 93 S.Ct. at 732, that abortion is medically necessary. To overrule the medical judgment, central as medical judgment is to the entire medicaid system, and withdraw medical care at that point because the medically recommended course prefers the health of the pregnant woman over the fetal life is an unduly burdensome interference with the pregnant woman's freedom to decide to terminate her pregnancy when appropriate concern for her health makes that course medically necessary. To deny the appropriate medical assistance to the patient in need of medical assistance and remit her to a less appropriate medical course and abandonment of her fundamental right of choice, or else to resignation of medicaid benefits, is not called for by *Maher v. Roe* and is forbidden by the principle it reaffirms.

The medicaid eligible woman who is pregnant has a statutory entitlement to medical assistance, and, if her pregnancy becomes a problem pregnancy, her entitlement extends to receiving the medical treatment appropriate to her medical problem, the treatment which is recommended by her attending physician's judgment. *Cf. Doe v. Bolton, supra,* 410 U.S. at 198–200, 93 S.Ct. at 750–751 (two-doctor concurrence); *United States v. Vuitch,* 1971, 402 U.S. 62, 70–71, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (criminal responsibility). Since the recommended abortion is medically necessary to safeguard the pregnant woman's health, and her basic statutory entitlement is to appropriate medical assistance, the disentitlement to medicaid assistance impinges directly on the woman's right to decide, in consultation with her physician and in reliance on his judgment, to terminate her pregnancy in order to preserve her health. The interests of the state and the federal government—for in medicaid their interests are united—their interests in the fetus and in preserving it are not sufficient, weighed in the balance with the woman's threatened health, to justify withdrawing medical assistance unless the woman consents to assume the risks to her health and essays to carry the fetus to term. That is plainly the case in the first and second trimesters, and scarcely less so in the extremely rare third trimester case. It is not necessary to go farther and consider whether the evidently dominant purpose of the enactments, as disclosed in the debates, is so directed to preventing exercise of the woman's constitutional right, and so clearly seeks to prefer the life of the fetus over the health of the pregnant woman, neither of which would be a licit purpose, that the statutory purpose of itself, precludes reliance on any other legitimizing legislative interest that might exist. But, as noted earlier, there is no federal policy of encouraging unwanted childbirth among the poor; to the extent that there is a settled federal policy, it is to promote family planning. See 42 U.S.C. §§ 300, *et seq.,* 300a–21, *et seq.,* 602(a)(15). The relevance of the woman's poverty is that medicaid is her health care reliance, and when she is excluded from receiving under medicaid the therapeutic abortion that is to her a medical necessity, there can be no assurance that she will receive the medically necessary abortion elsewhere. She is effectively denied assurance of a basic necessity of life (*Memorial Hospital v. Maricopa,* 1974, 415 U.S. 250, 259, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306) because of her medically advised decision. The evidence supports the inference that an undetermined but substantial percentage of women

738

denied medically necessary abortions under medicaid carry the fetuses to term, or obtain illegal abortions with some incidence of serious complications if not death, or, after a delay that increases their mortality risk measurably, do obtain legal abortions. Without justification in a countervailing legislative interest, the women's exercise of the right to a medically necessary service is denied them.

■■■ (d) The enactments clearly operate to the disadvantage of one suspect class, that is to the disadvantage of the statutory class of adolescents at a high risk of pregnancy defined in 42 U.S.C. § 300a–21(a), (quoted in footnote 74), and particularly those seventeen and under (Section 300a–21(b)(1)). See pages 680–686 supra. The congressional findings of fact describe in relentlessly concrete terms, particularly in findings (3) and (5), just such medical conditions, here, as they affect teenagers, as formed the central justifying perception in Roe v. Wade and Doe v. Bolton, quoted above at page 662 (410 U.S. at 153, 164–165, and 192, 93 S.Ct. at 726, 732–733, and 747). Pregnant teenagers, particularly the younger teenagers, are a disadvantaged class, recognized as such by Congress; they are disadvantaged by the convergence in their unwanted pregnancies of physical and psychological immaturity, poverty and dependence, and a high risk of serious pregnancy-connected physical and psychological complications that threaten permanently to undermine the health of the pregnant teenagers and their fetuses. The Adolescent Pregnancies title defines "core services" as including "primary and preventive health services including pre- and post-natal care"; the Secretary may require grant applications to include assurances that the pregnant adolescent will be informed of the availability of counseling "on all options regarding her pregnancy," and he is to give priority to applicants who will (inter alia) utilize existing programs and facilities for "ongoing pregnancy prevention and pregnancy-related services." 42 U.S.C. §§ 300a–22(4)(C), 300a–25(a)(4), 300a–26(a)(22). Yet the "Hyde amendments" enacted in 1978 and 1979 (and 42 U.S.C. § 300a–28) exclude medically necessary abortion from the primary health care services provided under Title XIX and under the Adolescent Pregnancies title. No legislative interest outweighing the interest in the teenagers' health can be advanced to justify the discriminatory denial of necessary medical care.

(e) The "Hyde amendments" cannot be sustained under the less demanding test of rationality that applies in the absence of suspect classification. Preterm, Inc. v. Dukakis implies as much in its conclusion that limiting funding to those abortions necessary to prevent the death of the mother was a proscribed discrimination violative of the purposes of Title XIX: to single out one medical condition, complicated pregnancy, and restrict treatment of it to life or death situations, the court held, crossed the line between permissible discrimination based on degree of need and entered into forbidden discrimination based on medical condition, because one cannot discern any rational social objective that it would serve (591 F.2d at 126). Noting that the narrow categories of the Hyde amendment enacted in 1977 "would certainly not encompass all situations in which a physician, exercising his professional judgment, could certify that an abortion was medically necessary" (id. at 131 n. 8), the court held that the limitation of abortion funding to cases where otherwise severe and long-lasting "physical" health damage would result impliedly excluded equally grave mental damage, and set up a presumption that physical health damage is always more serious and more important to prevent than mental health damage, a presumption that was nothing less than absurd and not "reasonable" (id. at 132). And, after the remand to the district court in Zbaraz v. Quern (supra, page 651) the court held the Hyde amendment invalid, 469 F.Supp. 1212, 1219–22, because the state's interest in fetal life, though growing as gestation advanced toward childbirth, could not be advanced at the cost of increased maternal morbidity

and mortality among indigent pregnant women.[82]

The Court in *Maher* observed that the distinction drawn by the regulation there under review was to be tested by seeing whether it was rationally related to a constitutionally permissible purpose. The purposes of the enactments in question that would be inferred from consideration of the debates in Congress would not be constitutionally permissible: the dominant purpose inferable was to prevent exercise of the right to decide to terminate pregnancy, to prevent the funds of taxpayers who disapproved of abortion on moral grounds from being used to finance abortions that were abhorrent to them. No purpose of encouraging normal childbirth was discussed, and no such demographic consideration as the Court suggested in *Maher,* 432 U.S. at 478 n.11, 97 S.Ct. at 2385 n.11, entered into the debates—except in the form of the argument suggesting that the pro-choice position on medicaid had in it elements of an unthinkable "final solution" for poverty. If a purpose emerges in result, it is the purpose to prefer the life of the fetus over the health interests of the pregnant woman except in the life-for-life case reflected in the life endangerment exception; the hard-won compromise that added the clause covering severe and long-lasting physical health damage was illusory in result, and the de-bates show that it emerged only as a vestige of what commenced as a proposed exception for "medically necessary" abortions. See Annex pages 794–798.

*Maher* is clear that if the Congress had forbidden funding of nontherapeutic abortions there could be no further debate. But in light of all the abortion cases in the Supreme Court the legislative interest that must be found is one that will, in terms of public interest values, outweigh the pregnant woman's health interest, and the legislative interest in fetal life, at very least during the period before viability, is not invested with an interest of that quality. *Planned Parenthood v. Danforth* and *Colautti v. Franklin,* in dealing with saline amniocentesis and with abortion techniques most favorable for the fetus to be aborted alive, appear to imply that any regulation of abortion must not preclude the physician from using the methods of medical management that preserve the woman's health and life as against fetal life when the interests conflict.

The statutory purpose of medicaid is to provide medical assistance to the needy, and, considered as an amendment to medicaid coverage, the enactments in question fail the rationality test, recently applied, in an emotionally neutral area, in the leading case of *White v. Beal,* 3rd Cir. 1977,

---

**82.** In *Reproductive Health Services v. Freeman,* 8th Cir. 1980, 614 F.2d 585, the court invalidated the Missouri restriction of abortion funding to cases in which full-term pregnancy and childbirth would cause the mother's death (a) under Title XIX as it read before the Hyde amendment, and (b), finding that the Hyde amendment modified Title XIX coverage, under the Fourteenth Amendment (i) on the ground that limiting abortion funding to the Hyde amendment instances made the state's medicaid scheme "irrationally underinclusive" and discriminatory in funding medically necessary abortions for rape and incest victims and not funding medically necessary abortions generally, and (ii) on the ground that, since the state may not properly elevate its interest in encouraging childbirth above its interest in maternal health, the exclusion of therapeutic non-Hyde abortions is invalid under the equal protection clause in singling out for exclusion one procedure, medically necessary to preserve health, without furthering a legitimate state interest.

In *Women's Health Services, Inc. v. Maher,* D.Conn. 1980, 482 F.Supp. 725, Judge Blumenfeld, using "middle tier" analysis, *Orr v. Orr,* 1979, 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306; *Craig v. Boren,* 1976, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397, held that the state's interest in encouraging normal childbirth was inapplicable to a woman in need of therapeutic abortion, and that the state could not encourage childbirth "no matter what the cost to the pregnant woman." The state may not, the court said, "place the life of the fetus on a higher plane than the health of the mother." The court concluded that the Connecticut limitation of abortion services to cases where the life of the mother would be endangered if the fetus were carried to term was not a limitation rationally related to any legitimate, articulated state interest and the exclusion of therapeutic abortions from medicaid coverage, being irrational, violated the equal protection clause.

555 F.2d 1146, 1151, interpreting Title XIX. The need for health care during pregnancy is basic, and, in the case of the complicated or problem pregnancy, it is indispensable. To exclude from the physicians' battery of procedures legal abortion when it is medically necessary is repugnant to the scheme of the entire medicaid program. The legislature, as *Maher* makes clear, need not be neutral between normal childbirth and nontherapeutic abortion, but the rationality test requires that it be neutral among medically necessary procedures, certainly in the absence of any special circumstance relevant to the legislative aims of the health care program. Restricting abortion, alone of all medical procedures, to the life endangerment circumstance has no support in any medical evaluation of medical conditions and the medical procedures appropriate to the medical conditions; the physicians who reject all direct abortion do so on grounds other than a medical evaluation of condition and procedure. Life endangerment is, simply, not the test for surgical intervention generally and may not rationally be made so in the one medical context when no legitimizing legislative purpose is served by such a restriction.

A special circumstance reinforcing the conclusion arises from the medical relevancy of poverty itself as a factor increasing the risks of pregnancy complications for the health of poor women; they are the class least able to sustain withdrawal of the procedure from the physician's battery of procedures. The indigent younger teenager who becomes pregnant represents the extreme of need, the class for whom withdrawal of the procedure would, from the nature of their physical and emotional plight, be most damaging, and most frequently damaging.

The exclusion from the severe and long-lasting physical health damage clause of any reference to mental health damage is not reasonable, and it has no support in permissible legislative purpose. Fear of fraud on medicaid, of feigned psychiatric problems, can hardly justify excluding a whole field of health damage from appropriate treatment. The evidence discloses the problems that pre-existing and supervening mental ill-health connected with pregnancy can cause, both in themselves and by complicating the task of medication, as well as through the supervention, particularly among younger teenagers, of suicidal ideation connected with pregnancy.

The special case of grave fetal defect, wholly excluded by the enactments in question, appears to impose a restriction that the profession did not apply even before the changes in abortion law of recent times.

The strangeness to medical thinking of "life endangerment" as the factor decisive of the use of a medical procedure is shown by the medical evidence, and is an added element relevant to the application of the rationality test. The meagre statistics on abortion since the Hyde amendment bear out the view emerging from the medical evidence: the life endangerment test is so uncertain of meaning in terms of medical content that it operates to restrict the use of abortion procedure in medicaid to the narrowest classes of cases, to crisis intervention. It seems to function to exclude many more cases than can be supposed to have been intended for exclusion because of the physicians' inability to divine what medical standards it implies.

It must be concluded that the enactments in question are invalid under the Fifth Amendment.

C

Plaintiffs' First Amendment argument is that the generating premise of the pro-life position is the proposition that from the moment of conception the conceptus is a human being, human life, that that belief is derived from religious conviction, that the enactments under review translate that belief into law, and that the secular justification for and support of the enactments, to the extent of its existence, is not legally significant weighed against the dominant religious origin, purpose and institutional support for the enactments. The evidentiary background related to the argument is summarized above, pages 714–715, 723–727.

The argument from the establishment clause must be rejected. That the enactments reflect, if imperfectly, one religious view, if it were true, would not be decisive. The enactments deal with human conduct, and that conduct in an area related to human life. They reflect a traditionalist view more accurately than any religious one, a view that was reflected in most state statutes of a generation ago. The purpose of the "Hyde amendments," if their purpose could be realized, would be the prevention of abortions, not an identifiably religious purpose, or one that became religious because, after 1973, the most vigorous spokesmen for it put their case in religious terms, and grounded them in religious reasons. The underlying difficulty with the plaintiffs' argument that there is here no clearly secular legislative purpose (within *Committee for Public Education v. Nyquist, supra*) is that the argument treats *Roe v. Wade* as removing the issue from the field of secular action, and as forbidding reference to a purpose conceptually at war with *Roe v. Wade* as a secular purpose. While *Roe v. Wade* argues for the measures' invalidity under the Fifth Amendment at least, it does not make the enactments any less secular in their legislative purpose. On its face such legislation, marking explicit disapproval of abortion in most cases, reflects a general and long held social view even if, as has been held, it goes too far in excluding medically necessary abortions.

The argument that the enactments have a primary effect that advances some religions (and inhibits other religions) by its involuntary effect on the conduct of pregnant women fails for essentially the same reasons as the secular purpose argument as well as for the reason that no connection to establishmentarianism is present in the kind of effect on conduct that the enactments were intended to have. The conduct enacted by the law's indirection is the familiar traditional submission to childbirth until recently enforced by criminal statutes.

The argument that the issue will involve excessive government entanglement with religion must, on the present record, be briefly noticed. *Lemon v. Kurtzman,* 1971, 403 U.S. 602, 619–620, 91 S.Ct. 2105, 2114–2115, 29 L.Ed.2d 745, and *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 794–797, 93 S.Ct. at 2976–2977, in speaking of entanglement with religion and divisiveness, had reference primarily to the kind of continuing relation arising out of annually renewed grants of assistance, annually debated on lines that would reopen religious controversy. As it happens that has occurred in the case of the enactments in question, but only because they have been introduced and passed in connection with annual appropriation bills. The annual debate does not arise out of the true nature and purpose of the enactments, but, as the debates make clear, because the pro-life members have been unable to bring to the floor for debate the bills embodying the proposed pro-life constitutional amendments.

But apart from that, it is clear that the healthy working of our political order cannot safely forego the political action of the churches, or discourage it. The reliance, as always, must be on giving an alert and critical hearing to every informed voice, and the spokesmen of religious institutions must not be discouraged, nor inhibited by the fear that their support of legislation, or explicit lobbying for such legislation, will result in its being constitutionally suspect. That does not mean that the fact of denominational support is not relevant to analysis of legislation to determine whether it violates the establishment clause; the law is otherwise.

Nevertheless the enactments do raise grave First and Fifth Amendment problems affecting individual liberty. The evidence (pages 696–697 *supra*) makes clear that in the Conservative and Reform Jewish teaching the mother's welfare must always be the primary concern in pregnancy, that the fetus is not a person, and that abortion is mandated to preserve the pregnant woman's health. The American Baptist Church position recognizes that abortion should be a matter of responsible personal decision, and it envisages danger to

the physical or mental health of the woman, evidence that the conceptus has a physical or mental defect, and conception in rape, incest or other felony as justifying abortion (*supra,* pages 697–700). The United Methodist Church affirms the principle of responsible parenthood and takes account, in the abortion context, of the threat of the pregnancy to the physical, mental and emotional health of the pregnant woman and her family; in that belief continuance of the pregnancy is not a moral necessity if the pregnancy endangers the life or health of the woman or poses other serious problems concerning the life, health, or mental capability of the child to be (*supra,* pages 700–702). These teachings, in the mainstream of the country's religious beliefs, and conduct conforming to them, exact the legislative tolerance that the First Amendment assures. *Wisconsin v. Yoder,* 1972, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15. The liberty protected by the Fifth Amendment extends certainly to the individual decisions of religiously formed conscience to terminate pregnancy for medical reasons. *West Virginia State Board of Education v. Barnette,* 1943, 319 U.S. 624, 634–635, 641–642, 63 S.Ct. 1178, 1183–1184, 1186–1187, 87 L.Ed. 1628.

A woman's conscientious decision, in consultation with her physician, to terminate her pregnancy because that is medically necessary to her health, is an exercise of the most fundamental of rights, nearly allied to her right to be, surely part of the liberty protected by the Fifth Amendment, doubly protected when the liberty is exercised in conformity with religious belief and teaching protected by the First Amendment. To deny necessary medical assistance for the lawful and medically necessary procedure of abortion is to violate the pregnant woman's First and Fifth Amendment rights. The irreconcilable conflict of deeply and widely held views on this issue of individual conscience excludes any legislative intervention except that which protects each individual's freedom of conscientious decision and conscientious nonparticipation.

Judgment must be for plaintiffs.

It is, accordingly,

ORDERED that the Clerk enter judgment in the actions in the accompanying forms, which have been approved.

### Annex

#### Contents

Debates on Hyde Amendment (fiscal 1977) — 743–770
June 24, 1976, House — 743–745
June 28, Senate — 745–750
August 10, House — 750–758
August 25, Senate — 758–763
September 15, House, the Joint Statement — 763–764
September 16, House — 764–768
September 17, Senate — 768–769
Presidential Veto Message (in part) — 770
Debates on overriding veto — 770–772
September 30, 1976, House — 770–771
September 30, Senate — 771–772
Secretary's implementing release, August 4, 1977 — 772
Debates on the amendment for fiscal 1978 — 772–836
June 17, 1977, House — 772–782
June 20, Senate (reference to *Maher, Beal* and *Poelker* — 782–783
June 21, Senate — 783
June 24, Senate — 783–798
August 1, Senate, Attorney General's opinion noted — 798
August 2, House — 798–802
August 4, Senate — 802–806
September 26, House — 806–813
October 12, Senate — 813–814
October 13, House — 814–817
October 13, Senate — 817–818
October 27, Senate — 818
November 3, Senate — 818–821
November 3, House — 821–827
November 29, Senate — 827–828
November 29, House — 828–831
December 5, House — 831
December 6, House — 831–833
December 6, Senate — 833
December 7, House — 833–835
December 7, Senate — 835–836
Secretary's regulations developed — 836–837
Amendment for fiscal 1979 (See also pages 643–646 n. 6, n. 7, 646–647 n. 9, *supra*) — 837
Continuing Resolution to November 29, 1979 — 837–840
Enactment of H.J.Res. 440 (for fiscal 1980) — 840–844

## Legislative History

Since there were no committee hearings on the "Hyde amendment," and the conference report material is meagre, if, in the case of the Appropriation Act for the fiscal year ending September 30, 1977, significant, the legislative history was made in large part in conference committee meeting and in the debates on the floor of the House and of the Senate. The wide ranging debates, necessarily repetitious in large part, are fairly evocative of the whole range of views entertained on and considerations involved in the issue of abortion, within the limits of the decisions in *Roe v. Wade*, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and of *Doe v. Bolton*, 1973, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201.

The Department of Labor—Health, Education, and Welfare Appropriations, 1977, bill (H.R. 14232) was reported to the House of Representatives on June 8, 1976 (122 Cong.Rec.H 5409).[1] On June 24th Mr. Scheuer, proposing an amendment to increase the appropriation for family planning services by $21,900,000, as the Senate had done, argued (H 6622):

"There is no more compelling argument for the need for family planning services than the fact that there were over 1 million legal abortions performed last year. And, since abortions are not yet available in all parts of the country, we can expect that many illegal abortions were performed. Many of these unwanted pregnancies were a result of contraceptive failure, since there are no methods of contraception which are perfectly effective. But many more were due to a lack of availability of preventive services.

"At least 1 million young teenage girls become pregnant each year. One-fourth of these pregnancies will result in birth out of wedlock and nearly one-third in abortions. Two-thirds of all teenage brides are pregnant at the alter; and we know, not surprisingly, that these teenage marriages have exceedingly high fail-

ure rates. Young girls should not have to begin their adult lives with such difficult experiences or responsibilities. There is a more humane and better way for the individual and the society to deal with unwanted pregnancy, and that is through prevention."

Mr. Beauman contended that, in spite of the prohibitory language in Section 1003 (Section 1008?) of Title X of the Public Health Service Act (42 U.S.C. §§ 300a–6, 300a–7), family planning funds were reportedly used for abortions (H 6623–24), and Ms. Abzug, agreeing that abortion is the least desirable form of family planning, nevertheless asserted that "the right to abortion is a fundamental right" (H 6624). Supporting the Scheuer amendment, Mr. Cleveland pointed out (H 6624):

"The National Center for Health Statistics reports that unwanted pregnancies continue especially in the very young. In 1974 alone the Center for Disease Control found there were 300,000 abortions and 221,000 illegitimate babies born to teenage mothers. Between 1970 and 1974, illegitimate births increased by 4 percent.

"In the same time period, the once promising growth of U.S. family planning programs came to a standstill and then began to decline. A prime reason for this was the freeze on family planning appropriations."

Later, on June 24th Mr. Hyde offered an amendment that would add to the bill a Section 209 reading (H 6646–47):

"None of the funds appropriated under this Act shall be used to pay for abortions or to promote or encourage abortions."

Mr. Hyde acknowledged that his amendment would stimulate debate, but he argued (H 6647):

"Nevertheless, there are those of us who believe it is to the everlasting shame of this country that in 1973 approximately 800,000 legal abortions were performed in this country—and so it is fair to assume that this year over a million human

---

1. Citations are to the daily edition of the Congressional Record. All citations to the 1976 debates are to Volume 122. For brevity in later citations only the House and Senate pages will be referred to.

lives will be destroyed because they are inconvenient to someone.

"The unborn child facing an abortion can best be classified as a member of the innocently inconvenient and since the pernicious doctrine that some lives are more important than others seems to be persuasive with the pro-abortion forces, we who seek to protect that most defenseless and innocent of human lives, the unborn—seek to inhibit the use of Federal funds to pay for and thus encourage abortion as an answer to the human and compelling problem of an unwanted child."

Mr. Hyde saw the issue as requiring a determination whether or not "the unborn person is human"; he said that medicine, biology, embryology say that the growing living organism is a human life, that, once conception has occurred, "a new and unique genetic package has been created, not a potential human being but a human being with potential," and that "birth is no substantial change, it is merely a change of address." He concluded that "An innocent, defenseless human life, in a caring and humane society deserves better" than to be destroyed before birth. Mr. Flood, although he favored a constitutional amendment on abortion, opposed the amendment as "blatantly discriminatory"; saying that abortion was not an economic issue he continued (H 6647):

> "To accept—now, this is coming from me—to accept this amendment, the right of this country to impose on its poor citizens, impose on them a morality which it is not willing to impose on the rich as well, we would not dare do that. That is what this amendment does. To me, the choice is clear. Listen: A vote for this amendment is not a vote against abortion. It is a vote against poor people. That is what it is, as plain as the nose on your face."

Mr. Guyer answered (H 6647) that the issue had become all but threadbare largely because "we cannot get action from the proper committee to really correct the wrong by constitutional amendment," that, meanwhile, "the children should have a bill of rights," that

"they have civil rights, they have property rights and they have divine rights.

"What a woman does with her body is her own business.

"What she does with the body of somebody else is not her business.

"I think that we here should go on record as safeguarding that most precious commodity, the gift of little children from God, who have a right to live."

Mr. Bauman supported the amendment (H 6647–48); agreeing that the amendment reflected frustration of other efforts in the House and Senate to bring the abortion issue to a vote, he urged that the children of the poor have no less right to life than the children of the rich, and that it would be better to protect the lives of all children than for the government to go on paying for more than 300,000 abortions a year at a cost of $40 to $50 million; he argued (H 6647):

> "I think the unborn children whose lives are being snuffed out, even though they may not be adults have a right to live, too, regardless of the mistaken and immoral Supreme Court decision. . .
>
> "This is the most fundamental issue that this House will ever address; it involves a precious right once accorded to every Member at some time in the past, the right to live. Let us not deny it to others."

Mr. Kindness (H 6648) saw the amendment as the only opportunity the House would—apparently—have to address the issue of abortion, and said that representatives should represent the members of the public who found it offensive to have their taxes used in this way. Ms. Abzug (H 6648) characterized the amendment as unsuited to accomplish the purpose of its sponsors and as cruel; she argued that opinion surveys indicated majority approval of the Supreme Court's 1973 decisions; she said that, although she supported the decisions, she also respected the right of others to disagree with the decisions, but, she continued:

"Still, there must be an understanding that those who differ as a matter of conscience or religious belief have no right to impose their views on others who also wish to exercise their rights in their own way.

"The implementation of this amendment or an amendment like this, if agreed to in this House, will mean only one thing, and that will be, as was pointed out by the subcommittee chairman, to deny to some people the rights the majority have in this country."

Ms. Abzug predicted an increase to 25,000 in the number of cases involving serious medical complications from self-induced abortions, and that some of the patients would die. She argued that by adopting the amendment the government would be "de facto putting itself in the position of countenancing abortion for those who can pay for it but denying it to others who cannot," and would be taking clearly discriminatory action. Referring to the hearings on the proposed amendments as the appropriate forum for considering the abortion issue, Ms. Abzug said:

"Some say that is not enough and there are individuals who seek only to reflect their own point of view in this lawless and inappropriate way; and not the point of view of the majority who seek to distort the legislative process; and who seek to deprive the poor person, who always carries the burden of discrimination now once again."

Mr. Butler stated (H 6649) that the House Judiciary subcommittee had not voted out any amendment because he found no consensus among the witnesses or in the subcommittee which would indicate that any amendment would pass either the House or the subcommittee. Mr. Butler announced his opposition to Mr. Hyde's amendment. Mr. Koch, announcing his opposition, said that even those opposed to the Supreme Court decisions "are not for this all encompassing amendment," which would "deny an abortion even to a woman whose very life would be lost without the abortion" (H 6649).

The amendment was put to a vote, and it carried 207 to 167, 57 not voting.

Later in the day Ms. Abzug reopened the issue, contending that the House could not have realized that the language of the amendment excluded therapeutic abortions, and so was "terribly discriminatory" to the poor women (H 6659). Mrs. Burke (California) noted that the language might forbid reimbursement for kinds of abortions in circumstances that would be allowed "within the Catholic Church," and that might result in death (H 6660). Mr. Bauman opposed reconsideration (*ibid.*), saying that the language did not forbid abortions performed "to save the life of a mother. It does not in any way forbid any abortions, or in any way restrict the right to have an abortion"; he said that the amendment did say that tax funds could not be used for abortions, that the concern was for "the poor children who are not yet born," that the House was concerned for mothers as well, "but the right to life is a right to be accorded not just to mothers but also to those who cannot help themselves." Mr. Bauman added that for two years the House had been denied the chance to vote on the issue by committees which had refused to report a right-to-life amendment. When, later in the day, the bill as amended came to a vote, a separate vote was called for on the Hyde amendment, and it was again agreed to, 199 for, 165 opposed, and 67 not voting (H 6660–61).

The Senate took up the Hyde amendment to H.R. 14232 on June 28, 1976, with Senator Packwood's offer of an amendment which would have stricken Section 209 from the bill (S 10793). Senator Packwood called the amendment "the most odious of all amendments" because it would forbid the use of federal funds for certain kinds of family planning "or for therapeutic abortions," including abortions to save the mother's life and "abortions because the child is likely to be born deformed" (S 10794). He argued that the amendment was alien to the function of an appropriation bill, that "the amendment is clearly unconstitutional," that state efforts so to

limit medicaid abortions had been invalidated in at least ten federal cases, that the courts, including the Supreme Court, had held that moral disapproval, cost, desire to discourage, and administrative convenience are not sufficiently compelling to allow a state to restrict a constitutional right, and that even an amendment excepting therapeutic abortions from its prohibition had been considered unconstitutional (*ibid.*). The Senator noted that DHEW had advised that denial of medicaid for abortion would increase the cost to the government of medical care and public assistance for the first year after childbirth; he asserted that the amendment prohibited abortions for the poor although the rich could still have abortions, and that the amendment would "simply force the poor back to the situation that existed before the Supreme Court decisions in the Roe and Doe cases" (*ibid.*). Senator Helms stated that the argument seemed to be that "it is cheaper to the State to kill the unborn children of the poor man than it is to let them be born" (*ibid.*). Senator Packwood said he did not rest on cost at all; he pointed to a DHEW estimate of two years earlier that 125 to 250 deaths from self-induced abortion would result if they could not be obtained legally, and referred to the possibility that there would be up to 25,000 cases involving serious medical complications from self-induced abortions (S 10794–95). Agreeing with Senator Helms that the issue was moral not financial, and that the view opposed to abortion was held very sincerely, very honestly, and in many cases very religiously, the Senator continued (S 10795):

"I have seldom seen in my now almost quarter century, in one form or another, of public life, an issue whose adherents on both sides more passionately felt that they are right. But just as there are those who want to prohibit abortions and are convinced, for whatever reasons, moral, religious, or others, that they are right, there are an equal number on the other side equally convinced that whether or not a woman chooses to have an abortion is not the business of this Congress, this Government, or of anyone else, but a private decision to be made between the woman and her physician. They feel that just as passionately."

He then presented a very long list of religious organizations, medical groups and public interest associations that supported legalized abortion, saying that they were not groups "unconcerned with the sanctity of life"; he said that opinion polls indicated that a majority of Americans consistently supported the Supreme Court decisions on abortion, and he concluded (S 10796):

"So in this case, it is not an effort by a well-intentioned majority to impose its wishes on a minority. It is an effort by a well-intentioned, sincere, zealous minority—minority—to impose on everyone in this country that minority's view of law, that minority's view of medicine, that minority's view of morality. I think it is a mistake."

Senator Bartlett opposed the Packwood amendment, arguing (as the Solicitor General was said to have argued in *Doe v. Beal*) that a woman's qualified right to an abortion does not imply a correlative constitutional right to free treatment, that the Government had no figures on the amount it expended for abortions but that it approximated $100 million a year, that the Supreme Court had ruled on the legality of abortion but could not mandate Congress to follow suit by spending taxpayers' dollars for abortions, that abortions were not legal by reason of Congressional action but by reason of the Court's action, and that, in consequence, the Senate had passed no legislation "to authorize the financing of abortions" and had not sought to conduct a hearing to determine the extent of federal financing of abortions (S 10796). Senator Helms opposed striking Section 209 from the bill; he argued that the question ought not be settled by referendum (S 10797):

"It involves human lives. If some Member of the Senate could persuade me that an abortion is not the termination of a human life, I would have no further problem with the amendment of the distinguished Senator from Oregon."

He reiterated the argument that the woman's right to privacy with respect to abortion did not import a federal duty "to use public funds to finance the termination of human life," that there is no such constitutional requirement—laying the moral issue aside—although (S 10797)

"I am not personally able to ignore what I consider an awesomely important moral issue."

Senator Bartlett suggested that there was a measure of hypocrisy in including in a bill providing medical and health items intended to save or prolong life a provision of millions "to destroy the lives of the healthy unborn" (*ibid.*). Senator Brooke argued (S 10797) that the Hyde amendment used language more restrictive than that of the proposed constitutional amendments, that under it even the health and life of the mother could not be protected if an abortion were the only way of protecting that life. Senator Pastore contended (*ibid.*) that the issue was not poverty but morality; believing, as he was brought up to believe, that life begins at conception, he yet respected the beliefs of those who disagreed; he continued (*ibid.*):

"But here we are spending public money on a highly controversial moral question."

The doctors, he urged, were the ones to decide whether an abortion was needed to save a woman's life. Senator Brooke interjected that the Hyde amendment denied the woman medicaid funding for that purpose. Senator Pastore answered (*ibid.*) that although that was true, it was also true that without the Hyde amendment the bill would be "sanctifying with public money something that other people morally have an objection to," that it was for the many private agencies active in parenthood service to finance such abortions, but that:

"The big question here is a large proportion of the American public do not believe in abortions. There is a large proportion of the American public who believe in abortion. I do not think that question ought to be decided with public money on the floor of the Senate. That is the only argument I have."

Senator Packwood pointed out that widespread moral objection to the Vietnam war was not considered a valid justification for resisting its prosecution with civil disobedience, and that the country's history was replete with federal expenditures for purposes that sometimes a few and sometimes many people thought wrong and immoral (S 10798). Senator Bartlett reiterated his assertion that there was hypocrisy in the Government's spending millions for cancer research and millions for abortions "taking lives of healthy unborn" (*ibid.*). Senator Brooke challenged the statement that millions were spent "for the abortion of healthy unborns" (*ibid.*). To Senator Pastore's urging that public funds should be kept out of this highly moral question on which American public opinion was split down the middle (*ibid.*), Senator Packwood answered that "All the Medicaid money that is given out does not force a woman to have an abortion against her will," and that the bill minus the Hyde amendment was neutral, whereas with the amendment, the bill came down "on the one side against the poor who cannot afford an abortion" (S 10798–99). Senator Brooke argued that it was unconstitutional discrimination to provide medical service to women who chose to bear children and deny it to women who chose to exercise their right to terminate their pregnancies in the first trimester, and that the private agency alternative referred to by Senator Pastore was not truly available to poor girls who "have to go down some dark alleyway" and have "an abortion by a butcher"; he noted that the Hyde amendment would deny abortion even to victims of rape and incest (S 10799). Senator Bartlett said the question was whether, recognizing that abortion is legal, the Senate wanted to finance the taking of thousands of human lives on the recommendation of the mother who is unwanting of the child and the doctor who is paid by the government; he asked whether Senators Brooke and Packwood felt that it was moral to take the thousands of lives that were being taken by federally financed abortion (S 10800). Senator Brooke said that he did

not think abortion should be used for birth control; Senator Bartlett at once said that existing law provided no test for determining whether abortion was being used for birth control. He argued that it was wrong to discuss abortion in terms of the mother and not the unborn child, and that the unborn were the "true minority" (*ibid.*). He agreed with Senator Brooke that the mother's life was a matter of concern, and he said that he would have included such a provision if he had drafted the Hyde amendment (S 10800–01); but he contended that the Hyde amendment was preferable to existing law, which provided financing "for abortions just not to have children" (S 10801). Responding to an argument about the morality of exposing the mother's life to risk, he said (S 10801):

"When people say they do not want their morals to be forced on someone else, that they want them to be free to act as they would like, they are forgetting about the fact that we are forcing a morality upon the unborn fetus."

Senator Magnuson observed that the Hyde amendment would conflict with his state's rejection on a controversial initiative of similar legislation; he questioned the effect of the amendment on the state's established funding of the state share of abortion cost. (*ibid.*).

Senator Bayh contended (S 10802) that the Hyde amendment introduced a dual standard between rich and poor, and would allow no relief to the woman whose pregnancy endangered her life; he said that neither the Hyde amendment nor a constitutional amendment would end abortion,

"So some of us who are really hard pressed to come to grips with this from a moral standpoint have to face reality as well as morality. The fact right now is not whether or not there are going to be abortions but whether they are going to be on the operating table, in the doctor's office, or in the backroom, on a butcher's block.

"The Senator may not have to face up to that, but that is what all the records show, that abortions are not going to

disappear. There perhaps will be a slightly fewer number—I will admit that—but there also will be a lot of lives lost because of the illegal abortions that are performed in the most horrible conditions."

Senator Bartlett insisted (*ibid.*) that to defer to the moral judgment of the mother who did not want the child and a doctor paid by the government forces the fetus to have its life taken, and ignores the moral question so far as the unborn child is concerned, that the unborn child is discriminated against because some do not consider it "to have the dignity of human life. But it is obvious that it does." Senator Bayh referred to evidence taken in the hearings on the proposed amendments concerning the traumatic experience of undergoing an abortion and of the evidence of mutilation and death [from illegal or self-induced abortion]; he referred also to abortion as a means of avoiding the birth of children suffering from Tay-Sachs disease, a fatal malady (S 10803).

Senator Hathaway supported Senator Packwood's amendment (S 10804), arguing that the Hyde amendment was substantive legislation inappropriate for inclusion in an appropriation bill, and that the Hyde amendment was invalid, denying indigent women equal protection of the laws and discriminating against them; he argued:

"The situation we are setting up by denying States the right to spend money for abortion purposes under the medicaid program is this: We are saying, in effect, that the poor or indigent woman who is pregnant can get money under Medicaid only if she intends to go through or is medically able to go through with a full-term pregnancy. If that is not her intention, however, and she wishes or needs to exercise her right guaranteed by the Supreme Court under the Constitution of the United States to have an abortion, we are denying her those funds. That is clearly a violation of the equal protection provision, because we are discriminating within a class of people who are entitled to Federal funds. Please note this is not

a "rich against poor" argument, but rather the setting up of discrimination classes among the poor.

* * * * * *

"We certainly are obligated not to discourage people from exercising their right under the Constitution by depriving them of funds so they can so exercise that right."

Senator Packwood in his closing argument (S 10805) observed that the Hyde amendment was a total prohibition, effectively denying to a large group of citizens the constitutional right to an abortion. He contended that it would be immoral for Congress to recognize the right but "to effectively take away that right for those who cannot afford it" (*ibid.*). Commenting on the difficulty in moving legislation on either side of the issue, he said (*ibid.*):

"If we are going to adopt the standard that the Federal Government or the State governments will not spend money on something that a bare minority of its citizens are passionately or morally opposed to, then we are not going to spend money for much of anything. A representative form of government cannot work if a minority at any particular stage will say, 'Wait, we feel strongly about that so we are not going to spend any money.'

* * * * * *

"We cannot allow a determined minority to attempt to impose upon all of the majority a view that that minority alone holds."

Senator Bartlett in his closing argument (*ibid.*) insisted again that "The real minority are the unborn children whose lives are denied by the actions in concert of the mothers, the prospective mothers, and a doctor paid for by the Federal Government." He argued that the treasured and constitutionally protected right of all to life was not [under existing law] extended to the unborn "even though human life is involved from the very beginning of conception, as the great majority of the people believe." He said (*ibid.*):

"This is a moral question, and I think at a time when the people are divided on this, either side can show polls that the majority favor their side, but I think it is very basic that the U. S. Government does not have to nor is there a right being denied if the U. S. Government does not finance abortion".

Quoting from the brief of the Solicitor General (already referred to) the assertion that "the fact that a woman has a qualified right to an abortion does not imply a correlative constitutional right to free treatment," he stated that the question was whether or not the Senators "want to finance a legal abortion and take the lives of thousands and thousands of unborn children" (*ibid.*).

Senator Dole brought the first phase of the debate to a close (S 10805–06); he characterized the House-passed language as "probably overly restrictive and absolute," and stated that he would vote against both the House language and the Packwood amendment. He observed that Senator Bartlett's motion to table the Packwood amendment had "prevented the basic qualification respecting the life of the mother from being adopted," a qualification that, he said, could well have made the prohibition acceptable to a majority; he concluded (S 10806):

"In any event, we may be dramatizing the issue too much by suggesting that a doctor or hospital is going to deny an abortion to a mother who cannot afford one—but whose life depends upon it— just because the Federal Government will not pick up the check. Let us face reality: If a dying woman requires emergency surgery, the oath of Hippocrates does not stipulate that a decision to proceed be based on dollar signs.

"While not totally satisfied with what section 209 of this appropriation bill—as added by the House—I am opposed to the pending proposal to delete it completely."

Put to a vote, Senator Bartlett's motion, to table the Packwood amendment deleting Section 209 from the bill, was defeated 27 to 55, with 18 not voting (S 10806).

Senator Bartlett at once offered an amendment to Section 209 (the Hyde amendment) that would have added the words "except such abortions as are necessary to save the life of the mother," but the amendment was ruled out of order on the ground that "The amendment would be legislation on an appropriation bill" (ibid.). The Senate then adopted the Packwood amendment deleting Section 209 from the bill by a vote of 57 to 28, with 15 not voting (S 10806–07). On June 30th the Senate adopted the bill as amended in the Senate, and sent it to conference (S 11139). The House appointed conferees on July 20th (H 7368).

The House turned to consideration of the Senate's disagreement with the Hyde amendment on August 10, 1976; Mr. Fraser opposed the Hyde amendment (H 8627-28) on constitutional grounds, arguing that it discriminated against the poor who are disproportionally black, Hispanic or from other minorities and as inappropriate in an appropriation bill (ibid.). He made part of the record a letter from the United States Commission on Civil Rights strongly opposing the Hyde amendment (ibid.). The Commission said:

"First, we believe that such an amendment would undermine the constitutional rights of women as set forth by the U. S. Supreme Court. Second, it is clear that restriction of Medicaid funds for legal abortion would negatively impact only on low-income women, among whom racial and ethnic minority women are disproportionately represented. Such a result, in our view, would violate the equal protection clause of the Fourteenth Amendment."

It argued that the amendment "would effectively nullify the Roe and Doe decisions for indigent women, as those women must rely on Medicaid and other federally funded health care programs for medical services" (H 8628). The Commission quoted the following from a DHEW impact statement [2] on the amendment:

"This language would affect virtually all programs involved in or related to the provision of medical care as well as those which are concerned with social and educational services or benefits funded by the Departments of Labor and of Health, Education, and Welfare. Included would be programs such as those of the Bureau of Community Health Services, the Public Health Hospitals, social service programs of AFDC and Medicaid . . .

"The program that would be most affected would be the Medicaid program in 49 States and the District of Columbia. It is estimated that the Department is currently financing between 250,000 and 300,000 abortions annually at a cost of $45–50 million. The preponderance of funding is through Medicaid . . .

"The provision would also clearly preclude the use of departmental funds for therapeutic abortions including those to save the life of the mother, severely constrain medical schools receiving capitation grants and other HEW funds from instructing students in the performance of abortions, and preclude any federally supported agencies or projects from counseling clients on the availability of abortion services."

Mr. Flood moved that the House insist on its disagreement to the Packwood amendment, which would have stricken Section 209 from the bill (H 8630). He explained that neither House nor Senate conferees would yield on the issue, and stated that he would support the insistence on the Hyde amendment although he thought the better way to deal with the matter was by constitutional amendment (H 8631). He said that he had been concerned that the amendment

2. Exhibits 204, 205 and 206, from DHEW files, are similar in content. Exhibit 205, an unsigned two page memorandum, reads in part:

"It is estimated that the Department is currently financing between 250,000 and 300,000 abortions annually at a cost of $45–$50 million. The preponderance of funding is through Medicaid. For each pregnancy among Medicaid eligible women that is brought to term, it is estimated that the first-year cost to Federal, State and local governments for maternity and pediatric care and public assistance is approximately $2,200."

might prohibit using funds where abortion was necessary to save a mother's life but had been persuaded that state, local and private funds could provide any necessary therapeutical and medical services (*ibid.*).

Mr. Pritchard urged the House to support the position of the Senate (H 8631–32). He argued:

"I have a high respect for those who have strong feelings and who are totally opposed to abortion. They have their beliefs, and I think that is proper. They fought hard and they are well organized, and they are one group.

"Then there are some of us who believe that it is terribly important that women have a right to make their own decision, in consultation with their doctor.

"Then there is a third group in this House who, I believe, think that abortions are all right in some cases, but they are very, very worried about voting at this time, just several months before the election.

"Some may feel that this vote will not be recorded or will not be known. Even though they admit that in their districts the majority of people support abortion and allowing women to make this decision—they also realize that a very hard and very skillful minority is working very hard—which is their right and they are afraid that they will be punished at the polls.

"Mr. Speaker, let me tell the Members that I believe this vote will be known all through each Member's district, for several reasons.

"First of all, I think it is important that we realize that this is a first step in the restriction of abortion. Those who have promoted this amendment I think will be honest and say that this is the way we take our first step in the restriction of abortion.

"The question I want to ask all the Members here today is, Do we really want to take this first step against the poor women and the women on welfare?"

He devoted much of his argument to the adverse effect that the amendment would have on local hospitals, on public health service facilities, Indian health service facilities and on teaching institutions, and predicted that not only the poor but also those employed in health service facilities of all kinds would make themselves heard. He asserted that the amendment was discriminatory and unconstitutional and that "This will not stop abortion, this will just stop safe abortions."

Ms. Abzug contended that the amendment would deny treatment and medication for rape victims, and could be interpreted to prohibit some kinds of family planning (H 8632). She argued (*ibid.*):

"Those who are personally opposed to abortion have the freedom to model their lives. On that precept, they are free to state their views publicly, to argue and persuade, and to fight for a constitutional amendment. I think they have that right, and I respect that right. But they do not have the right to say that what we provide by law for one group of women we refuse to provide by law for another group of women who by happenstance happen to be poor and underprivileged."

She expressed confidence that the Supreme Court would in *Maher v. Roe* invalidate the restriction in the state law on abortion funding.

Mr. Edwards (California) argued that the amendment was unconstitutional, and that it defied the common sense and the law as it then stood to insist on the amendment when the three pending cases (*Beal v. Doe, Maher v. Roe,* and *Poelker v. Mayor*) which the Court had agreed to review were undecided (H 8632–33). Mr. Mitchell (Maryland) argued that to support the amendment was to support class legislation (H 8633). He spoke of learning about the consequences of illegal abortions when he served as a probation officer (*ibid.*):

"Let me ask the Members some questions. Have the Members seen the results of a coat-hanger abortion? Have the Members seen the septicemia caused by a "dirty abortion"? Have the Members seen the illness that women suffer when they get caught up in these abor-

tion rackets? Have the Members seen the result of an abortion performed by a rusty penknife? Have you seen what that does to a woman physically and psychologically? I have.

"All we would do today under the Hyde amendment is to leave those ugly, brutal options open to one class of people: those at the very bottom. Other options would be open to other classes.

"We cannot live with that on our conscience. We cannot live with it."

He argued (*ibid.*) that the amendment was a blatant denial of equal protection to poor women of whom a disproportion were from racial and ethnic minorities, that it would not prevent abortions but increase self-induced abortions and their medical and cost consequences, the revival of back-alley abortions

". . . and more suicides of young women who cannot face the ugly reality of a child who is not only unwanted by the mother but unwanted by this society, as well."

He contended that the amendment could only increase social disparities.

Mr. Hyde, answering (H 8633–34), quoted from the Solicitor General's brief, said to have been filed in *Beal v. Doe*, the same passage quoted in the Senate and a further sentence asserting that the presumed right to undergo many recognized medical procedures by licensed physicians does not impose on the states the duty to pay the medical expenses of indigents undergoing those same procedures. He argued that the amendment did not prohibit any abortion deemed necessary to save the mother's life: such operations are not, medically, considered abortions; he added that "the medical indications for so-called therapeutic abortions today are almost zero due to advances in medical science and technology"; and he asserted that the amendment did not apply to the "morning after" pill (diethylstilbestrol, "DES"), nor to IUD cases (associated with spontaneous abortion, sep-

ticemia and pelvic inflammatory disease), nor affect instruction in medical facilities or schools (*ibid.*). Denying any discrimination against the poor, he argued (*ibid.*):

"Lastly, the most emotional appeal is made that this amendment denies to a poor woman a right to an abortion which a rich woman can enjoy. To accept the argument that this amendment denies the right to an abortion to a poor woman we have to accept the argument that an abortion is a desirable thing. I reject that completely. Abortion is violence.

\*    \*    \*    \*    \*    \*

"Abortion is an inhuman solution to a very human problem. The only virtue to abortion is that it is a final solution. Believe me, it is a final solution, especially to the unborn child.

"Mr. Speaker, let the poor women of America make a list of those things that society denies them and which are enjoyed by rich women. Decent housing, decent education, decent food, decent income, and then say to them, 'Now, those will take second place. But we will encourage you to kill your unborn young children. Besides, there are too many of you anyway.'"

He urged (*ibid.*) that "to kill an unborn child is to deny to the most defenseless of human beings the most basic right of all, the right to life," that the fetus is not a diseased organ to be excised but a human being, that, while women are free not to become pregnant, once a life has been created "a new set of rights and duties arises, and to kill this life because it is innocently inconvenient, to say that some lives are worthwhile and some are socially expendable, is to totally reject the words of our forefathers that 'All men are created equal,' not born equal, created equal." He said (H 8634) that:

"In New York City, last year for every 1000 minority births, there were 1,304

minority abortions. That is one way to get rid of the poverty problem." [3]

Saying that the Court's legislation of abortion in no way enshrined the procedure, and that it was the Court which "once found Dred Scott to be a chattel, a thing," he asserted that (*ibid.*).

"The wholesale slaughter of the innocently inconvenient in this country could well be called a 'bloody business' and one that must make Herod's biblical slaughter of the innocents seem almost benign."

He concluded (*ibid.*):

" . . . let us not make the innocently inconvenient scapegoats for our futility in finding human solutions to these human problems. When the mother, who should be the natural protector of her unborn child, becomes it adversary, then the legislature has a duty to intervene."

Mrs. Schroeder opposed the amendment (H 8634): "it will not stop abortions. This amendment will only limit the availability of safe abortions to poor women." Mrs. Schroeder emphasized that "teenagers" accounted for one third of the abortions and 55% of the babies born out of wedlock, and that four-fifths of the sexually experienced unmarried teenagers did not use contraceptives; she characterized the consequences of the unwanted pregnancies among teenagers as "tragic and costly—for the individual, for the unborn child, and for society," and observed that an undersecretary of the DHEW had recently underscored the health risks from teenage births, and had indicated that young mothers were more likely to bear low-birth-weight babies with greater risks of birth defects, retardation, and death. Mrs. Schroeder cited the HEW impact statement for the statement that while medicaid reimbursement for abortions approximated $50 million a year, "the implementation of this amendment, forcing poor women to carry unwanted pregnancies to term, will cost the Government from $450 to $565 million for medical care and public

assistance for the first year after birth" (H 8635). She contended (*ibid.*):

"In addition, retention of the Hyde amendment would interfere with existing State statutes on use of public funds for abortions. Forty-seven States and the District of Columbia now permit medicaid reimbursement for abortions, but the Hyde amendment would prevent them from following their own State laws and guidelines."

She argued that the amendment violated the equal protection clause of the 5th and 14th Amendments and the right of privacy defined in *Roe v. Wade* and in the decision outlawing the requirement of spousal or parental consent (*ibid.*), and that it would deny constitutionally guaranteed rights of conscience and of freedom to follow the teachings of one's own religion on abortion by imposing on poor women a religious doctrine not shared by all people (*ibid.*). Mrs. Schroeder asked the House to "have respect for our Constitution and compassion for the poor—those who can very often least afford to bear unwanted or unplanned children." (*ibid.*)

Mr. Paul asked (H 8635), "What other single social issue since slavery has prompted such political activism." He said that until April 1976 he had practiced obstetrics and gynecology, had treated thousands of obstetrical cases and delivered, he estimated, 4,000 babies; he continued, "During this period of time I never saw one case which required therapeutic abortion in order to preserve the life of the mother. The issue of 'the "threat" to the mother' is not realistic since it is so rare. This is emotionally concocted and does not do justice to those who use this as the reason for legislation" (*ibid.*). Mr. Paul argued that the amendment would not prevent treatment, e. g., of cancer by radiation or hysterectomy though the treatment caused the loss of fetal life (*ibid.*). He denied that the "potential birth of a malformed child" justified abortion any

---

3. "Abortion Surveillance 1975" and the prepublished figures for 1976 give the following New York figures:

| | Number of legal abortions per 1,000 live births | | | |
|---|---|---|---|---|
| | 1975 | | 1976 | |
| | White | Other | White | Other |
| New York City | 903 | 1,188 | 835 | 1,185 |
| Upstate | 291 | 534 | 326 | 604 |

more than it justified the elimination of new born defective life (H 8635–36). Referring to the manner in which, he said, young people had come to him seeking abortions, he commented (H 8636):

"This lack of concern for human life is an ominous sign of a decaying culture. We as a Congress must not contribute to this decay.

\*　　\*　　\*　　\*　　\*　　\*

"　.　.　.　The use of tax dollars for abortion flaunts the first amendment protection of religious liberty. The advice I give to the pro-abortionists is 'Do not use the dollar of citizens with devout religious beliefs against abortion to carry out this procedure.' This is like waving a red flag in front of a bull and providing an incentive for the antiabortionist to organize and rally with great strength. Just remember how the antiwar groups rallied and changed a bad situation in the 1960's when kids were forced to serve and die and taxpayers forced to pay for an undeclared illegal war pursued by an ill-advised administration."

Mr. Paul insisted that there was historic precedent to establish the rights of the unborn and to recognize their legal existence, as in matters of inheritance, and suits for prenatal malpractice (*ibid.*). He asserted (*ibid.*):

"Frequently abortion is performed at the desire of an aggressive social worker who fears food may become scarce and for various other personal prejudices. Teenage abortion now is done with specific exclusion of parental consent, if the Government so chooses; another attack on religious convictions regarding the sanctity of the family. Opposite to this is the abortion for the mother of the pregnant girl "to save face." In the private practice I had, this was the strongest motivating factor for abortion. The pregnant girl usually had a great psychological need and desire to be pregnant and deliver a baby. A symbol to her of something that represented love and affection. Abortion carelessly given, financed by the Government, hardly will settle this deep psychological problem.

"My entire political philosophy is built on the firm conviction of the absolute right to one's life and property but precludes all violent activity."

Mrs. Burke objected to the amendment because it contained no exceptions for rape and incest victims or for ectopic pregnancies (*ibid.*) Mr. Kindness opposed the Government's use of tax dollars to pay for an act in contravention of the civil rights of unborn children "which is particularly offensive to many people from whom these taxes are taken" (H 8636–37). Speaking of the expressed concern for the poor, he argued that nobody was as poor as "an unborn child who has no Government to protect it or who has no one to protect it" (H 8637).

Mr. Obey, although opposed to the Hyde amendment because it allowed no exceptions, urged insistence on it as the way to force the matter back to conference (*ibid.*). He explained his purpose (*ibid.*):

"Mr. Speaker, the only way we can get this very divisive and very painful subject discussed in a rational way is to force this issue back into the conference committee where it should have been handled in the first place, where we can try to achieve a rational balance between those who are sensitive about the use of taxpayers' funds for something which they very deeply oppose and those who want to insure that we have some rational exceptions made in the case of legitimate instances of medical necessity."

He noted that there were about six amendments at hand in the House to incorporate exceptions for the cases of danger of death, rape, incest, and such deformity as will result in the infant's death within two years; he added that no amendment took account of the cases in which pregnancy materially worsens pre-existing diseases (*ibid.*).

Mr. Quie supported Mr. Obey's position, but in principle opposed abortion; he contended (*ibid.*):

"Mr. Speaker, we are talking here about the right of people, because of their religious and moral beliefs, to not support taking the lives of human beings. Lives which have done no wrong and do not in any way qualify as the 'enemy.'

"When I first came to Congress, we could not even talk about birth control, which I believe in. We have come from birth control in 19 years all the way until now we are talking publicly about abortions in this country, and we could continue down the devil's toboggan slide to where we more and more accept as public policy, taking the lives of undesirable people after birth. Already this is occurring with some who are born deformed."

Mr. Meeds argued that the proper place to settle the issue of the morality of abortion was by constitutional amendment, not in an appropriation measure (*ibid.*). He asserted that in states where abortions were legal, those on welfare should be entitled to abortion in the same circumstances as all others (*ibid.*) As to the money involved in the appropriation measure, he said that the estimated $2,200 first year cost involved in pregnancies carried to term was tenfold the cost of abortion (*ibid.*) He concluded:

"One of the gentlemen said earlier rather than call it a potential child, he preferred to call it a child with potential.

\* \* \* \* \* \*

"The potential of a welfare child is that there will be a repeat of that situation.

"I think every child has a right to be brought into a family that wants that child. A welfare child who is unwanted has two strikes against him or her at the start."

He pointed to the *Beal, Maher* and *Poelker* cases as involving resolution of the Hyde amendment issues, and observed that taxpayers must pay for many governmental activities of which they disapprove (H 8637–38).

Mr. Bauman argued (H 8638) that the amendment was as little objectionable as one that forbade use of federal funds to pay for selective murder; he continued:

"From time to time before national legislative bodies major social and moral questions are posed in such a way that their resolution allows future historians to conclude that the decision was a watershed in the history of the Nation. The question before us today has that quality.

"One of my colleagues made reference in debate to a group of people in this House who are concerned politically about their vote on this issue. He suggested that is why perhaps these Members have made up their minds to vote for this amendment, I disagree. This issue is not going to go away, it is going to be with us until finally it is resolved in the only forum remaining, and that is the Congress of the United States."

He urged adherence to the position earlier taken by the House, and, referring to the statement about the comparative cost of abortion as against carrying the pregnancy to term, he said (*ibid.*):

"I suggest that it is a very offensive argument that the people of the United States of America have now reached the point where they will sanction the theory that our Government should use taxes to kill people because it is too expensive to let them live. Which one of us has the audacity to play the role of God and decide who shall or shall not be permitted to live?"

Mr. Nolan supported the amendment, (*ibid.*) quoting Benjamin Rush as having said that:

"Nothing can be politically right that is morally wrong: and no necessity can ever sanctify a law that is contrary to equity."

He spoke of all persons' "inalienable right to life" and of the national tradition of protecting the weakest and most vulnerable members of society (*ibid.*).

Mr. Russo (H 8638), while he vehemently disagreed with the decisions of the Supreme Court legalizing abortion, recognized them as the law until the enactment of a constitutional amendment; but he argued that the legality of abortion did not mean that "Congress must finance the taking of defenseless lives," and that the federal government

". . . should assume a neutral stance in this matter—neither interfering with the constitutional rights of the woman, nor encouraging it through the use of tax dollars."

Approving Mr. Hyde's upholding the "sanctity of human life," Mr. Russo continued (*ibid.*):

"Millions of Americans of all religious persuasions and convictions have beseeched Congress to take firm action and halt the tragic and ever-increasing number of abortions performed in the United States every year.

"Time and time again the proponents of unlimited abortion have derided and scorned those of an opposing viewpoint. This attitude in itself indicates the level of insensitivity that can be reached by the proabortion forces.

"The reverence for life embodied in the Hyde amendment amounts to a significant reaffirmation of what is best in the American character and something of which all Americans should be proud. The mind-set that is created by those who take a casual and flippant view of conception, pregnancy, and birth is destructive of American institutions and is chillingly reminiscent of the underlying philosophy of some of the world's most totalitarian governments."

He acknowledged some merit in the argument that the amendment discriminated against poor women; he contended, however, that the argument was "overshadowed by the fact that every time a woman has an abortion, a human life is lost. This is the essence of this entire discussion today" (*ibid.*) He concluded with a plea to the House to stop the increasing number of innocent victims of abortion (H 8639).

Mr. Wirth (*ibid.*) argued against the amendment and for concurrence in the Senate position. He contended that the amendment abridged the constitutional rights of many women, that it would not end abortions but would deny them to women who could not pay for them, and force indigent women to seek more dangerous methods of terminating unwanted pregnancies, exposing them to the risk of unnecessary death or severe emotional and physical complications. Admitting that the available statistics are hard to pinpoint to illegal abortion [4] he stated that (*ibid.*):

". . . available statistics indicate that the risks in illegal abortions are substantially higher than those involved with legal ones."

He argued that it was hard to estimate the cost of treating the after-effects of the self-induced abortions that would occur among the indigent if the amendment were passed, but that they would be very large (*ibid.*). He recommended effort and funding for family planning and birth control, so that abortion would become a rarely used

4. The CDC Abortion Surveillance Annual Summary 1975 reported deaths from illegal abortions only for the years 1972–1975 (pages 9–10).

| Year | Number |
|------|--------|
| 1972 | 39 |
| 1973 | 19 |
| 1974 | 6 |
| 1975 | 4 |

The decline was said probably to reflect a decrease in the number of illegal abortions, women who would otherwise have had illegal abortions electing the safer legal procedures as they became more widely available. It added that for some women the lack of public funding acted as a deterrent to their obtaining safer procedures. The data on deaths connected with legal abortions are in Tables 20–22 of the 1975 survey and Tables 20–23 of the Prepublished 1976 survey data. These data show a slightly decreasing rate of deaths:

| Year | Number of deaths | Number per 100,000 abortions |
|------|------------------|------------------------------|
| 1972 | 24 | 4.1 |
| 1973 | 26 | 4.2 |
| 1974 | 27 | 3.5 |
| 1975 | 27 | 3.2 |

The data demonstrate that the rate of fatality increases with weeks of gestation. Aggregate figures for 1972–1976 were:

| Weeks of gestation | Number of deaths | Deaths per 100,000 abortions |
|--------------------|------------------|------------------------------|
| 8 or less | 10 | 0.6 |
| 9–10 | 19 | 1.7 |
| 11–12 | 17 | 2.8 |
| 13–15 | 17 | 7.8 |
| 16–20 | 40 | 16.1 |
| 21 or more | 13 | 26.8 |
| Total | 116 | 3.0 |

For material on death and serious complications arising out of delayed abortion see W. Cates, et al., The Effect of Delay and Method of Choice on the Risk of Abortion Morbidity, Family Planning Perspectives, Vol. 9, No. 6, Dec. 1977, p. 266.

emergency measure (*ibid.*). He concluded (*ibid.*):

"I question the wisdom of the Federal Government using the power of the purse to dictate policies arrived at on the State level. My own State of Colorado was one of the first to enact legislation permitting abortions to take place under certain conditions. Clearly, passage of the Hyde amendment would seriously interfere with the exercise of the will of the people of Colorado as has been expressed in their laws. For all of the above reasons, I am voting against the Hyde amendment, and I urge my colleagues to do likewise."

Mr. Oberstar (H 8639), unpersuaded that debate was likely to change any minds, sought to "correct the record" by stating that the Court (in *Wade* and *Bolton*) addressed itself "primarily to the rights of the mother," ignoring what he, thousands of his constituents and millions of others believed was the "vital issue," "the rights of the unborn," which he believed would be best protected by a constitutional amendment. He concluded, urging the House to end "Federal financing for the taking of lives" (*ibid.*):

"To those who oppose abortion, I call upon their social conscience to consider the far-reaching needs for legislation in the areas of maternal and child health care and prenatal health care, perinatal and child health care, for legislation relating to the medical and other expenses incurred in the adoption of a child, and for funding for rape prevention and control. These are deeply felt needs in our society. It is not enough to support legislation of this kind while we ignore those other needs. The two must be joined together.

"The amendment that we are about to vote on is not, as some have referred to, discriminatory legislation; it is the only voice we can raise in behalf of the voiceless and the voteless—the unborn."

Mr. Frenzel (H 8640) recognized that there were degrees of agreement with the *Wade* and *Bolton* decisions as well as disa-

greement, but argued that the amendment discriminated against the poor, and was possibly invalid—a point the Court would consider in *Maher* and *Beal*. He contended the amendment "would prohibit abortions only for those who need them most," and remit them to illegal abortions with the attendant deaths and serious and costly medical complications; the "issue here," he said, "is equality under law, not the cost of passage or failure," but, he pointed out, the cost to the government if these women were "forced" to carry their pregnancies to term would be tenfold the cost of abortion (*ibid.*). Of the language of the amendment he said (*ibid.*):

"It is conceivable that this language could be interpreted to prohibit all abortifacient birth control methods, it could end all teaching of abortion methods in medical schools and could deny abortion counseling or discussions in any classroom or organization receiving Federal funds."

Mrs. Mink (*ibid.*) characterized the amendment as "inappropriate, unconstitutional, discriminatory, and cruel." She argued (*ibid.*) that the amendment sought to "set policy" through an appropriation bill rather than, more appropriately, through the Committees to which the issue raised by *Wade* and *Bolton* had been presented. She said the amendment was invalid under the equal protection clause, so broad that it prohibited medicaid abortions even if the mother's life was endangered, and urged (*ibid.*):

"This amendment is simply a discriminatory measure, one designed to limit access to safe, legal abortions to a segment of the population that can ill afford one on their own."

She noted that the measure could not be justified as saving money, and would compound the plight of poor women by driving them to seek illegal and unsafe abortions (*ibid.*).

Mr. McCollister, supporting the Hyde amendment, expressed his discouragement that those moved by the plight of the poor pregnant woman were so little concerned

for the welfare of the unborn child (*ibid.*). He agreed that the House was dealing with human life, including that of the child; he asserted (*ibid.*):

"Medical evidence is overwhelmingly clear that the processes of life begin at conception. Regrettably the Supreme Court has ignored this medical fact and has declared that the word "person" as used in the 14th amendment does not include the unborn.[5] However, there appeared no doubt in the majority's 1973 opinion as to what the legal effect of fetal personhood would have on that case. The Court stated:

'If this suggestion of personhood is established, the appellant's case, of course collapses, for the fetus' right to life is then guaranteed specifically by the Fourteenth Amendment.'

"Such a moral pronouncement by the Court seems to me to totally disregard the medical evidence as well as several legal precedents for the rights of the unborn in areas of common law and the law of torts."

Mr. Badillo (H 8640–41) stated that the hearings of the Judiciary Committee Subcommittee on Civil and Constitutional Rights in recent months had explored in depth the legal, moral, and medical aspects of the question without reaching any decision about proposing a constitutional amendment to the Congress and the people; the hearings, he said, made the divergence of opinion among the witnesses clear:

"Yes, there are people who, by their religious belief, feel that abortion is murder. Yet there were representatives of other religions who testified that life begins at birth, and still others stated that a child does not achieve the status of an individual until the age of 1 year. Each group is convinced of the morality of their position, and within the ethical framework of their religion, each is correct. It seems to me, therefore, that it is absolutely untenable for this body to make the judgment that we will accept the morality of one segment of our society, and reject that of another.

"We must, therefore, deal with the legality of abortion, and until there is a higher body to interpret our law than our Supreme Court, we must abide by its decisions. Three years ago, the Court decided that, under certain circumstances abortion is legal in this country. We must abide by that decision, and the Hyde amendment, on which we are about to vote, flaunts that decision. It is, therefore, clearly illegal and unconstitutional."

Mr. Badillo challenged the correctness of Mr. Hyde's assertion that the amendment would not prevent certain types of therapeutic abortions or extend to certain medical procedures that had the secondary effect of ending fetal life (H 8641). He asserted that the bill was doubly discriminatory, against the poor, and against those poor women suffering disabilities for which abortion is the medically indicated procedure (*ibid.*).

On the motion to recede from the disagreement with the Senate amendment (deleting Section 209, the Hyde amendment, from HR 14232), the vote was 150 in favor, 223 opposed, and 58 did not vote; the motion to insist on the disagreement was, accordingly, agreed to (H 8641–42).

The Senate debated the insistence of the House on the Hyde amendment on August 25th (S 14562–70). Senator Helms opened the debate (S 14562–63) by characterizing as invidious the argument that continued medicaid funding of abortion was cheaper for the government than funding childbirth (an argument that he attributed to Senator Packwood and to Dr. Hellman of DHEW); he said:

"To vote against the Hyde amendment in the context of this argument is to take the Senate on the first step to horror and tragedy. What we will be saying, if we

---

5. *Cf. Roe v. Wade,* 1973, 410 U.S. 113 at 158, 163, 93 S.Ct. 705 at 729, 732, 35 L.Ed.2d 147 (". . . the word 'person' as used in the Fourteenth Amendment does not include the unborn"; "With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability.") [Footnote by the Court.]

reject the Hyde amendment under these circumstances, is that innocent human lives can and, indeed, should be subordinated to the monetary interests of the state. If we embrace this principle today, to what extremes will we go tomorrow? I predict, and I do so with all seriousness that if we today embrace the principle that innocent human life may be disposed of to save the Government money in regard to child care, in the foreseeable future we could again hear this argument applied to the old, the feeble, the infirm, and the handicapped."

He asserted that "the modern practice of abortion as a policy of government first appeared in the Nazi and Communist dictatorships," that at the Nuremberg trials "the promotion of abortion was considered a crime against humanity," and that the Nazi regime in some circumstances forced abortions on Eastern European women as part of their genocidal policies" but strictly enforced as to Germans the German law prohibiting abortions (S 14562). He quoted from Nazi documents (apparently from the Nuremberg trial materials) instructions to occupation personnel to permit abortions for East European women if they requested them, unless the father was German, in which case special permission was required; he quoted passages indicating that some doctors at the time had disagreed on moral grounds with promoting abortion, and that the more intelligent female eastern workers had misgivings because they "knew" that artificial abortion impaired a woman's ability to conceive; he quoted the Nuremberg defense as arguing that they were exculpated by the fact that the women had requested the abortions, and that abortion generally was "a special violation against life" generally incurring a lesser punishment than murder, and had not before the trial been considered a crime against humanity (S 14562–63). He contrasted the position of American obstetricians and gynecologists expressed in 1940 and 1941 publications of treating the duty to preserve human life as including the unborn (S 14563). To the argument that in a pluralistic society one group should not impose its beliefs on oth-

ers, Senator Helms answered that he could think of no clearer imposition of one person's belief on another than "by requiring that person under penalty of law to finance activity to which he is morally, religiously, and philosophically opposed." He argued that the Senate had to consider whether it would force millions of Americans to violate their long tradition of religious morality concerning abortion and force them to finance an act which they believed to be a homicide; he asserted that millions of Christians found in the Bible many indications that abortion is contrary to Christian morality. He quoted (*ibid.*) Jeremiah, Chapter 1, verse 5 (from the King James version):

> "Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee . . ."

Senator Helms cited the June 1976 Southern Baptist Convention resolution as reaffirming the "biblical sacredness and dignity of all human life, including fetal life," and stated:

> "Practice of abortion for selfish non-therapeutic reasons wantonly destroys fetal life, dulls our society's moral sensitivity, and leads to a cheapening of all human life."

He argued that funding abortions restrained those who religiously opposed abortion in the free practice of their religion (*ibid.*). He admitted that a "legislative amendment" to an appropriation bill was generally undesirable, but urged (*ibid.*):

> "Even our most precious and longstanding constitutional principles admit of exceptions in certain circumstances. Today we are talking about the lives of hundreds of thousands of children about to be born and we are talking about a very positive and straightforward restraint on the freedom of religious practice by the use of the taxing power of the Federal Government. I believe that on balance, an exception and necessary on this occasion to our procedural practice."

Senator Bayh argued (*ibid.*) that a much stronger case could be made for no abortion than for the language of the Hyde amend-

ment which, he contended, said, "if you are poor, if you are a member of a minority group, your chances of having an abortion are going to be seriously limited; whereas, if you are affluent, of any color or ethnic group, you have the wherewithal necessary to get an abortion," and he expressed agreement with the lower court decisions that he said had held that language like that in the amendment was unconstitutional; he expected the Supreme Court would so hold. Senator Helms inquired (*ibid.*) whether it was not "a matter of saying that nobody shall have an abortion at Government expense?" Senator Bayh answered (*ibid.*) that the (implied) argument was very closely related to the earlier and unacceptable argument, "Why should my tax dollars be used to dump napalm on defenseless civilians in Vietnam?" Senator Brooke interjected (*ibid.*) that the point was that people who would be denied federal funding for their abortions if all funding of abortions was stopped are those people only who, if they are to have an abortion at all, would have to have it at federal expense because they cannot afford it in any other way. Senator Helms interpreted Senator Brooke as meaning that the remedy was to force the taxpayers to pay for hundreds of thousands of abortions (*ibid.*). Senator Brooke answered (S 14563–64) that no Senator favored abortion, that the issue was not "antiabortion or proabortion," but that under the Hyde amendment a mother cannot have an abortion even if it is to save her life. Senator Bayh made the same argument (*ibid.*) Senator Helms pointed out (S 14564) that Mr. Hyde had said his amendment did not intend "to prohibit those medical procedures necessary to save the life of the mother" but Mr. Brooke insisted that the amendment clearly ruled out all abortions at federal expense. Senator Helms answered (*ibid.*), "The doctrine of self-defense is applicable here," and argued that there was no uncertainty of intention: life saving types of procedures were not considered abortions, and Mr. Hyde had made the record clear. Senator Bayh denied the validity of the argument, as did Senator Brooke (*ibid.*)

Senator Packwood rose to deny that he had supported abortion as less expensive for the government than childbirth any more than he based his support of capital punishment on economic grounds (*ibid.*); rather, he said:

"I think the woman is entitled to determine for herself whether or not she wants to terminate an unwanted pregnancy. It is not the business of the Senator from North Carolina nor me nor the U. S. Government, nor anybody else. It is a decision for that woman to make."

He rejected the idea that other nations' experience in legalizing or forbidding abortion proved something about abortion (*ibid.*), and while saying, "Abortion is a moral issue," he pointed out that historically abortions had not been forbidden in Anglo-American law until the first half of the nineteenth century, that they were forbidden partly for moral reasons, partly because abortion was medically unsafe, and that in the 1960s some states began to legalize abortion, others considered and rejected such legalization. He continued (*ibid.*):

"But we can say that in 200 years, we have gone full circle; in terms of at least a majority opinion, from legal to illegal and back to legal again.

"I maintain that God did not talk to any of us at any time in that complete circle and say, 'At this point in time, we have reached the final decision on abortion: it is right, it is just, it is moral;' or, 'It is awful, it is illegal, it is immoral.'

"If anything, it is a personal decision, a very, very personal decision, and one that should be left to a woman and her physician to determine whether or not that abortion is going to be performed."

As bearing on the argument of morality he read again the list of about fifty religious organizations that favored legalized abortion (S 14564–65). The list included "Southern Baptist Convention, 1974 (Reaffirmed 1971 endorsement)" and "Catholics for a Free Choice, 1975" (S 14565). Senator Packwood explained (*ibid.*):

"I cite that list simply to say that there is a religious division in this country as to

whether or not we should have legalized abortion: a very significant portion of religious leadership in this country says yes, and a very significant portion says no. Under those circumstances, we should not, in this country, attempt to intervene on one side or the other in what is essentially a moral dispute."

He argued (*ibid.*) that the amendment would not stop abortions: the rich would be unaffected, the poor will bear their pregnancies to term, whether they wish to or not, or else will seek illegal abortions, risking death or other after-effects; if, he said, the Congress wished to weigh in on one side "of a very personal, moral issue," it should understand that they are weighing in, not to stop abortions, but to stop them "for a single slice of the country that is so poor, so barren of any economic resources, that unless they have Government help for medical assistance, they get no medical assistance," in this case, for abortion. He expressed the hope (*ibid.*) that the Congress would not take that position because it would be "hypocritical in the sense of thinking that we are going to stop abortions, and we are sentencing many women to death who will try to have abortions that will be badly, unscientifically performed, and who will die as a result of those abortions."

Senator Buckley assumed (S 14565) that his position on "the moral aspects" of the issues were known and needed no repetition; to the argument that the indigent woman was constitutionally entitled to public funding for abortion, he opposed the several times quoted assertion in the Solicitor General's Memorandum in *Beal v. Doe* that the qualified right to an abortion does not imply a correlative right to free treatment; he noted that then Governor Carter had recently expressed the same view. To the general argument that the poor should be accorded the same access to abortion that the means of the rich assure to them, he answered (*ibid.*) that the poor would be better served by being accorded some other advantage that the rich enjoy. He argued (*ibid.*) that Mr. Hyde's explanation in the House of the intent of the amendment made it clear that it would not preclude the use of medicaid funds where a woman's life was at stake.

Senator Stennis contended that the issue was not money, nor was it a political issue, nor a legal question (S 14566); he did not see how the Supreme Court could properly lay the predicates and guidelines, the legal and illegal terminology, and restrict the states and federal government in a field that did not present a legal question but a question of old-fashioned morality. He thought abortion virtually analogous to the wrongful taking of human life (*ibid.*), and, he continued:

"But other than that I believe this trend that we have drifted into, and drifted is a soft word, with reference to abortion as a whole, strikes at the very basic foundations of the family, which is not just an isolated institution, but the family that I refer to is the basic concept of our present civilization, whatever religious sect or whatever religious views, if any, one may have. I am talking about the basic concept of the family and family life.

"As I understand human nature there is no doubt in my mind that this drifting trend we have taken and that we argue and try to justify on a narrow concept is leading us over the abyss on the basic question of what does the family mean and what is its place and how essential and necessary and indispensable it is if we are going to have a society anywhere near the standards of morality and decency and the basic concept of life as we have inherited it and as we have been trained in it."

Senator Eagleton supported the amendment as embodying the only proper federal policy; he emphasized his role in securing passage of the Family Planning Services Act of 1970, and in obtaining senatorial concurrence in a House amendment forbidding use of Planning Act funds for abortions; he argued that the *Wade* and *Bolton* cases did not decide that the government had to pay for abortions (*ibid.*).

Senator Hathaway pointed out that the amendment might be taken to forbid funding for certain widely used birth control methods which may have abortifacient qualities—IUDs and "morning after pills"— might forbid the teaching of abortion procedures and the use of abortifacient drugs in institutions receiving DHEW funds, and might result in excluding abortion from the coverage of DHEW employees under their governmental medical insurance (ibid.). When Senator Buckley argued that Mr. Hyde had explicitly disclaimed such side effects, Senator Hathaway answered that the language of the amendment was too clear to permit resort to legislative history (S 14566–67). Mr. Brooke agreed with Senator Hathaway and said that Mr. Hyde could have used appropriate language to cover the exceptions (S 14567). Senator Helms explained that if Mr. Hyde (who was then seated in the Senate chamber beside Senator Helms) had tried to include such language he would have encountered the problem of legislating on an appropriation bill. Senator Brooke said that nevertheless no court called on to interpret the language would incorporate the exceptions that Senator Buckley "was trying to write into this language at this time" (ibid.). Working out new language in conference was discussed as a possibility (ibid.).

Senator Brooke argued (ibid.) that the Supreme Court had held that women have a constitutional right to terminate their pregnancies under certain circumstances and had not held that the right was a right only of the wealthy; the Hyde amendment, he argued, did so restrict the right. He asserted that "Women making the choice of abortion should not be discriminated against in Government programs," that the amendment would expose poor women to unsafe and fatal abortions (ibid.); he foresaw "an increase in abandoned, abused, and unwanted children" (ibid.). Senator Brooke cited the Civil Rights Commission's strong opposition to the amendment, its probable invalidity under the Fifth Amendment, its harsh prohibition of abortions to save the mother's life, and in the case of rape and incest, and its possible effect as a prohibition of abortion counseling by any health facility receiving any DHEW financing (ibid.). Observing that the amendment was legislation on an appropriation bill, that the Supreme Court would in the fall hear two cases involving the validity of restrictions on medicaid funding of abortion, and that one such restriction had been invalidated by the Tenth Circuit Court of Appeals, he argued that the amendment was ill-timed, unconscionable, and should be defeated (S 14567– 68). Senator Packwood, too, asserted that the Hyde language was too clear to be modified by reference to legislative history; he presented a letter from the American College of Obstetricians and Gynecologists quoting standard definitions of abortion (S 14568).

Referring to Senator Stennis's appeal to old-fashioned morality, Senator Packwood said (ibid.) that before statutes forbade abortions, family life was apparently most reverenced; that in Japan and China, one a democracy, the other a dictatorship, abortion was legal; that the issue did deal with the reverence of family members for one another; that he did not put the matter on constitutional grounds; he urged defeat of the amendment as a matter of wise policy, saying (S 14568–69):

"The wise policy in this country—not the constitutional policy, although I am convinced, as I said before, that the Hyde amendment is unconstitutional—but the wise policy, the decent policy, is one of individual choice. That is what this country was founded on 200 years ago; the right to make for yourself the decisions that affect you."

Senator Bartlett argued (S 14569) that the "life of the mother" point could be clarified and the bill passed; he attacked the argument of those who said they opposed abortion but also said, "I do not want to enforce my morality on other people." He said:

"Hogwash. I think we impose our morality on other people, or our constituents' morality on other people, time after time in this body. I think it is important that morality be involved in the decisions that

we do make, but I think what we are talking about here—"

After an interruption, Senator Bartlett resumed (*ibid.*):

"I think what we are doing here is enforcing someone else's morality on the fetus, on the life of the fetus, as to whether or not that life continued."

The Senate, he argued would be approving the use of one person's morality against another person (*ibid.*) The question, he said, presented a moral issue and also a legal issue that was legislated by the Supreme Court; the Court had "legislated morally," though in a way disapproved by many in the country; the issue was not one on which "we should feel we have a right or an obligation to finance abortions, which are simply considered anathema by many, many people in this country" (S 14569).

After Senator Helms noted that the name of the Southern Baptist Convention should apparently be deleted from Senator Packwood's list of religious organizations favoring the legalization of abortion, Senator Helms moved that the Senate recede from its disagreement with the Hyde amendment (*ibid.*). That motion was defeated, 35 voting for it, 53 voting against it, 9 not voting (S 14569–70). Senator Bayh then moved that the Senate insist on its disagreement with the Hyde amendment and authorize the Chair to appoint conferees on the part of the Senate; Senator Church explained that his vote for the motion would be based solely on the failure of the amendment to except abortions "to save the life or preserve the health of the mother," and Senator Javits presented a letter from the New York City Health and Hospitals Corp. urging deletion of the Hyde amendment as having the primary effect of denying to medically indigent women access to abortions even to save life (S 14570). Senator Bayh's motion was carried by essentially the same vote as that by which Senator Helms's motion lost (S 14570–71).

The Senate having insisted and appointed conferees for the committee, the House on August 26, 1976, appointed conferees as well (H 9087–88).

Mr. Flood submitted the Conference Report on H.R. 14232 to the House on September 15, 1976 (H 10126–27). Technically it was a report of disagreement—since the Senate amendment deleting the Hyde amendment was neither agreed to nor receded from—but it incorporated a Joint Statement of the managers reflecting the action agreed upon. The agreement in the statement was that the House managers would offer a motion to restore Section 209 amended to read (as it was finally enacted) as follows:

"Sec. 209. None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

And the Senate managers agreed to move that it concur in that amendment of the Senate's amendment. The relevant text of the Joint Statement read (H 10127):

"Most certainly, this is a difficult, emotionally charged issue—one which many believe should be dealt with by the appropriate legislative committees.

"Nevertheless, in an effort to resolve this issue and avoid further delay in meeting the vital needs addressed by programs in this bill, a majority of the Conferees have agreed to a modification of the House bill language.

"It is the intent of the Conferees to limit the financing of abortions under the Medicaid program to instances where the performance of an abortion is deemed by a physician to be of medical necessity and to prohibit payment for abortions as a method of family planning, or for emotional or social convenience. It is not our intent to preclude payment for abortions when the life of the woman is clearly endangered, as in the case of multiple sclerosis or renal disease, if the pregnancy were carried to term. Nor is it the intent of the Conferees to prohibit medical procedures necessary for the termination of an ectopic pregnancy or for the treatment of rape or incest victims; nor is it intended to prohibit the use of drugs or devices to prevent implantation of the fertilized ovum.

"Furthermore, the proposed language would not interfere with or limit Federal aid to medical schools conducting research into, or teaching of, abortion procedures for therapeutic purposes.

"The Congress is aware that there are three cases related to this issue to be heard by the Supreme Court this fall, and wishes to make clear that the Congress in its action upon this particular appropriations bill does not intend to prejudge any constitutional questions involved in those cases."

Mr. Flood called up the Conference Report on September 16, 1976, and moved that the House recede from its disagreement to the Senate's amendment deleting original Section 209 and concur in the amendment with an amendment restoring Section 209 amended to read as quoted just above (H 10312). Urging support for his motion, Mr. Flood explained the Conference action and Section 209 in these terms (*ibid.*):

"This has been the most difficult conference, believe me, the most difficult conference that I have ever experienced in my public life.

"We met repeatedly with the Senate conferees day after day for many, many hours. The House conferees insisted that they could not, and would not, recede from the clearly stated position of a majority of the Members of the House that HEW funds should not be used to pay for abortions. We proposed a modification of the Hyde amendment to permit payment for abortions only in those instances where it is necessary to save the life of the mother. The Senate conferees attempted repeatedly to persuade us to agree to language which we believed would leave the door open to payment for abortions in cases where it is not a true medical necessity. We rejected all such proposals. Finally, the House and the Senate conferees agreed to accept a proposal made by the gentleman from Massachusetts (Mr. CONTE) that the language be amended to read:

"None of the funds contained in this act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term.

"As far as I am concerned, this language means essentially the same thing as the language which I originally proposed to permit abortion only in cases where necessary to save the life of the mother. For that reason, and for that reason alone, I was able to accept it."

Mr. Flood strongly urged the President and the Secretary of HEW "not to permit this legislative provision, now whose intent is clear and unmistakable, to be emasculated by any regulations or interpretations," and he concluded (*ibid.*):

"I am convinced that if it is properly administered by the Department of Health, Education, and Welfare, it will bring about a substantial reduction in the number of abortions performed for nontherapeutic reasons."

Mr. Conte, supporting the motion, stated that the language "did not prohibit abortions per se; there is serious doubt whether such a prohibition could be made except through a constitutional amendment" (H 10312–13). He argued that Section 209 prohibited federal funding of abortions, not the performance of abortions, and he used the language of the Joint Statement to explain the amendment (*ibid.*). Mr. Conte said he thought Section 209 the best possible compromise, and he emphasized that prompt action was required if the Congress was to have the opportunity before its planned adjournment on October 2 to override the expected presidential veto, for the bill appropriated $4 billion above the President's budget (*ibid.*). Mr. Conte, author of amendments increasing the funding for mental health and other programs, said that he would vote to override the veto (*ibid.*).

Mr. Obey supported the amendment (H 10313–14). But he devoted his speech to a strong condemnation of the action of the American Council of Catholic Bishops in intimating a preference for a presidential candidate on the one issue of abortion. Mr. Obey said:

"The Council of Bishops has the same right as any other organized group—in-

deed they have an obligation—to speak out on moral issues which confront the Nation. But, when they collectively or individually, in and through their roles as officials of the Catholic church, go beyond that by leaving the implication that they prefer a Presidential candidate because of his position on one issue, to the exclusion of all others, they make a serious mistake for the church and a mistake for the country.

"One of the foundations of American freedom has been the tradition, rooted in the first amendment to the Constitution, which draws a hard firm line between church and State. That line stands as the one sure protection of all churches against the heavy hand of government and against the domination of public affairs by any one organized church.

"I am a Catholic . . . .

"But, because I do care about the church, and even as I support the amendment I feel it necessary to object to the bishops' political statement in my individual capacity as a Catholic and in my public capacity as a public official who happens also to be a Catholic.

"In my private capacity as a Catholic, I must object because I believe the bishops' action will produce a backlash against the church and is distorting Catholic values in the eyes of the American people. The action of the Catholic bishops in appearing to be subtly blessing the candidacy of one candidate for President simply on the basis of his position on abortion, even though that difference is one of tactics, not substance, and even though the other candidate is extremely close to the church on a great number of other moral issues, is a negation—even though unintentional—of what the church has always stood for—concern about poverty, about racial justice, about hunger, and other areas of social justice."

He quoted the President of Georgetown University (Rev. T. S. Healy) as condemning the reduction of all the issues in a major political contest to a single issue, and expressed the view that the bishops should not make any pronouncements about candidate preferences, and denied "the wisdom or the right of the official leaders of the Catholic church to pressure public officials, be they Catholic or not, into taking certain actions on matters of political strategy" (*ibid.*) Mr. Obey said he happened to agree with the Church position on abortion, but that he was voting for the amendment not because he was a Catholic but because he thought it sound public policy, although he said:

"I believe it should have given physicians more latitude in determining medical necessity, because the last time I looked, the physicians seemed to know a little bit more about medical requirements than the politicians. But I am willing to accept this language in order to save this bill and in order to try to keep this country together on this most divisive and emotional issue and I hope you are too."

He repeated that the Catholic Church "was operating outside of their own realm of competence" when its leaders (or those of any other church) tried to bring their collective weight to bear in a debate between public officials over such a question of strategy as whether a constitutional amendment or some other form of action is the more appropriate response of government to the abortion question.

Mr. Hyde deplored the reference to the Council of Bishops-Carter-Ford-abortion controversy, saying that it started with Carter's invitation to the bishops (H 10314). He supported the amendment as a compromise embodying the essentials of what he intended; he said (*ibid.*):

"No one, least of all myself, denies the hardship and even in some cases tragedy that can result from an unwanted pregnancy. The issue, however, is whether the avoidance of this hardship is worth the killing of a human life. The issue is the nature of the sacrifice to avoid this hardship."

Mr. Hyde objected to the Joint Statement's language about not prejudging the *Maher* and *Beal* cases as gratuitous and irrelevant (*ibid.*). After referring to environmentalists' concern for the animal and the inanimate, he concluded (*ibid.*):

"The unborn possess this distinction— they are human and, if not killed by some physician, then life and thought, emotion and choice, love and reason, will go on inside them.

"I do support this amendment, not because it is perfect, but because it is the best attainable. Many human lives will be saved, and this is no small achievement.

"This language says that human beings are not mere commodities to be manipulated, exploited, or thrown away. This language tells the social and biological engineers that this Congress still believes that human life is unique in creation and possessed of dignity."

Ms. Abzug, opposing the motion, contended that the amendment was discriminatory class legislation and unconstitutional; she wondered that the House did not await the Supreme Court's decision in the *Maher* and *Beal* cases, and charged (*ibid.*):

"What the Members supporting this amendment are challenging is a Supreme Court decision with which they disagree. And even though they disagree with that Supreme Court decision—with which they have a right to disagree—this is not the way to change it. We cannot change a Supreme Court decision interpreting the Constitution of the United States by an amendment to an appropriation bill. If you want a constitutional amendment, then fight for that. But I think this is an error, an inappropriate way to legislate. I believe the Court will strike it down."

She termed the amendment cruel to those who cannot help being poor, arguing that the Supreme Court had made the question of abortion one to be decided by the woman, not by the clergy nor by Congressmen (H 10314–15). She noted that the cost of denying abortion, in child care and after-care following self-induced or other illegal abortion was great, and that as a result of the amendment some would die (H 10315). She argued that the amendment precluded abortion for the victims of rape and incest, as well as for genetic deformity, and that the language "where the life of the mother would be endangered" would leave doctors and the states uncertain of their rights (*ibid.*). She urged sending the issue through regular committee procedures, especially in light of the expected Supreme Court decision in the *Maher* case (*ibid.*). Contending that the opponents of abortion knew that the only way to outlaw abortion was by constitutional amendment, she appealed to the Members "not to penalize those who are pregnant and poor and outlaw abortions for them when other women will continue to obtain safe, legal abortions" (*ibid.*). She asserted that a recent New York Times poll indicated that 67% of the respondents believed that the abortion decision should be left up to the woman and her doctor (*ibid.*) She said that the amendment exhibited poor draftsmanship and she characterized as deceptive the use of one kind of language in the amendment and of stating the exceptions to the amendment's language in the report (*ibid.*).

Mr. Fraser opposed the amendment, saying (H 10316):

". . . the medicaid program was designed to buy comprehensive medical assistance for the needy and for the indigent of this country. For us to say what the medical procedures should be and to say what is available to the indigent and the near poor is, I think, invidious discrimination, and it ought to be stricken down."

He predicted that enactment of the amendment would result in increased illegal abortions and a corresponding rise in abortion-related deaths, a chaotic situation affecting reimbursement to the 47 states and the District of Columbia which then reimbursed for abortions, and further lawsuits like the number which had already raised the issue presented in the *Maher* case (*ibid.*).

Mr. Bauman supported the amendment; he noted that years of efforts to bring a constitutional amendment concerning abortion to the floor had been unsuccessful, and said the amendment was a valid limitation in an appropriation bill and not an invalid prohibition (*ibid.*). "Why," he asked, "should Federal taxpayers' funds be em-

ployed to murder the unborn?" (*ibid.*). The lives involved are those of "defenseless human beings," and the cruelty involved is not toward the impoverished mothers but "the brutal denial of life itself" (*ibid.*). He said that the nation may have arrived at the milestone other nations had reached, that of no longer caring about the right to life; the argument (as he characterized it) of "inconvenience" can be extended "to the elderly or to the ill, those who just happen to be in the way of the majority, those who disagree" (*ibid.*) He disagreed with Mr. Obey on the role of the clergy, saying (*ibid.*):

"Let me add that the gentleman from Wisconsin (Mr. Obey) has the right to express his opinion as he did earlier in debate but I must suggest, he is mistaken in his view. There should be no indictment of the right of Catholics, Protestants, or Jews or anyone to raise moral issues within the political process. It is well that burning issues have a full airing. Those in places of leadership in our churches, whatever their denomination may be, should be able to step forward and make their views known on an issue so basic as the right to life. It would be immoral to shirk this duty."

Mr. Giaimo opposed the amendment as denying a woman her constitutional entitlement "if she happens to be poor" (*ibid.*). Characterizing the amendment as unfair, he concluded (H 10318):

"The easy vote, I believe, would be to vote in favor of this amendment in order to duck the issue. The only ones who will be angry with us will be some poor unknown women. I do not think that is right, and I think we should vote down this amendment."

Mr. Pritchard said that the amendment represented not compromise but capitulation; it did not take care of rape victims (*ibid.*). He expressed confidence that the Supreme Court would find the amendment invalid (*ibid.*).

Mr. Oberstar supported the amendment; he said that "the right to life" was not primarily or exclusively a religious issue, that it was a human rights issue (*ibid.*).

Noting that the President had a minimal role in constitutional enactment, which depended on the Congress and the state legislatures, he continued:

"It is, therefore, to the Congress, and the State legislatures, that the people of this country, including the Catholic bishops, the Protestant ministers, the rabbis and the Mormons should pay their attention not to the Presidential candidates, on the issue of a constitutional amendment to protect life.

\*　　\*　　\*　　\*　　\*　　\*

"This vote is not on the issue of poverty or discrimination, this is a human rights issue, the rights of the voiceless and the voteless—the unborn. So I ask my colleagues to vote today for those who cannot vote; vote for life; vote for the unborn."

Mr. Roncalio opposed the amendment: formerly a prosecutor, he had conducted prosecutions for illegal abortions, and remembered that some mothers had died from infections from the illegal abortions (*ibid.*). The abortions would go on whether or not there was federal funding, he said, but he thought it unjust to say that the poor can no longer have their abortions in hospitals, and that they would then have the abortions in the back alleys (*ibid.*).

Mr. Michel invited support of the conference amendment (H 10317–18), Mr. Frenzel announced his opposition, and Mr. Levitas announced his support on the ground that the conference amendment allowed the therapeutic abortions he was concerned for (*ibid.*). Mr. Reuss supported the conference amendment in the expectation that the conference report language would govern the amendment; he said that he had concluded that he could not support a right to life amendment; he said (*ibid.*):

"For example to deny to a State the power to legalize an abortion so as to arrest the fertilization that has taken place as a result of rape or incest, or where it is deemed by a physician to be a medical necessity, seems to me to disregard other important human rights—the

right of a mother to her health, and the right of a family whose maternal leader has been the subject of rape to avoid the consequences of a violent fertilization."

Mr. Flood's motion for the House to recede and concur in the Senate amendment with an amendment putting Section 209 in the form quoted above (page 763) was carried by a vote of 256 in favor, 114 opposed, and 60 not voting (H 10318–19).

The Senate took up the Conference Report on September 17, 1976 (S 16111), and Senator Magnuson reported on the status of the bill generally and noted that much time had been spent to reach language on abortion funding which might or might not be regarded as a compromise (S 16112).

Senator Brooke said that he could not in conscience vote for the revised Hyde amendment or recommend that his colleagues do so, although, he said, "the conference result is better than the original version" (ibid.). He found that the conference amendment discriminated against the poor who must rely on medicaid (S 16112–13). He expressed his conviction that Section 209 was invalid and that the Supreme Court would so hold, as the lower federal courts had held in the parallel state cases, but he stated his concern for the interim before the Supreme Court decided the issue; it was, he said, vital that HEW understand the intent of the conference action so that the administration was not to the detriment of those most directly affected (S 16113). He noted the provision permitting abortion where life would be endangered and the diseases mentioned as life-endangering in the conference report, and said that he would include "instances where suicide may be a concern" (ibid.). He emphasized the conference report language, language which he had proposed and he said that it was incumbent on him "to make crystal clear the intent of my language" (ibid.). Senator Brooke stated that he viewed the report's mention of multiple sclerosis and renal disease as "opening the door to other diseases," and he called attention to the report's exclusion from the prohibition of Section 209 of "treatment of rape and incest victims" and of the use of drugs or devices to prevent implantation of the fertilized ovum (ibid.). He insisted that the language of the bill and that of the report were "inextricably linked" (ibid.). He concluded that the amendment was unconstitutional and unconscionable and that he would vote against it (ibid.).

Senator Magnuson said he would support the bill as amended because of the overriding importance of funding all the HEW programs, but that he would have voted against the conference amendment if it had been presented as a separate bill (ibid.).

Senator Packwood opposed the amendment, saying that it was not a compromise (ibid.):

"There is simply no constitutional way, in light of the 1973 Supreme Court decision, to compromise, condition or qualify every woman's right, rich or poor, to obtain an abortion during her first two trimesters of pregnancy. I am disappointed and, frankly, disgusted, with the language the conference has agreed to."

He stated that the amendment in no way resolved "the moral questions involved with this issue" (ibid.). He repeated the argument that it discriminated against the poor, and that it would not prevent abortions, but remit the poor women to illegal abortions and the risk of death (ibid.). He asked the Senators to reject "this backward, anarchistic, and unfair abortion provision"; he noted that in discriminating against the poor it disproportionately discriminated against poor black women, and he asserted that it was "the worst example of socially unjust legislation this Congress could ever hope to put into law" (S 16113–14).

Senator Stevens supported the amendment; he was concerned to make it clear that the amendment did not alter state abortion law, but provided only for the circumstances in which the federal government would reimburse the states for abortions performed in compliance with state law and for which the state provided funding (S 16114).

Senator Bayh said that he would vote for the amendment, but emphasized his distress

in so doing lest the action of Congress prejudice the decision of the *Maher, Beal* and *Poelker* cases; he anticipated that the language of the amendment would be open to attack in the courts in the light of the lower court cases decided in the state context (*ibid.*). He incorporated in the Record a July 22, 1976, letter of the Commission on Civil Rights urging defeat of the Hyde amendment (in the original form) and a Memorandum on the constitutionality of legislation barring federal funding of abortions prepared in the American Law Division of the Library of Congress, concluding that such legislation would be invalid (S 16114–19), and expressed the hope that the Supreme Court in determining the *Maher, Beal* and *Poelker* cases would consider the report's statement that the Congress in enacting the bill did "not intend to prejudge any constitutional issue questions involved in those cases" (S 16114). Senator Bayh drew attention to the language of the Conference Report, and said that, although the conference amendment was better than the original Hyde amendment, it was certain to be challenged in the courts; he expressed confidence that it would be held unconstitutional, but observed that, meanwhile, it was important to fund those vital programs of health, education, and welfare (*ibid.*).

Senator Schweiker supported the conference amendment, pointing out the nature of the exceptions to the prohibition of funding, and said (S 16119):

"I think that the funding of abortion on demand by the Federal Government has been a very unfortunate development in recent years. I hear from thousands of Pennsylvanians who tell me that it is bad enough that abortion has been legalized, but they are personally insulted that their tax dollars are being used to pay for these operations. I am glad that this situation will now come to an end with this amendment."

After referring to the result of the conference deliberations, he concluded (*ibid.*):

"What we made clear is that abortions for family planning purposes, abortions for social convenience, or abortion-on-demand in general will not be paid for out of the Federal Treasury. I have supported this position in the past, and I am very pleased that it is about to become part of the law."

Senator Helms stated (S 16119–20) that the test involved in the prohibition was "a simple one," that is:

"Is the physical existence of the mother endangered."

He added (S 16120):

"However, this provision does not permit funding for abortions as a method of family planning, or for emotional or social convenience or for general health reasons when those reasons do not directly endanger the mother's life.

"Neither does it permit funding for abortions where pregnancy resulted from rape or incest unless the life of the mother is endangered by that pregnancy. The intent of this provision is clear. It is to restrict the use of Federal money for abortion. In doing so it carves out a single, limited exception and nothing more."

Senator Helms asserted that, despite the statement about prejudging constitutionality in the Conference Report, the Congress would implicitly uphold the constitutionality of the amendment by adopting it (*ibid.*).

Senator Bartlett expressed pleasure that the major concern of the Senators had been eliminated through the inclusion of "the 'life of the mother' clause"; the amendment, he stated, would clearly state "congressional policy on the whole question of using taxpayers' money to pay for abortions" (*ibid.*). He noted the language was almost the same as his amendment to an earlier appropriation bill that had passed the Senate in 1974 (*ibid.*). Senator Church stated that the conference amendment, "together with the intent as explained in the conference report," met his earlier-stated objections to the original Hyde amendment (*ibid.*).

The motion to concur in the conference amendment was carried, 47 voting in favor, 21 opposed, and 30 not voting.

The President vetoed H.R. 14232, and his veto message said in part (H 11848):

"I am sympathetic to the purposes of most of these programs. I agree with the restriction on the use of Federal funds for abortion. My objection to this legislation is based purely and simply on the issue of fiscal integrity."

The House debated whether to override the veto [6] on September 30, 1976 (H 11846–60). During the debate Ms. Abzug said that she would vote to override, but said (H 11850):

"Mr. Speaker, I do want to make this point, however, that I believe this bill contains a provision which is unconstitutional, discriminatory and ill-considered legislation. We provide in this bill for medical and health services for poor people. We provide for family planning, health and hospital care. Yet as we provide Federal funds for seeing to it that pregnancies come to fruition for poor people, we take away the same rights that poor people have to terminate those pregnancies by refusing to provide funds for abortion. I believe this provision is unconstitutional. I do not believe it even belongs in this legislation."

Mr. Hyde announced that he would vote to override, saying (H 11855):

"Mr. Speaker, I am voting to override the President's veto of H.R. 14232 with enormous reluctance, because every criticism the President made of this legislation in his veto message is absolutely correct. The $4 billion spending over the President's budget request is a dangerous refueling of inflation, and those of us who recognize inflation as the major threat to our Nation's ·economic stability bear a heavy responsibility when we vote to override.

"I am, nevertheless, voting to override the President's veto because within this legislation is a provision forbidding the use of Federal funds to pay for abortions. In starkest terms, the potential exists of saving some 300,000 lives which otherwise might be destroyed with the use of taxpayers' funds. The saving of these lives far outweighs the economic considerations involved in this legislation. It is unfortunate that the choice is between a sensible veto and the saving of so many human lives, but human life cannot be measured in terms of dollars, and so my choice is as clear as it is unpleasant. I reluctantly vote to override the President's veto."

Mr. Brademas stated that he, too, would vote to override, but reiterated his opposition to the Hyde amendment (H 11856) ". . . which restricts the freedom of poor women to exercise their constitutional right to choose an abortion in all the previous debates. It is an inappropriate way to legislate on a constitutional question. Although I will vote for this bill, I will continue to oppose this discriminatory provision in the courts and plan to serve as cocounsel in suits challenging this provision in New York and Washington, D. C. I disagree with the President's veto and I also disagree with his veto message which supports the denial of Federal funds for abortion.

\* \* \* \* \* \*

"A majority of Americans believe the abortion decision should be left up to the woman and her doctor, free from Government interference. This must apply equally to poor women as well as rich women. It will now be left to the courts to vindicate this basic right of privacy."

Mr. Badillo gave his vote for overriding, saying in part (H 11858):

"It is not the bill I would have proposed, nor does it begin to address the critical needs of the American people in any realistic fashion. Added to that, the so-called Hyde amendment which blatantly discriminates against poor women who seek abortions, is not only abhorrent to me, but unconstitutional as well. However, it is the best bill we could get, and it does provide continuation of many social pro-

**6.** The Speaker put the question under debate as, "Will the House, on reconsideration, pass the bill, the objections of the President to the contrary notwithstanding?" (H 11846.).

grams—welfare, bilingual education, health care programs—that are so desperately needed by our citizens."

The House passed the bill over the veto by a vote of 312 in favor of overriding, 93 opposed, 25 not voting. On the same day, September 30, 1976, the Senate, advised by the House that the bill had passed by two-thirds vote, debated whether to override (S 17296–304). In the course of the debate Senator Brooke, supporting a vote to override, said (S 17297):

"In making this recommendation, I am fully aware that this generally excellent bill does have an important defect. I refer, of course, to the restrictive Hyde language on abortions. That language has no place in this bill, and I fought hard to have it removed completely. I am convinced that the Hyde amendment is unconstitutional and that the Supreme Court will so rule."

Senator Brooke then emphasized again his view of the importance of administering the amendment in the light of the statement of intention in the Conference Report as indicated in his floor statement of September 17th (*ibid.*). Senator Javits concurred in the views of Senator Brooke (*ibid.*).

Senator Helms, supporting the President's veto on broad monetary and social grounds, argued that the bill mistakenly supposed that human problems could be solved by spending the taxpayers' money, that the tendency to equate a politician's compassion with his willingness to spend other people's money to alleviate human ignorance and misfortune was mistaken, and that problems are only solved when people solve them, benefactor and recipient joining in charitable and mutual actions (S 17298). He continued (S 17298–99):

"Although some material difficulties may be alleviated for some individuals temporarily, the long-term result is the degeneration of the moral character of all levels of society. And no society can long maintain itself when both the 'haves' and 'have-nots' no longer feel any responsibility to support moral values.

"A case in point is the use of Federal funds to pay for abortions, an action which has never been approved by Congress, but which has been initiated by bureaucrats through their own interpretation of court decisions. It is highly offensive to millions of our citizens that their money should be used for the calculated taking of innocent human life. Yet others, supposedly out of human compassion, are advocating the taking of innocent human life because it will be cheaper to kill a child before the child becomes a continuing tax burden. Meanwhile, the easy availability of tax-paid abortions removes one of the last sanctions against immoral activity in our society."

Senator Helms asserted that "the same kind of moral distortion" that the amendment "sought to correct in just one small area of the bill" was "rampant throughout all of HEW's programs to a greater or lesser degree" (S 17299). He expressed confidence that if the veto was sustained and a fiscally acceptable bill drawn, it would "leave the Hyde amendment intact" (*ibid.*). He recommended against voting to override for the sole purpose of enacting the Hyde amendment into law, saying (*ibid.*):

"We must not allow the big spenders to hold the Hyde amendment hostage while they attempt to pass exorbitant appropriations. The Senator from North Carolina will not succumb to that kind of blackmail, because nothing can vitiate a moral issue more quickly than to allow it to become a bargaining chip in cynical political dealings."

Senator Hansen supported the President's veto and his stand on funding abortions, but appeared also to agree with Senator Brooke's position on the conference abortion amendment, although he had voted for the bill as so amended while Senator Brooke had voted against it (*ibid.*)

Senator Packwood said (S 17303) that he would vote to sustain the veto, although he supported most of the programs in the bill, because

". . . I cannot in good conscience support this bill because of the provision

added in the conference with the House prohibiting the use of Federal funds for abortion.

\*     \*     \*     \*     \*     \*

"In this particular case, I regard the addition of the prohibition on the use of Federal funds for abortion as so immoral, so distasteful, and so clearly unconstitutional that I cannot support the entire bill. It is my hope the veto will be sustained and a new bill will be passed with the bulk of the appropriations intact but that the unconscionable limitation on the use of Federal funds for abortion will be eliminated."

The Senate voted to override, 67 to 15, 17 not voting (S 17303–04), and the bill became law as Public Law 94–439 (90 Stat. 1418, 1434).

When the Secretary implemented the law, on August 4, 1977, his ruling, published later in the Federal Register (42 F.R. 40486) and transmitted to all state medicaid agencies, HEW regional officers, Public Health Service Hospitals and grantees, and state medical associations, was in the following terms:

> "Section 209 of Public Law 94–439, the Labor-HEW Appropriation Act of 1977— popularly known as the Hyde Amendment—provides that:
>
> 'None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term.'
>
> "Last October, a Federal District Court issued an order enjoining the Department from enforcing the Hyde amendment. That injunction has now been dissolved. Accordingly, the Department will provide Federal financial participation in the cost of abortions only where the attending physician, on the basis of his or her professional judgment, has certified that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term.

"The legislative history of the Hyde Amendment, however, makes clear that the Amendment does not bar funding for certain medical procedures. Specifically, the Conference Committee Report interpreting the Hyde Amendment states as follows:

> 'Nor is it the intent of the Conferees to prohibit medical procedures necessary for the termination of an ectopic pregnancy or for the treatment of rape or incest victims; nor is it intended to prohibit the use of drugs or devices to prevent implantation of the fertilized ovum.' (HR Rep. No. 95–1555, at p. 3)

Thus Federal funds will continue to be available for such medical procedures. 'Treatment for rape or incest victims' is, however, limited for these purposes to prompt treatment before the fact of pregnancy is established. As in all cases, Federal funds for abortions for rape or incest victims will be available where the physician has certified that the life of the mother would be endangered if the fetus were carried to term."

*Cf.* Joint Statement from the Conference Report, *supra* 763–764.

The proceedings in the Congress that led to the enactment by Joint Resolution on December 9, 1977, of the proviso in the second paragraph of Section 101 of Public Law 95–205 (91 Stat. 1460) commenced on June 16, 1977, when a Section 209 in the precise language of the Hyde-Conte amendment of the preceding year was offered as an amendment to H.R. 7555, the Labor-HEW Appropriation bill for the fiscal year ending September 30, 1978 (H 6054).[7] When, on June 17th, the House turned to that amendment, Mr. Allen objected that it constituted legislation in an appropriation act, the Chair sustained the point of order, and Mr. Hyde then offered a substitute Section 209 forbidding use of the appropriation funds to pay for or promote or encourage abortions "except where a physician has

---

**7.** Citations are to pages in the daily edition Volume 123 of the Congressional Record, 95th Congress, First Session.

certified the abortion is necessary to save the life of the mother" (H 6082–83). The point of order was renewed by Ms. Holzman, Mr. Allen and Mrs. Burke (California) and resisted by Mr. Bauman, and the Chair again sustained the point on the ground that the proposed amendment would impose on physicians, some of whom were federal officials, new duties, and determinations not required of them by law (H 6083). Mr. Hyde then presented an amendment in the form of the one he had introduced a year earlier—forbidding the use of any of the appropriated funds to pay for, promote or encourage abortions—expressing regret that he was required to exclude from it the therapeutic exception (H 6083).

Mr. Hyde agreed that it was unfortunate to introduce the abortion issue on an appropriation bill but, he said (H 6083):

"The problem is that there is no other vehicle that reaches this floor in which these complex issues can be involved. Constitutional amendments which prohibit abortion stay languishing in subcommittee, much less committee, and so the only vehicle where the Members may work their will, unfortunately, is an appropriation bill. I regret that. I certainly would like to prevent, if I could legally, anybody having an abortion, a rich woman, a middle-class woman, or a poor woman. Unfortunately, the only vehicle available is the HEW medicaid bill. A life is a life. The life of a little ghetto kid is just as important as the life of a rich person. And so we proceed in this bill."

He argued that the constitutional right to an abortion did not imply a duty on the part of taxpayers to pay for the abortion; he rejected the argument that it was less costly to pay for the abortions than to support the children of the poor; he expressed the belief that, if funding for the abortion was denied, the children would be born and not slaughtered; and he said that he was "prepared to pay the price to see that they get an education, decent housing, and adequate clothing" (H 6084). He criticized pro-abortion editorials that emphasized that the decent, economic, and compassionate thing to do was to let welfare mothers abort their unborn children, saying that it was a human being that was being aborted, and that it was biology, not theology, that said so (*ibid.*).[8] He continued (*ibid.*):

"The old argument that we who oppose abortion are trying to impose our religious concepts on other people is totally absurd. Theology does not animate me; biology does. That is a human life; that is not a potential human life; it is a human life with potential.

"When a pregnant woman, who should be the natural protector of her unborn child, becomes its deadly adversary, then it is the duty of this legislature to intervene on behalf of defenseless human life."

Mr. Hyde contrasted the abortionists, unconcerned for the unborn children, with the concern expressed in legislation for the perpetuation and conservation of animal species (*ibid.*). In the course of his speech Mr. Hyde had said that "millions of people are concerned about our tax dollars paying for the slaughter of innocent, inconvenient, unborn children" (H 6083), and, later, referring to the charge that antiabortionists were seeking to impose religious concepts, he asked:

"By what right do the pro-abortionists seek to deny us access to the political process?"

Mr. Obey opposed the amendment (H 6084–85), although strongly opposed to abortion ("indiscriminate abortion brutalizes not just the unborn, but all of us") and convinced that payments for abortion could be constitutionally limited, and, wisely, should be so limited, because "I really believe that one of the ways in which we help cement this society together is by trying, as best we can, to avoid offending the moral sensibilities of other people" (H 6085). He thought the amendment proposed was either brutal or inhumane since it did not

8. Mr. Hyde quoted a statement of the California Medical Association Journal.

provide any exceptions for the case in which the life of the mother would be endangered by the pregnancy or where the prospective mother was suffering from renal disease or multiple sclerosis. He said (H 6085):

". . . I think it does not represent what we are supposed to represent if we really believe in equal protection under the law, because what we are really saying is that even in the case where life is in danger, if you are poor, sorry; if you are wealthy, fine you can have an abortion with no difficulty. I do not think we want to say that" (H 6085).

Mr. Obey thought that in the case of renal disease and multiple sclerosis there might not be certainty that the life of the mother was threatened at the moment, but there would be medical certainty that the woman's life would be considerably shortened or she reduced to invalidism; he said that he did not believe that politicians ought to be making those judgments, which, as medical judgments, ought to be made by people who know far more about the specific instances than do practicing politicians who are laymen, in scientific terms (*ibid.*).

Mr. Bauman favored adoption of the amendment and going to conference as had happened in the preceding year; he did not consider the amendment discriminatory nor unconstitutional but as in fact preserving "a very basic constitutional right, a right that has been stated from our earliest moments of existence as a nation, the right to life" (*ibid.*).

Mr. Stokes opposed the amendment, referring to the injunction in the present *McRae* case, and asserting that the amendment "restricts the right of the poor to make their own personal decision with regard to abortion, a right that is guaranteed to all women by the Supreme Court" (*ibid.*). He contended (H 6086):

"However, refusal to fund abortion services for the poor while willing to pay for prenatal and delivery care clearly destroys Government neutrality in the issue. It means that with regard to the poor, the Government has instituted its own judgment, its own concept of morali-

ty, a judgment which we do not and cannot impose upon more affluent women in this country."

Mr. Dornan, supporting the Hyde amendment (H 6086–88), denied the validity of the argument that it discriminated against the poor; he pointed out that *Wade v. Roe* found a qualified constitutional right of privacy in a woman's decision whether or not to terminate her pregnancy and held that the imposition of criminal sanctions upon the exercise of the right in favor of abortion could be constitutionally justified only by a compelling governmental interest; that holding, he said, fell far short of requiring the federal government or the states to pay for the abortions. He contended (H 6086):

"The Court-ordered 'right of privacy' is not affected in any way by the Hyde Amendment. It is not that the Hyde amendment denies a woman's right to privacy but that it does not enhance the value of that right by paying for its exercise. The government has no constitutional obligation financially to facilitate the exercise of privacy rights. The Federal Government must merely refrain from violating such rights—and the Hyde amendment does not violate any privacy rights. It simply denies Federal funds for the realization of a personal, subjective decision and judgment."

Mr. Dornan argued further (*ibid.*) that *Roe v. Wade* and *Doe v. Bolton* did not vindicate a "right" to receive an abortion but rather the right to be free to seek an abortion without governmental penalties or interference. To the equal protection argument he answered in terms of the Solicitor General's brief, stating that, in eliminating federal funding for elective abortions, Congress was motivated by two legitimate concerns, to protect the potentiality of human life, and to avoid spending federal funds to support an activity many taxpayers felt to be morally repugnant; these concerns, he said, constitutionally justified the distinction Congress drew between abortion and childbirth (*ibid.*). He argued that Congress could properly take considerations of moral-

ity into account in allocating social welfare monies contributed by taxpayers whose moral views were being respected; he continued (*ibid.*):

"Moral considerations historically have played an important and legitimate role in legislative decision-making. For example, such considerations underlie most legislative proscriptions against 'victimless' crime, such as prostitution and gambling."

He rejected the discrimination argument on the ground of the Solicitor General's argument that the fact that a woman had a qualified right to an abortion did not imply a correlative constitutional right to free treatment. He referred to the decision in the present *McRae* case on the injunction as based on the erroneous proposition that the legislature lacked constitutional power to resolve controversial issues in favor of either of two contending sides and as amounting to an attempted judicial appropriation of funds in violation of the Constitution (H 6087). Answering the supposed argument that the amendment should be defeated because abortion was less expensive for the government than childbirth, Mr. Dornan pointed out that, while that might have been the only factually correct argument made by the anti-abortionists, it was morally unthinkable (*ibid.*). He asserted that to his knowledge some of the conservative members of the Congress supported pro-abortion legislation as a means of controlling the growth in the population of blacks, Puerto Ricans or other Latins or whomever they thought should not bear more than a polite one or two "burdens on society" (*ibid.*). Saying that Communist countries were opting for life rather than death and encouraging childbirth, he closed by saying (H 6088):

"Why are we going in the opposite direction? Materialism? Decadence?

"I close with this thought, that in this beloved Nation of ours we are now making war on our young. When will we pass a bill to stop three-and-four-year-old children from being used in loathsome pornographic films, when will we begin to mandatorily put drug pushers in jail who kill off our youth, and when will we stop pleading to subsidize death as a right for the poor just because some, repeat some, rich people decide to terminate the lives of their posterity. I beg you to support this amendment for life . . . ."

Mr. Eckhardt opposed the amendment as too important for consideration as an amendment limiting an appropriation, which had to be dealt with peremptorily on the floor of the House, and as being discriminatory and the more seriously so in denying to the poor woman, the person who is most subject to every difficulty, including rape and ill-health, the equal protection of the law (*ibid.*).

Mr. Rudd supported the amendment (*ibid.*) on the ground that it was not discriminatory against the poor people because there was no individual right to an abortion any more than to face-liftings or hair transplants, and that it is discriminatory against taxpayers who oppose abortion on religious and other grounds to make them finance abortions. To the argument that women should have freedom of choice about childbearing he answered that they should choose not to become pregnant and should not ask the taxpayers to pay for their failure to exercise that choice (*ibid.*). He characterized the preliminary injunction decision in the present case as a foolish and wrong attempt to exercise the congressional power of appropriation (*ibid.*).

Mr. Rose opposed the amendment; he said that the amendment concerned poor women, concerned the few who are on medicaid, and that "the greatest sin that we can commit is the bringing of life into existence in an environment in which it can neither be wanted nor loved" (H 6089). He said that if one's religious convictions told him that abortion was wrong, he should honor them but not impose them on the poor women of the nation for that would be "strapping discrimination" (*ibid.*).

Mrs. Fenwick, while expressing great respect for the Right to Life advocates who came to Washington at great expense to express an opinion about something they

believed to be of enormous importance, regarded the amendment as discriminating on money grounds, condemning the helpless, while those with means have legal and proper procedures open to them (*ibid.*). She argued that the amendment would not stop abortions but send the people to motels and abortion mills with the consequence that the victims would turn up in hospitals sometimes dying of infection or hemorrhage (*ibid.*). Mrs. Spellman opposed the amendment because it did not provide for abortions necessary to save the life of the prospective mother.

Mr. Pritchard opposed the amendment; he said that many wanted the government to manifest neutrality on abortion by not paying for abortions; but he argued (*ibid.*):

"The truth of the matter is that today if a poor or welfare woman wants to terminate a pregnancy, we give her somewhere between $175 and $190 to pay for that abortion. If she wants to carry that pregnancy forward and produce a child in 9 months, we come up with $2200. That is over ten times as much money from the taxpayer that goes to allow that woman to carry the child to term if she wants to.

"So right now we are in a neutral position, and if anything, we are on a 10-to-1 basis, encouraging the woman to carry that child to term."

He contended that the amendment would end government neutrality and that to do so was wrong (*ibid.*). He rejected the argument that people should not be forced to finance expenditures repugnant to their religious views by saying that all citizens are required to pay taxes to support many things to which they are violently opposed (*ibid.*).

Mr. Young (Missouri) supported the amendment, arguing that the country discriminated against the poor not by failing to provide free abortions but by failing to help attain satisfactory housing, employment, and education (*ibid.*). Mr. O'Brien favored the amendment on the sole ground that as a matter of scientific, biological, and medical fact life begins at conception (H 6090).

Mr. Allen opposed the amendment, saying that it would operate "to deny to many of the poor children, some little teenage or sub-teenage children, any relief whatever from the plight in which they find themselves, some of them being pregnant as a result of incestuous relations forced on them by . . . some . . . male member of their family" (H 6090); he contended that the House must recognize that there are circumstances in which children of poor, welfare families are entitled to some measure of relief from their plight (H 6090).

Mr. Edwards (Oklahoma) recognized that people who have less money have limited options; he noted that a number of the black Members of the House seemed to feel a need to oppose the legislation, and said that the black people in his district did not support abortion; he pointed out that those in the House who generally considered themselves liberal were opposed to the amendment, and he added that there had been a long process of turning around the definitions of liberal and conservative; but that "there is nothing liberal, nothing humane, nothing compassionate about snuffing out the life of an unborn child" (*ibid.*).

Mr. Volkmer strongly supported the amendment; he asserted that the Congress could constitutionally prohibit the use of tax dollars to promote and perform abortions; he continued (*ibid.*):

"For the moral values of this Nation we must do so. As the Members know, I have sponsored a resolution to prohibit abortions except to save the life of the mother. I have been unable to obtain a hearing from the subcommittee chairman on that resolution. I will continue to struggle against abortion and one way to do so is to adopt the Hyde Amendment.

"Personally I strongly support the right to life of every human, born or unborn. To me, promotion of abortion is a sign of decay in the moral values of our Nation."

Referring to the increased number of teenage pregnancies, he attributed this "to the policy statements of the Supreme Court

which now permits permissiveness in our movies, magazines, store signs, newspapers, everywhere suggestive sex material is thrown at our teenagers, along with the information and knowledge that if one becomes pregnant that abortion will be available to take care of any unwanted pregnancies" (*ibid.*). He said (*ibid.*):

"We must stop abortion in this Country . . .

\* \* \* \* \* \*

"I am appalled by the proponents of abortion and hope as good people they will see the error of their ways."

Mr. Mazzoli supported the amendment but in concluding his statement, and offering into the record two magazine articles opposed to abortion, he said (H 6090):

"Finally, Mr. Chairman, those who today suggest the Hyde language would strengthen their position and answer the 'one-issue' charges leveled against them if they were to support, as vigorously, day care centers for children, increased funding for education, job programs and other such programs which provide women with the economic, social and educational support needed to encourage them to carry babies to term and to support and nurture them after birth."

Mr. Kindness said that it was the right and duty of Congress to determine the policies of the country, but that the courts had been doing that in the absence of strong expressions from the Congress, such as the Hyde amendment of the preceding year; he characterized as specious the argument that the amendment discriminated against poor women, saying that "if we want to help poor women, then we should eliminate poverty, not eliminate humans" (H 6092).

Ms. Holtzman, opposing the amendment, said that the decision would not be before the House to be made if the membership were as overwhelmingly made up of women as it was at present overwhelmingly made up of men; she said that those supporting the amendment were not really confronting the fact that it condemned to death women who would die in childbirth because they could not afford an abortion, nor the fact

that the amendment would require 11 or 12 year old victims of rape or incest to endure the trauma of childbirth, nor the circumstances of women who must bear children for whom they could not psychologically or economically provide (*ibid.*).

Mr. Hillis, although opposed to abortion, was opposed to the amendment because it did not contain exceptions to cover cases involving the life and health of the mother nor cases of rape or incest (*ibid.*).

In response to a question from Mr. Pritchard, Mr. Flood said that the House had no specific data from DHEW over the comparative costs of abortion and childbirth, and he added that

". . . it is very clear from the debate that has been going on so far today, and which has gone on time and time again, that money is not the issue" (H 6092).

Mrs. Burke (California) opposed the amendment, saying that it "really should be called the forced childbearing amendment"; she continued (ibid.):

"I want to tell the Members why overwhelmingly large numbers of blacks are concerned. We are concerned because we do not believe that young girls should be forced to have children. We do not believe in a society where no one is willing to feed those children after they have them and that they should place those children in poverty. We also regret the fact that those children do not have a chance to get adopted, because there are no adoptive homes available for little black girls and boys who are born in poverty."

She said that one-third of the medicaid abortions were performed on teenagers who do not get information, education, family planning, or other things spoken of during the debate; she reiterated that the House was "forcing girls to have children who not only do not want them but who cannot really go through that pregnancy" (H 6092–93). "They are the high-risk mothers," she said (H 6093).

Mr. Weiss opposed the amendment, saying that since 1973 one in eleven American women of reproductive age had exercised the right to abortion, yet the amendment sought to limit that by prohibiting the government from paying the cost of abortions (*ibid.*). He said that DHEW estimated that about one-third of all abortions are paid for by medicaid nationwide; he asked what would happen to the women denied safe, legal and funded abortion who had not the option available to affluent women; he argued that the cutting off of funding would occasion injury and death for women who sought legal abortions or attempted self-induced abortion; he argued (*ibid.*):

"Legal and safe abortions are the right of every American woman, not just the privilege of a select few. The Hyde provisions stand in moral judgment of, and refuse any safe alternative to, poor women confronted with unwanted pregnancies."

Mr. Allen, without taking sides on the question of abortion itself, wondered if some of those preparing to vote on the amendment realized "the cruelty its literal enforcement would visit upon the poor, the sick, the mentally ill, and the innocent victims of rape and incestuous pregnancies among welfare patients"; he argued that the amendment would foredoom the teenage victim of rape or forced incestuous relations to go through the pregnancy and to bear a child that might be deformed (*ibid.*).

Mr. Seiberling thought that the amendment clearly violated the Constitutional rights of the poor women who had to turn to public funds to pay for their health care by denying to them a right that the Supreme Court had held all women enjoy; however, his principal concern was with teenage pregnancy: he said that in the preceding year one million teenage girls, 10% of all teenage girls, had become pregnant, that such adolescent woman are biologically unfit for safe and effective childbearing and their babies would experience a mortality rate two or three times that for the average, that their babies were more likely to be premature and of low birth weight, and that the teenage mothers themselves were more disposed to birth-related death, illness, or injury than others (H 6093). He continued (*ibid.*):

"And in addition to these physical health problems, a majority of pregnant teenagers are mentally and emotionally immature and unprepared to cope with the realities of pregnancy and child rearing. As a result their offspring are likely to suffer the same kinds of deprivations, to a repetition of the pattern.

"According to a nationwide study conducted by Johns Hopkins University, 75 percent of all teenage pregnancies are unintended. While a good number of undesired pregnancies will be carried to term, the wishes of many adolescents to avoid early parenthood is evident in studies showing that about one-third of all U.S. abortions each year are obtained by teenagers."

To Mr. Seiberling the important question was what could and should be done to prevent the problems posed by unwanted pregnancies; working toward that goal would in the end eliminate the need for abortion, he said, but enacting the Hyde amendment would only increase the risks of dangerous self-induced or non-medical abortions for women who cannot afford to pay for medically sound legal abortions; he contended that the real task before the Congress was to develop professional counselling services for the pregnant teenagers, including psychiatric counselling, and said (H 6094):

"In fact, the question of its constitutionality aside, I would find the Hyde Amendment somewhat more palatable if it made exceptions for clinics and health institutions which offered, in advance, objective counselling on the potential consequences of either terminating a pregnancy or carrying it safely to term."

He argued that the Congress could no longer avoid the reality of increased sexual activity among teenagers, "Nor can we punish the problem out of existence," he said (*ibid.*). Agreeing that abortion was hardly a satisfactory or desirable means of birth control, he concluded (*ibid.*), "But it is a

result, not a cause and it is foolish, to say the least, to suppose that we can improve the moral climate of the country by withholding from a certain segment of our population their constitutional right to equal protection of the laws or the aid, attention and counsel they deserve" (*ibid.*).

Mr. Mitchell (Maryland) made a statement, authorized by the Congressional Black Caucus and all its members, against the amendment; he reminded the House that he had opposed the amendment in the preceding year on the ground that it would drive women back to illegal abortion with its physical dangers; he said that the members of the Black Caucus believed that the issue posed by the amendment raised a fundamental question of rights in the democracy and, more pointedly, of the rights of poor persons in our democratic system; of the 250,000 to 300,000 who had obtained medicaid abortions in 1975 he said (*ibid.*):

> "Those were women whose only alternatives without those funds would be to have an unwanted child, or obtain an unsafe abortion performed by a nonphysician."

He noted that by far the largest number of abortions were performed without federal funding; Mr. Mitchell then discussed in some detail an opinion of Professor Thomas I. Emerson of Yale Law School furnished to the Black Caucus; he characterized the opinion as providing with exceptional force the constitutional underpinning for what each member knew—that the Hyde amendment was discriminatory legislation (H 6094–95). He noted that one-third of those receiving abortions were teenagers, that it is married persons already supporting several children as well as the unmarried who choose abortions at the time of undesired pregnancy (H 6095). He continued (*ibid.*):

> "And, as we know, Black women are disproportionately represented among the poor and are relatively more likely to need the assistance of medicaid to obtain the same abortion that their wealthier sisters will be able to obtain in any case."

Mrs. Schroeder stated that she "violently opposed" the amendment; she went on (*ibid.*):

"Yes, I love life as much as anyone and unlike many others who have spoken, I am a mother. We are not asking for abortion as birth control but we are asking the Government remain neutral about abortion in the areas, rape, incest, the mother's life, her mental health, her age, and many other things that are private matters between the doctor and physician [patient?]. We should not have one standard of care for private patients and another standard for public-care."

Mr. Bauman asserted that in a very real sense abortion is the "final solution"; he said that after listening to the arguments he thought it came down to "whether or not the Congress of the United States of America is willing now to embrace the morality of Dachau or the common anthill" (*ibid.*). He said that adopting the arguments of the opponents of the amendment would sanction the elimination of the insane, old people who are judged no longer needed and of those who are inconvenient to society; referring to the characterizations of the amendment as cruel to the poor and wanting in compassion, he said (*ibid.*):

> "What kind of cruelty is it that shows no concern for 1,100,000 murders in the United States last year, 300,000 of them conducted at Federal taxpayers' expense. You tell us how terrible it is for those who are denied abortions. What is the degree of terror for those who are murdered?"

He said that without the amendment the government would deny life to many, and that both the President and the Secretary opposed federal funding of abortions (*ibid.*). He dared say (*ibid.*)

> ". . . that if those millions of children were born and had a chance to speak, voices we will never hear, they too would vote for the right to live."

Mr. Stanton supported the amendment (H 6095); he said that he had learned in the first grade not only the fundamental facts of his religion but, later on, to read the Constitution, and, he continued:

"It seems to me there are certain unalienable rights that come from God and not from man, and among these is the right to life, liberty, and the pursuit of happiness according to the preamble to the Constitution."

He asserted that "this is a question of a moral right" (ibid.).

Mr. Stokes opposed the amendment; saying that he was black and had been poor in this society, he continued (ibid.):

"I sat here and I was appalled yesterday when I watched the U.S. Congress, 23 years after the Supreme Court of the United States said that separate but equal is inherently unequal, put on to an appropriation bill a clause that still, after 23 years, denies little black children in America their constitutional right to go to school in America under conditions of equality.[9] And I sat in this body today and I have watched the poor in this society, the majority of whom are black and who need these services, be segregated out once again and segmented into a special class in America. It is appalling to sit in this body and watch, after 23 years, the further denigration of Brown against Board of Education and what it stood for."

He concluded that adopting the Hyde amendment would again make minorities and the poor separate and unequal (ibid.).

Mr. Obey opposed the amendment; he said that he was opposed to abortion, but that his beliefs did not require him to say that his government would not provide needed medical assistance to anyone, most especially a poor woman who needs that medical assistance to maintain her own life (ibid.). Referring to those who had argued respect for human life, Mr. Obey said (H 6095–96):

9. Mr. Stokes referred to the counterpart in H.R. 7555 of Sections 206–208 of the Appropriation Act for the year ending September 30, 1977, (Public Law 94–439, 90 Stat. 1418, 1433–1434) which affected student busing, transfers or assignments of students, and transportation to redress racial imbalance in schools or to desegregate them; Section 208 of the Act provided:

"I wonder where those same voices and votes were when legislation has been on this floor to increase support for family planning so that you can effectively avoid abortion. Where have those same voices been when we have had efforts in this Congress to try to obtain decent day care centers, for instance, so that you have a little bit more ability to convince the woman facing the choice of abortion, or not, to choose the right decision, to choose to carry the child to full term? There are some places in this world where there is one abortion for every live birth. Where have those same voices and votes been on foreign aid legislation which would provide additional family planning, additional food assistance, additional economic assistance so that we can attack the conditions of poverty which lead to those abortions in incredible numbers, not just within our own borders but all around the world?"

He concluded (H 6096), that the amendment would not save lives but would say that the government will not be allowed to help save the life of a living person.

Mr. Flood drew the attention of the House to its earlier and repeated support of amendments essentially similar to the pending amendment; he noted that Presidents Ford and Carter had included similar language in their budget requests, and that Secretary Califano during his confirmation hearing made clear the Administration's opposition to federal funding of abortion (H 6096). Mr. Oakar supported the amendment (ibid.); he said that the issue was very difficult for him

". . . because I know that low income women who are confronted with an unplanned pregnancy are treated abominably in our society. Often they are packed off to abortion clinics without being at all informed on their legal rights,

"None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, and which offers the courses of study pursued by such student, in order to comply with Title VI of the Civil Rights Act."

and the benefits and services available to them if they choose to have the child."

He explained his support of an earlier bill that he had introduced to provide assistance for pregnant women, all predicated on his deeply held belief that abortion was wrong and that the government was obligated to do all it could to stop it (*ibid.*). He continued (*ibid.*):

> "So strong are my feelings on abortion that I had grave reservations about supporting the diluted medicaid fund cutoff that was included in the bill as reported from committee. That provision would have permitted medicaid funding when the life of the mother is in danger, and to me, that language could be construed so broadly as to make the ban on abortion funding meaningless. The proponents of that language admitted that the exception would extend to cases in which psychologists, for example, said the mother's life would be in danger."

He urged the enactment of the Hyde amendment in its then present form, and argued that the House were morally obligated to provide real assistance to low income women faced with an unplanned pregnancy (*ibid.*).

Mrs. Collins (Illinois) opposed the amendment on the ground that it would not stop abortions but rather limit the availability of safe abortions to poor women, that it would violate the very purpose of the appropriation bill—providing services for all Americans regardless of their economic status— that it was clearly discriminatory against the poor and would force poor women who could not afford abortions either to bear unwanted children or undergo unsafe, "illegal butchery," and that it could prohibit the prescription of morning-after pills to rape victims at hospitals or crisis clinics which received funds under the appropriation (*ibid.*).

Mr. Milford supported the amendment in the expectation that it would be modified in conference with the Senate to allow the use of medicaid funds if the mother's life was endangered and in the cases of rape and incest (H 6096–97). He said (H 6097):

"Subsequent to last year's vote, I checked further into the situation to find that few, if any, physicians who perform this procedure would refuse assistance to an indigent person. I have found charitable agencies that were willing to provide assistance. I have found that most persons who find themselves in need of abortion services are usually able bodied and are capable of earning their own living."

He said that he believed it was asking too much of those who are morally opposed to the issue to take their tax money "to fund the very act that violates their religious convictions" (*ibid.*).

Mrs. Meyner opposed the amendment (H 6097); she said that it was discriminatory, and repugnant not only to the equal protection clause of the Constitution but to the values of American life that the Congress sought to uphold; she contended that the amendment would not stop abortions but deny them to one class of women, the poor ones; she said that District of Columbia clinics charge $150 for an abortion while private practitioners charged $450 to $600 for abortions performed at the hospital. She continued (*ibid.*):

> "It does not require a great deal of imagination to see that poor women will be forced to either carry their unwanted pregnancy to term, or to obtain an illegal or self-induced abortion. Meanwhile, more fortunate women will be able to visit a private practitioner and obtain a safe and legal abortion. Clearly this is not a question of being for or against legal abortions, it is a question of class discrimination."

She contended that to include such an amendment in an appropriation bill was "inappropriate and dangerous" (*ibid.*); expressing a reluctance to speak in such terms, she noted that economics should be foremost in the Congress's mind in considering an appropriation bill, and that, from that point of view, the Hyde amendment would greatly increase the cost to the government for the first year after birth costs of those women forced to carry unwanted pregnancies to term (*ibid.*). She

concluded by warning Members not to yield to the temptation to vote for the amendment in the expectation that the courts would invalidate it (*ibid.*).

Mr. Russo supported the amendment (H 6097). He spoke of *Roe v. Wade*, a case that he believed had been wrongly decided, as having "ruled that the Government must remain neutral in the matter" (*ibid.*). He continued (*ibid.*):

"Yet, Department of Health Education and Welfare Officials have implemented regulations whereby women can use medicaid funds to procure their abortions. This stance is far from neutral—it actively encourages and assists women to abort their fetuses rather than bring them into the world."

He spoke of the Hyde amendment as attempting to remove any federal involvement in a woman's decision and then continued (*ibid.*):

"Eliminating the source of funds may tip the balance towards bringing the child into the world and I believe in tipping the scale in favor of life almost every time. One study which I have read estimates that 80 percent of the abortions now performed with medicaid funds would not occur if medicaid money were unavailable for this purpose. That would save approximately 240,000 lives every year."

He observed that eliminating federal funding would not end all government financing of abortions, since the states would have the option to continue to do so; he argued further (H 6097–98):

"But the Federal government's example would encourage States participating in the medicaid program to discontinue this aspect of medical care to the poor—an option States cannot exercise at the present time."

He argued that constitutionally Congress had exclusive power over the appropriation process and that the temporary injunction in the present *McRae* case violated the separation of powers principle; he concluded by urging his colleagues who strongly supported the right-to-life movement to support also the programs which would help

"these youngsters break the poverty cycle" (H 6098).

Mr. Rangel opposed the amendment as clearly discriminatory (H 6098); he contended that before *Roe v. Wade* those who could not afford large sums to obtain a safe abortion were left to either having unwanted children or to having abortions performed by those not adequately prepared to perform such operations (*ibid.*). He continued (*ibid.*):

"We all applaud the decision in Wade and Bolton, as these cases finally recognized the need to protect a large segment of our population. With the Hyde language still in this bill, we find that we are back where we were before the Supreme Court rulings."

He said that many Members had expressed concern about the large number of children born out of wedlock and the increasing numbers of children who must be subsidized, and he noted that the amendment "would only serve to intensify those problems," adding that if the Congress wanted to reduce the public assistance rolls and child support programs, then it must delete the amendment from the bill (*ibid.*).

The amendment was then put to a vote, and the amendment offered by Mr. Hyde was carried by a vote of 201 to 155, 77 not voting (H 6098–99). A few days later Mr. Bonoir explained that his vote against the Hyde amendment was determined by his moral conviction that the mother's life had to be considered; the amendment did not contain language directed to that end; however, he explained that he believed life began at the moment of conception and was opposed in principle to abortion (H 6218).

In the Senate on June 20, 1977, Senator Stennis expressed his objections to abortion and to federal funding of abortions; he then stated (S 10178):

"In addition, the validity of the provision which we adopted last year has now been upheld by the Supreme Court of the United States. The Court specifically held that the Constitution does not give a woman the right to compel the Federal Government to pay for an abortion that is

not medically necessary. Therefore, there is now no constitutional or legal impediment to the readoption of this prohibition."

His reference, of course, was to the June 20, 1977, decisions in the *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464, and *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528, decisions.

On June 21, 1977, Senate Report No. 95–283 (95th Congress, 1st Session) was submitted to the Senate by Senator Magnuson from the Committee on Appropriations; the report contained the following language (p. 130):

"The Committee is concerned with preserving the freedom of choice of a woman who is receiving or has applied for benefits and services under such welfare programs to undergo an abortion or sterilization. There is great danger that a welfare recipient who is ill prepared to defend her personal rights will be persuaded against her will to undergo an abortion or sterilization as a condition of receiving welfare payments. The Committee believes it is absolutely essential that no woman regardless of her education, social or economic background be forced against her will into having an abortion or sterilization. To this end, the Department of Health, Education, and Welfare is instructed to establish regulations and procedures to make certain that any abortion or sterilization procedures paid for under this Act be voluntarily requested by the recipient."

The report stated that the Committee had changed the language of Section 209 as it came from the House so that it read:

"None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term, or in the case of multiple sclerosis or renal disease, or other diseases which would seriously deform or debilitate the fetus, or for the termination of an ectopic pregnancy or for the treatment of rape or incest victims. This section does not pro-

hibit the use of drugs or devices to prevent implantation of the fertilized ovum." *Cf.* 1976 Conference report, *supra*, pp. 763–764.

On the same day Senator Helms discussed the *Maher, Beal* and *Poelker* cases (S 10369); he said (*ibid.*):

"These decisions of the Supreme Court are a vindication of all of us who have for so long maintained that tax dollars should not be used to finance the killing of unborn children and that it is constitutional for the Congress to deny the use of taxpayers' funds for this purpose. A majority of both the House and the Senate, in passing the so-called Hyde amendment, has agreed with this proposal and it is gratifying that the Supreme Court has agreed with this majority sentiment."

After summarizing the three cases Senator Helms explained the status of the present *McRae* case, and said that it was altogether likely, if the Court acted on the defendant's petition in that case in a timely manner, that the injunction barring enforcement of the amendment could be lifted within the next few days (*ibid.*).

The Senate had expected to reach the proposed Senate amendment of Section 209 on June 28th, but other matters prevented that (S 10919–22), and the debate opened on June 29, 1977, with Senator Packwood's presenting an amendment (No. 602) striking Section 209 from the appropriation bill, "so that if this amendment is successful, Federal funds will be available for use in abortions" (S 11030). Senator Packwood reviewed the history of legal attitudes toward abortion and its criminalization, and emphasized the change in attitudes toward matters related to abortion, homosexuality, and women's rights; he referred to the 1965 enactment of the Colorado abortion statute, followed by the New York, Alaska and Hawaii statutes, as well as that of his own state of Washington, all preceding the 1973 decisions in *Roe v. Wade* and *Doe v. Bolton*; he said that polls showed that by an overwhelming margin Protestant, Jewish and Catholic youth alike supported the right of a woman to have an abortion, but

784

that in the upper age categories there was still opposition to abortion (*ibid.*). Senator Percy, interrupting, suggested (S 11030) that premarital sex resulting in an unwanted and unplanned child who could not be cared for and who would interfere with the life of its young mother had always been looked upon as immoral and impermissible and that the generally accepted practice, hundreds of years ago, was to overcome that greater ill by having recourse to the lesser ill of abortion (*ibid.*). Senator Packwood, resuming, emphasized that one hundred years of prohibitory law did not stop abortion but resulted in illegal procedures that might result in infection and death (*ibid.*). Senator Percy suggested that the laws prevented girls from going to their own doctors to get the benefit of any kind of counselling, and forced them into the so-called back alley operations, many times performed in the second or third trimester by someone whose only business was performing abortions and who did not counsel avoidance of abortion and the handling of the problem in some other way (S 11030–31). Senator Packwood said that the laws prohibiting abortion passed between 1850 and 1950 were not passed because of moral reasons but for health reasons including death from abortions (S 11031). Senator Packwood said that the Supreme Court in 1973 had not decided that women "have a right to an abortion," but rather had decided, as the *Maher, Beal* and *Poelker* cases made clear, that "every woman has a right to make a decision as to whether or not she wants an abortion—the right to make a decision" (*ibid.*). He said that neither the state nor the federal government has an obligation to fund an abortion; that he supported abortion, but had never supported it on the ground that it is cheaper than carrying pregnancies to term and having babies on welfare; nor did he argue that abortion was needed for population control (*ibid.*). Senator Percy inquired whether it was not those who take an adamant position against abortion who are at times in the forefront of condemning welfare in every way possible; he inquired whether, if an unwanted child is born to a

mother who already has seven or eight children who could not adequately care for the additional child, that additional child would not be a ward of the government for fifteen to eighteen years, and, whether, if raised in the ghetto, surrounded by crime, it would not have a great chance of being drawn into the business of crime (*ibid.*).

Senator Packwood, resuming (S 11031), asked, ". . . do we in Congress have any obligation to fund abortions? Not a constitutional obligation, a moral obligation" (*ibid.*). He said that it was clear that the 250,000 to 300,000 women who now receive abortions paid for under medicaid were going either to have babies that they did not want, or to go to backroom abortionists; continuing, he said (*ibid.*):

"There is no question that the poor are going to be discriminated against. It does not mean that we have an obligation to help, but should we?"

He pointed out that the poor were provided with food through food stamps and other federal programs, with housing, through public housing, with a variety of health services, through medicaid and other programs, and with legal services, not only to defend against government prosecutions, but so that poor persons could sue their landlords; he pointed out further (*ibid.*):

"We provide them with education, because we think it is right in this country that the rich and the poor have a reasonably equal chance for education.

"Yet, in every one of the items I have cited—education, legal services, medicine, food, and housing—the Supreme Court never once has said, 'You have a right to those.' They have never even raised it to the dignity of the right of a woman to decide whether or not she wants an abortion. Yet we are willing to fund for the poor all those programs, and we do it gladly, to the limit we can afford, because we think it is the decent and moral thing to do."

Senator Packwood said that abortions were perhaps more critical to a poor woman than any of these other things, and would have a greater effect on her life; yet it is said that

the government has no obligation to fund abortions for the poor (*ibid.*). He pointed out that "We do not have any obligations to feed, house, or educate them, either" (*ibid.*), and he inquired (*ibid.*):

"What is the reason why we do it for those other things and not for abortions? I will tell Senators why, and they all know why.

"It is not that we lack compassion for the poor it is that we personally think that abortions are immoral, and because we think they are immoral we are going to impose our standard of morality on the poor, and the fact that the poor, in many cases, do not think that abortions are immoral is tough luck. That is the standard."

Senator Packwood admitted that abortion was a passionately divided issue; he said that if the Congress wanted to deny abortions to the poor because it did not have the money, that was a decision to weigh in the light of the government's finances, and if the Congress wanted to deny the poor abortions because it was more important that they have legal services or public housing, that might be an unfortunate but necessary balancing of priorities; he went on (S 11032):

"But to say that we are going to deny abortions to the poor because we disapprove of them is a disdainful, haughty, arrogance that should not demean this Congress."

Senator Packwood pointed out that the American Civil Liberties Union, the American Bar Association, and numerous religious organizations, the names of which he read into the record, supported legalized abortion; Senator Packwood continued (*ibid.*):

"Those are organizations every bit as concerned with human life and morality as any church any of us might belong to.

"What they illustrate is that there is indeed a strong division of opinion in this country, an honest division of opinion, on the issue of abortion. But by their stand in favor of legalized abortion what they are saying is that it is not the business of a government to put its particular stamp of morality on abortion. It is the business of Government to keep its hands off the business of abortion."

He contended that to refuse to fund abortions was to force "our view of morality" on the people of the country so far as the poor were concerned (*ibid.*).

In answer to inquiries of Senator Percy it was brought out that the average cost of a medicaid abortion in the first trimester was about $200 as compared with the cost for first year after birth of about $2200, and that provision for a child throughout its minority could cost, in Senator Percy's estimate, $60,000 to $100,000 (*ibid.*). Senator Percy saw an incongruity between this country's support of population planning on a global scale at a cost of approximately $100 million and on the other hand taking away the access of poor American women to $200 abortions (S 11032–33). Senator Packwood then referred to Mexico's need for population stabilization and related that country's population to illegal immigration into the United States (S 11033). Senator Percy suggested (*ibid.*) that discussion and changes of attitude toward family planning, abortion and population control were going on within religious groups, and that concern for the growing number of the poor who cannot contribute adequately to their children's educational and other needs indicated that they should have available the option of abortion, though it may be the least favorable option; he said that although he personally hated abortion, he thought it was an option of which the Congress could not deprive one particular group of women by making it the one medical expense that the Congress was going to exclude from the bill; he referred to his being picketed and accused of being a murderer by the Right-to-Life groups, and noted that the pickets were for the most part lovely people who were earnestly seeking the truth, were deeply convinced that they have arrived at the truth and were unshakeable in the belief that they were on the right side on moral grounds (*ibid.*). Senator Percy discussed the prenatal development of the fetus, read the headnote in *Roe v.*

*Wade* into the record, stated that he would oppose the Hyde amendment and support the Packwood amendment, striking Section 209 from the bill, and concluded (S 11033–34):

"But here, in a HEW bill, a provision that just arbitrarily takes low-income women and discriminates against them; a provision that says 'You cannot apply for funds for a right given to you by the Supreme Court,' I just feel that that is improper and immoral."

Senator Garn opposed the Packwood amendment (S 11034); he said that he disagreed totally with everything that Senators Packwood and Percy had said "in a moral, ethical, and every other way"; he rejected the contention that the effect of the Hyde amendment was to impose the morality of one group on another; he argued that the *Maher, Beal* and *Poelker* decisions did not seem meaningful to Senator Packwood; he continued (S 11034–35):

". . . and I want to know about my rights as a taxpayer and those of millions of people around this country who feel the same way I do about legal abortion, and do not believe their money should be taken involuntarily to fund something they feel is a heinous crime, and that they are opposed to."

In concluding his argument (S 11034–35) Senator Garn expressed his resentment at what he characterized as Senator Percy's sarcasm and innuendoes, and the laughter that was caused by some of Senator Percy's statements (S 11035).

Senator Packwood pointed out that many who were genuinely opposed to the Vietnam war were required to pay their taxes or to go to jail; he expressed the hope that Senator Garn did not seriously suggest that the Congress henceforth adopt a standard of personal morality for tax payment (S 11035). Senator Garn said that he did not, that, obviously, there were some issues for which his tax money was taken which he did not support but which he did not feel about so strongly as he felt about "the taking of human life" (*ibid.*). Senator Packwood said that the standard could not

be how personally deeply a taxpayer felt about an issue (*ibid.*), and Senator Garn asked whether in any of those other areas the Supreme Court had ruled as it had in the case of the Hyde amendment passed in the preceding year, that the Congress was not required to fund abortions (*ibid.*), and Senator Packwood pointed out that he had not argued that the Congress was required to fund abortions (*ibid.*).

Senator Brooke supported Senator Packwood's motion to strike Section 209 from the bill (S 11035), arguing first that it was a blatant case of legislating on an appropriations bill, an unwise practice to which he was adamantly opposed; in addition he opposed restrictions on medicaid abortions because the Senate should not, through a funding decision, "in effect deprive our most vulnerable and helpless citizens, the poor, of an established constitutional right," nor should the Senate thoughtlessly try to impose simplistic solutions on a complex issue, nor legislate in a medical area in which it had no competence (*ibid.*). Of the *Maher, Beal* and *Poelker* decisions he said (*ibid.*):

"The Supreme Court decisions of last week left this right completely intact for the woman who is able to pay for her own abortion. But the right of the poor woman is left in practice to our, the government's sense of justice and courage.

"If we now restrict or ban medicaid funds for abortions, the Government will accomplish for poor women indirectly what the 1973 opinion expressly forbade it to do directly."

He referred to language in *Singleton v. Wulff*, 428 U.S. 106, 118, fn. 7, 96 S.Ct. 2868, 2876, fn. 7, 49 L.Ed.2d 826, that the state's refusal to fund an abortion is, for a doctor who cannot afford to work for nothing and for a woman who cannot afford to pay him, as effective an interdiction of it as would ever be necessary. He argued that if the Senate voted to restrict medicaid funds for a poor woman's abortion, it would "make a mockery of her right" (*ibid.*). Senator Brooke said that to say that the

government does not finance all constitutional rights and that the rights of the poor are always less numerous than those of the well to do "does not excuse a country with democratic aspirations from trying at least to assure those basic, necessary rights to all its citizens" (S 11035). He argued that it was unrealistic and insensitive to say that withdrawing medicaid funding for abortion did not deprive the poor woman of her constitutional right, and that the Congress should absolutely respect the constitutional right of poor women by refusing to place restrictions on medicaid abortions; he said that the great difficulty in legislating fair, humane restrictions on abortion underlined the practical as well as the constitutional wisdom of the 1973 decision that abortion is an intensely personal and private decision which must be left totally to a woman and her doctor, the poor as well as the rich woman (S 11035). To the contention that the Senate should ban or restrict funding he answered (*ibid.*):

"But the Senate cannot know the thousands of individual or family situations which cause a poor woman, any more than a well-to-do woman, reluctantly to decide that an abortion is the only tenable alternative for herself and her family. The Senate cannot gauge the desperation, fear and hopelessness which might drive a woman to such a decision.

"The vast majority of Senators realize this and oppose an absolute ban on abortion funds, allowing no exceptions. But when we do attempt to list those mitigating circumstances under which we will sanction a poor woman's obtaining an abortion, we soon realize the impossible complexity of the issue and our limitations in attempting to impose solutions."

Saying that few Senators would oppose funding abortions when the life of the pregnant woman was endangered, Senator Brooke asked whether the Senate was insensitive to pregnancies that might seriously or permanently endanger the pregnant woman's health, insensitive to the victims of rape and incest, and insensitive to the plight of a 12 or 13 year old pregnant girl (S 11036). He argued that parents should not be denied the right to decide whether to bring into the world a child suffering from deformity or debility or incurable disease (*ibid.*). Referring to the Committee effort in drafting the bill, he said (*ibid.*):

"That bill stands as a testament to the limitations and the unfairness of any such efforts. And nowhere are those limitations clearer than when the Senate attempts to make medical decisions, decisions which only a doctor is qualified to make."

He said that the Senate Committee draft of Section 209 included reference only to multiple sclerosis and renal disease omitting reference to other diseases more detrimental to health, solely because a member of the House delegation to the conference on the preceding year's bill had insisted that his concern for those two conditions be expressed in the report language accompanying the bill, and that the Senate Appropriations Committee in 1977 simply voted to incorporate the preceding year's limited report language into the bill (*ibid.*). Senator Brooke argued that the Senate would have either to allow doctors to make the decisions only they were qualified to make, or to have those medical decisions determined by the chance of persuading individual Senators or Congressmen to offer amendments excepting particular diseases or medical conditions from the ban on abortion; the latter alternative, he contended would be "intolerable" (*ibid.*). He argued that denying the poor women funds for abortions would not prevent abortions among poor women but only force them into dangerous self-induced or back-alley abortions, and then allow to the 25,000 poor women each year who, the DHEW estimated, would suffer serious complications from such dangerous abortions, the medicaid funds needed to correct the botched abortions the Senate forced the women into (*ibid.*).

Senator Helms opposed the Packwood amendment to strike Section 209 from the bill (S 11036–37); he asserted that Senators Percy and Packwood had not discussed the fundamental issue really involved, that is "the deliberate termination of an innocent human life"; he said (*ibid.*):

"If my distinguished colleagues can persuade me that they are not advocating that the taxpayers be forced to furnish the money to terminate innocent human life, then this argument will be over, and I will not even submit my amendment."

He said that the Senators talked about the population explosion and offered "the remedy of killing human beings who have never had the right even to be born" (ibid.); he argued that the defenseless people involved were not the poor but the tiny human beings, yet waiting to be born; he read excerpts from a letter from a physician in Maine (who was Chief of Pediatrics at a hospital in Bangor, Maine) who opposed abortion, arguing that there was medical care for all new borns, that medical science was advancing so rapidly that there were few diseases that the medical profession could not help, that sterilizations and abortions lead eventually to euthanasia, infanticide and so on and on, and that there are literally no diseases, mental or physical, that the medical profession cannot save a mother from as a result of her pregnancy (S 11036). Senator Helms argued that during the debate in the preceding year Senator Packwood had argued that it was cheaper to kill unborn children than to let them be born (S 11036–37). Senator Packwood denied that he had so argued during the preceding year or ever (S 11037).

Senator Domenici, commending Senator Packwood for not making the cost-benefit argument, nevertheless argued (S 11037):

"I say to my friends in the Senate that anyone who thinks we ought to use tax dollars to abort the unborn children of the poor because, in fact, it is cheaper for the taxpayer, then they better read a little bit of history, because it is not far fetched that a society that passes judgment on human life based on whether or not it is devoid of value will bring upon it such instances as what Hitler did to the Jews in Germany."

He argued (S 11037) that children born to the poor served the country, produced for the country, and turned out not to be poor in talent and accomplishment; he argued, as he said he had argued earlier, that there was no responsibility to pay for abortions for the poor under medicaid, and he contended that the Supreme Court had just confirmed that; as for the cause of the legislative muddle, he said (ibid.):

"It is because the U.S. Congress passed a medicaid law, general in nature, at a point in history when they have to admit they never contemplated paying for abortions, because the U.S. Supreme Court had not written its first decision on the matter, and the most States prohibited it, for the most part. We sat here, in Washington, D. C., and watched medicaid evolve as a result of an interpretation of our Constitution, and we wonder why there is such confusion.

"I say to my good friend from Oregon that we should not be funding abortions here today, when no committee of either House of Congress has ever had the courage to conduct a hearing on authorizing legislation to look at the dimensions of abortion. This is not an appropriation decision. This is a decision to be made after hearing. . . . "

Senator Hatch opened his argument (S 11037–38) against the Packwood amendment by pointing out that a number of the senators had come from poor backgrounds as had a number of great people, and he continued (S 11038):

"I think it is a crass observation to think that simply because people are poor, if abortion laws are not granted or the right to abortion is not granted or the right to life is granted, they would not have their children or would not bring them up properly or would not give them the opportunities of growth or the opportunities to become something in this world.

*     *     *     *     *     *

"I, for one, believe that the people of this country have some rights. I believe that the majority of the people of this country are against abortion except to save the life of the mother. I really believe that. I believe they are against it on moral and religious grounds that has

made this country the greatest country in the world and will keep it there as long as we believe in moral values and religious grounds.

"I believe that the reason great countries fail is that they become immoral, because they bring in prostitution, vice, obscenity, pornography, violence. They fail to work hard. They fail to try to provide jobs for the poor. They use the poor as a great national constituency by keeping them bound down, by not letting them have jobs, by having 'minimum wages' which prevent the poor from getting jobs.

"I think we have that particular danger right now in this country. We have become a country that is on the verge of becoming morally bankrupt, because of some of these things I have mentioned. I think abortion fits into that category.

\* \* \* \* \* \*

"I think it is a moral crime that we have more than 1 million abortions in America a year and that approximately 300,000 of those have been paid for by Federal tax dollars, much of which have been paid into the Federal Treasury by people who do not believe in abortion for purely religious grounds or for moral reasons.

"To impose abortion on these people, I think, is wrong."

Senator Hatch said that he felt a little upset by the comments suggesting that it was the conservative senators who opposed welfare appropriations generally who appeared to be opposed to abortion, and he said that many liberal friends felt exactly as he did on the abortion issues and just as strongly (S 11038).

Senator Bayh asserted that research would assure Senator Hatch of the "remarkable similarity between people who oppose the right of a mother to choose abortion and the votes of those same individuals who vote against increased Head Start programs, increased money for food and medical assistance for children, increased money for public housing, increased money for rat control so you can keep the babies who are born from being bitten by rats" (S 11038). Senator Hatch answered (*ibid.*) that there was "a remarkable similarity between many of those who believe in abortion and who are spending us into bankruptcy, and who now have us with an $800 billion total national debt and a $4 to $6 trillion unfunded debt, and who are bankrupting this country monetarily." He added that he thought there was a remarkable similarity between many who vote for abortion (though not all) "and those who keep this marvelous national poor constituency by making them always come to the Federal Government to solve their problems, and those who make it easier to be on welfare than to give them a job or an opportunity for a job." Senator Hatch opposed to the argument aimed at the conservative position generally and its replication on the abortion issue his contention that "the biggest problem in our society with the poor is that we have become a public government, a centralized government, society that is overregulated to death, and this is another approach that brings the poor down to subjection and overregulation" (*ibid.*). Senator Hatch concluded his argument with the statements that he believed the vast majority of people in the country did not believe in abortion except to save the life of the mother, that there were very many who would fight right down to the wire for those beliefs, and that the argument that there was only one viewpoint with regard to abortion was wrong, as was the argument that the fact that people felt deeply and religiously about abortion made them somehow less humane (S 11039).

Senator Bellmon submitted a statement emphasizing the importance of assuring, whatever legislation was passed, that women be given a genuine and informed choice on issues of abortion and sterilization (S 11039). Senator Stennis submitted a statement opposing the Packwood amendment (S 11039–40) on the ground that abortion was the calculated killing of an innocent inconvenient human being; he recognized that the Supreme Court had both legalized the right to abortion and had also made clear that there was no affirmative right to

be provided with an abortion at the taxpayers' expense, and he recognized that the problem of the unwanted child was a tragic human problem; he did not, however, consider "the violent act of abortion" the proper solution, but a complete failure to look for and find a solution; on the issue of discrimination he said (S 11040):

> "Let me say that I believe that the Government has the fundamental responsibility to protect the basic rights of its citizens and to provide them with decent employment opportunities, freedom from hunger and accessible education. However, I believe that it is discrimination of the worst kind against any taxpayer who opposes abortions—on religious grounds or otherwise—to make that taxpayer finance elective abortions."

Senator Stennis preferred the form of Section 209 recommended by the Senate Appropriations Committee to the House amendment, and he concluded (*ibid.*):

> "The concept that a woman has the right to be free to seek abortion services without governmental obstruction or interference is completely separate from the question of whether the Government has or should have a legal obligation to pay for such abortion on demand."

Senator McGovern opposed the Hyde amendment (S 11040), saying that the Supreme Court had been clear that the Constitution did not require the Congress to fund abortion services for indigent women, but had left that entirely to the federal and state governments to decide through the normal processes of democracy; he argued that the issue was one of equity: to decide whether abortions would be available equally to poor as well as non-poor women (*ibid.*). He opposed the Hyde amendment on the ground that it discriminated effectively against minority women who are more heavily dependent than others on medicaid, that it would interfere with the doctor's ability to prescribe treatment according to his own best medical judgment, that it would cause an increase in cheap, illegal abortions and resulting medical complications and deaths, that it would especially hurt teenagers who rely on medicaid for their medical care because they are most vulnerable physically and emotionally to the effects of unwanted pregnancies, and that it would impose one moral viewpoint upon all poor women, who are not in a position to make their views known (S 11040).

Senator Helms then presented, as a substitute for the Packwood amendment that would have stricken Section 209 from the bill, an amendment (No. 603) reading:

> "None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

Senator Helms commenced his argument for his amendment by stating that the Supreme Court had ruled the Hyde amendment constitutional by its decision in the *Maher* case holding that a state could not be required to finance non-therapeutic abortions (S 11041). He said that millions of Americans opposed use of tax dollars to pay for abortions of convenience, that about 85% of the public hospitals in the United States refused to perform non-therapeutic abortions of convenience and allowed abortions only where there was grave threat of death or injury to the mother; that many states financed non-therapeutic abortions only because required to do so under federal court order; he argued that those Congressmen who had voted against the Hyde amendment on constitutional grounds were now answered by the decision in the *Maher* case; he continued (*ibid.*):

> "Mr. President, let it be clear that by the terms of the Hyde amendment which was accepted by both the House and the Senate last year, Congress prohibited funding for abortions which were not medically necessary. Medically necessary abortions, those necessary to prevent the death of the mother or when the mother's life is endangered, were not prohibited by the Hyde amendment. Proponents of abortion on demand now insist, however, that tax dollars be used to provide nontheapeutic, convenience abortions.

"With the slogan, 'every child should be wanted,' the proponents of subsidized convenience abortions maintain that abortion must be recognized as simply a backup method of birth control in family planning."

Senator Helms argued that the "right to life of any child should not depend on whether or not he is wanted by someone else," that the humane and positive response of government is to encourage life rather than accept the argument allegedly made by the opponents of his view that it was cheaper for the state to kill the unborn than to let them be born, an argument which, he contended, invoked the lesson of Nazi Germany (S 11041–42); he continued (S 11042):

"Of course, the beginnings at first are merely a subtle shift in emphasis in the basic attitude of society. It starts with the acceptance of the idea that there is such a thing as a life not worth living. In its early stages, this attitude concerns itself only with the so-called 'hard cases' in which the victims, because of age or illness or mental capacity, are unable to speak for themselves. Gradually this category is enlarged to include the socially unproductive and the ideologically unwanted."

Urging adoption of his amendment, which was in the language of the preceding year's Hyde-Conte amendment, Senator Helms argued that an exception for ectopic pregnancies was unnecessary since dealing with them did not involve abortion, that there should be no exception for fetal deformity because "fetal euthanasia" was not a solution to the handicapped child in the womb, and that a rape exception was both unnecessary and unenforceable because there were none or few pregnancies resulting from reported rapes and there would be no means of determining the origin of pregnancies alleged to have followed from unreported rapes (*ibid.*). Of the spectre of maternal deaths from abortion, Senator Helms said that in 1971 "there were only 120 maternal deaths from abortion, including legal abortion," and that there was no reason to suppose that maternal deaths due to back-room abortions would increase beyond what they had been before the legalization of abortion; he added that "for every two human beings who experience an abortion, only one is left alive"; pointing to the great sums spent in saving the lives of new born babies, particularly prematurely born babies, he saw that expenditure as contradicting the use of taxpayers' money "to exterminate the lives of literally hundreds of thousands of innocent unborn children" (S 11042).

Senator Javits, saying that he disagreed with the *Maher* decision "that the Federal Government may place restrictions upon the medical aid which it gives, even though that aid is supportive of that private right of the woman" which *Roe v. Wade* had given her, argued that the question of constitutionality was immaterial because the discussion related to policy not constitutionality, and "as a matter of policy we cannot deny to the poor woman what we grant very clearly to the person who can afford it," and that the law should not inhibit the exercise of a private right by those who can least afford it and need government assistance (S 11043). Senator Bayh said that the hearings before the subcommittee on constitutional amendments had carried him to the conclusion that "we were talking about life when we discuss the fetus," but that he opposed the Helms amendment because he thought "people have a right to differ on this issue"; he argued that it would be more equitable to debate the constitutional question whether all American women were to have the right to choose or not than the issue presented by the amendment; that issue, he said, was not whether to establish a moral standard of right and wrong for all the people—all thirteen year old girls, all parents confronted with the tragedy of an unexpected pregnancy—but was whether to separate out a certain group of Americans, a minority of Americans, those on the low end of the economic scale, those who do not have the financial resources to exercise the constitutional right which the Supreme Court had said they had (S 11043). He continued (*ibid.*):

"Thus, in essence, we are saying that those who have the resources to enjoy their constitutional right may do so. Those who do not have the financial resources have the constitutional right, but a right without the ability to use it is absolutely worthless."

Senator Bayh agreed that "abortion for convenience alone is tragic"; but he contended that denying funding for abortions would not stop poor women from trying to have abortions, that they would resort to backroom abortions with resultant risks of death and irreparable harm (S 11043). Senator Long, interrupting, agreed that as a practical matter the amendment did not forbid abortion but forbade abortions in hospitals performed by doctors and he said that (ibid.):

"In desperation, people do turn to abortion, and when they do it is tragic that it either costs a life or permanently impairs the health of the person on whom the abortion is being performed."

Senator Bayh said that he was not prepared to lay down a rule of conduct for those faced with the abortion decision (S 11044); he considered such decisions personal, family decisions, and said (ibid.):

"But for us to stand here and make a collective decision for individuals everywhere else, I think is the ultimate in audacity."

He pointed out that the effect of the amendment was that only the poor would be denied access to abortion when victimized by rape and incest or threatened with the birth of a child determined prenatally to be afflicted with Tay-Sachs disease, a degenerative and fatal affliction striking at the age of one; he contended that the child 13 or 14 or 15 who becomes pregnant should not be precluded from being able to make a decision, in consultation with her parents, as to whether to bear the child or abort it (S 11044). Arguing that the issue was one of policy and not of constitutionality, Senator Bayh contended that the issue was whether the Senate was willing to discriminate against the poor women who could not avail themselves of a constitutional right availa-ble to other women; noting that the Supreme Court had said that there were other sources of funding (Maher v. Roe, supra, 432 U.S. at 474, 97 S.Ct. at 2382), Senator Bayh said (ibid.):

"The fact of the matter is that we are the court of last resort. As we vote, let us recognize that consequence. Let us not wait for some white rabbit to pop out of a hat and suddenly bring a bundle of cash into the dusty living room of a poor family with no money for an abortion, because it is not going to be there. We are either going to make that available in the event the choice is made, or we are not."

Senator Percy, opposing the Helms amendment (S 11045), expressed regret if any of his earlier statements were felt to have been sarcastic or to have ridiculed others; he opposed the amendment because it denied medicaid abortions to poor women, leaving them to choose between unsafe abortion or the birth of children they did not want or could not afford, leaving well-to-do women unaffected; he said that the amendment would not stop abortions but only deny poor women equal access to medical service; he said that it had been estimated that 70% of the women who today receive legal and safe abortions would still get abortions even if they had to resort to unsafe means; he asserted that after the legalization of certain abortions in California and New York it was noted that the number of women admitted to hospitals for post-abortion treatment had declined by 68% in the two years following the change in the abortion law in San Francisco and by 88% in Los Angeles, and that data from the New York City hospitals indicated a drop in abortion complications of 52% in the first three years under the changed abortion law; he said that Chicago Board of Health statistics indicated that 4,000 women annually were admitted to Cook County Hospitals from 1962 to 1968 for medical care following criminal abortions, but that in April and May of 1973 the Chicago Board of Health found less than five such cases a month at the same hospital facility (S 11045). Senator Percy said that abortion-

related maternal deaths had declined as a result of the change in the abortion laws in California from 20 deaths per 100,000 live births in 1957 to two such deaths per 100,000 live births in 1971 and that in New York City four maternal deaths from abortion were reported in 1972–1973, after the change in the abortion law, while 22 deaths had been reported in 1970, before the change in law (*ibid.*). Citing general statistics indicating a decline in deaths related to childbirth, which could be ascribed in some part to the choice of abortion over the continuance of difficult pregnancies, Senator Percy argued:

> "There is no doubt in my mind that passage of section 209 would undoubtedly cause a reversal of that trend, resulting in the unnecessary deaths of many women. Illegal abortionists rarely, if ever, provide counselling services."

He argued for a further increase in the funding of the federal family planning effort, estimating that 172,500 low-income women had no access to such services; he noted that teenagers had the least access to family planning services; Senator Percy reiterated that the central issue was nondiscrimination against poor women, and he urged adoption of Senator Packwood's motion, which would have stricken Section 209 from the bill entirely; he noted that the Helms amendment would deny funding for abortions for the victims of rape, who numbered 56,000 in 1975, and he concluded by reiterating that the Hyde amendment would not prevent abortion but only deny poor women equal access to this medical service (S 11045).

Senator Schweiker, a co-sponsor of the Helms amendment, pointed out that the Supreme Court had obviously said that a person can have an abortion but that a legislature, be it local, state or federal, had the right to say that taxpayers do not have to pay for the abortion; he saw no discrimination, arguing that those who have means can elect to do many things including engaging medical services not paid for by medicaid; he continued (S 11046):

> "Obviously abortion is not the same as a facelift, but the principle is that some-

body has to choose what is covered and what is not.

> "If this amendment prevails, exactly the same freedoms and rights will prevail as there always has been. People will not get an abortion done at taxpayers' expense. They can freely go to a local agency and get it financed.

> \*   \*   \*   \*   \*   \*

> "There is a great difference in honest opinion about the ethics and morality of this issue. I happen to be on the side that abortion is ethically and morally wrong. I happen to feel that I do not have a responsibility to finance other people who feel differently. The Court said those other people who feel differently have the right to have that abortion and that is not the issue here."

The Helms amendment was then put to a vote and it lost, 33 voting in favor of it, 65 voting against it, and 2 not voting (S 11046).

The debate then turned to the Packwood amendment (*ibid.*). Senator Packwood reiterated much of what he had argued earlier in the day (*supra* pp. 783–785) and he noted, responding to the argument that invoked the Nazi precedent, that in the list of organizations that he cited as supporting legalized abortions there were "more Jewish organizations that support legalized abortion than any other particular kind of religious organization" (S 11047). Senator Schweiker in opposition to the Packwood amendment (S 11048) stated that the Packwood amendment would provide basically for "abortion-on-demand"; he then explained the holdings in the *Beal, Maher* and *Poelker* cases, and contended that in the light of the decisions the basic issue was

> "Do we want to make it Federal policy to encourage, support, and increase the abortions in this country?"

Senate Schweiker insisted that the issue was not the right to abortion: that, the Supreme Court had already decided; it had also said, he argued, that the federal legislature had the right to say that (*ibid.*)

"There are some limitations on whether we will ask people to put their money into a common fund and support, encourage, and foster a policy of this kind."

Senator Packwood then resumed his argument (S 11048) and again read the lists of the organizations supporting legalized abortion; he said that he did not support abortion for some of the reasons that had been attributed to him; he did not support it because it was cheaper than childbirth for the government, nor for population reasons, but because women had a constitutional right to abortion, and because the funding of abortions was decent and in good conscience should be done because it is fair (S 11049). Repeating his earlier argument elaborating on the extent of the federal programs for the support of the poor and contrasting that to the denial to them of the medical service connected with abortion, Senator Packwood argued (*ibid.*):

"When we say, 'No, we are not going to fund abortions,' we say it for one reason and one reason only, and that is because some Members of this body think it is wrong, think it is immoral, and if they can, they are going to impose that view on everyone else in this country; and that is wrong."

Quoting excerpts from earlier statements of Senators Helms, Domenici, Hatch and Garn, Senator Packwood said that he supported the Senators' right to those views, but he submitted that "the sole reason for their opposition is their own personal idea of morality" (*ibid.*). Senator Packwood derided as mockery the argument that the abortions in question could be funded privately (*ibid.*). Referring to the Senate Committee draft amendment, he said that the exceptions which it visualized would not amount to one percent of the pregnancies, and would deny freedom of choice to 99% of the pregnancies, which are not problem pregnancies; he argued that if the poor woman were offered the chance to exchange her federally subsidized rights to education, legal services, housing, food, and medicine for the funds needed for an abortion, the choice would be for an abortion (*ibid.*):

"The most important decision she would make is whether or not to have an unwanted child. She would exchange all of that money, the food stamps, the housing, the money for that right, she would exchange all of that for the abortion.

"But this Senate says, 'No, you will not have that choice.' We middle-aged men, born before 1950, raised in a different era of morality, will impose our ideas on her.

"I pray to God this Senate is not that haughty, not that disdainful, to think that somehow God has given us the right to impose our sense of morality on the rest of this country."

Senator Percy then in a brief statement supported Senator Packwood's position (S 11049). Senator Goldwater (S 11049–50) said that he would not commit himself about his vote but would say:

"I am not ashamed of the morals that were taught me by my mother and my father. I am not ashamed of the morals I have, and I never intend that any law of this country will change the way I feel about morality."

Senator Packwood responded (S 11050):

"I do not want anybody to change their morals, to change their beliefs, or to impose them on anybody else. I would be perfectly happy if we went back to the morals and standards of the founders of this country on abortion."

Senator Riegle (S 11050) stated that he did not greatly favor abortion but strongly supported the Packwood amendment; he continued (*ibid.*):

"More than that, I just want to say that I believe, particularly at this time and on this issue, it is difficult to offer leadership if one holds the view the Senator [Packwood] holds and which I hold."

The Packwood amendment (No. 602) was then put to a vote and it was defeated by a vote of 42 in favor, 56 opposed and 2 not voting.

Senator Brooke then presented an amendment reading in the following language (S 11050):

"Sec. 209. None of the funds in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term, or where medically necessary, or for the treatment of rape or incest. This section does not prohibit the use of drugs or devices to prevent implantation of the fertilized ovum."

Senator Brooke explained (S 11051) that his amendment differed from the amendment proposed by the Senate Committee in substituting for the specific diseases and conditions mentioned in the Senate bill the inclusive expression "where medically necessary." The new language, he said, reflected his understanding that the matters specifically mentioned omitted other medical conditions and diseases far more detrimental to the health of the pregnant woman; he argued that the Senate could not well determine what diseases should be specifically excepted, that the only alternative was to allow the doctors to make the decisions that only they were qualified to make, and that the language he suggested would leave the medical decisions where they so clearly belonged (S 11051). Senator Hatfield asked whether "medically necessary" included psychological as well as organic problems, and Senator Brooke answered that "medically necessary" meant that whatever the doctor determined was medically necessary would be covered, including the case in which the physician acted on a woman's indication to him that she did not feel that she was emotionally or psychologically prepared to carry the pregnancy to term; Senator Brooke made clear that the doctor would have to make a medical determination, however, and not take the word of the pregnant woman (S 11051). In response to Senator Hatfield's question whether the amendment would provide any criteria governing the medical doctor's action, Senator Brooke answered that he did not think the Senate would want to subject the doctor to the Senate's determination as to what was medically necessary; he said that neither he nor, he thought, the Senate was competent to make medical decisions, as it would be doing if it used the language of the Senate Committee draft naming the two diseases, renal disease and multiple sclerosis; Senator Brooke agreed to Senator Hatfield's summary of the effect of the language in the following words (S 11051):

"By the language 'medically necessary,' in effect, we have an open end situation that the doctor can make any determination, within his scope of competence to determine, whether or not an abortion should be permitted?"

Senator Curtis asked whether medically necessary included being medically necessary to prevent a headache or death and Senator Brooke answered (*ibid.*):

"Medically necessary to save the life of the mother or to see that the fetus would not be endangered."

In answer to a question of Senator Schweiker's, however, Senator Brooke assented to the idea that the expression "medically necessary" would make it possible "to have an abortion if the life of the mother or the life of the child was not in danger" (*ibid.*). Senator Domenici asked whether the words "medically necessary" were words of art in the medicaid bill, and Senator Brooke answered that they were words of art (*ibid.*)

". . . used throughout medical legislation. They are used for all social security funds and for all medical funds."

Senator Javits pointed out that the term medically necessary was used in the Social Security Act, in the grant for medicare, in the Peer Review Act and in the Hospital Utilization Act (S 11052). Senator Javits continued (*ibid.*):

"I would say it would have to be a serious and good-faith medical finding by a doctor that it is necessary in this particular case for sound medical reasons to abort."

Senator Magnuson suggested as a likely inclusion a case in which the life of the mother was not endangered but the pregnancy could leave her "in such a serious health condition that her life might be worthless, or dramatically altered" (*ibid.*). Senator Magnuson made clear that he was

talking "not about emotional or psychological, but physical diseases" (S 11052).

Senator Bayh (S 11052) stated that the Senate's earlier votes had recognized that complete access to abortion was not the desire of the Senate and that it was not enough to except only the cases in which the mother's life was endangered; he explained, referring to his earlier argument (*ibid.*):

".   .   . if you look at those individual circumstances that this amendment is designed to reach, I was not prepared, and am not now prepared, to take away the individual choice of individuals who are confronted with the circumstances, and I pray to God none of us in this body ever will be.  We are now sitting as judge and jury imposing our assessment on women of this country who have been and will be confronted with the circumstances."

Referring to the Senate Committee action of the year before, he said that its purpose was to deal first with the case where the life of the mother was concerned, and second where certain types of diseases were involved which would lead to an increased chance of death or to the impairment of the health of the mother, and that the two examples were used as illustrative only; it was meant to reach a good many other diseases, all those diseases that, when a woman was pregnant, significantly threatened her health or would significantly have reduced her longevity (*ibid.*).   Senator Johnston (S 11052) suggested that the purpose of the Committee report had been to except diseases like multiple sclerosis and renal disease, but that the language chosen made those two diseases an exclusive list. Senator Bayh agreed with Senator Johnston (S 11053), and argued that use of the term medically necessary was preferable to the Committee draft's inexpert attempt to list the specific matters to be excepted.  He pointed out that in the *Beal* case the Supreme Court dealt with the term "medically necessary" (432 U.S. at 441–442 and footnote 3, 97 S.Ct. at 2369 and footnote 3); Senator Bayh referred then to the exceptions in the Senate Committee draft for diseases which would deform or debilitate

the fetus, and he questioned whether that language would cover a Tay-Sachs disease instance; he argued that Senator Brooke's language would do so, and he noted that no one had mentioned rubella nor thalidomide; he indicated that he thought in those cases there should be freedom to choose abortion (S 11053).

Senator Brooke introduced an amendment to his suggested Section 209 by adding after the words "of rape or incest" the word "victims" (*ibid.*).

Senator Kennedy, though opposed to "abortion on demand," believed that abortions might legitimately be required by certain medical conditions, and that the availability of abortion was equally important for all women regardless of economic status in cases of genuine medical necessity (S 11053).  He said that the law under consideration applied only to the poor, the most powerless segment in our society, and that the Hyde amendment would impose upon them a standard which no other women would have to live up to;  the effect would be thousands of medical complications and hundreds of deaths each year, a burden that most of the women in this country do not carry, and one which medicaid recipients should not carry;  he said that the real question was how to develop a standard under the medicaid law which eliminated abortions of social convenience and allowed those procedures which could be justified for all citizens;  he said that medical necessity was such a standard, and he cited the language of the conference statement of the preceding year as embodying the intent of the amendment agreed to in the preceding year;  the language he referred to and quoted was:

"To limit the financing of abortions under the medicaid program to instances where the performance of an abortion is deemed by a physician to be of medical necessity and to prohibit payment for abortions as a method of family planning or for emotional or social convenience."

Senator Kennedy said that the quoted statement was a standard against which all

abortions could be judged and that he continued to support that intent (S 11053). He urged devoting time to developing positive programs for effective family planning and prenatal and postnatal care for those citizens who could not afford it; only then, he argued, would the government be able to reduce the economic and social pressures which result in poor women seeking non-therapeutic abortions (*ibid.*):

> "No woman in the richest nation on Earth should be forced to make the moral choice of aborting a pregnancy because she is too poor to carry, then care for her child."

He argued that there should be better services, such as education, for unwed mothers, that there should be maternity coverage for dependent minors or unmarried women at the same cost as medical insurance policies presently provided for abortion, and that, simply, the focus should be on the services required to support a woman through a pregnancy rather than on provision for abortion (*ibid.*).

Senator Helms advised that at an appropriate time he would raise a point of order on the amendment (S 11053), and Senator Brooke said that he understood the point would be that the amendment was legislation on an appropriations bill; Senator Brooke argued that most of the votes of the preceding day had been legislation on an appropriations bill, and that, if Senator Helms raised his point of order, he would raise the question of the germaneness of Senator Helms amendment to the bill (*ibid.*). Senator Domenici said that he would present a "perfecting amendment" deleting from Senator Brooke's amendment the words "or where medically necessary" thus limiting the amendment to the cases "where the life of the mother would be endangered" (S 11053). Senator Brooke answered that the Senator's "perfecting amendment" would in effect go back almost to the Helms amendment which the Senate had already voted against. The Domenici amendment was then presented (as Amendment No. 606), and Senator Domenici argued that the words "medically necessary" had put the Senate in a position in which it

did not know what it meant; he said that he assumed that all abortions that doctors had been doing were medically necessary in one or another sense, and that in consequence the Brooke amendment would abolish the whole area of debate; he said that he would not read the Supreme Court case, but that (S 11054):

> ". . . I believe if the Senator has it here he will find that they have held in talking about the right to abortion, not whether we pay for it, that psychological grounds are medically necessary. They are synonymous. I believe the Senator is opening that door, too. I just want to clarify it and make sure the Senator understands that if we strike it we are limiting it to the kind of things the Supreme Court said we had to do as a matter of right."

Senator Magnuson stated that Senator Domenici could achieve his purpose by simply voting against the Brooke amendment which would result in the Senate Committee amendment coming forward with its limitation to the two named diseases (S 11054). Senator Brooke pointed out that his amendment did not simply add the words "or where medically necessary" to the Senate Committee draft, but was in substitution for the words "or in the case of multiple sclerosis or renal disease, or other diseases which would seriously deform or debilitate the fetus"; hence, Senator Brooke pointed out, acceptance of the Domenici amendment would delete even the two diseases specifically mentioned in the Senate Committee version as well as the reference to deformed and debilitated fetuses (*ibid.*). A motion to table the Domenici amendment carried 59 votes in favor, 36 votes opposed, and 5 not voting (*ibid.*).

Senator Helms did not press his point of order (S 11055), and Senator Schweiker said that he would move to table Senator Brooke's amendment and the issue would be clear: if the Senators wanted a big loophole, a barn door opened, if the Senators wanted abortions for any purpose, they would vote not to table. On the other hand if the Senators voted to table they would be

voting for the language in the Senate Committee draft, language which he had not originally supported but which he believed was better than that in the Brooke amendment. He therefore moved to table (S 11055). At the instance of Senator Goldwater a point of order with respect to the germaneness of the amendment to the appropriations bill was raised and submitted to the Senate, and the Senate voted that the amendment was germane, 74 voting that conclusion, 21 opposed, and 5 not voting (S 11055–56).

Additional statements were submitted, the first by Senator Moynihan, addressed to the Packwood amendment which he supported, in which he said (S 11056):

"In my view, decisions about birth and abortion are moral and religious decisions, which must be left to each individual or family to make. That at all events is the law.

"In this context I believe that there should be a minimum of social provision which makes this freedom of choice meaningful. This extends to the payment of medical costs for the indigent."

Senator Metzenbaum also submitted a statement in which he said (S 11056):

"The amendment's very design—to withhold Federal funds for abortions—flies in the face of all notions of fairness and equality. The amendment does not say: 'Abortion is illegal.' Rather, it has the effect of saying: 'You can have an abortion—if you can afford it, but not if you can't.' The result of this provision would be that affluent women would continue to have abortions performed by high-priced specialists in modern hospitals, while poorer women would be forced to seek out cheap, and often unsafe, abortions."

Senator Schweiker then brought forward his motion to table the Brooke amendment and the motion to table was defeated, 37 voting in favor, 58 voting against tabling, and 5 not voting (S 11056). The Senate then voted on the Brooke amendment and the Brooke amendment was carried 56 voting in favor, 39 votes opposed, and 5 not voting (S 11056).

On August 1, 1977, Senator Bayh noted in the Congressional Record that the Justice Department's office of Legal Counsel, at the request of the Secretary, had prepared a memorandum concerning the interpretation of the language of the Hyde-Conte amendment of the preceding year; Senator Bayh said that he understood that the position taken by the Justice Department memorandum was that HEW could reimburse only for abortions in which the mother's life was endangered despite the Conference Committee report language (S 13225).

On August 2, 1977, Mr. Flood reported to the House from the Conference Committee on eighty-nine amendments to the appropriations bill that had been resolved by the Conferees, and he added that on one amendment (No. 82), relating to abortion, there was no agreement; he stated that he would offer a motion in the House to recede from its position and to concur in the Senate amendment with an amendment inserting the language of the Hyde-Conte amendment of the preceding year—as a fair compromise between the two bills (H 8330). The Senate amendment (No. 82) was read to the House, and thereupon Mr. Flood moved that the House recede from its disagreement to amendment No. 82 and concur in it with an amendment substituting the language of the preceding year's Act reading (H 8348):

"None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

Mr. Flood explained that if the House concurred in the motion to recede from disagreement with Senate Amendment No. 82, he would at once offer a preferential motion to concur in Amendment No. 82 with an amendment inserting the language of the Hyde-Conte amendment of the preceding year; he urged adoption of the motion to recede (H 8348). Mr. Hyde supported the motion to recede as the only way to get to the amendment that he had originally offered (ibid.). In answering a question by

Mr. Kazen, Mr. Hyde said that the language of the preceding year's Act "is the only language the Supreme Court had had before it." The motion to recede was thereupon agreed to (H 8348), and Mr. Flood moved that the House concur in the Senate amendment with an amendment substituting the Hyde-Conte language (*ibid.*). Mr. Flood reported that the House conferees had refused to agree to the Senate language and the Senate conferees had refused to offer any kind of compromise, although the House conferees were perfectly willing to agree to compromise language permitting abortions where necessary to save the mother's life; he strongly urged that the House vote for the compromise language because a large vote for it would send a clear message to the Senate, and expedite the enactment of the sixty billion dollar appropriations bill, which was very important to the public welfare (H 4348–49). Mr. Conte supported the Flood motion, saying that the government was presently spending about $50 million a year in federal funds for some 300,000 annual abortions, representing a serious abuse of the medicaid program; he argued that a significant number of people were using abortion as a form of birth control or as a matter of convenience, although the medicaid statute does not mention abortions; abortion funding, he said, arose out of administrative interpretation of the Act although it was a question which, in his judgment, should have been dealt with legislatively; he argued that the medicaid authorization should specifically prohibit or provide for covering abortions, but that the authorizing committees had not acted, and, out of "frustration with their inaction, here we are with this language on an appropriations bill"; he urged the House to reaffirm its position by voting the language of the Hyde-Conte amendment (H 8349).

Mr. Stokes opposed the Flood motion and argued that the House should recede from its disagreement to the Senate amendment and concur in that language; he said (H 8349):

"Although I am certainly not satisfied with the restrictiveness of the Senate language, I believe that this is a question of civil rights and a question of equal access under the law for poor women. I believe that acceptance of the Senate language is the least that the house can do. Under the Senate language we would be sticking to our job which is legislating and allowing the medical profession, that is, the physicians, to treat the individual medical conditions of their patients in accordance with their best medical judgment."

He argued that the Congress should not restrict doctors' ability to treat their patients in what they considered the medically necessary way, and said that to do so would also be an "unconscionable intrusion into the privacy of the doctor-patient relationship" (*ibid.*). To the argument that the term "medically necessary" was too broad, Mr. Stokes answered that it was the only realistic language, because there were an extraordinary number of medical conditions that would make continued pregnancy inadvisable, and he quoted a medical authority as saying that it would not be possible to devise a "predetermined list of conditions completely including each individual patient for whom a procedure is medically necessary and excluding all others"; he asked whether the House would force poor women to continue pregnancies when they were carrying diseased or seriously deformed fetuses; he asked whether the pregnancies of teenagers which were high risk for the teenager as well as for the baby had to be carried to term (*ibid.*). He thought it ironic that those who would not allow poor women to obtain abortions because they felt it was necessary, would allow these same women to subject themselves to self-induced or illegal abortions and risk their lives; he referred to the HEW's supposed estimate that 25,000 persons would suffer serious injury requiring hospitalization from illegal abortions if denied federal funding; he referred to the Supreme Court's statement that the woman seeking abortion could resort to private agencies, and argued that it was because the poor had not had access to medical services that Congress had enacted med-

icaid (H 8349–50). He urged the Members to vote not on the question of their view on the morality of abortion but to vote instead upon the right of the poor to obtain abortions when it is deemed medically advisable; he asserted that the Supreme Court clearly portended that it was the Congress which had to deal with the question of federal funding; he said that those who assumed that they could vote for the Hyde amendment in 1976 because the Court would take care of the issue for them had the responsibility to act in accordance with a sense of fair play in at least making sure that poor women seeking abortions for medical reasons had the chance to have a safe abortion (H 8350).

Mr. Obey said that he was a Catholic, was opposed to abortion, thought that "indiscriminate abortion brutalizes all of us and all of society," and thought that in the main the government should not pay for abortions (H 8350). He thought, however, that the Hyde-Conte amendment language did not go far enough in dealing with abortions in extenuating circumstances; he said (*ibid.*):

"For instance, it makes no exception whatsoever in the case of rape or incest. It makes no exception in the case of life-shortening diseases, diseases such as renal disease, although we were willing to spell that out in the report last year."

He argued that doctors, rather than medically uneducated politicians like himself, should determine what conditions were life-endangering or life-shortening; he asked that the House reject the Hyde-Conte language because the previous year's conference report, among other things, indicated that the Congress would make exception in the case of life-threatening diseases such as renal disease; he stated that the previous year's conference report also did not intend to prohibit medical procedures necessary to terminate ectopic pregnancy nor to exclude rape or incest, nor to prohibit the use of drugs or devices to prevent the implantation of the fertilized ovum; he asked the House to vote down the amendment before it so that he could offer an amendment dealing specifically with rape and incest

victims and cases in which the mother "is afflicted by potentially life shortening diseases which will be aggravated if the fetus is carried to term," and which would also exclude from the prohibition drugs or devices to prevent the implantation of the fertilized ovum or medical procedures necessary to terminate ectopic pregnancy; Mr. Obey noted that in the Attorney General's opinion letter to the Secretary (dated July 27, 1977) the Attorney General had said that the Hyde-Conte amendment of the preceding year did not permit funding of abortions in the case of pregnancies resulting from incest or rape; Mr. Obey said that the language he intended to propose would make it clear that the House intended to allow an exception from the statutory prohibition in the case of rape and incest (H 8350).

Mr. Oberstar supported the Flood motion; he argued (H 8350):

"Much has been said during this debate about the disadvantaged and about possible discrimination against the poor, in the funding of abortions. We ought to be very clear that where there is no basic human right there can be no discrimination. There is no basic right to a federally financed abortion; therefore to preclude the use of Federal funds for that purpose is not to deny the poor or any other class in society of a so-called right, since no such right exists."

He argued that the real discrimination against the poor lay in the inadequacy of the health care provided for parents and children, born and unborn; he gave details of the inadequacy of health care, and the extent to which the health services provided had failed to reach the poor children for whom the Congress intended them; he continued (*ibid.*):

"The argument that poor people need Federal aid to abort their unborn will have a hollow ring until we have adequately provided Federal funds for a wide range of programs that will make it largely unnecessary for poor people or people in any economic class to even consider abortion as an option."

He argued that the $53 million spent in 1976 to finance abortions should be reallocated to the liberalization of adoption laws, adequate maternal and child health care, aid to unwed mothers, prenatal care, support of rape prevention and treatment centers, increased research on birth defects, and programs intended to reduce poverty and eliminate its causes (H 8350–51).

Mrs. Schroeder urged a vote againt the Flood motion (H 8351); she said that she was the mother of two children and had lost two children and that she did not "have children very well"; she continued (*ibid.*):

"After the birth of my last child I spent 10 days in intensive care. I am not sure whether any doctor would say to me, if I were pregnant again, that I would die; but I am also not sure that I want to put my family through trying to decide whether or not I live. I resent very much my Government's saying to me, if I am poor, that my family would have absolutely no alternative but to either attempt to find the money during a period of time that realistically is less than 5 weeks or that I should gamble and hope that I live through it.

\*    \*    \*    \*    \*    \*

"I think that when we look at the issue, we will find that we really ought to allow language including something about 'medically necessary' in the amendment. If something such as a 'medically necessary' provision were in there, it would cover someone like myself if I were unfortunate enough to have to be relying on medicare or medicaid."

Mr. Michel said that the record should not indicate that the House was indifferent to "the gravity of the issue, the volatile, the emotional issue that is before us" (H 8351). He said that the language was exactly the language that had been fully debated in the preceding year and that he did not think that any Member would change his position by reason of what was then said "unless he or she is influenced in one way or the other by the most recent Supreme Court decision, which, frankly, in my opinion, buttresses the House's position more this year than

was the case last year" (*ibid.*). Mr. Pritchard expressed disappointment at the parliamentary maneuvering which had prevented the House from voting directly upon the Senate amendment; he said that he was disappointed because he did not think that the House would come out with the position that the majority truly held on the issue (H 8351). Mr. Michel answered that the forthcoming vote on the Flood motion really amounted to either accepting the position of the House or the position of the Senate (*ibid.*).

Mr. Hyde answered the argument that the House should not attempt to play the role of doctor by saying that it should not "play God" (H 8351). Speaking of the crippled and deformed, Mr. Hyde said that the suicide rate among crippled and deformed people is almost zero; that the people who wanted to destroy their lives were the "jaded people who seem to have wealth and affluence, but the crippled and deformed want to live" (*ibid.*). He said that there had been two significant developments since the debate in the House on June 17th; the Supreme Court had decided that a legislature was not forbidden constitutionally from denying tax funds to pay for abortions; and a New York Times—CBS telephone poll of 1447 persons in late July reported that to the question whether the government should help a poor woman with her medical bills when she has a baby, 64% answered yes and 26%, no; that to the next question, whether the government should help a poor woman with the cost of contraceptives to prevent pregnancy, 63% answered yes, and 29%, no; and that to the third question, Do you think the government should help a poor woman with her medical bills if she wants an abortion, 38% answered yes, 55% answered no, and 7% said they did not know (H 8352). Mr. Hyde argued that (H 8352):

"Those of us who accept the medical scientific, clinical evidence that a fetus is human life and that abortion kills that human life, and who object to killing as a solution to the problems of poverty, are in the main stream. Some of the media

and some militant organizations paint us as cultural lags and as throwbacks to the middle ages. But the New York Times and the CBS poll says most Americans oppose using Federal Funds for abortion, so it is, we who understand the mood of America. Those of us who oppose Federal Funds for abortion respect the consent of the governed."

He argued that if there was discrimination it was against the unborn of the rich because no voice was raised to defend them if their parents wanted "to kill" them, while the unborn of the poor had a fighting chance to survive (*ibid.*). He argued that the Senate amendment was a gesture that would accomplish nothing, and he quoted Dr. Louis Hellman (formerly of HEW) as admitting that 90% of the medicaid abortions currently being performed could be performed under the Senate language (*ibid.*). He argued that a caring, humane society does not kill those who are "unwanted," whether the senile, the deformed or unborn children (*ibid.*).

Mrs. Fenwick spoke against the amendment saying (H 8352):

"If we could stop abortion, if this or any other bill would stop abortion, it would be different. It does not. Nothing does. It never has and probably, sadly, never will. There have been self-induced abortions and bad abortions and back street abortions ever since life began on this earth."

She asserted that the number of medicaid abortions did not signify an increase in abortions because no one had listed the number of irregular abortions performed by unqualified persons; she stated that when she was in Chile she was told that 35% of the beds in every hospital in the nation were filled with women dying from self-induced abortions, and that that did not occur in Puerto Rico where everything was legal (*ibid.*).

Mrs. Burke (California) argued (H 8353) that the House should not think that it was being asked to vote for the same thing it had voted on a year before, because in the preceding year there had been reliance on the language in the committee report indicating the expectation that rape, incest and other instances were excepted from the prohibition; she pointed out that the Attorney General had just advised that if the House intended to give assistance to victims of rape and incest it would have to say what it meant, that the Hyde-Conte language before the House did not do that, and that its meaning could not be extended by a committee report; she questioned the poll results on the ground that the pollsters had not asked such questions as "Would you be willing to provide Federal assistance to assist a 12-year-old girl who has been the victim of rape?", nor such a question as "would [you] be willing to allow Federal Funds that would prevent a mother from being crippled if she was required to carry a child to term"; she argued that the questions involved could not be simplified in a poll (H 8353).

Ms. Holtzman opposed the amendment on the ground that it would not provide medicaid funds for abortion in the case of rape or incest or the case in which the mother's life would be forever marred and she be maimed or crippled if she had to give birth; she argued (H 8353):

"I do not think anybody in this House has a single illusion about the fact that by supporting this amendment we are stopping abortions. Instead, we are simply condemning the poor women of this country, and in some cases these are teenagers or very young girls, to the horrors of back alley abortions or self-mutilation."

Mr. Volkmer urged support of Mr. Flood's motion (H 8353), arguing that the amendment did not deprive anyone of the right to an abortion nor deny any doctor or clinic the right to perform an abortion.

The Flood motion was then put to a vote and it carried, 238 voting in favor of it, 182 opposed, and 13 not voting.

The deadlock in the conference committee on the abortion issue was reported to the Senate on August 4, 1977 (S 13641–42), and the Senate turned to consideration of the abortion language that had been agreed

to in the House on August 2 (S 13670). Senator Magnuson moved that the Senate disagree to the House amendment to the Senate amendment on abortion (No. 82), and Senator Schweiker, for himself and Senator Helms, moved that the Senate concur in the House amendment to Senate amendment No. 82 (S 13670).

The long course of debate and of successive amendments that led in the end to the language in the joint resolution of December 9, 1977, brought forward few, if any, arguments that had not been repeatedly made in the preceding year and in the earlier debates in the House and Senate on H.R. 7555. Senator Schweiker urged concurrence in the House amendment, drawing attention to the Times-CBS poll of July 29, 1977, and repeating Dr. Hellman's statement that under the "medically necessary" language of the Senate amendment 90% of all of the abortions currently being performed under medicaid would continue (S 13670–71). Senator Helms reported the termination of the temporary restraining order in the present *McRae* case (S 13671). Senator Brooke argued that the Senate should reaffirm its position of June 29 on Senate amendment No. 82, and insisted again that the issue was essentially one to be decided by the physician in each individual case, citing medical association statements about the impossibility of defining the occasions which would make up medical necessity (S 13671). Senator Magnuson pointed out that the voluminous hearings on the appropriations bill contained no evidence whatever on the abortion issue (*ibid.*), and Senator Brooke pointed out that he was not asking the Senate to take the extreme position marked by the Packwood amendment (S 13672). Senator Javits urged the Senate to reaffirm its position, arguing that the Hyde amendment was discriminatory, that it made no provision for rape, and ignored the consequences of self-induced abortions that would follow if medicaid abortions were withdrawn; he asserted that the Senators in opposing medicaid funding were not being honest with themselves but were responding to their prejudices and not to the justice which the coun-

try requires between rich and poor (S 13672). Senator Bartlett urged (S 13672–73) adherence to the action taken in the preceding year particularly in view of the Supreme Court decisions in *Maher, Beal* and *Poelker* and of the Times-CBS poll; he argued that to fund abortion would be to encourage abortion among the poor; referring to the list of religious organizations said to favor legalized abortion, he argued that the Senate should "keep religion out of the debate on abortion," that it was a matter of science, pure and simple, and that the issue was whether to use the resources of the federal government to deny the most basic of human rights, the right of life to unborn children, "the most helpless, the most defenseless, the most innocent among us" (S 13673).

Senator Domenici argued (S 13673) that the expression "medically necessary" was not really a check on abortion-on-demand but would in the opinion of experts permit 90% of the abortions permitted under the abortion-on-demand concept; he argued that "medically necessary" would approach being the will of the expectant mother rather than an expert medical decision of the kind that only the medical profession could make, and that the Supreme Court decision from which the expression "medically necessary" was drawn had indicated that mental anguish would justify a doctor's finding that a woman needed an abortion; he argued that under the Supreme Court decision no issue of right was involved but a legislative decision about what abortions should be paid for through medicaid; he argued that Senators could not satisfy their anti-abortion constituents by voting for the Brooke amendment and against the Hyde amendment because the constituents were all going to find out soon that a vote for the Brooke amendment meant paying for abortion-on-demand. Senator Brooke, answering (S 13674), said that the distinction between the two amendments was clear and that the Brooke amendment was not intended to mislead anyone; he said that the Hyde amendment would not include victims of rape and in-

cest; as to the term "medically necessary," Senator Brooke cited Senator Domenici to the language from *Beal v. Doe* (432 U.S. at 442, footnote 3, 97 S.Ct. at 2369, footnote 3, quoting *Doe v. Bolton*, 1973, 410 U.S. 179, 182, 93 S.Ct. 739, 742, 35 L.Ed.2d 201) where the Court said:

> "Whether 'an abortion is necessary' is a professional judgment, that . . . may be exercised in the light of all factors—physical, emotional, psychological, [familial,] and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment." (Senator Brooke omitted the word "familial" in reading the excerpt from the footnote in the opinion.)

He argued (*ibid.*) that the term was not new, that it was "mischievous" to suggest that a woman could assign any trifling reason and a qualified doctor would thereupon say that she was entitled to an abortion; he said that the concern was for the life and the health of the mother and the health of the fetus; saying that some diseases are worse than death, that in such circumstances abortion was the only humane thing to do, he contended that rejecting the Hyde amendment language represented a humane rejection of the position that abortion should not be allowed for rape and incest victims, or where the abortion was medically necessary to save the life or the health of the patient and the health of the fetus; under his position the decision would be left to doctors and not to Senators who, in his opinion, were not competent to make that judgment. Senator Bartlett (S 13674) made the point that in abortion the fetus is not saved, and Senator Brooke answered that he was speaking of the fetus infected with a disease that would mean a life of pain and suffering for the child and a life of suffering for the mother, the father and the family of the child. Senator Bartlett questioned whether a prenatal determination of disease was made and Senator Brooke indicated that it had been determined that if the mother had a certain disease or was being treated with certain drugs that the fetus would be affected; he said, however, that these were medical determinations for doctors to make (S 13674).

Senator Magnuson illustrated what he thought was the incompetency of legislators to make judgments in the matter by referring to the effort in committee discussions to provide that abortions could be performed on women who became pregnant under 15 years of age; he said that the House conferees would not agree even to dropping the age to 13 years (S 13674); Senator Bartlett indicated that no matter how young the prospective mother was, abortion by agreement between her and the physician would nevertheless be wholesale abortion (S 13675). Senator Magnuson said that he did not want to decide, and he did not want the Senate to decide, whether or not a twelve or thirteen year old child should bear a child or be aborted (*ibid.*). Senator Brooke referred to the many genetic and other diseases that could adversely affect the life of the mother, her health and the health of the fetus and pointed out that the Supreme Court (*Roe v. Wade*, 1973, 410 U.S. 113, 153–154, 160, 93 S.Ct. 705, 726–727, 730, 35 L.Ed.2d 147) had said that abortion was a personal and private matter between a woman patient and her doctor, and that the woman had a constitutional right to abortion, and that in the more recent cases the Supreme Court had decided that the medicaid matter "is best left up to the courage and the justice of Congress and the State legislatures to make the decision" (S 13675); he continued:

> "What good is a constitutional right if there is no remedy? When that statement was made—and I trust it was made inadvertently—the other day that women can go and get an abortion if they want it, it should also be stated that poor women cannot go to a hospital and get an abortion."

Senator Brooke reiterated that the Hyde amendment would discriminate against poor women and would not stop abortions, and that the amendment he proposed would say that "women who are raped, children who have been violated by incest, or if it is

medically necessary, can get an abortion if they are too poor to pay for it" (*ibid.*).

Senator Bayh said that the problem involved religious and moral feelings and decisions and also medical decisions, and that the Congress was not qualified to make the medical or the moral or the religious decisions (S 13675). He said that the concept of "medical necessity" was not before the Senate for the first time but had been in the joint statement in the previous year's conference report; he said that he thought that the Senators who voted for it in the preceding year had believed that the Hyde language would be modified by the report language, which had clearly said "medical necessity" (*supra* p. 764); he said that it now appeared from the opinion of the Justice Department that the language would not be so interpreted; indicating his own disapproval of abortions of "convenience," Senator Bayh said that he was worried about the cases of disease, rape and incest, as well as about the significant number of teenage pregnancies; he argued that the doctors should be allowed to make the medical decision and the pregnant woman accorded the right, in consultation with the doctor, to make the personal decision that she alone could make; he said that they were not deciding whether the 200,000 to 300,000 abortions would take place but where they would take place and under what conditions (S 13676).

Senator Schweiker argued that a former Deputy Assistant Secretary of HEW for Population Affairs had said that with the words medically necessary in the enactment 90% of the abortions could be performed (S 13676). Senator Bayh said that the former Deputy Assistant Secretary had characterized his statement as a guess, and had added that it was not based on an understanding of Senate language but rather upon a definition used by the World Health Organization, which allowed for social abortions (*ibid.*). In answer to a question put by Senator Javits, Senator Schweiker agreed that he would be equally opposed to the language even if it allowed only 60 or 70 or 40% rather than 90% of the abortions (*ibid.*). Senator Schweiker argued that the conten-

tion that those favoring the Hyde amendment were a minority seeking to impose its view on a majority of Americans was refuted by the CBS-New York Times poll showing that although over 60% of those polled favored government assistance for pregnancy care and for contraceptives, only 38% favored governmental funding of abortions; he argued (*ibid.*):

"This poll makes it very clear that there are certain limits to public financing, public support, and social policy where the public believes we should draw the line. That is the position that we are taking here today."

Senator Brooke then argued (S 13676–77) that the poll did not present the question on abortion in terms related to medically necessary abortion or in terms of abortion to save the life of the mother; he suggested that a 38% affirmative answer was very high in view of the form in which the question was asked. Senator Schweiker answered that CBS-Times had framed the questions, and that they were not known as advocates of right wing causes (S 13677). Senator Domenici argued that it was prudent not to put the question in terms of "medically necessary" abortions because those words were meaningless (*ibid.*). Senator Helms repeated the argument (S 13677) earlier made that there was an appalling contradiction between the amount of human concern and costly scientific attention being devoted to preserving the lives of prematurely born infants whose parents were on their knees praying for the fragile lives and the debate in the Senate about the deliberate termination of innocent human life with tax money in the face of opposition to abortion by the vast majority of Americans (S 13677).

Senator Brooke asked whether Senator Helms believed that a poor child that had been abused by her father and became pregnant should be entitled to an abortion, or whether the 13 year old victim of a rape should be entitled to a medicaid abortion if she became pregnant (S 13677); but Senator Helms answered that the argument from incest and rape was a red herring,

that statistically the incidence of pregnancy from rape and incest was "so infinitesimal as to be impossible of serious consideration in a discussion of such magnitude" (*ibid.*).

Senator Thurmond said that he had taken the position that federal funds for abortions should be restricted to cases in which the life of the mother was endangered or in the case of rape, incest, or dread disease, and that language permitting use of federal funds "where medically necessary" was unacceptably broad (S 13677). He said he would nevertheless vote "Yes" on the Hyde amendment, because he believed it was less dangerous to restrict federal funds than to open the door "to abortions under unwarranted circumstances" (*ibid.*); ideally, he said, the matter of abortions should be settled once and for all by the people through the constitutional amendment process (S 13678).

On the motion to concur in the House amendment to Senate amendment No. 82 (the House amendment substituting for the Brooke "medically necessary" language the language of the Hyde amendment of 1976) the vote was 34 in favor of the motion, 59 opposed and 7 not voting (S 13678). On the motion to disagree with the House amendment to Senate amendment No. 82, the vote was 60 in favor of the motion, 33 opposed and 7 not voting (*ibid.*). The Senate then agreed to a motion to request a further conference with the House on the disagreement to the House amendment to Senate amendment No. 82 and that the Chair be authorized to appoint Senate conferees (S 13677).

House conferees were appointed on September 9 (H 9061). On September 26, 1977, Mr. Stokes presented H.Res. 780, a resolution instructing the House conferees to recede from the House amendment to Senate amendment No. 82 and to agree to the Senate amendment; Mr. Stokes explained that the purpose was to present to the Senate a definite action of the House specifically directed to the Brooke ("medically necessary") amendment (H 10094–95). On September 27, 1977, Mr. Stokes argued for H.Res. 780, pointing out that the Senate

had twice voted approval of the language of the Brooke amendment and had twice voted disapproval of the House language, the Hyde amendment; he urged that, since the fiscal year would expire in three days and the appropriations bill, involving $60 billion in money items, was the most important piece of social legislation passed by the House, the House should in a spirit of compromise assent to the Senate language; Mr. Stokes himself preferred no language in the bill, and his attitude was summed up in his saying (H 10129):

> "For 3 months your constituencies and mine have been denied this important legislation because of this punitive and pernicious Hyde amendment."

Mr. Bauman called for defeat of the resolution (H 10129) as not a compromise, saying (*ibid.*):

> "There can be no compromise on the issue of life and death. That is what we are debating here today. The Senate language is so broad that without question it sanctions abortion on demand."

Mr. Bauman argued that if the House soundly rejected H.Res. 780 the Senate would have to adopt the House position as it had done in the preceding year (*ibid.*). Mr. Michel approved the parliamentary step of having a House vote on the Brooke amendment, and he urged the House to vote against H.Res. 780 so that the House conferees could return to the conference with a good faith statement that the House had reaffirmed its earlier position (H 10129). Mr. Flood opposed agreement to the Senate amendment on the ground that the expression "medically necessary" would open the door to abortions for all sorts of reasons, especially those related to mental health, family planning, or emotional or social convenience; he urged defeat of the resolution so as to strengthen the hand of the House conferees when they went back to conference.

Mr. Conte supported the Hyde language, opposed the Brooke language, and therefore urged defeat of H.Res. 780 (H 10130); he said of the issue (*ibid.*):

"It is difficult because support or opposition to abortion is not based on economics or practicality, but rather on our moral and philosophical beliefs.

\*   \*   \*   \*   \*   \*

"While I disagree, I respect the right of an individual to believe that abortion should be a matter of personal choice. However, it does not necessarily follow that such a choice should be exercised at public expense."

The large number of abortions indicated, Mr. Conte said, that abortions were being performed as a matter of convenience or as a matter of birth control and not as a matter of genuine medical necessity (*ibid.*). He argued that "medically necessary" would mean an abortion that was requested by a woman; the medical testimony, he urged, was that abortion is very rarely a medical necessity; he said that when California changed its abortion law in 1968, 92% of the abortions done in the first year were for mental health reasons; he equated that with "abortion upon demand"; he said that pregnancy rarely resulted from rape, and that law enforcement officials said that inclusion of the rape-incest language would induce individuals to file false reports of rape to become eligible for federal funding for abortion; he pointed out that the House amendment would not prevent treatment directed to preventing fertilization or the implantation of the fertilized ovum in promptly reported rape cases before the fact of pregnancy had been established; he agreed that excessive use of DES can induce cancer, but he argued that it was only excessive use that did so, that alternatives were available and that he would advocate funds to promote research and new programs for rape victims; he referred to Dr. Louis Hellman's estimate that 90% of the abortions performed would still be financed under the Brooke language whereas possibly only 1600 abortions a year would be financed under the Hyde language (H 10130).

Mr. Roybal left his position unclear: he argued that, having to choose between the language of the Hyde-Conte amendment of the preceding year and the language from the joint statement accompanying the conference report of the preceding year, he favored the language of the joint statement (H 10131–32).

Ms. Holtzman urged agreement to the Brooke amendment saying (H 10132):

".   .   . I hope almost every Member would agree that to deny a safe medical abortion in cases of rape is unconscionable and to deny a safe medical abortion in the case of incest is unconscionable, that to deny a careful, safe abortion, in a circumstance where a doctor determines it is medically necessary is unconscionable."

She argued that in agreeing to the life endangerment exception the proponents of the Hyde amendment had already made a compromise so that the choice was no longer between compromise and no compromise. Mr. Giaimo argued (*ibid.*) that "it behooves us all to find a middle ground, a compromise if you will, so that we can get on with this very difficult situation which afflicts not all women, but which afflicts poor women"; he argued that the compromise language was reasonable, that it did not offend or should not offend anyone's sensibilities, even if he opposed abortion.

Mr. Obey (H 10132) urged defeat of H.Res. 780 so that the House could return to the conference and reach a compromise "which is different than both the Senate language and the House language"; he argued that if the language of either body prevailed the issue would be renewed from year to year depending on which group polled a majority in the particular session; he said (*ibid.*):

"I think we want a law which is consistent for all groups to live with, even though they may not like it."

He urged defeat of the language of both House and Senate amendments and a return to conference so that "we can get some rational compromise" (*ibid.*).

Mr. Hyde opposed H.Res. 780 as not a compromise but total capitulation (H 10132). He cited Dr. Jane Hodgson as having testified in the present case "that all

abortions are medically necessary" and repeated Dr. Hellman's alleged statement that 90% of medicaid abortions would be permitted under the medically necessary language; he said that the New York Times had quoted a Senator as asking whether any abortion would not fit the description and added (*ibid.*):

"The pregnant woman would not even have to claim she had a headache or athlete's foot to get an abortion under this language."

To the argument based on the probable increase in back-alley abortions if the Hyde amendment were continued, Mr. Hyde answered that the CDC had been monitoring for maternal deaths due to back-alley abortions and had discovered none since August 4th when the Courts "permitted enforcement of the Hyde amendment," whereas the April 1977 CDC statistics indicated that "the leading cause of abortion-related maternal death in the United States is legal abortion" (H 10132). To the argument that the poor would prefer to wait for food, education and housing rather than be denied abortion funding he answered by quoting the Reverend Jesse Jackson as opposing federal funding of abortion and advocating applying the funds to meet human needs and in new directions of caring for the most precious human resource, children; referring to talk of "the quality of life" Mr. Hyde said that "the quality of a society is measured by its concern for the rights of human beings who exist on the very edge of full humanity—the very aged, the dispossessed, the dying, and the preborn"; he argued (H 10133):

"Our society wavers on the razor's edge of a choice between efficiency, economy and comfort on the one hand, and respect for the lives of the weak, helpless, unproductive, and unborn on the other.

"The cause against wholesale abortion is a cause for the soul of a society that must make that choice—do we want efficiency and convenience more than respect for the helpless, defenseless lives that interfere with that convenience?"

Mr. Hyde closed by asking whether the House wanted to commit American society to violence as a solution to its socioeconomic problems, and contended that the resolution was a step toward consigning untold thousands of preborn children to death for the crime of being "innocently inconvenient," and a step toward transforming the medical profession from healers "to executioners-for-hire" (*ibid.*).

Mr. Tucker opposed the Hyde-Conte language because it would prohibit funding abortions of poor people even where the mother's health would be permanently impaired and she left permanently crippled or with permanent brain damage (H 10133). Mrs. Schroeder said that if only the women members of the House voted on the issue it would adopt the Senate language; she suggested that the rape and incest exception might lead to assertions of rape in order to obtain an abortion followed by being beaten at home for alleging rape or incest; she said that one in ten teenage girls in the United States had become pregnant in the preceding year, that death from complications of pregnancy and childbirth was 13% greater for teenagers and 60% greater for children 14 or younger than for women in their early twenties; she said that babies born to teenagers are two to three times more likely to die in their first year than babies born to women in their early twenties [10], and that teenagers bore nearly one-fifth of the babies born in this country, two-fifths of them being born out of wedlock; she concluded (H 10133):

"Allowing doctors to perform abortions when they determine one is medically

---

10. In enacting the legislation introduced as Adolescent Health Services, and Pregnancy Prevention and Care Act of 1978, 92 Stat. 3595, now 42 U.S.C. §§ 300a–21, *et seq.*, the Congress found that adolescents are at high risk of unwanted pregnancy, that in 1975 almost 1,000,000 adolescents became pregnant and nearly 600,000 carried their babies to term, and that pregnancy and childbirth among young adolescents often result in severe adverse health, social and economic consequences including a higher percentage of pregnancy and childbirth complications, a higher incidence of low-birth-weight babies, a higher frequency of developmental disabilities, and higher infant mortality and morbidity.

necessary is not promiscuous abortion on demand. We are talking about complicated medical decisions and the Congress should not start down the dangerous road of quarterbacking doctors' professional opinions in this area."

Mrs. Burke (California) argued that there were two classes of women for whom childbirth could involve risk, women over 35 and women under 18, and that without abortion funding it would only be the poor women who would be required to take the enhanced risk of childbirth incident to their age (*ibid.*). Mr. Rudd opposed the resolution (*ibid.*), and supported the Hyde amendment. He referred to a letter he had received from the Navajo tribal superintendent of police who had said that the ultimate effect of the Senate version would be "the filing of false rape and/or incest reports by women wishing to obtain free abortions at taxpayer expense"; he noted that the Hyde amendment "protects the woman who is the victim of rape or incest—prior to proof of pregnancy"; he said that the House had a moral obligation to stand by its earlier decision (H 10133–34).

Mr. Dornan urged the House again to insist, as it had on five previous occasions, on limiting abortions to those necessary to save the life of the mother (H 10134). He quoted Dr. Jane Hodgson as having testified in the present case that

"In my opinion, 'medically necessary' means any abortion that was requested by a woman." (*Cf.* Tr. 99–101.)

Mr. Dornan referred to Dr. Louis Hellman's opinion and identified Senator Packwood as having publicly asked whether there was any abortion that could not fit within the "medically necessary" language *(ibid.).*

The debate was closed by Mr. Stokes (H 10134), and when the question on H.Res. 780 was put, the resolution to concur in the Senate amendment was defeated, 164 voting in favor, 252 voting against it, and 18 not voting (H 10170).

On October 3, 1977, Mr. Flood submitted to the House a conference report that House and Senate conferees were in disagreement on Senate amendment No. 82 (H 10501). On October 7, 1977, Senator McGovern had printed in the Record the Public Health Brief prepared by CDC personnel entitled Restricting Medicaid Funds for Abortions: Projections of Excess Mortality for Women of Childbearing Age; it calculated, on the basis of the 1974 statistics, the increase in mortality that would follow if the women who had abortions had carried their pregnancies to term; the Brief pointed out that the maternal mortality ratio is many times higher than the abortion mortality ratio, and that both the maternal and the abortion mortality ratios of white women are very markedly lower than those of blacks and other women; the Brief referred also to estimates prepared by Dr. Christopher Tietze that 70% of those denied legal abortions would resort to illegal abortion, with an increase in mortality risk from four per 100,000 abortions to 40 per 100,000 abortions; the Brief also estimated the effect of a simple delay of two weeks in obtaining legal abortions due to difficulty caused by the cessation of federal funding. The Brief estimated that the total excess deaths would be 49, and if it were assumed that 70% of the women denied funded abortions would seek illegal abortions then the estimate was that there would be 77 deaths (S 16739–41).

On October 12, 1977, Mr. Flood moved that the House recede from its amendment to Senate amendment No. 82 and stated that, if the House did so, he would then offer a new amendment to Senate amendment No. 82 reading (H 10829, 10832):

"Sec. 209. None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term. This section does not prohibit payment for medical procedures, performed before the fact of pregnancy is established, necessary for the prompt treatment of the victims of forced rape or incest reported to a law enforcement agency. Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy."

Mr. Flood reported that it had been impossible to reach agreement and he expressed the hope that the language that he now suggested would furnish a basis for agreement with the Senate *(ibid.)*. Mr. Steers said that a letter received from Senators Magnuson and Brooke had indicated that the language to be proposed by Mr. Flood would not be agreed to by the Senate, and he therefore expected to offer, if Mr. Flood's motion was defeated, the Brooke-Magnuson wording which would read:

"None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term or for victims of rape and incest or if the mother or fetus would suffer serious health damage."

Mr. Steers argued (H 10830) that the language that he proposed presented a genuine compromise, that serious physical damage was considerably narrower than "medically necessary" but would include such things as cardio-vascular disease whether contracted before or after the pregnancy and such other things as neurological disease, carcinoma, severe psychiatric disease, schizophrenia or suicidal paranoia. Mr. Steers had expressed concern about the effect failure to enact the Appropriations Act would have on the programs, particularly those affecting his constituents, and Mr. Conte pointed out that it would always be possible to pass a continuing resolution pending the working out of the disagreement *(ibid.)*. Mr. Michel urged the House to approve the language suggested by Mr. Flood rather than that suggested in the Senate and reported by Mr. Steers *(ibid.)*, and Mr. Hyde urged defeat of Mr. Flood's motion to recede, arguing that the Senate position was "abortion on demand, no matter how one colors it," and said that the House ought to stand on its position, that "the position is morally sound; I think it is the right one for America" (H 10830).

Mrs. Fenwick argued that what the House was discussing was the situation of children in the seventh and eighth grades who were expecting babies, an entirely new circumstance arising from the fact that for the first time children at the ages of eleven through fourteen are able to bear children; she said that honorable clergymen were on both sides of the question, that it was one on which devout and earnest theologians were divided; she continued (H 10831):

"What should the State do under these conditions? Surely, it would be wrong to mandate abortions. But is it not equally wrong to forbid them, especially to the poor, when the clergy are trying to tell us that there are two sides, can we be sure when we take one side that we know God's will?"

Ms. Mikulsky was opposed to the Hyde amendment (H 10831); she favored the first of Mr. Flood's motions but opposed the second because his new language would allow only for prompt medical treatment before the fact of pregnancy, although the child who had been raped or had been a victim of incest would in many instances not tell her mother until after the pregnancy was established; she opposed the Flood language because the procedures it referred to would be either a D & C or the administration of the so-called morning-after pill (DES) which she said the Congress did not allow even to be given to cows *(ibid.)*. Mr. Bauman opposed the motion to recede *(ibid.)* and urged the House to stand on its position, saying:

"I have talked with the leaders of the Right to Life Movement—Protestant, Catholic, and Jewish—and all of them feel that the best possible thing we can do to save human life and to prevent the funding of abortions with taxpayers funds is to stand by the House language."

Mr. Volkmer opposed the motion to recede, arguing that the language in the Hyde amendment was language "that has already been interpreted by the Supreme Court" whereas the new language had not been *(ibid.)*. Mr. Michel asked the House to vote for the Flood motion to amend as the only practical thing to do in the parliamentary situation (H 10831). The Flood motion was then put to a vote and was carried, 209 voting for it, 206 against it and 19 not voting (H 10831–32).

Mr. Flood then offered his motion and explained that the compromise language was intended to make it clear that the House did not seek to inhibit the use of morning-after pills or IUDs as methods of birth control or the termination of ectopic pregnancy; he noted that the language also provided for medicaid payments for treatment of rape and incest victims on the stated terms and conditions (H 10832).

Mr. Steers specifically objected to the requirement that the rape be a "forced" rape rather than a statutory rape and, saying that he would introduce his broader amendment if the Flood amendment was defeated, he said that the statute should permit federal funding for abortions in the case of a very large number of diseases including psychiatric ones (H 10832–33). Mr. Seiberling pointed out that there were involved not only serious health problems of pregnant women but also the cases of fetuses which had been determined prenatally to be deformed or hopelessly diseased (H 10833). Mrs. Schroeder opposed the language proposed by Mr. Flood (ibid.), criticizing the vagueness of the term "endangered," and objecting to the report requirement, particularly in the case of incest: she argued that a child reporting an incest would be abused at home, so that it would be necessary to provide a shelter for a child so reporting; finally, she objected to the "forced" requirement in the case of rape, noting that there had recently been reported childbirths by three women who were ten years of age (ibid.). Mr. Hyde reluctantly supported the amendment (H 10833), noting that so far as reported forced rape and incest were concerned, the statute would not permit conscious abortion, although that might occur from treatment procedures taken before the fact of pregnancy had been established (H 10833–34). Mr. Brinkley inquired whether the word forced should not be deleted so that the treatment permission would extend to girls eleven to sixteen years old (H 10834). Mr. Hyde answered that if the word forced were deleted, any woman under eighteen would be entitled to an abortion simply by asserting that she had been raped; he said (ibid):

"It is wrong to take an innocent human life, no matter how unfortunate, no matter how tragic the circumstances in the creation of that life is."

In dialogue with Mrs. Burke (California) Mr. Hyde explained that the rape treatment would be appropriate even two months after the rape if the woman did not know that she was pregnant and the usual tests did not establish the pregnancy (ibid.). Mr. Oberstar said that he would have preferred the language of the Hyde amendment but would, as a compromise, be prepared to accept the unsatisfactory compromise language of Mr. Flood as preferable to still other alternatives (H 10834). In dialogue with Mr. Seiberling Mr. Hyde took the position that the life endangerment language sufficed to cover the genuinely serious health problems of the woman, and he contended that even if the fetus were to be born a Mongoloid it would be a "human being" that he would think that society would find a way to take care of rather than exterminating it (H 10835).

Mr. Early said that in the meetings of the conference committee the full House representation was always present but only 40% of the Senate conferees were present, and that the result had been that in the meetings the House conferees tried to compromise with each other, then offered their compromise points to three Senators present, and they, with little discussion, rejected them; he argued that the question was not whether or not the House opposed abortion on demand but rather how abortions should be paid for, and he did not believe that the federal government should do so; arguing that it was for the states to provide funding he said that the Alan Guttmacher Institute reported that of the 260,000 federally funded abortions performed in the United States in 1976 120,000 had been performed in California and New York; he added that governors from 7 other states had suggested that if the federal government did not pay for abortions their states would absorb the costs (ibid.). Mr. Tsongas brought out from Mr. Early that the Gover-

nor and the Secretary of Human Resources of Mr. Early's state, Massachusetts, had said that their state would not pay for abortions if the government did not fund them (ibid.). Mr. Early made clear that he was opposed to abortion on demand, but, he said, if the people in any given state chose to support abortion on demand through their own taxes the Flood amendment would not prevent them from doing so (ibid.).

Mr. Conte supported the Flood compromise language, noting that in his judgment it represented a partial incorporation of language from the joint statement in the previous year's conference report (supra p. 764), and he added that the Congress should commit itself to funding of programs and research to improve the treatment of rape and incest victims (H 10835–36). Mr. Obey said that the House should not think that by this legislation it was cutting off all federal support for abortions, because the defense bill had no rider attached to it, nor had the Federal Employees Health Insurance legislation been so amended; the amendment would mean only that poor women cannot obtain abortions; he said that the language of the Flood amendment was not a compromise but simply reflected the interpretation which the Attorney General had placed upon the Hyde amendment of the preceding year; saying that both sides had been totally uncompromising in the conference, he urged the House to vote against the Flood language (H 10836). Mr. Giaimo urged defeat of the Flood motion (H 10836). Mr. Giaimo argued that all of the abortions under discussion were legal abortions under the Supreme Court decision; he said that he realized the great importance of enacting the Labor-HEW Appropriations Bill but also recognized that "we cannot compromise a fundamental principle because of that"; he continued:

"The fundamental principle is that we are not treating people alike in this country."

Mr. Volkmer reluctantly supported the Flood language (H 10836), although he felt a difficulty with the permission to treat rape and incest before the fact of pregnancy is established even where treatment occurs several months after the rape or incest; he questioned the predictability of retardation and mongolism in prenatal testing (H 10836–37).

Mr. Glickman, although opposed to restrictions on abortion funding, said he would vote for the Flood compromise because (H 10837):

"By continuing to quibble over financing of abortions for the poor, we are in effect holding back funding for health care, education, job programs and so forth designed in large part to benefit that same segment of our population: the poor. Time has come for those other needs to take precedence."

Mr. Stokes said that he opposed the Flood language because it was no compromise and the Senate would reject it for that reason, and that it was more repressive than the language passed in the preceding year, when it was still thought by many in the House that what was passed by the Congress would not be important because it would be invalidated as a matter of equal protection (H 10837). He pointed out that delay in enactment of H.R. 7555 was actually preventing the payment of salaries and was causing curtailment of governmental services; as to the treatment for rape and incest language he argued that the primary rape treatments were "DES," the administration within 48 hours of the event of an estrogen drug which had been determined to be a carcinogen and had been taken off the market in many other countries, and D & C (dilation and curettage) procedures which remove the contents of the uterus, terminating any pregnancy whether diagnosed as such or not; a D & C is a surgical procedure and not a standard rape treatment procedure for any health facility, he argued; the result of the language would therefore be to require the woman in every case to undergo one or the other of the two procedures before the establishment of the fact of pregnancy, which is thought to occur in approximately 4% of rape cases; he objected also to the limitation to "forced"

rape, and to the requirement of report, saying that at least 43.7% of all rapes were unreported, and that incest is generally unreported unless accompanied by violence, severe emotional disorder or a pregnancy; the result, he argued, would be that the preventive treatment provided in the Flood language would not be applicable to most incest victims; he argued that the preceding year's conference report allowed for the prompt treatment of rape and incest victims "and did not set up the impossible, unreasonable, and insensitive restrictions found in this supposed compromise language"; he asserted that the Senate would not accept the language of the Flood amendment and that the House had an obligation to submit a reasonable compromise (H 10837–38).

Mr. Flood's motion was then put to a vote and the vote was 263 in favor, 142 opposed, 28 not voting and 1 answering present (H 10838). Later in the legislative day Mr. Fowler detailed the extent of the interference with the operations of the government caused by the delay in enacting H.R. 7555, and he concluded (H 10861):

"I urge my colleagues on the conference committee and in the House to agree to language which would constitute a true compromise with the Senate or else to sever the abortion issue from the Labor-HEW bill and consider abortion separately. The Labor-HEW appropriations bill can no longer be held hostage by an issue extraneous to it."

The language in the Flood amendment was laid before the Senate on October 12, 1978, and Senator Magnuson moved that the Senate concur in the House amendment to Senate amendment No. 82 with an amendment which would have substituted for the Flood language the following (S 17048):

"Sec. 209. None of the funds in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest, or if the woman or fetus would suffer serious health damage. This section does not prohibit the use of drugs or devices to prevent implantation of the fertilized ovum."

Senator Helms then presented an amendment in the nature of a substitute for Senator Magnuson's language which would have restored the Flood language with immaterial if any changes (S 17048). Senator Magnuson emphasized the importance of moving forward on the appropriation bill itself and suggested that it would be better for the abortion issue to be handled by separate legislation; he said (S 17049):

"There should be a national policy on this matter."

Senator Scott expressed a concern for the national policy, saying (S 17049):

"It appears to me that the proper national policy would be to have the policy we had before the Supreme Court ruling, to say that the question of abortion is a question to be decided by the States, under the police power. There is no reason to have uniformity on matters protecting the health and the morals of the people of this country. Anyone who has studied our system of government knows that we are a nation of dual sovereignty, and rights that affect people as closely as this are decided at the State level."

Senator Scott urged the bringing to the floor of a constitutional amendment on the abortion issue (*ibid.*)

". . . in order to get the abortion question out of consideration as frequently as we have it, because we waste a lot of valuable time in attempting to make decisions at the federal level that should be made at the State level."

Senator Brooke said that he thought that it had been agreed in the appropriations committee that a continuing resolution would be called up that night to continue pay to the thousands of employees of HEW and Labor, and he said that he had proposed to call up an amendment which would have provided that the continuing resolution delete the Hyde amendment from the 1977 bill; he said that further discussion had brought out that any continuing resolution should originate in the House and

should provide for the continuance in effect of the Hyde amendment; Senator Brooke indicated that his understanding of the agreement had been that the House amendment would be entertained and concurred in with an amendment, and that the Senate would move at once to consider the continuing resolution, which would carry with it continuation for the month of the continuing resolution of the Hyde amendment (S 17049–50). Senator Helms, however, said that the House of Representatives had made itself perfectly clear that if the Senate really wanted to resolve the issue it had only to approve Senator Helms's amendment and send it back to the House; he continued (S 17050):

"As far as compromising on this issue, my conscience will not let me do it because we are talking about the deliberate termination of innocent human life, period. And do not ask the Senator from North Carolina [Helms] to compromise on that because I cannot. I wish I could find some middle ground, but either you kill them or you do not. I am talking about the babies involved."

Senator Brooke insisted that he was not asking Senator Helms to compromise but to agree on an arrangement to allow time for concurrence in an amendment (*ibid.*). Senator Helms inquired how voting on his amendment could delay matters, and Senator Brooke answered that it was attempting to substitute a resolution of the differences for a return to conference deliberation (*ibid.*). After a delay for discussion, Senator Brooke explained that the purpose of what he was proposing was simply to have substituted for the Flood language the Magnuson language, which was somewhat more restrictive than the earlier Senate language, so as to furnish a basis for further conference discussion, and to continue the Hyde language in effect so long as the continuing resolution was in effect (S 17050); Senator Helms then withdrew his motion for the Yeas and Nays on his motion to amend (S 17051).

Senator Brooke then discussed the language of the Flood amendment (S 17051). He pointed out that the language made no provision for abortions in the case of serious health damage to the pregnant woman or the fetus; he said that the language most recently approved by the Senate ("medically necessary") could be compromised, that the Senate conferees were willing to modify that language to permit abortions if the woman or fetus would suffer "serious health damage"; he pointed out that the House language on rape and incest might be unworkable in permitting "medical procedures" to be performed only before the fact of pregnancy had been established; that meant that rape victims would be required to submit to DES, a known carcinogen, or to D & C, a surgical procedure that might be needless; he said that the report requirement did not take account of the fact that almost half of all rapes and rape attempts are unreported out of fear or ignorance, and that when a victim discovers that she is pregnant, she will resort to clinics or other health facilities rather than go to the police; finally, the "forced rape" formulation denied relief to victims of statutory rape recognized by virtually all states; he argued that the House language on rape and incest would very likely do little to prevent pregnancies resulting from such tragedies and that its language was more prohibitive than the joint statement in the conference report on the 1977 bill; he urged the House to concur in the language proposed by Senator Magnuson in the hope that the other House would try to meet the Senate at least half way (S 17051). The question of agreeing to the motion to concur with an amendment was then put and the motion was agreed to (S 17051). Senator Magnuson then put forward a joint resolution (S.J.Res. 91) making continuing appropriations for the Department of Labor and of HEW until October 31, 1977, or such earlier date as an appropriation was enacted into law; the joint resolution was passed on a voice vote (S 17052).

The Senate action on the Flood amendment, substituting for it the Magnuson amendment, and on S.J.Res. 91 were reported to the House on October 13, 1977 (H 10881). On the same day the House began

consideration of H.J.Res. 626 making continuing appropriations for the fiscal year 1978 (H 10887). Mr. Bolling explained that the joint resolution would make it possible to meet federal payrolls but would not alter any policy matter (*ibid.*). Mr. Bauman obtained the assurance of Mr. Mahon that the joint resolution in fact continued in effect the language of the Hyde-Conte amendment of the preceding year; Mr. Bauman then characterized as an extraordinary act of arrogance the Senate's passage of S.J.Res. 91, a "derogation of the House's constitutional right to appropriate funds and initiate appropriations" (H 10887). Mr. Mahon stated that the House would assert its constitutional right to originate appropriation bills (H 10887). H.J.Res. 626 was then read to the House (H 10888), and, after brief discussion which brought out, among other things, that no significant additions to funding contained in H.R. 7555 would take effect under the joint resolution, the joint resolution was passed (H 10888–89). Later in the same day Mr. Flood moved (1) that the House take up the Senate amendment to the House amendment to Senate amendment No. 82, (2) that the House disagree to the Senate amendment, and (3) that the House request a conference on the disagreeing votes (H 10966). Mr. Steers then presented a preferential motion to concur in the Senate amendment. Mr. Flood then explained the sequence of events in House and Senate, and he emphasized that the Senate had not directly voted on the House language, which, he said, "was a retreat from the strong position taken by the House in adopting the original language of the Hyde amendment"; the language now proposed by the Senate, he said, did not represent a compromise but was very close to the language earlier presented by the Senate; he urged the House to disagree to the Senate amendment and send the Bill back to conference (H 10966–67). Mr. Stark urged approval of the Senate amendment apparently on the ground that disagreement with it would protract the stalemate and deny to the beneficiaries of Labor-HEW legislation the additional benefits voted in the pending bill (H 10967).

Mr. Michel suggested that the two motions be in effect consolidated for argument, and he yielded time to Mr. Steers to make the case for his motion (H 10967). Mr. Steers said that the House must choose whether or not it would perpetuate or end the legislative impasse; he said that the key words in the Senate language were "serious health damage," language that would be subject to some abuse, inevitable if language left any choice to a doctor, but which he thought it reasonable to do; he argued that the earlier Senate language "medically necessary" would have allowed the doctor to take account of such things as the economic position of the pregnant woman; he instanced six major items that would not be taken care of under the Flood language but would be taken care of by the language "serious health damage": cardiovascular disease, neurological disease, carcinomas, severe psychiatric diseases, metabolic disorders, and gastrointestinal disorders (H 10967–68). Mr. Seiberling inquired whether it was not the fact that under the medical benefit program for Members of Congress their wives could have abortions because of a serious medical problem at government expense (H 10968), and he asked whether the Senate had voted on the Flood language; Mr. Steers answered that the Senate had voted on the Flood language but not in a reported vote, and Mr. Michel said that at the time only 20% of the Senators were present and the Flood language was defeated by a vote of 11 to 9; Mr. Michel further pointed out that an earlier version of Senate language had required "permanent" health damage rather than "serious" health damage, a tightening rather than a relaxation of the Senate's original position (*ibid.*). Mrs. Fenwick said that to vote against the Steers amendment would be to deny public funds for a legal operation—if you have the money—and to deny it where the doctors say that severe health damage is in prospect; she characterized that as "almost unbelievable" (H 10968). Mr. Ketchum supported the Steers amendment as a humanitarian gesture (*ibid.*).

Mr. Conte advised the House that the Senate had already concurred in the House joint resolution continuing appropriations and that it had been sent to the President (H 10968); he argued that the Senate had not met the House compromise (including the life endangerment exception) with anything, since the new words were tantamount to the old "medically necessary" words; he said that there is in every birth some damage to the veins of a woman so that any woman would have serious health damage if her pregnancy were carried to term; repeating what he had earlier said about the infrequency of pregnancy following rape, Mr. Conte said that the inclusion of the language respecting rape and incest in the Flood amendment was for only one reason, to prevent abortion on demand, for without it any woman could assert that she had been raped and obtain an abortion (H 10968–69).

Mr. Oberstar stated (H 10969) that the Flood language "does not compromise the position of those of us who oppose abortion"; he said that "it does not in any way allow abortion"; the Flood language, he said, did allow medical treatment short of abortion for rape or incest victims before pregnancy had been established, but that treatment in the interval between fertilization and implantation is something that pro-life advocates can support. Mr. Hyde contended, however, (H 10969) that the Senate language provided doctors with a license to kill; he said (H 10969):

"I am weary unto death of hearing people say, 'I am against abortion, but'—and then refuse to lift a finger to stem the tide of 1 million abortions in this country every year."

Mr. Hyde argued that some favored public funding of abortion as a means of controlling welfare costs by reducing the numbers on welfare, but he said that to be an accessory to that solution was to him "outrageous and incredible"; he argued that the inclusive rape and incest language in the Magnuson amendment was "an invitation to gigantic wholesale fraud"; he saw a contrast between the Supreme Court's holding that capital punishment for a rapist was unconstitutional, and concluding that the product of such a rape is socially expendable; he cited organizations of chiefs of police and sheriffs as saying that 90% of reported rapes in such circumstances would be fraudulent; of the key language "if the woman or fetus would suffer serious health damage," he asked whether that did not mean that a human life was the tradeoff for some doctor's judgment call on what serious health damage is; he argued that "serious health damage" is a judgment call by a doctor with a financial interest in making the judgment; he repeated that in California 92% of abortions were for mental health reasons; he argued that not all people born with a disability are sub-human and should therefore be terminated; he said (H 10969):

"I submit to the Members that life is not just for the privileged or the planned or the perfect. Life is for everybody, and we ought not allocate to ourselves the role of Almighty God . . . ."

At the close of his argument he said (H 10969):

"We think of young girls who are pregnant, unwanted pregnancies, the tragedy of being brought up in the ghetto, the tragedy of renal disease. What about the tragedy of human life being thrown away because we have no alternatives? Have we exhausted our capacity for caring for human beings by telling poor women that the only answer is killing their unborn young?"

Mr. Michel asked the Members to vote down the Steers motion "because it is a complete abdication, absolutely, lock, stock, and barrel, of the earlier position which we took and conceded the Senate position"; He asked adoption of Mr. Flood's motion and a return to conference (H 10969).

Mr. Flood said that the House conferees had already rejected the Magnuson language in conference; he said that under the Senate language the House would be permitting payment for abortion for all sorts of reasons, including emotional problems, and in effect would be paying for abortion on demand. (H 10969–70).

Mr. Stokes opposed the motion of Mr. Flood, arguing that he had said earlier that the Senate would reject the new language of the House, and it had done so, and had brought forward the compromise Magnuson language (H 10970). He asserted that in the name of humanity and decency he could not see how the House could rationally reject the Senate language; it was not, he said, abortion on demand, and he said (*ibid.*):

"This language is not talking about social justice—we evidently gave that issue up several months ago. This language is talking about very real concern for poor women and very real, serious medical problems.

"How do we have the audacity to suggest that these women who are at higher risk of illness, because they are poor and have less access to quality medical care, should not be allowed abortions when they are seriously ill or are carrying a diseased or severely deformed fetus?"

Mr. Stokes noted the expressed fear among House conferees that exceptions for women with medical problems would permit fraud on the system, and he asked (H 10970):

"What are we saying about those we represent when we allow that kind of thinking to dominate public policy? What is this saying about those who are patients suffering from illness, of those women who may be suffering from cancer, from diabetes, or any number of other equally serious conditions? What are we saying about their doctors?"

Mr. Stokes expressed amazement at the casual dismissal of medical judgments on these matters (*ibid.*); he asked whether the House was saying that it was so afraid that someone might take advantage that it should say "No" to everyone regardless of circumstances; he pointed out that the whole medicaid program was not stopped because a few took advantage of it; he said that the amendment dealt also with women who found as a result of prenatal testing that they were carrying a genetically diseased or seriously deformed fetus, and he inquired how an abortion can be refused

when the fetus has sickle-cell anemia, Tay-Sachs or a deformity resulting from the mother's having ingested certain drugs; he argued that the fear of fraud by patients and doctors acknowledged the desperation felt by women faced with unwanted pregnancies; he asked the House to defeat the Flood language and approve the Steers language (*ibid.*).

Ms. Holtzman (H 10970) reluctantly supported the limited coverage of the Steers amendment rather than, by defeating it, to sanction serious health damage for poor women, and to force poor women, the victims of rape and incest, to choose between the trauma of such birth and the health risks of self-induced abortions; she said (*ibid.*):

"To condemn the living in this manner is to make a mockery of the term 'right to life.'"

She said that the whole appropriation should not be held hostage to the most radical anti-abortion position; she urged that the pro-life advocates should have some small compassion for the living, and allow the expanded programs to take effect at once (*ibid.*).

The preferential motion of Mr. Steers (to concur in the Magnuson amendment) was first put to a vote, and it was defeated, 163 voting in favor of it, 234 voting against it and 37 not voting (H 10970–71). Mr. Flood's motion, to disagree with the Senate amendment to the House amendment to Senate amendment No. 82 was then agreed to (*ibid.*).

Earlier on the same day (S 17159–60) the Senate had concurred in the joint resolution of the House, H.J.Res. 626, for continuing the appropriations until October 31 or the date of earlier appropriations enactment. It was made clear that the Hyde-Conte anti-abortion language continued in effect under the joint resolution. Senator Eagleton took the occasion to note that he was opposed to the compromise language of Senator Magnuson, which had been adopted on the floor of the Senate on the preceding evening when, as Senator Eagleton asserted, most Members of the Senate were of the

belief that no further substantive legislative activity would occur. He argued that the Magnuson language would leave the door as open to abortion on demand as would the "medically necessary" language (S 17159–60).

The Senate having received from the House a message announcing its disagreement to the Senate amendment to the House amendment to Senate amendment No. 82, Senator Magnuson moved the Senate to insist upon its amendment, agree to the request of the House for a conference on the disagreeing votes, and to appoint conferees; the motion was agreed to (S 17186).

On October 27, 1977, the Senate, in response to the request of the House that the Senate have a roll call vote on the Flood amendment, agreed to a procedure for doing so (S 17900), and Senator Schweiker then presented a resolution directing that the Senate conferees concur in the Flood amendment (*supra* p. 810), and he presented for the record a letter to Senator Magnuson from Mr. Flood stating that it was the impression of the House that if the Flood amendment were presented in the Senate for a roll call vote it might well be accepted (S 17901). Senator Magnuson indicated that the language of the Flood amendment did not substantially change the original House language (S 17902), and Senator Packwood then argued that the House language was getting worse instead of better: adoption of the House language, he said, meant (S 17902):

"No woman can have an abortion unless her life is endangered except, first, in the case of rape or incest if she reports it, if she reports it to the legal authorities; second, that she can have an abortion if she has ectopic pregnancy, which is where the fetus is growing in the Fallopian tube and must be aborted; and third, this is not even an abortion, payments are allowed for drugs or devices to prevent pregnancy."

He argued that the language was so limited and narrow as almost to insult the Senate (*ibid.*).

Senator Brooke asserted that the House language was totally unacceptable; it did not provide for the health of the mother nor for the health of the fetus; the language on rape and incest was more repressive than the policy then in effect; the rape and incest language was harsh and clearly unworkable, and the House language was not a compromise in any sense of the word; he noted that the Congress was perilously close to the October 31 deadline of the continuing resolution, and still an opportunity was needed to sit down with the House conferees to reach a reasonable and humane compromise (S 17902). Senator Schweiker's resolution was then put to a vote and it lost, 33 voting in favor of it, 59 voting against it and 8 not voting (S 17902–03).

On November 1, 1977, Mr. Mahon introduced in the House H.J.Res. 643, a joint resolution making further continuing appropriations for the fiscal year 1978 and for other purposes, and it was referred to the Committee on Appropriations (H 12012). On November 2, the House received a conference report in which continuing disagreement on amendment No. 82 was reported (H 12066–67). On November 2 the Senate determined, without objection, that the debate on the conference report on Senate amendment No. 82 and motions related to that issue should be limited to two hours (S 18566).

Senator Bayh opened the debate on November 3, 1977, with references to the difficult history of the legislation, and he said that in a spirit of compromise the Senate conferees were prepared to eliminate the option of abortion for the prenatally defective fetus, and to limit abortions to the case in which the threat to the mother's health was a threat of physical health damage; he indicated that there still was difficulty with the language over rape, and that the differences were still being worked out (S 18582–83). He explained (S 18583):

"How the wording can best be decided is a matter that we are presently trying to work out with the House conferees, but I think it is important for the Senate position to stand on that, and for us to

get the message to the Secretary of HEW that when we are talking about treatment for the victims of rape or incest, if indeed we have to leave the word 'treatment' in there, we are talking about the option being available for a woman who is assaulted in that manner to resort, if she feels in her conscience the necessity, to an abortion."

He said that the language presently under consideration in conference took the form (S 18583):

"None of the funds contained in this act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term, or except for medical procedures necessary for the victims of rape or incest, or except in those instances where severe or long-lasting damage to the mother would result if the pregnancy were carried to term."

Senator Bayh observed that the language covered four points: first, the point covered in the Hyde amendment of the preceding year; second, the language would permit use of federal funds if abortions were necessary for treatment of rape or incest victims; third, abortions would be permitted if the woman's physical health would suffer severe or long-lasting damage if the pregnancy continued; and, fourth, language repeats the part of the preceding year's conference report permitting federal funds to be used for drugs or devices which prevent implantation of the fertilized ovum and for medical procedures for terminating ectopic pregnancy (*ibid.*). He noted that the entire field of diseased or defective fetuses had been abandoned, and that the limitation of health damage to the physical eliminated the possibility of coverage for mental disorders; of the health damage language he said (S 18583):

"We hope that the language presented to the Senate will cover abortions in situations where a woman will not necessarily die as a result of the pregnancy but will suffer some type of impairment as a result of her pregnancy being completed."

He repeated the arguments that such legislation had no place in an appropriations bill, and that the prohibition on the use of federal funds would not end abortions throughout the country but only make it more difficult if not impossible for poor women to choose a medical procedure that the Supreme Court has decided is their right; he suggested that the language under consideration represented the whole of the distance which the Senate was prepared to go (S 18583–84).

Senator Magnuson then presented the amendment (S 18584), which, in addition to the paragraph quoted above, contained two additional paragraphs reading as follows:

"Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy.

"The Secretary shall promptly issue regulations and establish procedures to ensure that the provisions of this section are rigorously enforced."

Senator Helms contended that if the Senate accepted the proposed language it should be very clear that the compromise would not end the debate in Congress over the use of taxpayers' money for the funding of abortions, that, as long as he had breath, the debate would continue regardless of the Senate action and that enactment of the compromise language would simply delay the debate until the next year's appropriation bill came up; he argued that the decision as to whether to use taxpayers' money for abortions should be left to the states and to the people through their local representatives; he insisted, as he had before, that the basic issue in the debate was "the deliberate termination of innocent human life" (S 18584). He argued in the light of the CBS–Times poll that the American people did not want their tax money spent on abortion, and he asked whether the proponents of federal funding were willing to say the same thing; he read from the letter of a medical practitioner that women with kidney disease and multiple sclerosis can successfully bear their children and they were

not best served by abortion; the same doctor's letter also indicated that in one instance the legal abortion of a patient had not protected her from a septic abscess and peritonitis incurred in the course of the abortion; a second letter from the same physician asserted that thousands of women had not in fact died annually from back-alley abortions, that careful studies of illegal abortion deaths in such states as Minnesota and Illinois during the mid to late 1960s revealed no more than 2 to 5 deaths in any one year; and the letter asserted that those who had died did so for want of present day antibiotics, to a considerable extent (S 18585). Senator Brooke supported the proposed amendatory language as a reasonable and humane compromise in which the Senate had gone more than halfway in concession; he said that the Senate might be thought to have dropped reference to mental illness by agreeing to the word "physical" but that he could not himself agree that mental illness could be separated from physical condition; he continued (S 18586):

"The ambiguous word 'physical' was part of the price for an agreement with the House, and the Senate, unfortunately paid that price."

Senator Brooke said that the Senate had similarly given up on its concern for the health of the fetus, knowing that there were several thousand genetic diseases which can afflict the new-born child; he said that the House conferees at one point made some concessions on rape and incest, but even then withdrew them and returned to their harsh earlier provisions; he repeated the arguments against requiring the reporting of rape and incest, and against the exclusion of all rape from coverage except "forced" rape; he said that the House conferees had announced their abandonment of the language providing for payment for medical procedures only if provided before the fact of pregnancy had been established, but, he said, it turned out that this concession meant nothing, since it implied returning to the language which the regulations of the Secretary had already interpreted as applying only for treatment before the fact of pregnancy had been established; he argued (S 18586):

"Nowhere, under any circumstances, must we accept a compromise that jeopardizes the life of a woman, any woman, even if it is one woman: and here we are talking about literally thousands of women who may be forced back to the old back-alley abortions."

He referred to a report of such a death in the case of a woman who had gone to Mexico for an abortion which she could not get in her own state (S 18586–87). Senator Case joined Senator Brooke in supporting the compromise amendment (ibid.). Senator Magnuson associated himself with the remarks of Senator Brooke and continued (S 18587):

"There is a lot of irony in this matter, Mr. President. There was a group of 10 to 12 men—all men—sitting in a room, deciding probably one of the most important matters in the life of a woman. The irony, also, is that neither the House nor the Senate heard even one witness. We did not have any testimony from anyone."

Senator Chiles pointed out that the language read "severe or long-lasting physical health damage," and he suggested that if the language was to meet the approval of the House it should read "severe and long-lasting"; he asked unanimous consent so to modify the amendatory language (ibid.). After the discussion Senator Brooke interposed an objection to the unanimous consent procedure (S 18588).

Senator Schweiker then opposed the amended language, although agreeing that it was a good faith and sincere effort to bridge differences. Senator Helms reiterated his argument that the contentions about rape were a red herring from a statistical viewpoint; he argued that granting the right to an abortion for unreported rapes rendered the exception clause unenforceable; he said that a just society would support the severest possible penalties for the rapist, more humane treatment for his victims, but would not allow an unsupported claim for rape to excuse abortion;

even in the rare case of pregnancy from rape, he asked whether the Senate could encourage the killing of the innocent child just because he or she was conceived during the criminal act of another; to the comment that all the conferees were men and that women were not represented, he answered that the real question was "Where were the representatives of the innocent unborn children whose lives may be terminated at the expense of the taxpayers?" (*ibid.*). Senator Bayh said that the hearings on the constitutional amendment had adduced evidence that pregnancy did result from rape and incest and provided great pain to the families involved (S 18589). Senator Bartlett expressed approval of the House language respecting incest and rape and continued (S 18589):

"I think that the value of life in this issue must be overriding. For a Nation that wants to finance the taking of the lives of its own children on, I would say, a very promiscuous and promoted basis, as has been done, and in which the numbers are not kept, in which the figures are not made known to the general public, in which the authorization was never made by Congress, I think it is a sad commentary on this Nation to permit that to happen."

Senator Helms then said that Senator Bayh's figures were not statistics but estimates or projections from FBI statistics on the basis of the regular fertility figures for normal pregnancies; he insisted that not one actual case of pregnancy had been cited (S 18589). Senator Packwood said that he could not support his colleagues in their effort to find a provision acceptable to the House; he continued (S 18589):

"It has become clear over the past few months that the House is unwilling to pass language that shows any degree of fairness, humanity or compassion for poor women.

\*     \*     \*     \*     \*     \*

". . . To clarify, I do very firmly believe that abortion should be a strictly personal decision made between a woman and her doctor, and that all women, regardless of financial status, should have equal access to this medical service."

He characterized the limitations in the proposed language as harsh and ignoring the many in between cases of women who would be forced to carry their pregnancies to term and undergo needless suffering simply because it was neither severe nor prolonged enough according to someone else's standards; he objected to the exclusion of mental illness, and he reported that the National Women's Health Organization had prepared a number of case studies on medically necessary abortions for severely disturbed and disoriented women who should not be forced into motherhood, and he asked leave to have these reports printed in the record (S 18589–91). Senator Packwood objected additionally on the ground that there was no provision for women carrying deformed fetuses; Senator Packwood presented a letter from doctors at Stanford University Medical Center asking for restoration of federal funding for abortions in cases in which it had been prenatally determined that the fetus would be born with crippling conditions (S 18591).

The motion to concur in the House amendment to Senate amendment No. 82 with an amendment was then put to a vote, and the motion was carried 59 voting in favor, 29 voting against and 12 not voting (S 18591).

Later in the same day, on the motion of Senator Robert C. Byrd to reconsider the vote on the abortion amendment, Senator Brooke proposed to amend the language of the Senate amendment by substituting "and" for "or" so that the phrase would read "severe *and* long-lasting physical health damage to the mother"; the motion was put to a vote and was carried, 62 voting in favor, 27 voting against and 11 not voting (S 18621–22).

On the same day, November 3, 1977, the House adopted by an overwhelming vote a resolution for the prompt consideration of the conference report of disagreement on Senate amendment No. 82 (H 12167–68). The Senate amendment in its amended form ("severe *and* long-lasting physical

health damage") was then reported to the House, and Mr. Mahon then offered a preferential motion that the House concur in the Senate amendment (H 12168). Mr. Mahon emphasized that House and Senate had for three months been trying to reach agreement on the issue of abortion and said (*ibid.*):

"Mr. Speaker, as chairman of the committee, I have the unpleasant duty of making this motion because we must establish the fact that our system of government can operate and that the Speaker and the leader and the committees and the Members of Congress can carry on the business of the session. Therefore, we have to make some concessions.

"My credentials are good with respect to the so-called Hyde amendment.

\* \* \* \* \* \*

"There is no way for the Senate to completely have its way. If we are intelligent enough to be spokesmen for the people of the United States, we have got to deal in some degree of compromise in order to make our American system work."

Mr. Mahon then read the new language clause by clause, noting, after reading the life endangerment exception, that "of course, the doctor who was not too scrupulous could say in almost any case that the life of the mother would be in danger"; he then read the rape and incest clause and continued to the third clause ("severe and long-lasting physical health damage") and said of it that it was "just about the same as" the life endangerment clause; he continued (H 12168):

"In other words, that just about says what we are saying in paragraph 1, that the life of the mother must be in danger, seriously in danger, and of a long-lasting nature."

Mr. Mahon noted that the Senate had first voted language making "severe" and "long-lasting" alternatives and had reconsidered and gone over to the conjunctive language at the instance of the House (*ibid.*). He then explained the insistence of the House on the closing language of the amended section requiring the Secretary to ensure vigorous enforcement (H 12169). He said (*ibid.*):

"If the Secretary of HEW carries out the mandate of Congress and we adopt this language, then we will have a quite restrictive program of federally funded abortions. This was the best that could be worked out.

\* \* \* \* \* \*

". . . We have done the best we could with a difficult situation and I think we just have to tell our folks at home what we have done. They will not all be happy, some will not be happy if we adopt this and some will not be happy if we do not. But something has to be done to make available the money we have provided in this Health, Education, and Welfare and Labor Department appropriation bill."

Mr. Seiberling inquired whether the term "physical health" included "mental health" (H 12169), and Mr. Mahon answered that the Senate had insisted for days that abortions be allowed if the mother would suffer mental health problems unless one were performed but that the House conferees had totally rejected that because it would open a loophole so big that it would make the legislation ridiculous; he said that the interpretation of "severe and long-lasting" had been left up to the administrators of the program and their regulations (*ibid.*). Mr. Seiberling then asked if schizophrenia were aggravated by having a child, whether that would constitute severe and long-lasting damage; Mr. Mahon said that he was unable to answer all the technical questions that might be asked; he insisted that "if we want to solve this problem, this is the best approach we have to solve it" (H 12169).

Mr. Bauman pointed out that it was possible to take further time to deliberate and again to pass a continuing resolution through the end of November (H 12169), and Mr. Mahon agreed that that could be done although the continuing resolution would have to deal with the abortion issue, and the Senate had warned that it might

tie its language or other language to a continuing resolution and the controversy would continue (H 12169). Mr. Volkmer asked whether the "medical procedures necessary for the victims of rape or incest" would include abortions (*ibid.*), and Mr. Mahon answered that the language was an exclusion from the prohibition of abortion and seemed to him a little bit fuzzy but "at the same time not too bad"; to Mr. Volkmer's further question he answered that the language could possibly include abortions, but that regulations would have to be promulgated and rigorously enforced (H 12169). Mr. Obey said that no one there could honestly say what the clause meant but that (H 12169)

> "The fact is what that language means, in the end specifically what it means will be determined by the regulations which are established by HEW, and they will determine whether or not there will or will not be abortions under that language. The gentlemen in the well cannot tell us definitely that."

Mr. Mahon noted that pregnancy of 11 to 15 year old children and statutory rape were issues involved in the question, but that no better language could be worked out; he urged adoption of the amended language on the House (*ibid.*).

Mr. Michel said that the issue was not one on which he could speak with assurance, that in the final analysis he would have to vote "No," but that he would not argue either side, because the matter was one of the individual conscience of the Member; he approved the life endangerment language, pointed out that the rape and incest language did not include the concept of "forced" rape and therefore permitted abortion on demand in the case of statutory rape, and said that the health language was insufficiently restricted to prevent physicians from using it as a framework for abortions on demand; he observed that the House compromise language had suggested "grave physical permanent health damage"; he approved the deletion of provisions respecting the health of the fetus and the exclusion of mental health damage from consideration (H 12169–70).

Mr. Hyde emphasized that the Senate was trying to change existing law; of Mr. Mahon's statement—that he thought that the new language was language with which the House could live—he said that he did not think that it was language that the unborn could live with, and that that was the real subject of discussion; he was disposed to accept the first clause (life endangerment) although it involved a judgment call by a doctor and was itself a compromise; the rape and incest clause he characterized as inviting "massive fraud" because it did not say "prompt" or set a time limit on when the medical procedures could be considered necessary for the rape victims, and evidently involved an abdication to HEW's administration of responsibility on a question of life and death; of the severe and long-lasting physical health damage clause he said that it "trades a human life for a judgment call about the health of the women"; he argued that there were many conditions unrelated to pregnancy that might arise during pregnancy or even because of it which the doctor could yet treat while saving the child; of the reported death of the woman who sought an abortion in Mexico he said (H 12170):

> "The Members have read in the wire service, I am sure, over the weekend about a young woman who lost her life due to an illegal abortion in Mexico. Her death is tragic. We all agree with that. All abortion deaths are tragic whether it is the unborn or whether it is the pregnant woman. What about the 1½ million unborn a year who die as a result of abortion?"

He said that CDC reports indicated 14 maternal deaths as a result of legal abortions during the preceding year, and said that deaths as a result of abortion have apparently risen because of legalized abortion; saying that he wished the issue was not before the House, he concluded (*ibid.*):

> "But I will not sell out, for my own convenience or my political advantage or to be comfortable or to avoid being vilified further, simply because the Senate will not move. They are sorry they took

the language last year, and they want new language this year. I cannot support funding for the homicide of innocent preborn life."

Mr. Mazzoli associated himself with Mr. Hyde's remarks (H 12170).

Mr. Conte opposed the amended language (H 12170–71); he asserted that the "severe and long-lasting" language invoked the same subjective determination as "medically necessary," and, because it was subjective and ambiguous, he had no doubt that it would "lend itself to the same kind of abuse"; the term long-lasting was of wholly uncertain sense. Mrs. Fenwick said of childbirth (H 12171):

"It should be a happy moment in the life of everybody. It should be a glorious moment in family life. But I can only tell the Members from wide experience in the world, that that is not the way it is."

She repeated her earlier description of her visit to the Chilean hospital where 35% of the beds were filled by women suffering from sequelae of self-induced abortions; she repeated the story of the mother and daughter who sought an illegal abortion for the daughter with the consequence that the daughter died and the mother was indicted as an accessory to her murder; she continued (ibid.):

"This is what we are talking about— the despair of people. As for the Members in this room who keep voting this way, I am honestly sure they do not understand the desperate feeling that makes somebody do such things. Some of these people are mothers trying to protect their children. They are young married women with three or four children, the husband not making much money, or any money, and they are trying to work out some kind of solution to a difficult life.

"Then the doctor says:

'Look, you are going to have permanent kidney damage.'

"That is one of the great dangers of child-bearing; permanent, crippling kidney damage."

Emphasizing that the amendment required a danger of severe and long-lasting physical health damage, she asked whether the House could not understand that; she continued (ibid.):

"Suppose this is abused by one or two? Is that not better than having butchery in the back-alleys? Is that not better than having desperate, self-induced abortions? Is that not better than permanent health damage to a mother of children, severe, long-lasting, physical health damage?"

She concluded that the House was not God and could not really decide "so lightly issues that led to the agonies and suffering of other people" (H 12171).

Mr. Seiberling said that he would, but reluctantly, vote for the compromise, that he believed mental health was inseparable from physical health and intended his vote to mean that (H 12171). He said that he thought that if a majority of the House had been women the Hyde amendment would never have got off the ground, because the issue is not a simple right against wrong issue but of right against right, as are many basic issues in human affairs; he continued (H 12171):

"The right of people who do not believe that abortion is proper to prevent their tax money from being spent for abortions is being asserted here in such a way as to impinge on the liberty of other people to do as they wish with their own body."

He referred to the exhaustive hearings on the constitutional amendment and said (ibid.):

"One thing was clear from the testimony, and that is that any effort to restrict abortions by law has tremendous sociological, legal, and medical ramifications. Yet the Hyde amendment treats this complex issue as though it comes down to one simple question of whether people should be allowed to prevent tax money from going to somebody else to pay for an abortion. I can think of no better example of the inappropriateness of using the appropriations process to enact social policy."

Mr. Obey supported the amendment, saying (H 12171):

"I support it in spite of several differences, because I think it is an honest effort, it is a huge effort to attempt to balance rights, to attempt to balance the right of the fetus against the right of the mother. I do not know if that balance has been correctly achieved here, but I think we should understand some of the history of this language."

Then he recited the extraordinary action of the Senate in so promptly amending the "severe *or* long-lasting" phrase to "severe *and* long-lasting"; he reminded the Members that there was no way of converting minorities into majorities, and concluded that the time had come to compromise so that the House could finally pass the most important bill that it dealt with during every session (H 12172).

Mr. Bauman argued against permitting legislative weariness to result in an unacceptable compromise (H 12172); he contended that abortion was murder, and that the death of one unborn child was as important as the life of one mother who did not want the child; he referred to a speech of the late Senator Humphrey made in the House earlier that day concerning the role of the House as the representative of the people and as being closest to them in thinking, and he continued (H 12172):

"What is it that the people are thinking in your districts and in this Nation? And why is it that some of you who have no moral attachment to this issue have voted repeatedly for the right to life? Maybe you do not really believe abortion is murder, but you do have a sense of what your district wants. What is it the people are thinking all across this Nation, when the school textbooks their children use are taken out of their hands and control, so that they are taught things their parents do not believe in? What do parents feel when their children are taught it is all right to legalize drugs and use marihuana in small amounts; when they are told they cannot pray in school, when contraceptives are made readily available to children so they will eventually use them?

When they are told to be permissive and if a problem occurs abortion is readily available? What do they believe when they are taught that lesbians should teach in schools and homosexuals should have the right to adopt children? What do your people think when this whole era of permissiveness comes crashing down on them, and finally they focus on one issue and this is the most horrible of all? What happens to the family when parents are told it is all right to murder your children? That is why people are upset—Fundamentalists, Protestants, Jews, Catholics, people who do not believe in a God but who believe in a moral order, all are rightly upset. Because life is at stake."

He argued that the present language was no different from other language presented by the Senate, that if it became law it would "allow wholesale slaughter"; he appealed to the House, if it believed in the right to life, to stand firm on the issue and said (*ibid.*):

"If moral belief does not prompt you, think of the political consequences."

Mr. Dornan said that while he wanted to accord respect to the view that the quality of life is more important than just life itself, he thought the judgmental word "unwanted" was dangerous and wrong when applied to human life; he complimented Messrs. Hyde and Bauman on their steadfastness and their great political courage in continuing to take a stand against which media opinion in the nation was running ever more strongly; he continued (H 12173):

"However, I also concede political courage with the proabortion position taken by those of you in districts where there are very active prolife groups and where you know you are going to get passionate mail against you and where in town hall meetings you must face citizens, people who feel a deep commitment to life being preserved at any cost, and who associate you with killing."

He insisted that the issue was not the underlying abortion issue but "whether citizens who consider it killing must pay for it with their tax dollars"; he concluded by saying (H 12173):

"I address those of you in this House who are on the opposite side of this critical issue from me. I know you also believe in this motto up here above our Speaker: 'In God We Trust.' But God will not be mocked. We cannot continue to kill millions of innocent preborn children each year. Human beings with an immortal soul and their entire genetic code in place.

"I beg you, my colleagues, to reject this vague compromise, this retreat from fairness, and stand tough against the other body's arrogance."

Mr. Steers said that he thought 90% of what had been said in the debate was irrelevant, and he continued (H 12173):

"We are not here to argue about what is legal. The Senate amendment does not permit one abortion that is not totally legal now. The only question is whether or not a rich woman shall have a privilege that a poor woman cannot have."

He urged adoption of the amendment rather than continued discrimination against poor women (ibid.).

Mr. Volkmer pointed out, and Mr. Steers agreed, that the Hyde amendment deprived no one of the right to an abortion, nor prevented any doctor or charity from providing poor women with abortion services without charge, and Mr. Steers answered (H 12173):

"As a practical matter, when we do not give a poor woman the money to have an abortion, she cannot have one. So I repeat that this amendment does not allow anything that is not perfectly allowable by law and I speak to the Members as one who many times has called abortion an evil in my campaign last year. I still feel it is an evil, but I do not believe that we should prevent poor women for lack of money from having an abortion."

Mr. Levitas interposed that, as in the case of the Vietnam war, the question was not whether or not tax money could properly go to support it, but that the question was rather a matter of national policy and a matter of law (ibid.).

Mr. Miller (California) commended one of the speakers for focusing on the issue, and he continued (H 12173):

"What is this rhetoric about taxpayers' dollars being used for poor women's abortion? Any of your wives can have an abortion. They can go into the best hospitals in the country and it is all deductible. What are you talking about?

"The Federal Government picks up half the premiums on your health insurance. The taxpayers do that, so I think we also ought to amend the IRS Code. We ought to amend who pays for our health premiums. Let us lay it out right there. That is what we are talking about. We all know abortions are legal. It is a question who has the privilege."

He argued that what the House really would be endorsing is discrimination and that it had to be stopped; he continued (ibid.):

"That is the issue, and to say that somehow this is equated with whether or not gays can speak in our schools or whether or not lesbians can teach or be in the legislature is so wrong. Is that what we are going to do, prohibit gays from having jobs, the right to earn an income, is that where we are going next, so that a minority or majority can visit that upon people who cannot defend themselves in this body, in this body of very wealthy people by the national standards?"

Mr. Flood opposed the amendment as not restrictive enough; he feared that, in spite of the legislative history, the Senate language might be interpreted by physicians, by the administration, and by the courts "in a way that would open the door to payments for many, many abortions"; he said that the Senate language was not a compromise (H 12173–74). Mr. Mahon referred to the Secretary's known opposition to abortion and to the last paragraph of the Section, and he said that under the circumstances he thought that the law would be

administered "in a conservative and helpful spirit from the standpoint of the American populace" (H 12174).

Mr. Neal said that if he accepted the postulate that human life began at conception he too would feel compelled to work to end abortion whenever and however possible; he said that inquiry had indicated that churches in North Carolina's Fifth Congressional District for the most part had been unwilling to say to their Members that what had the potential for human life became human life at a particular point; saying that the answer to the beginning-of-life question was not agreed upon by the nation's spiritual leaders, he continued (H 12174):

"I certainly do not think the government should be in the business of making such moral decisions, but by denying medicaid funds for abortion, we are, in effect, making that very same judgment for many citizens of the United States. We are eliminating the choice, and by that, denying the women affected the right to choose an abortion which the Supreme Court has ruled is included in the right of privacy."

Mr. Neal then read to the House excerpts from statements made by Protestant church bodies qualifiedly recognizing the right to choose abortion in appropriate circumstances (H 12174).

Ms. Holtzman supported the motion to agree to the Senate language despite its restrictiveness; she referred to the risks of deaths from unsafe abortion, to the 55 women who, she said, had already been hospitalized as a result of back-alley or self-induced abortions to which they were forced as a result of the Hyde amendment (H 12174–75).

The Senate amendment was then put to a vote, and it failed of adoption, 172 voting in favor of the amendment, 193 voting against it and 68 not voting (H 12175).

Mr. Flood then moved the House to disagree with the Senate amendment to the House amendment to the Senate amendment No. 82. The motion was agreed to without a record vote (H 12175–76).

Then the House turned to consider a resolution continuing appropriations through the fiscal year 1978 for the District of Columbia and, in the course of that deliberation, to take account of the matter of continuing appropriations for the Departments of Labor and of HEW; the District of Columbia bill, amended to include the DHEW and Labor appropriations matters was thereupon read and passed (H 12177–80). On November 4, 1977, the Senate, after discussion, concurred in the joint resolution, but not before there had been an effort in committee to annex the Senate's proposed abortion amendment as a rider to the joint resolution continuing the departmental appropriations (S 18788–92).

On November 29, 1977, Senator Hollings moved that the Senate recede from its amendment No. 82, and, that motion having been agreed to, Senator Brooke then moved that the Senate concur in the House amendment with an amendment reading as follows (S 19236):

"Sec. 209. None of the funds contained in this Act shall be used to perform abortions;

"Except where the life of the mother would be endangered if the fetus were carried to term;

"Or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported to a law enforcement agency or public health service or its equivalent;

"Or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term."

Two additional paragraphs, not quoted, were identical with those in the previous Senate amendment (*supra*, p. 819). Senator Helms then proposed an amendment to Senator Brooke's amendment which would have substituted for it the language of the preceding year's Hyde-Conte amendment (S 19236).

Senator Hollings said that he had been asked by Senator Magnuson to make it clear to the Senate and to the administration (S 19237)

". . . that it is imperative that the Departments and agencies which are funded through this bill strictly follow the language contained in both the Senate report and the conference report."

Senator Brooke then explained that HEW had refused to give an interpretation in advance, and had advised that they would look to the Houses of Congress to tell them the intent of the language recommended; Senator Brooke continued (S 19237):

"We will be as precise as we can so that no doubt is left in Mr. Califano's mind as to what we intend. And we expect our intent to be carried out in the regulations the Secretary will issue."

Senator Brooke then secured the concurrence of Senator Hollings in the following explanation of the term "medical procedures" in the case of rape and incest (*ibid.*):

"It is our intention that 'medical procedures necessary' not be viewed as a limitation on the length of time during which medical assistance will be available. We fully intend 'medical procedures necessary' to include abortions. So long as the rape or incest has been reported to a law enforcement agency or to a public health service or its equivalent the woman is eligible for a publicly funded abortion."

Senator Brooke then explained that it was intended that the police and other affected agencies should arrange for such modes of report as would minimize the trauma of report by establishing specialized bureaus or personnel (*ibid.*). He explained further that the report did not have to be made by the victim, but could come through a physician, attorney, rape center counsellor, welfare agency or relatives; he said that report to a public health service or equivalent was intended to be broadly interpreted, so that, at minimum, there was a center available in each community within easy distance; Senator Hollings formally concurred in each of these interpretations (S 19237).

The Helms amendment to the Brooke amendment was then put to a vote and it failed to carry, 21 voting for it, 42 voting against it, and 36 not voting (S 19237–38).

Mr. Helms then proposed to amend Senator Brooke's amendment by adding the word "promptly" so that the medical procedures for rape or incest victims would be available when the rape or incest "has been *promptly* reported"; Senator Brooke opposed the amendment, arguing that the Senate had gone far enough by including a report requirement in its draft for the first time, and should not go the length of requiring that the report be prompt (S 19238). Senator Scott said he thought the requirement a reasonable one (*ibid.*). Senator Hansen opposed the amendment on the ground that it ignored the realities, that only when pregnancy becomes obvious will the facts be disclosed and the child victim of an incest seek assistance (S 19239). Senator Schweiker supported the Helms amendment, saying that without it the rape provision became a loophole, enabling a woman to fulfill the report requirement by simply stating to an abortion clinic that she had been raped (*ibid.*). The Helms amendment was then put to a vote and it failed to pass 23 voting in favor, 42 voting against, and 34 not voting (S 19239). Senator Brooke's amendment was then put to a vote and it carried, 44 voting in favor, 21 voting against, and 34 not voting.

The House took up the Senate amendment on November 29, 1977; Mr. Michel presented the Senate amendment and noted that the new language was that which related to reporting; he explained that the Senate had been requested to include a requirement of prompt reporting but had declined to do so; he expressed the hope that the members would vote for the language then before them (H 12487). Mr. Conte opposed the amendment because of the vagueness of the physical health damage language, and the ease with which the rape requirements could be circumvented and used as a means of fraud (H 12487–88). Mr. Wright said that the time had come for the House "to yield to commonsense"; he said (H 12488):

"Since the very fundamental question of when life itself begins could not be agreed upon by St. Thomas Aquinas and St. Augustine, it is little wonder that

Members of this body find difficulty in reconciling their disparate views with any set of words."

He stated that he did not believe in abortion and supposed that there were few, if any, in the House who favored government subsidization of abortion on demand; he continued (*ibid.*):

"By the same token, I just do not believe that there are very many, if any, Members of this House who would be so cruel and so crass and so unfeeling that they would condemn a poor woman to death or to lifelong physical disability for want of response on the part of the Federal Government when she is in genuine need of medical treatment."

He said that he believed the conferees had done as well as they could, and that the language before the House came as near as any language could to recognizing the convictions of both sides (*ibid.*). He argued that those who opposed the language did not oppose the principle the language sought to express—to secure medical assistance to a woman if she was going to die or to suffer long-lasting physical disability, or to give aid to some young person victimized by rape or incest; he continued (H 12488):

"No, the opponents do not really oppose the principles which the language expresses. They fall back on the assumption that some physician is going to act in bad faith and to certify falsely. Well, my colleagues, if we were to assume that with respect to every law that is passed, we could not pass many laws."

Mr. Bauman stated that the issue was life itself and that the basic objective of the proponents of the Hyde amendment was to save the lives of 300,000 babies murdered each year with taxpayers' funds (H 12489); of the language of the Senate amendment he said (*ibid.*):

"It is very broad. It does allow for fraudulent representations to cause abortions. It allows liberal physicians who are in favor of abortion and profit from abortions, and make a career out of running abortion mills, to make these decisions and certify that they will allow these children to die. And it allows the Secretary to issue future regulations and procedures that we know nothing about. Perhaps they will or will not be strict, although it says, 'rigorously enforce.' "

To the argument that unwanted children were especially liable to abuse, Mr. Bauman said that "the ultimate child abuse we all know is death" (H 12489). He asked the membership to mark his words (*ibid.*):

"I have said it before, and I am not preaching at all, I am just telling the Members a political fact; the issue will not leave us. This is not a threat; it is a fact. We are going to have to deal with the right-to-lifers who cut across all parties lines and all political divisions; Jewish, Christian, Protestant, Catholic, no particular formal religion, they are going to be at your congressional office door, and they are going to be out campaigning because this fundamental issue has stirred America and will remain with us."

He asked the House to defeat the amendment, and, should it pass, he said that he would ask the President to veto the bill (*ibid.*).

Mr. Bonker said that, although opposed to abortion, he felt that the legislative deadlock could be broken if the conferees could come to grips with a provision relating to rape (H 12489). He favored concurrence in the Senate language as containing a report requirement and appropriate allowance for those women in extreme circumstances whose life or physical health were jeopardized by their pregnancy; saying that the rape clause could not be both an open door to abortion on demand and a closed door to legitimate victims of rape, he argued that the report requirement sufficed, noting that it was a significant and difficult act for a woman to perform (*ibid.*).

Mr. Hyde, answering Mr. Wright, said that there had been some progress in medical science since Augustine in the 4th and Aquinas in the 12th (*sic*) century; he denied that the question turned on a philosophical speculation, and said that the problem was one of discarding human life through abortion; he objected to the com-

promise language because it did not require that the rape or incest be "forced," arguing that anyone under the statutory age who became pregnant would be entitled to an abortion; he objected to the absence of a limitation of time on the report requirement as opening the door to questionable practices; he argued that existing law in effect provided for rape and incest victims at least during the first month following the occurrence; he objected to the "severe and long-lasting health damage" language as imposing a requirement impossible of verification and open to abuse with impunity; and he said that investigation of the Mexican abortion incident had apparently disclosed that the woman was not denied a Texas abortion but went to Mexico to conceal the pregnancy and abortion (H 12489–90). Urging the House to stay with the Hyde-Conte amendment of the preceding year, he concluded (H 12490):

"We are talking about innocent, inconvenient human lives. If this society cannot find ways to handle the human problems of unwanted pregnancies without resorting to abortion, then we are seriously deficient."

Mr. Michel supported the compromise amendment; he pointed out that the constant 2 to 1 ratio in Senate votes indicated that at some point someone had to yield ground; he continued (H 12490):

"Some of my colleagues on the subcommittee cannot give because of the tremendous pressures they have at home, and I realize that. But a few of us have got to give in order to compromise and reach an agreement. It is disturbing to me to have to say that, but we must give. The Senate has backed down from its original position."

He argued that the well known opposition to abortion of the President and of the Secretary would assure rigorous administration and regulation (ibid.).

Mrs. Fenwick said she had run twice against the same right-to-life opponent, and that he had received very few votes; she also said that she did not think anything would stop abortions; she referred again to the 35% of hospital beds in a Chilean woman's hospital occupied by self-induced abortion patients (H 12491). Mr. Volkmer argued that the issue was one of clear principle, one that, to some House members, could not be compromised; he said (ibid.):

". . . what bothers me here is to see those who waffle on the issue to find excuses to vote one way or another when there is no compromise. It is basically an issue of whether taxpayers pay for abortion or whether taxpayers do not pay for abortion. Let us vote on that issue and let us decide that issue."

He said that if the language under consideration was adopted and went to the President he would call on the President to veto the bill "because of his prior commitments to the policy that no taxpayers' money be used to pay for abortions" (H 12491).

Mrs. Spellman said that HEW employees and their health insurance carriers wanted to know whether Section 209 would affect them, through their health insurance payments, since the health insurance program was subsidized with federal funds (H 12491). Mr. Flood answered that the question was under consideration and the answer was complicated by the fact that the employees paid a part of their health insurance premium; he said that while he could not give a definite answer "we do not intend to tell the employees how to spend their money. I am sure about that" (ibid.).

Mr. Flood opposed the amended Senate language, arguing that it reflected the original Senate position; he said the report requirement was not clear, and that the "severe and long-lasting physical health damage" language was susceptible to abuse in interpretation which might result in using federal funds to pay for abortion on demand (H 12492).

Mr. Smith (Iowa) argued that the matter should really be passed on in a separate medicaid bill in which guidelines could be developed; under existing circumstances, he argued, the House should try to agree on language which has enough support so that the matter can be considered as settled and can readily be agreed to next year, instead

of again holding up funding of important programs; he concluded that while the language provided in the amendment did not come as close to representing majority opinion as it could, it was close and therefore he planned to vote for it (H 12492). Mrs. Schroeder presented to the House 2 letters from or on behalf of rape victims indicating the difficulty of their plight and the importance to them of having access to medicaid abortion (H 12492–93).

Mr. Neal then substantially repeated the remarks and the excerpts from the church statements referred to above (*supra* p. 827) (H 12493–94).

Mr. Mahon's motion was then put to a vote and it failed, 183 voting in favor, 205 voting against, and 46 not voting (H 12494).

On December 5, 1977, Mr. Mahon advised the House that on the next day when the House considered the supplemental appropriation bill conference report and H.J.Res. 662, a continuing resolution for District of Columbia appropriations for the balance of the year, he would offer an amendment to include appropriations for the Departments of Labor and HEW at the rates of the conference agreement; he explained that Mr. Michel would then offer a further amendment on the abortion issue, the first paragraph to read in the following language (H 12615):

"*Provided.* That none of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of forced rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term."

Two additional paragraphs were the same as in an earlier amendment (*supra* p. 819) (*ibid.*). Mr. Mahon pointed out that the difference in language was to add the word "forced" and the word "promptly" and to delete the expression "or its equivalent" in the rape and incest clause (*ibid.*).

On December 6, 1977, Mr. Mahon introduced an amendment to the District of Columbia bill the effect of which was to provide for continuing appropriations to the Departments of Labor and HEW at a rate, to the extent and in the manner provided for in H.R. 7555 as modified by the House on August 2, 1977; Mr. Michel then offered the amendment quoted just above (H 12651). Mr. Michel then explained the language of the amendment with some care (*ibid.*). Mr. Volkmer asked whether the "medical procedures" for rape and incest victims included abortion. Mr. Michel agreed that it did not (H 12652). Mr. Volkmer then asked whether the "medical procedures" language, excluding abortion, also governed the severe and long-lasting health damage clause and Mr. Michel seemed to answer in the affirmative (*ibid.*). Mr. Michel said that the language did provide for exceptions from the tightly drawn prohibition of funding, and, he added, the House expected that those who promulgated the rules and regulations would follow the legislative history closely in making sure that the flood gates were not opened (*ibid.*). In answer to further questions by Mr. Bauman, Mr. Michel said that he understood that "severe and long-lasting" as applied to a condition meant one that was pre-existing at the time of pregnancy, and that the medical judgment could not rest on the doctor's opinion that some condition might result because of the pregnancy's being allowed to continue (*ibid.*). In answer to another question Mr. Michel said that he thought the requirement of prompt reporting implied also a requirement of prompt treatment, and that prompt report embraced at least a 30-day period within which the rape victim could be expected to learn whether she had become pregnant; he indicated that the requirement of report would be satisfied whether or not the agency to whom the report was made credited the report (H 12652–53). Mr. Michel agreed that the language of the statute did not require that the victim of the rape or incest

be the one who made the report; he said he expected that the regulations would draw guidelines covering details of the report; he said that he considered that "a public health service" included every health service funded to any degree by federal funds (H 12653). Mr. Smith (Iowa) interposed that all of these questions were just attempts to find an excuse to oppose the amendment and fog the issues (*ibid.*).

Mr. Hyde opposed the amendment as one that sought to trade a life for a health condition; he argued that the health endangerment language was inexact, and he continued (H 12653–54):

"Let me simply say also that this is not an effort to impose somebody's religious beliefs on other people, which is the thrust of the editorial from the Miami Herald that was recently put in the RECORD, any more than those clergy that marched at Selma were trying to impose their religious belief in fighting for civil rights or any more than Jefferson when he wrote, 'All men are created equal and are endowed by their Creator with certain unalienable rights' was an effort by him to impose his religious beliefs on anyone."

Mr. Bauman opposed the Michel amendment and said that all of the right-to-life groups opposed the language (H 12654). Mr. Flood opposed the amendment, contending that the House should not agree to language which meant nine different things to nine different people and which could destroy the whole intention of the House; he was particularly critical of the "severe and long-lasting physical health damage" clause as being loosely constructed, wide open, and subject to any kind of interpretation anyone wanted to give to it (H 12654).

Mr. Obey asked the House to support the amendatory language; he said that, while the exemptions from the prohibition of the Hyde amendment were very narrow, they were real; he noted that his efforts to have included an exception for pregnancies of children younger than 13 had failed (H 12654–55). Mr. Bonker supported the amendment and explained the changes made in the rape and incest provision (*ibid.*). Mr. Miller (California) asked for a vote against the amendatory language because of the inclusion in it of the report requirement for rape and incest (H 12655). Mr. Fraser said that he had repeatedly voted for Senate positions "because they would hurt fewer people than the House versions"; he argued that the changes in the rape language were not minor, but were "punitive and harsh additions to an already harsh and discriminatory measure"; he contended that the amendment would reverse the progress being made in the humanization of public health provision for victims of rape and of incest; he emphasized the discrimination against poor women implicit in the bill; he continued (H 12655–56):

"Women, it seems, bear the responsibility for avoiding pregnancy. They must be punished if they do not. Yet avoiding pregnancy is not always possible; some contraceptives are ineffective and others entail risks, some minor, some major.

"Avoiding pregnancy is even more difficult for victims. A new Center for Disease Control study not yet released shows that about 2.5 percent of rape victims do become pregnant."

Mr. Mahon reviewed the Michel amendment, emphasizing its rigors and the narrowness of its exemptions, and urged the House to support it (H 12656). Mr. Michel urged those whose objection to the amendment was that it was too harsh not to vote against it on that ground because to do so would give up such progress as had been made (H 12656–57). He said (H 12657):

"Let us face it, there are so many Members hard in concrete that there can only be a handful on either side who can shift their position, but that is assuming that we could hold the ranks that previously had supported a bit more liberal position a week ago."

In answer to a question by Mr. Allen, Mr. Mahon said that he had some indications that the Michel language would be agreeable, and some that it would not be agreeable, to the Senate because the forced rape language was too strong, but that he hoped,

in view of all of the pressures, that the Senate would accept what the House did (H 12657). The Majority Leader of the House, Mr. Wright, then outlined to the House the serious consequences of the continuing impasse on the conduct of the government, and he said (H 12657):

"If you want to sit intractably and inflexibly and insist that you have not yielded one inch from your convictions, if those in the Senate sit intractably and inflexibly and insist that they have not yielded one inch from their convictions, well, then, the legislative process will simply break down. The institution of the Congress will fail in its responsibility.

\* \* \* \* \* \*

"Then the institution of Congress can be subject to public ridicule and if that happens—if that happens, let me assure you that the public is not going to be impressed by our argument that it is the Senate's fault, nor will the public believe the Senate's argument that it was our fault. The blame will be upon us all."

Mr. Flood then suggested that the consequences envisaged by Mr. Wright would not follow if the Michel amendment was defeated and the Mahon amendment passed; Mr. Wright responded that the House had been doing that for five months, and he reiterated his argument that to prolong the impasse jeopardized important programs (H 12657–58). The Michel amendment was then put to a vote and it was defeated, 170 voting in favor of it, 200 voting against it, and 64 not voting (H 12658–59). The House then passed the Mahon amendment which simply added continuing appropriations language for the Departments of Labor and HEW to the District of Columbia Continuing Appropriations Act (H 12659).

When the Senate, on December 6, 1977, took up the joint resolution for continuing appropriations Senator Magnuson offered an amendment in the terms of the Michel amendment omitting the word "forced" before rape (S 19396–97). Senator Brooke joined Senator Magnuson in urging adoption of the amendment (S 19397). Senator Metzenbaum suggested that "prompt-ly" was open to a wide range of interpretations, and Senator Brooke agreed, but said that "promptly" would mean a reasonable and humane period of time in which the rape or incest would be reported; the report might be by a parent on behalf of the victim, or by the victim (S 19397). Senator Magnuson said that he would not suggest waiting months, but indicated that 60 or 90 days, or within the first part of pregnancy, would be appropriate; he expected that the departmental regulations might be expected to define the word somewhere around 90 days as a middle figure (S 19397–98). After brief further discussion the joint resolution (H.J.Res. 662) was read and passed (S 19398).

The Senate amendment was presented to the House on December 7, 1977 (H 12770), and Mr. Mahon urged its adoption; he argued that having voted for abortion in the life endangerment situation, what remained were questions of degree; as to the deletion of the word "forced," he said that the term rape itself implied force as to women who were above age, and, as to children under age, courts could well hold that statutory rape was forced rape (H 12771). Mr. Bonker argued that the deletion of "forced" did not change existing law as interpreted in the regulations, and argued that the key word was "promptly" (ibid.). Mr. Bauman argued that the Senate debate showed that "promptly" was an elastic term that could extend to months (H 12771–72). Mr. Mahon answered that the word was too clear for such interpretation, and Mr. Bonker pointed out that the word "promptly" was first introduced by Senator Helms (H 12772).

Mr. Hyde opposed the amendment; he said that "the immoderate subject of killing prenatal young does not lend itself to moderate discourse"; he objected that the removal of the word "forced" opened medicaid abortions to any woman under age without reference to rape or consent; referring to the argument that respectable theologians·differed about the moment when life becomes human, he answered (H 12772–73):

"But I say, 'So what?' If you cannot tell when life begins, where do you allocate the benefit of the doubt? Do you shoot the gun through the door because you are not sure anyone is behind it?

"More importantly, the commencement of human life is determined by biology, not theology.

"Theology says, 'Thou shalt not kill.'

"Biology says, 'That fetus is human life.' "

Mr. Hyde cited a 1964 pamphlet of Planned Parenthood which evidently assumed that the life of the fetus was the human life of a baby (H 12773). Mr. Flood opposed the amendment, reminding the House that, if it had voted against the preceding amendment, it should even more strongly vote against the present one (ibid.). Mr. Bauman argued that there are more than one million abortions a year in the United States, about three hundred thousand of them federally financed; that ever since the Hyde amendment had been passed, the Senate had been fighting to increase the loopholes and their scope so as to permit more abortions; he said that an expert had advised him that if the word "forced" were deleted, that would mean that one-quarter to one-third of the three hundred thousand abortions would be permitted, and that the same expert had said that a loose interpretation of the "prompt" report requirement would mean almost unlimited abortion funding; he asked the members not to switch their votes (H 12773–74). Mr. Michel said that if the amendment were defeated it would be his intention to offer new language which would have added to the introductory life endangerment clause the additional language "or except where the pregnancy would substantially aggravate a pre-existing serious physical illness to the mother," to which would be added a paragraph saying that the section did not prohibit payment for medical procedures necessary for the prompt treatment of the victims of rape or incest (H 12774). Mr. Bonker pointed out that the Hyde amendment said nothing whatever about rape or incest, and that the regulations limited the "treatment" for rape or incest to prompt

treatment before the fact of pregnancy had been established; he inquired whether the supporters of the Hyde amendment would object to use of the language of the existing regulation to cover the subject of rape and incest (ibid.). Mr. Hyde said that he had no quarrel with the regulations, but he objected to the Senate's "games" with the term "medical procedures"—"because [the Senate] wanted to use that term to mean an abortion" (ibid.). Mr. Bonker asked whether the prompt report requirement did not do exactly that, but Mr. Hyde answered that it was prompt treatment that interested him, that the prompt report requirement was to avoid the fraud incident to someone's saying six months afterwards that she had been raped by an unknown assailant; in that case the "treatment" "would be an abortion" (H 12774). Mr. Bonker continued to indicate that he thought the matter could be handled through the Secretary's regulations, and Mr. Hyde made it clear that he believed that attempts to accommodate the Senate's views in the rape and incest cases had to stop short of abortion after the fact of pregnancy had been established (ibid.). Ms. Holtzman inquired whether the Secretary would have the power to protect legitimate privacy interests in drafting regulations respecting the report requirement, and Mr. Michel answered that he thought so (H 12775). Mr. Michel indicated also that he thought that, in the case of a ten year old incest victim, the report requirement would have to take special account of the victim's age and circumstances (ibid.).

The amendment was then put to a vote and it was defeated, 171 voting for it, 178 voting against it, one answering present, and 84 not voting (H 12775–76).

After discussions between representatives of the two bodies, and later on December 7, 1977, the House agreed to return to consideration of the joint resolution and the amendment to it (H 12827–28), and Mr. Michel, after the Senate amendment had been presented to the House again, then moved to concur in the Senate amendment with an amendment that would have changed the text so that the first paragraph read as follows (H 12829):

"*Provided*, That none of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."

Mr. Michel pointed out that the only change was to include the two physicians requirement; the Senate's deletion of the word "forced" was continued (H 12829). Mr. Bauman insisted that there was no difference except to increase the cost to the government (H 12829–30). Mr. Hyde said that a three physician requirement in even stronger language in the California law had not prevented the performance of 100,000 abortions (H 12830). Mr. Mahon argued that the additional requirement was appropriate and asked the House to vote in favor of it (*ibid.*). Mr. Carter said that the amendatory language about two physicians had come from him and Mr. Skubitz, and that he thought the language was both good and necessary, and accordingly he favored the present amendment as humanitarian (H 12830).

The amendment was then put to a vote and it carried, 181 voting in favor, 176 voting against, one answering present, and 85 not voting; among those voting against the amendment were Messrs. Conte, Flood and Hyde (H 12830–31).

Later on the same day Senator Dole stated to the Senate that compromise language had been forged after six months of debate; he said (S 19438):

"Although many have complained that this day had been too long in coming, I feel that the realization of a House-Senate consensus on the proper Federal role in preserving the sacred right to life of the unborn has been worth every minute, day, week, and month it took."

He said that without compromise "a democracy would wither in its own indecision"; he emphasized that his position on the amended language in no way indicated a lessened sense of the sanctity of life; he put into the record a letter to him from the executive director of the Kansas Catholic Conference questioning Senator Dole's vote in favor of the Brooke amendment after Senator Dole had so long supported the pro-life position (S 19438–39).

Senator Magnuson brought before the Senate the House resolution agreeing to the Senate amendment to the joint resolution with an amendment, and he said that the question before the Senate in the very emotional matter was what was the most humane thing to do; he reviewed in outline the legislative course of amendment, expressed his dissatisfaction with treating the subject as a rider on an appropriations bill, but reluctantly recommended that the Senate concur in the amendment; he said that he did not like it but did not know at the late hour what the Senate could do except concur (S 19439–40).

Senator Brooke reminded the Senate that what it was now voting on was not a continuing resolution but all the bill that there would be; he explained the circumstances in which the House had included the phrase "when so determined by two physicians," and had then voted on the amendment (so modified) a second time and had passed it (S 19440–41). Turning then particularly to the language about medical procedures in connection with rape and incest he said (S 19441):

"However, I want the record to show clearly that we are talking about abortions when we talk about medical procedures, where we are concerned with the victim of rape or incest."

Senator Brooke said that the abortion issue was not only an emotional one but to some was a religious issue, to others a moral issue, to still others a political issue, and to some it was all of these; of the two physicians language he said that "this language has no rational connection at all with the

patients' needs," and that it unduly infringed upon the physicians' right to practice medicine, and violated the equal protection clause; he suggested that the woman might be free to consult more than two physicians, and that the physicians should be physicians of her own choosing (S 19441).

Then with considerable formality, turning to Senator Magnuson, he asked whether he was not correct that "medical procedures" included abortion, and Senator Magnuson said that he was correct (S 19441–42). In very explicit continuance of the same dialogue, the two Senators made clear that they did not mean the word medical treatment to be confined to such quasi-abortive procedures as the D & C, but to cover abortion itself; referring to the two physicians test, it was indicated that the determination of the physicians would have to be a reasonable determination (S 19442).

Senator Javits favored the amendment, saying that "Abortion is a matter of individual conscience," and he continued (S 19443):

"Denial of Federal funds otherwise available for medical care, for 'medically necessary' abortions is discrimination against the rights of millions of American women who can least afford it. Such action deprives women too poor to pay of the rights which under the Constitution and the Supreme Court decisions are accorded to women with means."

Senator Eagleton opposed the amendment as broadening the life endangerment exception to an unacceptable level (S 19443–44). After discussion of other issues, Senator Magnuson moved that the Senate concur in the House amendment to the Senate amendment, and the motion was agreed to (S 19445).

Senator Stennis said that abortion at choice was an attack on the human family and therefore on the very form of government; he said that he did not see how the Senate could go on with the practice of trying to read into its own language certain interpretations that the Senate expected the courts and the Secretary to follow (S 19445). Senator Schweiker agreed with Senator Stennis that abortion was an attack on the human family, an attack on human life (ibid.). Senator Brooke moved to reconsider the vote that had been taken by the Senate on the language, Senator Javits moved to lay that motion on the table, and that motion was agreed to (S 19445).

The bill became law on December 9, 1977.

The Secretary, supported by an opinion of the Attorney General (January 26, 1978), concluded, in proposing regulations (released on January 26, 1978), that "medical procedures" included abortion, that reports of rape or incest must include the name, address and signature of the person reporting, that such reports must be made within sixty days of the incident, and that states would not be reimbursed if they paid for abortions (or other medical procedures) in any case before receiving the documentation required in the life endangerment, severe and long-lasting physical health damage and rape and incest cases. The proposed regulations did not attempt to define life endangerment or severe and long-lasting physical health damage but required that the physicians certify the existence of the statutory conditions (Proposed Regulations, 42 C.F.R. §§ 449.103, 449.104). Mr. Hyde, in a statement printed in the Extension of Remarks section of the Congressional Record of January 30, 1978, attacked the proposed regulations as "the weakest regulations possible, inviting massive fraud and providing no protection whatever to prenatal life." He criticized particularly the allowance of 60 days to report rape and incest, the definition of "medical procedures" as including abortion, the failure to require documentation of the existence of the health condition occasioning the abortion, and the looseness of the report requirement.

After receiving comments on the proposed regulations the Secretary modified them (1) to require additional details in the reports of rape and incest, (2) to require the physicians' certifications in the life-endangerment and severe and long-lasting physical health damage cases to contain the name and address of the patient, and (3) to require, in the severe and long-lasting phys-

ical health damage cases, that at least one of the certifying physicians be not either a physician whose income would be directly or indirectly affected in any manner by the fee paid for the performance of the abortion, or the spouse of, or another relative who lived with, such a physician. The Secretary's responses to comments made clear his conclusions that (a) the abortion exceptions did not include fetal malformations and abnormalities, 43 Fed. Reg. 31876, (b) the statute forecloses funding where only the mother's mental health would be severely and lastingly damaged (*ibid.*), (c) a woman's belief that her pregnancy would, if carried to term, endanger her life did not satisfy the life-endangerment requirement (*ibid.*), (d) the legislative history dictated that the decisions (on life endangerment and severe and long-lasting physical health damage) must be left to physicians on an individual case basis, without regulations specifying risk categories or medical criteria (*ibid.*), (e) whether or not psychologists and psychiatric social workers could competently decide that a woman would be likely to commit suicide as a result of her pregnancy, the regulations would continue to require a physician's certification of life-endangerment (*ibid.*), (f) the statute does not require that the life endangering or health impairing condition pre-exist the pregnancy or be present at the time of abortion (*ibid.*), (g) the statutory condition is met if severe and long-lasting physical health damage would result even though the result is from an emotional cause (43 Fed. Reg. 31876–77), (h) the regulations would not specify the circumstances that could result in life endangerment; that decision is left to the physician (implying that "mental health circumstances which would endanger the life of the mother if the fetus were carried to term" are not excluded from the range of circumstances the physician may take into account) (43 Fed. Reg. 31877), and (i) the severe and long-lasting physical health damage must be related to the fact of pregnancy's being carried to term to come within the statutory exception (*e. g.*, where a pregnant woman has a brain tumor that can be removed surgically, an abortion

would not be funded if the abortion would have no effect on the health damage that would occur) (*ibid.*).

The regulations are presently in 42 C.F.R. §§ 441.200–441.208.

The Department of Health, Education and Welfare Appropriation Act, 1979, Public Law 95–480, 95 Stat. 1567, 1576, 1586, Section 210, reenacted the proviso of Section 101 of the 1977 enactment with only a formal change and the omission of the paragraph directing the Secretary promptly to issue regulations.

At the First Session of the Ninety-Sixth Congress several appropriations bills had not been passed, and the wide ranging controversies included not only the abortion issue but also federal salary questions. H.J. Res. 404 had been introduced in the House for the purpose of continuing certain departmental appropriations for the fiscal year 1980 at the levels of the previous year pending the final adoption of departmental appropriation bills or other effective legislation. The Senate Committee on Appropriations included in the resolution as its Amendment No. 17 a Section 117 which would have reenacted the abortion language enacted in 1977 and in 1978. On September 27, 1979, a motion was made in the Senate to strike all of the language following the words " . . . to perform abortions except where the life of the mother would be endangered if the fetus were carried to term" (125 Cong.Rec., 96th Cong., 1st Sess. S 13573) but a motion of Senator Magnuson to lay the amendment on the table was carried by a vote of 55 in favor, 36 opposed, and 9 not voting. On the next day, September 28, 1979, the House, on motion of Mr. Whitten, agreed to insist upon its disagreement to Senate Amendment No. 17 (H 8762). On October 9, 1979, two joint resolutions continuing appropriations for fiscal 1980 were introduced in the House in place of H.J.Res. 404 (H 8850, H 8854–55). The first, H.J.Res. 412, dealt with all the departmental appropriations except Labor and HEW, which were dealt with in H.J. Res. 413. On the same day the House debated and defeated by a vote of 162 in

favor, 234 opposed, and 37 not voting, an amendment, offered by Mr. Dicks, that would have included in the continuing resolution for DHEW appropriations for the fiscal year 1980, H.J.Res. 413, the language enacted in 1977 and in 1978 (H 8854–59). It was said during the debate that the language of the current law had eliminated 99% of federal funding of abortion (H 8856) and Mr. Volkmer said of the language of Senate Amendment No. 17 (*ibid.*):

" . . . the language contained in the amendment would basically open the floodgates.

"What concerns me is that we would have several hundred thousand children who will no longer be alive; they just would not be alive if the language in the amendment passes, while if we adopt the House language and continue with the House language, then we would have those children and they would be living. It is just a question of respect for human rights and whether children should live or not live."

Mr. Hyde observed that it was impossible to get abortion legislation out of subcommittee, "so the only vehicle to stop the killing is an appropriation bill" (H 8857).

On the following day the Senate passed its version of H.J.Res. 412, including, as Section 118, by Senate Amendment No. 5, the abortion language used in the two preceding years (S 14319–20, S 14325). The vote in the Senate was 81 in favor, 15 opposed, and 4 not voting. The Senate then voted to insist upon its amendments to H.J.Res. 412, to request a conference with the House, and to appoint conferees (S 14325). On the same day the House agreed to a further conference on H.J.Res. 412 (H 8942–43).

On October 12th the conference committee for H.J.Res. 412 reported disagreement on Senate Amendment No. 5 (H 9075–76, H 9080, H 9081). The majority leader, Mr. Wright, then offered a preferential motion (H 9081) that the House recede from its disagreement to Senate Amendment No. 5 and concur in it with an amendment inserting the following language—which ultimately became Section 118 of Public Law 96–86 of October 12, 1979:

"Sec. 118 Notwithstanding any other provision of this joint resolution except section 102, none of the Federal funds provided by this joint resolution for the District of Columbia, Foreign Assistance and Related Programs, the Departments of Labor and Health, Education, and Welfare, or the Department of Defense shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service.

"Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy."

Mr. Wright urged adoption of the amendment, pointing out that it would be effective only until November 20, 1979, and that the language, eliminating the reference to severe and long-lasting physical health damage to the mother, represented a measure of victory for the House and of retreat for the Senate from the positions taken in the preceding year; he emphasized the damage to legislative programs that would follow from further delay (H 9081–82). Mr. Hyde (H 9082) commended the majority leader, Mr. Wright, for a "good faith effort to compromise what is essentially uncompromisable"; he said (*ibid.*):

"The word 'abortion' has a clinical sound to it—but it always happens over someone's dead body, a defenseless totally vulnerable unborn child.

\* \* \* \* \* \*

"I cannot endorse this new language, even though it is a substantial improvement over the current language—even though it will mean fewer and fewer tax paid abortions. I cannot endorse it because some abortions will still occur under this language. I know I speak for all the Pro-Life legislators who have voted with us so far."

Mr. Hyde concluded by saying that "this fight has only begun" (H 9082). Mr. Dornan then said (H 9082):

"Mr. Speaker, I also congratulate the majority leader for trying to work out something, but I would point out to this House that one of the world's great religious leaders said on the Mall Sunday 'Stand up for life.'

"These weird snakes across the aisle from me can hiss all they want. I do not care about 2 million damned paychecks being held up. We killed 2 million human beings in their mothers' wombs in the last 2 years. These Federal employees will get their paychecks next week, but all those babies will never get their lives back.

"I am now going to put a Dornan amendment on the Treasury bill and on every other bill in this House that kills innocent human life, so be prepared for it.

"I ask you, Mr. Speaker, to speak in the well as eloquently for human life as you have in killing the B–1 bomber and as eloquently for human life as you have for giving the Panama Canal to a dictator."

Mr. Wright's preferential motion was then agreed to (H 9082).

H.J.Res. 412, as passed by the House on October 12th, was presented in the Senate on the same day as involving a two element compromise, first, limiting the cost-of-living increase of federal pay to 5.5 percent rather than the 12.9 percent automatic increase that would otherwise have taken effect, and, second, dropping from the abortion language the clause relating to the physical condition of the mother (S 14482–83). Senators Robert C. Byrd and Baker urged adoption of the resolution, but Senator Weicker opposed it strenuously, concentrating his attention on the cost-of-living increase provisions (S 14483–84). Senator Weicker said (S 14484):

"Do you realize how preposterous, outside of this Chamber, it is to be talking about tradeoffs between pay raises and abortion? That might sound normal here, but it just sounds plain nuts on the street. That is what has been going on—tradeoffs."

The presiding officer then put the question on agreeing to the conference report and it failed to carry; the vote was 26 in favor, 62 opposed, 1 answering "present," and 11 not voting (S 14485–86). Upon the motion of Senator Stevens to reconsider the vote, and after considerable debate, the motion to reconsider was agreed to (S 14486–90). The presiding officer then for the second time put the question on agreeing to the conference report and it was agreed to 44 voting in favor, 42 opposed and 14 not voting. The Senate then turned to consider the House amendment to Senate Amendment No. 5 (S 14491). Referring to the limitation on abortion funding, Senator Magnuson said (S 14492):

"I have been working on it for over 6 years now and I hope it will be settled tonight. It has been 6 years. It does not belong on an appropriation bill. I keep reiterating, Mr. President, I am going to think of some way—I do not know what it is—to get a Senate resolution that the legislative committees of the Senate take up the abortion issue where it more appropriately belongs.

"I introduced five bills—the Senator from New Mexico mentioned it the other night—five bills on abortion. I took the Hyde amendment. I took every one. And they were referred in the last Congress to five different committees and the committees have not even had the courtesy to set a hearing date. It all comes back to appropriations. On every piece of legislation if it is a hot potato the legislative committees do not want to tackle, or someone gets frustrated because the legislative committee will not pass a piece of legislation that they are for, they come down to the Appropriations Committee and try and attach it there. Frankly I am getting a little bit fed up. The abortion issue has been holding up the whole Government. It does not belong on an appropriations bill and particularly a continuing resolution bill.

"Now, they have abortion language in four other bills. HEW has it. The Defense Department has it. The Peace Corps has it. Foreign Relations has it. And the District of Columbia has it. All have abortion language on them, and that has all to be decided by the Appropriations Committee."

A parliamentary difficulty arose in connection with an amendment to the amendment proposed by Senator Weicker (S 14492–93), and, in that context, Senator Stevens indicated that if the matter had to be referred back to committee he would not favor adherence to the language then before the Senate; of the changes effected through deletion of the severe and long-lasting physical health damage language he said (S 14493):

"This change includes the case of a woman who has cancer and has to decide whether to take chemotherapy treatment and risk damage to the fetus or whether she should have an abortion, try to cure the cancer and then attempt to have another pregnancy later. It is a very limited matter, perhaps, to some people.

"It also covers a situation of a woman who has diabetes and the treatment for diabetes could harm the fetus, and they decide to treat the diabetes, remove the fetus, and give her a chance to have a normal child after the diabetes has been treated."

After further discussion a motion to table the amendment proposed by Senator Weicker, dealing with the salary matter, was carried, 43 in favor, 42 opposed, and 15 not voting (S 14495–96). Following further brief discussion, the presiding officer put the question on agreeing to the motion of Senator Magnuson to concur in the House amendment to Senate Amendment No. 5, and the motion was agreed to, 43 voting in favor, 41 opposed and 16 not voting (S 14496–97). The President signed the joint resolution on the same day, October 12, 1979.

On November 13, 1979, the House considered H.J.Res. 440 which proposed to appropriate such amounts as might be neces-

sary to continue projects or activities of various departments of the government for the fiscal year ending September 30, 1980, until that date or the earlier enactment into law of an appropriation for any project or activity provided for in the joint resolution, or the enactment of the applicable appropriation act by both Houses without any provision for the project or activity; Section 109 provided that, "None of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term" (H 10605–06). Mr. Conte explained that the joint resolution as reported contained the abortion language which had passed the House earlier as part of the Labor-HEW bill, and that each member would vote his conscience on this difficult issue, and, he added, "I am sure that we will be considering different abortion language within the next few days" (H 10608). The joint resolution was then passed by the House (H 10611).

H.J.Res. 440 came before the Senate on November 15, 1979 (S 16694); Senator Magnuson noted that the HEW appropriation was being held up on the abortion amendment, and expressed his disapproval of such legislation on an appropriation bill (S 16695–96). The Senate Appropriations Committee reported the joint resolution to the floor with Section 109, the abortion amendment in the House version of the joint resolution, deleted in its entirety (S 16696). Senators Helms and Hatfield argued that the Senate Appropriations Committee's action in striking out all of the Section 109 language was promoting abortion on demand (S 16705), and, to Senator Magnuson's argument that his proposal would simply take the abortion question out of the appropriations bill altogether, Senator Hatfield answered that rather the amendment would remove the restrictions on abortion and make it an open-ended affair (S 16705–06).

After an interruption for a discussion of another matter Senator Magnuson presented an amendment which would have substituted for the House version of Section 109,

the same language that had been enacted in 1977 and 1978; Senator Exon thereupon presented as a perfecting amendment to Senator Magnuson's amendment a version of Section 109 which, by deleting the severe and long-lasting physical health damage clause, was identical in terms with language enacted on October 12, 1979, *supra*, page 838 (S 16710). Senator Helms supported the Exon amendment; he said that he was "going to use every opportunity he can to stop the practice of using taxpayers' money to encourage or promote the deliberate termination of innocent human life" (S 16711). Senator Exon argued that it would be useless to adopt Senator Magnuson's amendment because that would require further conference with the House which was adamant (*ibid.*).

Senator Stevens, objecting to legislation on an appropriation bill, said (S 16712):

"For myself, I believe it is a matter that should be determined by a woman and her doctor, in consultation with her husband, and it should not be something that 99 men fight with 30 times a year. We just do not have the competence to deal with this as a legislative matter.

\*　　\*　　\*　　\*　　\*　　\*

"I might say to the Senator there is no issue here that pertains to an unborn child. The question is, what dollars pay for abortions? These abortions are going to take place anyway. They are going to be paid for by Federal funds, State funds, or foundation funds. And the question here is, to what extent does the Federal Government maintain its commitment to those people to whom we have made a commitment that they are entitled to Federal medical services or payment for medical services from the Federal Government?"

Senator Stevens argued particularly that abortion funding should not be excluded from the defense appropriation (S 16712–13). He argued finally that the Senate should reject the language of the House bill and insist on the language of the preceding year (S 16713).

Senator Exon's amendment of Senator Magnuson's amendment was then put to a vote and the amendment was rejected, 44 voting in favor, 49 voting against and 7 not voting (S 16713–14). Senator Magnuson's amendment was then put to a vote and it carried 57 voting in favor, 36 voting against and 7 not voting; the committee amendment as thus amended was then agreed to (S 16714). The joint resolution was then put to a vote and it carried, and, on motion of Senator Magnuson, the presiding officer appointed conferees on the part of the Senate (*ibid.*).

The committee of conference on the disagreeing votes of the two Houses on the Senate amendments to H.J.Res. 440 reported agreement on an amendment which would continue the language of the October 12, 1979, continuing resolution without change (H 10953–54). Mr. Whitten, reporting the abortion amendment to the House on November 16, 1979, said that it did not involve the moral issue or the legality of abortion but whether any federal funds could be used to pay for abortions (H 10955). Mr. Dornan, in the course of discussing a book by a former abortion advocate who had reversed his position on abortion, said (H 10955):

"What I would like to do today, since my opponent whom I saw in these Hallowed Halls today took more money from NARAL, a pro-abortion political action committee group, than I did from any pro-life group, is to point out the existence of a deliberate, premeditated plan to foment a vicious and cowardly program of bigotry raw prejudice against the Catholic hierarchy in this Nation and make this respected clergy the villain in this abortion struggle.

"I take offense to this not only because I am a Catholic, but because I find lately that most of my support to 'hang tough' in this battle comes from Baptists and evangelical ministers from every corner of this country."

He then read a passage from the book describing a dinner conversation with a NARAL representative who allegedly rec-

ommended casting the Catholic hierarchy as a group as the villain responsible for the unjust laws against which NARAL was at that time campaigning; Mr. Dornan argued that this "low road to bigotry has its adherents," implying that among them were those members who had allegedly hissed Mr. Dornan during the October session (H 10955–56); continuing, Mr. Dornan said (H 10956):

"I would ask the Members of this body who are for abortion to concede please that those of us on the other side do sincerely draw a perfect analogy between the 1973 abortion decision and the Dred Scott Supreme Court decision on slavery. We are not going to give up on pro-life amendments even if it costs some of us our seats. Even if we are opposed by a Georgetown graduate, as I was, who accepted tainted blood money from abortionists at NARAL and yet still claimed to be loyal to his faith."

Mr. Dougherty argued for adhering to the strict Hyde language on the ground that its standards would set the outer limit of what the states could be required to do under their local funding laws (H 10956). Mr. Whitten pointed out that the Senate had yielded on deleting the severe and long-lasting health damage language and that the rape and incest language had resulted in only 56 abortion fundings over a nine month period while there had been 2,214 abortions under the Hyde language; Mr. Dougherty argued that his group would have violently opposed the rape and incest amendment had the group not had at least an understanding that "some effort would be made to adopt a States rights amendment in the final conference committee report" (H 10956). Mr. Dicks said that there were supposed to have been 350 abortions committed in fiscal 1979 under the lasting health damage language, and that it was estimated that through the balance of the year there would be a further 56 to 72 cases (H 10957).

Mr. Hyde said that the issue was not a Catholic, Protestant, Jewish, Republican or Democratic issue but an issue "concerning human life"; he continued (H 10957):

"Now, if there are only 350 abortions that we are talking about, the gentleman is asking us to compromise on the principal of throwing away a human life for a secondary value. Why do not some of the abortionists who are getting fat on this practice, who are making a lot of money on it, perform a free abortion once in awhile? Let them subsidize these 350 abortions, but do not ask us to compromise human lives."

Referring to the rape and incest exception he said (*ibid.*):

"Now, on rape and incest, if it was promptly reported it would not be an abortion. Does the gentleman realize that if it was promptly reported it is a medical procedure that cleans up any venereal disease, that gets evidence of the rape and prevents pregnancy?

"But the rules that we are stuck with from HEW say 60 days is prompt reporting. Well, after 60 days there is definitely a pregnancy, and then an abortion occurs.

\*    \*    \*    \*    \*    \*

"The Supreme Court held you may not execute a rapist; that is cruel and unusual punishment. Then why execute one of the innocent victims of that rape, the unborn child? That is why this language was unacceptable before and it is unacceptable now."

Mr. Whitten argued that victims of rape, particularly younger girls, could not be expected to make a prompt report of their plight, that when legislators expected anyone's daughter or any parent "to rush to the police or to anybody else and tell this until they have to, you are just asking the impossible" (H 10957). Mr. Hyde answered that "for the few times, and they are few, that those tragic situations occur, you are setting up a system and a procedure whereby an awful, an awful lot of innocent human lives will be wasted"; he said (*ibid.*):

"Now, tragic as those few occurrences are, society, with its resources, ought to find a way that does not provide the solution of death to the innocent, inconvenient victim, the unborn child."

Mr. Bauman opposed the conference report; he said that the House had been debating the issue ever since the Supreme Court handed down "its odious decision allowing abortion on demand," that language had been offered on appropriation bills not to inconvenience the House or to tie up departmental funds but because that was the only legislative vehicle available to express views on the issue; he appealed to the leadership to bring to the floor legislation, possibly a constitutional amendment, that would deal once and for all with the issue in statutory form that could express the concern of millions of Americans and preserve the lives of the unborn (H 10957). Mr. Michel traced the origin of the Hyde amendment to the discovery that abortions were being funded under medicaid; and stated that the riders to the appropriation acts had the effect of eliminating federal funding for 99 percent of the abortions covered by medicaid; he argued that the compromise went 80% toward the House position, "because of the 422 abortions funded last year under the rape and health exemptions 350 fell under the health category with only 72 due to rape or incest" (H 10959). After some further discussion the question on the conference report was put to the House and the report was agreed to (H 10960).

The Senate took up the conference report later on the same day, November 16, 1979 (S 16881–82); Senator Young supported the amendment, and Senator Packwood, after reviewing the history of the legislation, said that before the Hyde amendment was passed medicaid was funding between 250,-000 and 300,000 abortions a year but that from roughly December 1977 or February 1978 onward medicaid had been funding about 3 to 4 thousand abortions; he said that the difference in language which the Houses were debating was not significant; he continued (S 16882):

"The battle is largely symbolic on this issue. Right to Life has won and we fund relatively few abortions. The symbolism is important. I shall vote for this conference report. As between the two, I obviously prefer the Senate language to the Hyde language.

"But let not anybody be mistaken. Even under the Senate language, Right to Life has won 99 percent of what they wanted. What they wanted was to deny to poor women in this country medicaid funding of abortions and, for 99 percent of the poor women in this country who are covered by medicaid, they have been successful."

Senator Weicker opposed the amendment in a lengthy speech in which he reviewed the law and mentioned the cases of *Roe v. Wade, Colautti v. Franklin* and *Zbaraz v. Quern* (S 16883). Senator Weicker particularly emphasized the consequences of denying funding for abortions in which severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term; he discussed specifically genetic disorders, particularly as they occur more often in the pregnancies of women over 35 years of age; Senator Weicker described six conditions in which the amendment under discussion would deny abortion funding: (a) sickle cell disease cases having a 25% chance of going into sickle cell crisis and dying as a result of the pregnancy; (b) cancer cases in which pregnancy tends to cause the cancer to spread throughout the body, and which also involve risk of fetal defects through the administration of teratogenic agents which are used to treat cancers; (c) cases of diabetic nephropathy, and cases of diabetics suffering from heart disease; (d) cases of acute renal failure occurring as frequently as once in fourteen hundred pregnancies; (e) cases of pulmonary arterial hypertension in women with cardiac problems; and (f) cases of rheumatic heart disease, said to account for at least 61% of all pregnant cardiac patients, with the most common form being a mitral stenosis; Senator Weicker continued (S 16884):

"Mr. President, limiting funds for abortions has the same result as limiting the actual right to an abortion insofar as indigent women are concerned. It is unrealistic to believe that an indigent woman can make a valid choice if she knows

she will be deprived of the means to effectuate her choice.

"What we are doing here is imposing a governmentally ordained morality on an indigent woman. She knows she will not receive funds for an abortion—even if she is facing 'severe and long-lasting physical health damage.' Yet, if she chooses to follow the State-encouraged morality and bear her children she will be reimbursed not only for her pre-delivery and delivery expenses but also for her children's post-natal costs, as well as receiving an increase in her welfare stipend."

Senator Weicker said that a new New York Times/CBS News poll showed that 64 percent of Roman Catholics and 69 percent of Protestants surveyed felt that the "right of a woman to have an abortion should be left entirely to the woman and her doctor" (*ibid.*). He asserted that the issue was raised in connection with appropriation acts because it was recognized that, if legislation outlawing abortion or providing for a constitutional amendment outlawing it were considered directly either in the House or the Senate, it would be defeated (S 16884–85).

The question on agreeing to the conference report was then put to the Senate, and, by a vote of 51 in favor, 23 opposed and 26 not voting, the conference report was agreed to (S 16885). The President signed the joint resolution on November 20, 1979.

The statutory language effective until September 30, 1980, unless amended before that date is the following:

Sec. 118. Notwithstanding any other provision of this joint resolution except section 102, none of the Federal funds provided by this joint resolution . . . shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service;

Nor are payments prohibited for drugs or devices to prevent implantation of the fertilized ovum, or for medical procedures necessary for the termination of an ectopic pregnancy.